# EXHIBIT D

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd. <br><br> Claimant, <br><br> v. <br><br> AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC, <br><br> Respondent. | Case No. 50 110 T 00075 11 <br><br><br> **RESPONDENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Respondent, American University of Antigua ("AUA"), hereby submits the

following proposed Findings of Fact ("FOF") and Conclusions of Law ("COL").

## I.      FINDINGS OF FACT

### Background Facts

1.       This dispute arises out of the construction of AUA's new medical school campus

(the "Campus") in Antigua (the "Project").  In 2008, AUA retained the Claimant, Leeward

Construction Co., Ltd. ("Leeward") to construct the structural works for the Campus, which

involved constructing the following buildings:  (i) the Classroom and Laboratory Building; (ii)

the Library; (iii) the Service Block; and (iv) an outdoor Amphitheater.  Witness Statement of Lt.

Colonel Roche Antony ("Antony Statement"), ¶ 8.

2.       Leeward commenced work in March 2008, before the parties entered into a

formal contract.  Transcript (Antony), 4:634:10-636:17[1]; Antony Statement, ¶ 12.  The parties

entered into a Letter of Intent in April 2008, and a second Letter of Intent in May 2008, while

---

[1]  Citations to the Hearing Transcript from the five days of oral testimony taken on March 5, 2012 through March 9, 2012, will be made with the following convention:  **Transcript (Witness), Hearing Day (1 to 5):Page:Line.**

they negotiated the terms of a formal contract during the Summer of 2008.  Joint Pretrial Report

Factual Stipulations ("Stipulations"), ¶¶ 2 and 3.  *See* LC 69 and LC 70[2].

3.      Lt. Colonel Roche Antony, then an employee of Manipal Group, which holds a

controlling interest in AUA, served as General Manager and AUA's representative for the

Project.  Antony Statement, ¶ 1.  Col. Antony has extensive experience in engineering and

construction.  Prior to his appointment as General Manager for the Project, he served in India's

Army Corps of Engineers for 27 years, and spent the following seven years managing large

construction projects for Manipal.  *Id.*, ¶¶ 4-6.  Col. Antony was responsible for negotiating the

Contract Documents (defined herein) on behalf of AUA.  *Id.*, ¶ 12.

4.      Neil Dickinson was Leeward's Project Manager, and was the person primarily

responsible for negotiating the Contract Documents for Leeward.  Transcript (Dickinson),

1:79:17-21.

5.      Sundaram Architects Pvt., Ltd. (the "Architect") was retained by AUA to prepare

the design drawings and oversee the construction of the campus.  A.S. Nagesh served as the

Architect's representative on the Project.  Witness Statement of A.S. Nagesh ("Nagesh

Statement"), ¶¶ 3-4.  Mr. Nagesh has worked as a civil engineer in India since 1989 and, prior to

the Project, served as a project coordinator on several large construction projects.  *Id.* ¶¶ 6-11.

According to Leeward, Mr. Nagesh was an "accomplished civil engineer."  Witness Statement of

Neil Dickinson ("Dickinson Statement"), ¶ 52.

6.      In the summer of 2008, the parties retained Peter McLeod, a Quantity Surveyor

from DHP Associates in the Bahamas, to serve as a liaison to provide historical data regarding

Caribbean construction costs, mobilization costs, and Preliminaries.  Mr. McLeod's experience

aided the parties in reaching agreement on the Preliminaries to be paid for setting up and

---

[2]  Citations to Leeward's Exhibits shall be "LC__."  Citations to AUA's Exhibits shall be "AUA Ex. __."

maintaining the construction site and on the unit rates to be paid for each item of work Leeward was to perform.  Antony Statement, ¶12; Witness Statement of Peter McLeod ("McLeod Statement"), ¶ 8; Transcript (McLeod), 1:185:6-189:12.

7.      Mr. McLeod also facilitated the parties in negotiating the Contract Documents. Mr. McLeod prepared the initial draft of the contract (AUA Ex. 31) in July 2008 and thereafter assisted the parties' negotiation of those proposed terms.  Antony Statement, ¶ 13; McLeod Statement, ¶¶ 8-10.

8.      After months of negotiations, the parties executed the Contract Documents on September 25, 2008.  AUA Ex. 1.  Col. Antony signed on behalf of AUA; Neil Dickinson signed on behalf of Leeward, and both initialed each page.  *Id.*; Antony Statement, ¶ 14.

## The Contract Documents

9.      The Contract Documents consisted of the following documents:  (i) AIA Document A101-1997 -- Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum (the "Contract"); (ii) AIA Document A201-1997 -- General Conditions for the Contract for Construction (the "General Conditions"); (iii) the Bill of Quantities ("BOQ"); (iv) the Drawings (which were annexed separately); and (v) the Division One Specifications (the "Specifications") (collectively, the "Contract Documents").  *See* AUA Ex. 1 at AUA 000025 (General Conditions, §1.1.1); Antony Statement, ¶ 14.

10.     The Contract Documents were complementary such that "what is required by one shall be as binding as if required by all."  AUA Ex. 1 at AUA 000025 (General Conditions, §1.2.1).

11.     The AIA Forms used by the parties -- the Contract and the General Conditions -- are standard forms generated by the American Institute of Architects ("AIA").  These form

contracts were negotiated by the parties, with certain provisions added, others deleted, and others amended.  McLeod Statement, ¶¶ 9-10.  *E.g.*, LC 78 to LC 80.[3]

12.     The AIA form contracts used by the parties do not typically call for a Bill of Quantities (sometimes referred to as "BOQ"), Transcript (McLeod) 1:137:9-11, but here one was used.  A Bill of Quantities, unusual in American construction, is a common way of procuring work in a construction project in the United Kingdom and Caribbean countries with a United Kingdom background.  McLeod Statement, ¶ 21; Transcript (McLeod), 1:193:17-194:5.

13.     The Bill of Quantities used by the parties here was prepared by the Architect and based upon the Drawings issued at the time the parties executed the Contract Documents.  The Bill of Quantities represented Leeward's then scope of work.  Antony Statement, ¶ 22; McLeod Statement, ¶ 20.  It set forth in detail the tasks to be performed by Leeward to build the structural works designed by the Architect, as reflected in the Drawings.  *Id.*

14.     With Mr. McLeod's assistance, the parties negotiated the unit rates for each specific line item of work listed in the BOQ.  Antony Statement, ¶ 22; McLeod Statement, ¶¶ 8-10.  These negotiated unit rates were "all-encompassing."  Transcript (McLeod), 1:161:5-12.  Section 4.3 of the Contract provides:

> The unit rates and other prices in the Project Manual shall determine the value of extra work or change as applicable.  <u>They shall be considered complete including as appropriate all materials and equipment, labour, installation costs, overhead and profit and shall be considered uniformly for either additions or deductions</u> subject to the provisions of Article 7 of the General Conditions of the Contractor.

AUA Ex. 1 at AUA 000007 (emphasis added).

---

[3]  For example, the parties expressly amended section 5.1.3 of the Contract so as to require that the Owner agree to each monthly Application for Payment prepared by Leeward before it was to be certified by the Architect and, before ultimately agreeing, payable by the Owner.  AUA Ex. 1 at AUA 000007.  *See* LC 80 at LC003008 (reflecting Leeward's objection to this amendment to the form provision).

15.     The Specifications were based on another form document typically used in American construction projects.  McLeod Statement, ¶ 8; Transcript (McLeod), 1:199:10-22. Mr. McLeod provided the initial draft of the Specifications, and these too were expressly negotiated by the parties.  McLeod Statement, ¶¶ 8-10; Transcript (McLeod), 1:199-10-22. *E.g.*, LC 80 at LC003011-3013 (evidencing negotiations over the Specifications).

### The EC $27,436,824 Contract Sum Was "Subject to Additions and Deductions"

16.     The parties used AIA Document A101-1997, Standard Form of Agreement Between Owner and Contractor where the basis of payment is a Stipulated Sum.  A "fixed price" or "Stipulated Sum" simply means that the parties reached agreement on what will be paid to complete the scope of work as currently designed.  The BOQ defines this scope of work as it represents the scope shown on the "contract drawings."  The Contract Sum is not a flat fee or a guaranteed payment.  Rather, the Contract Sum is subject to change, either upwards or downwards, to the extent that the specific scope of work changes.  McLeod Statement ¶ 20.  This fact is made absolutely clear in the Contract Documents, which provide that the Contract Sum payable to Leeward is "subject to additions and deductions."  AUA Ex. 1 (Contract, § 4.1) at AUA 000006.  Leeward agrees.  Dickinson Statement, ¶ 21.

17.     The Contract Sum is a defined term in the Contract Documents.  Section 9.1.1 of the General Conditions provides that the "Contract Sum . . . including authorized adjustments, is the total amount payable by the Owner to the Contractor for performance of the Work under the Contract Documents."  AUA Ex. 1 at AUA 000041 (emphasis added).

18.     When the parties executed the Contract Documents, that amount was EC $27,436,824 "subject to additions and deductions as provided in the Contract Documents."  AUA Ex. 1 at AUA 000006 (Contract, § 4.1) (emphasis added).  The Contract Sum of EC $27,436,824

was based upon a specific scope of work defined at that time.  Transcript (Dickinson), 1:82:10-84:15 ("We defined the scope and the work at the time, yes.").

19.     The parties arrived at the initial amount of EC $27,436,824 by valuing three components of compensation:  (i) Preliminaries/General Conditions (EC $3,906,146); (ii) Cash Allowances (EC $1,000,000); and (iii) Measured Works (EC $22,530,678).  *Id.*  These components were detailed in the Contract Documents on a single-page called "Statement of Contract Sum."  AUA Ex. 1 at AUA 000071.

20.     By the time the parties executed the Contract Documents on September 25, 2008, the architectural designs were sufficiently complete that the parties had agreed upon a fixed BOQ.  McLeod Statement, ¶ 21; Transcript (McLeod), 1:133:15-134:5.

21.     As the Project progressed, however, changes were made to Leeward's scope of work, whether due to design changes, site conditions, the removal of provisional or other items from Leeward's scope, or otherwise, so that the scope of work Leeward actually performed differed greatly from what was reflected in the initial BOQ.  Antony Statement, ¶ 27.

22.     As provided in the Contract Documents, the Contract Sum was to be adjusted to account for these "additions and deductions" to Leeward's scope of work, and Leeward was only to be paid for the work it actually performed.  *Id.*; McLeod Statement, ¶¶ 20-22.  Leeward did not submit any evidence to the contrary.

**Leeward Was To Be Paid Only For What It Built**

23.     In a contemporaneous summary of the Contract Documents, Leeward's Senior Quantity Surveyor Robert Winwood confirmed Leeward's understanding to be the same as AUA's.  LC 84; Transcript (Winwood), 2:219:4-220:3; AUA Ex. 69 (metadata confirming creation of this document on September 25, 2008).  He acknowledged that the total payment for the Measured Works was to be "as built" and in accordance with the "final measure."

6

> Measured works in the BOQ will be as built.  A change Order will
> be required when the final measure differs from the Contract BOQ.
> Rates for doors and windows are provisional.

LC 84 at LC003034.

24.     The largest component of the Contract Sum was the "Measured Works," which

was set forth in detail in the Bill of Quantities and based upon a specific scope of work.

Transcript (Dickinson), 1:82:24-83:5 ("[The Contract Sum] was based upon the … quantity and

the available design …at the time which identified what was the scope of what we had at the

time."); McLeod Statement, ¶ 22; Antony Statement, ¶ 23.

25.     The Statement of Contract Sum provided for Measured Works that totaled EC

$22,530,678, broken down as follows:  (i) Classroom and Laboratory Building (EC $5,060,075);

(ii) Service Block (EC $1,471,074); (iii) Library Block (EC $14,975,517) and (iv) Amphitheater

(EC $1,024,012).  AUA Ex. 1 at AUA 000071.  These amounts were based entirely on the BOQ

at the time the parties executed the Contract Documents.  Antony Statement, ¶ 26; Transcript

(Dickinson), 1:84:8-15 (treating "Measured Works" and "Bill of Quantities" synonymously).

26.     As Mr. Dickinson explained, the amount of the Measured Works component of

the Contract Sum was "purely a function of the quantity and applied rates."  Transcript

(Dickinson), 1:83:9-15.  The sum of all the amounts in the four sections of the BOQ comprise

the total amount of the Measured Works included within the initial EC $27,436,824 Contract

Sum.  Transcript (Dickinson), 1:85:19-24.

27.     If Leeward performed each and every task exactly as stated in the fixed BOQ

included in the Contract Documents, it would have been entitled to be paid EC $22,530,678 for

the Measured Works.  Transcript (Dickinson), 1:85:25-86:4.

28.     If the scope of the work changed, however, then so did the BOQ, and in turn, the

Contract Sum.  McLeod Statement, ¶ 22; Transcript (McLeod), 1:192:14-195:19.  When the

scope of the work increased, the Contract Sum increased, and when the scope of the work

decreased, the Contract Sum decreased, as the parties intended.  Transcript (Dickinson), 1:99:22-

100:2; Transcript (McLeod), 1:194:11-195:19.

29.     With respect to the Measured Works, the agreed upon unit rates set forth in the

BOQ were used to adjust the Contract Sum upwards or downwards as necessary.  Transcript

(McLeod), 1:192:14-195:19.  As Mr. McLeod explained in Paragraph 22 of his witness

statement:

> Although "fixed," the BOQ is fluid in nature because it is meant to
> reflect exactly what is in the drawings.  If the drawings change,
> then the scope of the work changes, and in turn, so does the price,
> to value the BOQ in its "as built" form.  The whole point of having
> a fixed BOQ is to establish transparency in the adjustments made
> to the Contract Sum by applying fixed unit rates to the changes
> made to the scope of work defined in the BOQ.  The fixed unit
> rates are used to value the "additions and deductions" to the
> Contract Sum that result from changes to the design and/or
> constructed works.

30.     Mr. McLeod further explained at the hearing:

> [The BOQ is] basically a shopping list of everything you bought at
> the time.  If you [ ] have everything on that shopping list, it gives
> you a very fair way of determining what you do and don't pay for.

Transcript (McLeod), 1:193:12-16.

31.     When questioned further about the "shopping list" analogy, Mr. McLeod testified:

> Q.     When you referred to the shopping list in your answer,
> what document within the contract documents were you referring
> to?
>
> A.     The BOQ -- Bill of Quantities.
>
> Q.     The Bill of Quantities.  So if you had a fixed, or stipulated
> sum, and a Bill of Quantities as a shopping list, like you said, what

happens if there is work that's in addition to what's on the Bill of
Quantities?

A.      You used the unit rates and you increase the quantities to
reflect the revised scope.

Q.      And what happens if it goes the other way, and the
quantities you have are less?

A.      … You deduct the quantities and apply the unit rate.

Q.      And from your experience in negotiating and drafting the
contract, what was the intent of the parties here in this case,
Leeward and AUA, with respect to additions and deductions, how
would that be done?

A.      Like you say, there's going to be additions and deductions
using the unit rates that were established at the time.

Transcript (McLeod), 1: 194:7-195:5.

32.      Adjusting the Contract Sum for additions and deductions was not limited to

changes in the scope of the work, but also applied when there were measurement errors in the

BOQ.  Transcript (McLeod), 1:153:8-23.

33.      Section 1200, Part 1.5(F) of the Specifications (AUA Ex. 1 at AUA 000114)

makes this clear:

All changes arising out of the performance of the work and any
errors and/or omissions in the Bills of Quantities shall be measured
and valued in accordance with the methods adopted in the unit
rates.

Section 1200, Part 1.5(E) of the Specifications (AUA Ex. 1 at AUA 000114) places the onus on

Leeward to "verify the accuracy of quantities" and confirms that "any errors and/or omissions

are subject to adjustment via Change Order."

34.      As set forth in more detail below, after taking into account all "additions and

deductions" to the Contract Sum to adjust for the Measured Works "as built," the amount of

9

Measured Works Leeward performed (and was paid for performing) totaled EC $17,727,635.37. Antony Statement, ¶ 51.

35.     Another component of the Contract Sum was "Preliminaries," which generally refer to the overhead costs incurred in setting up the construction site, maintaining the site, and managing/supervising the work performed by Leeward's employees.  Antony Statement, ¶ 19.

36.     At the time they executed the Contract Documents, the parties estimated the amount of Preliminaries and site set-up costs that would be expended over the negotiated 52 week construction period to construct the structural works of the Campus based upon a set of assumptions (AUA Ex. 1 at AUA 000062 to AUA 000063), and incorporated that estimate (EC $3,906,146) in the Contract Sum.

37.     Given that the actual cost of Preliminaries would change, the Contract provided that "Time related recurring, setup and Management Costs are to be based on actuals provided these are approved one week in advance by the Owner."  AUA Ex. 1 at AUA 000007 (Contract § 4.3) and AUA 000071 (Statement of Contract Sum); Antony Statement, ¶ 20; Transcript (Antony), 5:815:25-818:24.  AUA actually paid EC $4,936,303.60 in Preliminaries over the 52 week schedule, which is EC $1,030,157.60 more than the parties had estimated.  Antony Statement, ¶ 20.

38.     The final component of the Contract Sum was an EC $1,000,000 Cash Allowance.  Antony Statement, ¶ 21.  This consisted of an EC $1,000,000 contingency that was to be expended in accordance with AUA's directions.  *Id.*; AUA Ex. 1 at AUA 000029 (General Conditions, § 3.8.1) and at AUA 000113 (Specifications, Section 1200, Part 1.3A).  Approved changes, as well as charges for overtime, scaffolding, craneage and other contingent costs were

to be adjusted against this contingency upon the Owner's approval. *Id. See* AUA Ex. 1 at AUA 000071.

39.     AUA paid Leeward EC $2,262,166.51 for these additional costs (including extra work, overtime, scaffolding and craneage), which was EC $1,262,166.51 above the EC $1,000,000 Cash Allowance set aside at the time the parties executed the Contract Documents. Antony Statement, ¶ 56.

### The Parties Documented "Additions and Deductions" to the Contract Sum Through the Monthly Measurement and Requisition Process

40.     The parties did not use formal change orders in the manner set forth in the Article 7 of the General Conditions to document "additions and deductions" to the Contract Sum. Rather, the parties kept track of all changes to Leeward's scope of work (including additions, deductions, and modifications) through Leeward's submission of monthly Applications for Payment (the "Payment Applications"). Antony Statement, ¶¶ 30-34; Nagesh Statement, ¶¶ 13-18; Dickinson Statement, ¶¶ 47 and 55.

41.     Mr. Dickinson testified in Paragraph 47 of his Witness Statement: "Despite the lack of written change orders, we kept track of changes on the Project as it progressed and submitted the costs as part of our monthly requisitions."

42.     According to Mr. Dickinson, the monthly measurement and requisition process was done for two purposes:

> First, the actual value of the monthly applications was based on the additional works performed since the last certificate. The only way to agree to that and prove to the AUA what work had been completed was to measure the Project. The other reason for taking monthly measurements was because changes were being made to the Project on an ongoing basis. The only way to get an accurate payment amount due for extra work was to measure the Project on an ongoing basis.

Dickinson Statement, ¶ 55 (emphasis added).

43.     At the hearing, Mr. Dickinson admitted that the monthly payment application process was also used to keep track of underlined deductions in the scope of the work, admitting that it would be correct to add the following sentence to the end of Paragraph 55 of his Witness Statement: "The way the parties got an accurate deduction to the contract sum reflecting reductions in the scope of the work was also to measure the project on an ongoing basis." Transcript (Dickinson), 1:112:4-20 (emphasis added).

44.     The process for submitting, reviewing and revising each Payment Application was detailed at the hearing. Leeward would submit Payment Applications based on the actual work it performed since its last Payment Application, with supporting documentation. Antony Statement, ¶ 31; Nagesh Statement, ¶ 16. In so doing, Leeward submitted the BOQ to reflect the amount of Measured Works it performed since the last billing period. Antony Statement, ¶ 31; Nagesh Statement, ¶ 16; Dickinson Statement, ¶ 55. Each interim version of the BOQ would reflect the initial quantity or measurement, the actual measurement of the work performed, the unit rate, and the amount due for each line item based upon the actual measurements. Antony Statement, ¶ 31; Nagesh Statement,¶ 16. Leeward would also provide the back-up documentation for the actual measurements taken. *Id. E.g.*, AUA Exhibit 8 at AUA 000813-855.

45.     Upon receipt of each Payment Application, a representative of the Architect (usually Mr. Nagesh) and a Leeward representative (usually Paul Webster) would check all of the measurements to verify that the Measured Works Leeward claimed accurately reflected the quantity of the Measured Works Leeward actually performed. Antony Statement, ¶ 32; Nagesh Statement, ¶ 17. Mr. Nagesh would reach agreement with Leeward as to the revised measurements, and then make corresponding revisions to the Payment Application to reflect the

12

amount the parties agreed was due to be paid.  Antony Statement, ¶ 32; Nagesh Statement, ¶ 17;

Dickinson Statement, ¶ 56.  Mr. Nagesh would then review the Payment Application, with

amendments, with the Owner's representative (Col. Antony) to obtain the Owner's agreement as

to the amount of the Payment Application, consistent with Section 5.1.3 of the Contract.  Antony

Statement, ¶ 32; Transcript (Antony), 5:811:12-815:13.

46.     The Payment Applications not only documented changes to the Measured Work,

but they also documented:  (i) the actual Preliminaries sought by Leeward; (ii) additional work,

including overtime, performed by Leeward outside of the tasks listed in the BOQ that Leeward

called "Change Orders"; and (iii) all Claims for an increase in the Contract Sum sought by

Leeward.  Antony Statement, ¶¶ 53-56.  *E.g.*, AUA Ex. 22 at AUA 002855 and AUA Ex. 9 at

AUA 000897-900.  These amounts were also reviewed by Mr. Nagesh and Col. Antony for

accuracy, and adjustments were made to the Payment Applications as necessary.  Antony

Statement, ¶ 33; Nagesh Statement, ¶ 19.

47.     Each Payment Application came with a "Collections Page" summarizing the

amount sought for payment by Leeward.  AUA and the Architect would revise the Collections

Page to ensure that it accurately reflected the agreed upon adjustments made to the

measurements submitted with the Payment Applications.  AUA and the Architect then calculated

the amount due Leeward for the Payment Application, taking into consideration, among other

things, monies withheld as retainage and monies paid for Antigua and Barbuda Sales Tax

("ABST").  Once all parties agreed on the payment amount, Mr. Nagesh would certify the

Payment Application for payment and Col. Antony would counter-sign.  Antony Statement, ¶ 33;

Nagesh Statement, ¶ 20.

48.     The parties followed this monthly true-up process through and including Leeward's submission of the Draft Final Account in October 2009, which was submitted after Leeward had completed its Work.  Antony Statement, ¶ 34; Nagesh Statement, ¶ 22.  With one (Additional Preliminaries), Leeward acknowledged and accepted all "additions and deductions" to the Contract Sum when it submitted the final version of the Draft Final Account on October 19, 2009 to obtain payment only for what it actually built.  Antony Statement, ¶ 34; Nagesh Statement, ¶ 22; AUA Ex. 21.

### The Adjustments to the Contract Sum Documented in the Payment Applications

49.     The "additions and deductions" to the Measured Works portion of the Contract Sum consisted of omitted work, deleted work, and modified work, as described below.

### *Omitted Work*

50.     In many instances, design changes or site conditions resulted in omitting items from the BOQ, including items that were only provisional at the time the parties executed the Contract Documents.  When an item was omitted (*i.e.*, not performed at all), that reduced Leeward's scope of work, and in turn, the Contract Sum, to the extent of the item.  Antony Statement, ¶ 35; Transcript (Dickinson), 1:101:3-18.

51.     Because Leeward was only to be paid for works "as built" (by adjusting the Contract Sum upwards or downwards to reflect any "additions and deductions"), Leeward properly did not include any of the omitted work in its Payment Applications.  Antony Statement, ¶ 35.

52.     For example, during the Project, Leeward asked Mr. Nagesh to confirm whether it should build a chain link fence around the Service Block, which was a line item in the BOQ.  It did so by submitting an RFI on November 18, 2008 specifically referencing that line item.  LC 90 at LC003212-003213; Transcript (Dickinson), 1:92:3-94:18.  AUA decided it did not need to

build the fence that had initially been contemplated, and so advised Leeward. Accordingly, Leeward did not build the fence. Transcript (Dickinson), 1:94:19-99:21.

53.     Since the fence was omitted from Leeward's scope of the work, Leeward did not seek payment for it. Transcript (Dickinson), 1:99:10-21. The BOQ indicated Leeward was to be paid EC $55,848 for this item if it was built exactly as provided therein (Transcript (Dickinson), 1:91:1-5; AUA Ex. 1 at AUA 000084), but in the Draft Final Account, and every monthly payment application before then, Leeward sought EC $0.00 for the fence because it had not been built. *See* AUA Ex. 21 at AUA 002915. This is demonstrated with an excerpt from AUA Ex. 25 (below), which is a comparison between the amount listed in the BOQ (had the items been built at the expected quantity) and the amount Leeward sought in its Draft Final Account. The "BOQ Amount" column represents the amount listed in the initial BOQ and the "DFA Amount" is the amount sought in the Draft Final Account.

| Sl. No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| Xiii | MISCELLANEOUS | | | | | | |
| 1 | Providing and spraying **chemical emulsion pre-constructional antitermite treatment** creating a chemical barrier under and around the column, wall trenches, excavation, top surface of plinth filling junction of wall and floor, along the perimeter of building, expansion joint, surroundings of pipes and conduits etc., complete. **(plinth area)** | 633.00 | 390.98 | Sy | 8.12 | 5140.00 | 3,174.76 |
| 2 | Providing and fixing of chain link mesh fencing with poles at equal distance as per the standards | 860.00 | 0.00 | RFT | 64.94 | 55848.00 | 0.00 |
| 3 | Providing expandedmetal lathe in the chases made in the wall and rendering the chase with cement mortar 1:3,1" thick applied in two coats with top coat finished smooth to receive other finishes | 300.00 | 0.00 | Rft | 6.21 | 1862.00 | 0.00 |
| 4 | 6mm thick Floor Slab Damp Proof Membrane | 500.00 | 390.98 | SY | 6.48 | 3,240.00 | 2,533.55 |

54.     The compilation prepared by AUA reflects 78 line items from the BOQ submitted as part of the Contract Documents that were simply not performed (by Leeward or anyone else) because AUA, for one reason or another, decided against building the Project in that manner. *See* AUA Ex. 25.

55.     In total, EC $1,604,617 of work enumerated in the BOQ was removed from the scope of the work and not performed by Leeward or anyone else. AUA Ex. 25. When Leeward

submitted each Payment Application, through and including its Draft Final Account in October 2009, it did not seek to be paid for the chain link fence or any of the other Omitted Work items, as these items had been removed from the Contract Sum.  Transcript (Dickinson), 1:101:3-18. Leeward now seeks to be paid in full for this work, totaling EC $1,604,617 (Antony Statement, ¶ 41; AUA Ex. 25), that it never performed.  Leeward is not entitled to recover the Omitted Works portion of its EC $6,701,390.33 Claim.

### *Deleted Work*

56.     In addition to the EC $1,604,617 in work omitted from the Project due to design changes, AUA deleted, with a few isolated exceptions, all finishing works from Leeward's scope of work because AUA had fallen far behind schedule on completing the structural works. Antony Statement, ¶ 41; Transcript (Antony), 4:732:16-733:12.

57.     The finishing works deleted, totaling EC $3,667,711, generally fell into three categories:  (i) Doors and Windows Work (EC $191,090) (AUA Ex. 29); (ii) Flooring Work (EC $1,741,032) (AUA Ex. 27); and (iii) Painting Work (EC $1,735,589) (AUA Ex. 28).  Antony Statement, ¶ 41; AUA Ex. 26.  As with the Omitted Work, Leeward did not seek payment for the Deleted Work in any of the Payment Applications.  Antony Statement, ¶ 41.  *See* AUA Exs. 8 to 21.

58.     Leeward also did not seek payment for the Deleted Work when it submitted its Draft Final Account.  AUA Ex. 21.  Thus, for just about every single line item in the BOQ under the headings "Doors and Windows," "Flooring" and "Painting and Finishes," the "Measure" column is either blank or says "0.00" and the "Amount" due column says either " – " or "0.00." Below is an example of the "Painting and Finishes" section from the Library Block-Amphitheatre BOQ that Leeward provided as part of its Draft Final Account:

| Sl.No. | Description Of Item | Qty | Measure | Unit | Rate | Amount |
|---|---|---|---|---|---|---|
| IX | PAINTING AND FINISHES | | | | | |
| 1 | Providing and painting external surface with trowellex including feature bands/grooves etc., of approved colour all as per manufacturers instructions and directions inlcuding scaffolding etc., complete at all levels. | 378 | | SY | 74.95 | 0.00 |
| 2 | Preparing surface and painting with Traveltex fine grade internally Plastic emulsion paint of approved colour including providing and removing scaffolding, finishing etc., complete | 800.00 | | SY | 74.95 | 0.00 |
| 3 | Preparing surface and painting with 2 coats of latex emultion of approved colour and make over a coat of primer for ceiling internal surfaces as per directions including providing and removing scaffolding, finishing etc., complete in all floors. (may not be required for full area due to false ceiling) | 750.00 | | SY | 19.94 | 0.00 |

AUA Ex. 21 at AUA002913. A comparison between the amounts set forth in the BOQ and the amounts sought in the Draft Final Account for all of the Deleted Work items is reproduced as AUA Exhibit 26.

59.     In fact, Leeward concedes that the Contract Sum was reduced by the removal of the Doors and Windows Work and Painting Work. Witness Statement of Andy Green ("Green Statement"), ¶ 51; Amended Demand for Arbitration, ¶¶ 23-24. Leeward acknowledges this deduction to the Contract Sum notwithstanding the absence of a formal Change Order. *Id.*

60.     When reducing the Contract Sum to account for Deleted Work, however, Leeward neglected to exclude the Flooring Work, which had been removed from Leeward's scope of work under the Contract Documents, and in turn reduced the Contract Sum. Antony Statement, ¶ 42; Transcript (Dickinson), 1:105:11-106:3. By failing to remove the Flooring Work from the Contract Sum, Leeward seeks to be paid in full for this Deleted Work in this arbitration, even though its Draft Final Account submitted in October 2009 sought $0.00 for the deleted Flooring Work. AUA Ex. 21; AUA Ex. 27.

61.     The difference between the amount of Deleted Work actually removed from the BOQ (EC $3,667,711) and the amount Leeward reduced the Contract Sum on account of Deleted Work (EC $1,948,755.32) is EC $1,718,955.68 (the "Deleted Works Delta").  Leeward is not entitled to be paid for this portion of the EC $6,701,690.33 Claim.

### *Modified Work*

62.     The parties agreed and understood that Leeward was only to be paid for the work it actually performed.  LC 84 at LC003034.  In many instances the quantity of items changed as a result of design alterations.  Leeward built the Project based upon the altered designs and submitted Payment Applications each month seeking payment based upon the changed scope, thereby only seeking payment for what it built.  Antony Statement, ¶ 45.

63.     When the measurement was <u>greater</u> than the quantity reflected in the initial BOQ, Leeward sought and was paid a <u>greater amount</u>, based on the actual measurement and applying that to the agreed upon unit rates in the BOQ.  *Id.*  For example, in the following item on the Library Block –Amphitheatre BOQ, the BOQ quantity called for 3 cubic yards for a cost to AUA of EC $251.00.  The actual measurement was 120.74 cubic yards.  Leeward did not seek a mere EC $251.00.  Leeward sought and was paid EC $10,121.63 based upon the actual measurement. *Id.* This is reflected in the excerpt below of AUA Ex. 24, which is a comparison between the BOQ and the Draft Final Account.

| Sl.No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---|---|---|---|---|---|---|---|
| 3 | Selected hardcore material back filling to the sides /pockets of foundation and under floors in layers of 6" including watering, tamping & consolidation to get required 95% proctor density etc., complete. | 3.00 | 120.74 | Cy | 83.83 | 251.00 | 10,121.63 |

64.     Similarly, when the measurement was <u>less</u> than the quantity reflected in the initial BOQ, Leeward sought and was paid a <u>lesser amount</u>, also based on the actual measurement. Anthony Statement, ¶ 46.  For example, in the Classroom and Lab Block BOQ, the original

quantity for the concrete pour was 295 square yards.  The actual measurement of the pour was much less – 137.02 square yards.  Leeward sought payment and was paid based on the actual measurement.  *Id.  See* AUA Ex. 24.

| Sl. No. | Description Of Item | Qty | Measure | Unit | Rate | BOQ Amount | DFA Amount |
|---------|--------------------|-----|---------|------|------|------------|------------|
| I | **PLAIN CEMENT CONCRETE** | | | | | | |
| 1 | Providing & laying **2000 PSI** grade cement concrete 2" thick blinding for grade beam with 3/4" size agregates well compacted including machine mixing, tamping, curing, etc., complete. | 295.00 | 137.02 | SY | 33.04 | 9,748 | 4,527 |

65.   The parties followed this practice through the monthly true-up process from the time they signed the Contract Documents through and including the Draft Final Account. Antony Statement, ¶ 47.  *See* AUA Ex. 21.

66.   AUA Exhibit 24 contains all of the BOQ items performed by Leeward where the amount due in the BOQ based on the original design differed from the amount paid in the Draft Final Account based on what Leeward actually built.  Had the Project been built as originally designed, Leeward would have been entitled to be paid EC $16,551,326 for these items.  Based on the quantities built, however, Leeward was paid EC $16,565,620 for this work.  In the aggregate, changes in these quantities resulted in AUA paying Leeward EC $14,294 more than AUA planned to pay under the original BOQ (the "Modified Works Delta").  Antony Statement, ¶ 49.  Leeward is not entitled to any damages in connection with Modified Work.

\*       \*       \*

67.   As discussed below, Leeward's Draft Final Account adjusted for the work it had performed and the work it had not:  Leeward sought, the Architect certified, and AUA paid a total of EC $17,727,635.37 in Measured Works, meaning the Contract Sum was reduced by a total of EC $5,258,042.63 for the Measured Works portion of the Contract based upon "additions and deductions" to the original BOQ.  Antony Statement, ¶ 51.

68.     Adjusting for work that was omitted, deleted, or modified is precisely what Leeward's Senior Quantity Surveyor Robert Winwood understood was to happen when he wrote an abstract of the Contract Documents at the time they were executed:

> <u>Measured works in the BOQ will be as built</u>.  A change Order will be required when the <u>final measure</u> differs from the Contract BOQ. Rates for doors and windows are provisional.

LC 84 at LC003034 (emphasis added).

69.     Leeward failed to provide any evidence to refute Mr. Winwood's admission, contemporaneous with the execution of the Contract Documents, and the other evidence adduced by AUA, that the Project was to be valued and AUA was to pay for the Project "as built" and in accordance with the "final measure."

### *Preliminaries/General Conditions, Change Orders and Claims*

70.     Each monthly Payment Application included a running total of the Preliminaries sought by Leeward and approved by AUA.  Antony Statement, ¶ 53.  *E.g.*, AUA Ex. 19 at AUA 000372-00374.  Leeward included charges for scaffolding, craneage, and concrete testing in its "Preliminaries."  *Id.*

71.     The Draft Final Account as approved and paid by AUA included a total of EC $4,936,303.60 in Preliminaries and Site Setup costs actually incurred by Leeward during the same 52 week schedule.  AUA Ex. 22 at AUA 002855.  Accordingly, Leeward was paid an additional EC $1,030,157.60 for Preliminaries, resulting in an increase in the Contract Sum, despite the absence of formal change orders.  Antony Statement, ¶ 54.

72.     Leeward also sought an additional EC $955,554.08 in Preliminaries when it submitted its Draft Final Account, which represented the Preliminaries it claimed to have incurred between the end of the Contract Time (extended to May 14, 2009 during the Project) and the date of Substantial Completion (July 31, 2009).  As detailed herein, AUA and the

Architect rejected Leeward's request for Additional Preliminaries because Leeward failed to complete its work within the Contract Time. Antony Statement, ¶¶ 59; 76-84; Transcript (Nagesh), 5:944:12-949:9.

73.     Each Payment Application also contained a running tally of what Leeward called "Change Orders." *E.g.*, AUA Ex. 9 at AUA 000897-900. This enumerated list tracked all the additional work Leeward was asked to perform that was not included in the BOQ. Antony Statement, ¶ 55. This additional work increased Leeward's scope of work, and in turn, increased the Contract Sum. Transcript (Dickinson), 1:86:12-87:21.

74.     Leeward included each overtime item approved by AUA as an enumerated "Change Order," and tracked monetary "Claims" in a separate column. Antony Statement, ¶ 55. *E.g.*, AUA Ex. 19 at AUA 000379-000388. The "Claims" included monetary compensation sought for time lost due to, among other things, adverse weather and holidays. *Id.* at AUA 000384 (Item No. 54:  Labour Day Close Down Costs) and AUA 000385 (Item No. 58:  Adverse Weather).

75.     In the final version of its Draft Final Account, after the Architect and Leeward made corrections to the application, Leeward ultimately sought to be paid for a total of EC $1,232,008.91 in "Change Orders" and EC $162,372.12 in "Claims." *See* AUA Ex. 21 at AUA002896 and AUA002945. Leeward was paid for these adjustments to the Contract Sum without AUA issuing a formal Change Order.

76.     Leeward's itemization of Preliminaries and Change Orders included all the contingent expenses that were to be drawn against the EC $1,000,000 Cash Allowance. Here, the extra Preliminaries and Change Orders approved by AUA totaled EC $2,262,166.51. The first EC $1,000,000 drew down the entire Cash Allowance included in the initial Contract Sum.

The additional contingencies increased the Contract Sum by EC $1,262,166.51.  Antony

Statement, ¶ 56.  Leeward's Amended Demand improperly seeks to recover the entire EC

$1,000,000 Cash Allowance account a second time even though that allowance was fully paid

and then exceeded by a further payment in the amount of EC $1,262,166.51.

**Both Iterations of Leeward's Draft Final Account Sought**
**97.5% of the Contract Sum Based Upon Substantial Completion**

77.     Leeward's Managing Director, Andy Green, admitted that he wanted Leeward to

get paid "as much as it is legally entitled to be paid ... as soon as it is legally entitled to be paid."

Transcript (Green), 3:370:6-11.

78.     Pursuant to Section 5.1.7.1 of the Contract, Leeward was entitled to be paid

97.5% of the Contract Sum upon Substantial Completion.[4]  AUA Ex. 1 at AUA 000008;

Transcript (Green), 3:382:8-13.  This percentage was to be derived from the total Contract Sum

after factoring in all "additions and deductions."  Transcript (Green), 3:382:14-383:20.

79.     Leeward achieved Substantial Completion of its Work on July 31, 2009.  Leeward

then submitted to the Architect a list of snag works to be completed by Leeward, as required by

Section 9.8 of the General Conditions to the Contract, and requested a Certificate of Substantial

Completion.  LC 195.  Leeward "considered itself legally entitled" to be paid 97.5% of the

Contract Sum at this time.  Transcript (Green), 3:387:16-388:16.  In order to make a claim for

97.5% of the total due on the Project, Leeward first had to calculate the total that it considered

due, *i.e.*, the Contract Sum as of the time of Substantial Completion.

80.     On October 8, 2009, Leeward submitted its first version of the Draft Final

Account.  Antony Statement, ¶ 57; AUA Ex. 30.  The Draft Final Account submitted on October

8, 2009 was based upon the final measurements for the Measured Works performed by Leeward,

---

[4]  Indeed, this was one of the negotiated provisions of the AIA Form, as the form contract required payment of the
Full Contract Sum upon Substantial Completion.  AIA Document A101-1997 (Sample Form).

and sought payment for work completed by Leeward since its September 2009 Payment Application.  Nagesh Statement, ¶ 22; Antony Statement, ¶ 57.

81.     As demonstrated at the hearing, Leeward's first version of the Draft Final Account sought exactly 97.5% of the Contract Sum, taking into consideration all additions and deductions calculated by Leeward, as confirmed by the Collection Page from this version.  AUA Ex. 30 at AUA 000260.  The balance was held as retainage.  *Id.*

82.     Leeward had previously been paid EC $22,908,374.09 and sought an additional EC $1,336,121.57 in this version of the Draft Final Account, so that it would receive a total payment of $24,244,495.66 as against the Contract Sum of EC $24,886,149.40, representing the actual amount of Preliminaries, Measured Works, Change Orders and Claims Leeward claimed to be entitled to receive over the life of the Project.  Transcript (Green), 3:393:23-398:22.  As confirmed at the hearing, Leeward sought to be paid exactly 97.5% of the Contract Sum.  Transcript (Green), 3:403:10-406:5.

> EC $22.908,374.09 (prior payment) +
> EC $1,336,121.57 (current request) = EC$ 24,244,495.66
>
> EC $24,244,495.66 (total payment sought)/
> EC $24,866,149.40 (Contract Sum claimed) = 97.5%

83.     As with all the prior Payment Applications, Leeward's Draft Final Account was reviewed for accuracy by the Architect and AUA.  With respect to the Measured Works, Mr. Nagesh and Paul Webster of Leeward went over in detail the quantities of all the Measured Works, and reached agreement on the quantities actually built.  All agreed that Leeward was entitled to total compensation of EC $17,727,635.37 in Measured Works.  Antony Statement, ¶ 58.

84.     With respect to Preliminaries, Leeward sought EC $5,891.857.68, but AUA only agreed to pay EC $4,936,303.60 (AUA Ex. 30) -- the difference being EC $955,554.08. Transcript (Green), 3:415:13-419:24; Antony Statement, ¶ 59.

85.     With respect to "Change Orders," the parties reached agreement on the amount due, EC $1,232,008.91 (AUA Ex. 21 at AUA002896 and AUA002935-2946), reducing the amount Leeward claimed in its October 8, 2009 Draft Final Account.  AUA Ex. 30 at AUA 000260 and AUA 000297-000307.  *See* Transcript (Green), 3:420:8-25.

86.     As for Claims, AUA and the Architect approved EC $162,372.12 of the amount claimed in the October 8, 2009 Draft Final Account (AUA Ex. 21 at AUA002896 and AUA002935-2946), excluding only Leeward's claim for overhead and profits and its claim with respect to the Whitsuntide Holiday.  AUA Ex. 30 at AUA 00260 and AUA 000297-000307.  *See* Transcript (Green), 3:420:8-25.

87.     After the parties reached agreement on the specific adjustments to be made to the Draft Final Account, Leeward made changes to the Draft Final Account and emailed the Excel file to Mr. Nagesh on October 19, 2009.  AUA Ex. 21.  As of this time, Mr. Green "had full supervisory responsibility for the AUA project," as the two individuals primarily responsible for the Project, Robert Winwood and Neil Dickinson, had left Leeward's employ.  Transcript (Green), 3:374:16-376:4.

88.     As the Collection Page confirms, the October 19, 2009 version of the Draft Final Account incorporated the Measured Works, Change Orders and Claims amounts agreed to by AUA.  AUA Ex. 21 at AUA002896.  However, Leeward still sought to be paid EC $5,891,857.68 in Preliminaries, and not the EC $4,936,303.60 agreed to by AUA.

89.     As was the case with Leeward's first version, however, Leeward sought to be paid exactly 97.5% of the Contract Sum it claimed to be due, with the balance held as retainage. AUA Ex. 21 at AUA002896; Transcript (Green), 3:409:5-413:22.

> EC $22.908,374.09 (prior payment) +
> EC $1,036,528.13 (current request) = EC$ 23,944,902.22
>
> EC $23,944,902.22 (total payment sought)/
> EC $24,558,874.07 (Contract Sum claimed) = 97.5%

90.     With the exception of the EC $955,554.08 dispute regarding Preliminaries, AUA agreed with Leeward as to the Contract Sum and thereafter paid Leeward exactly 97.5% of the Contract Sum, as reflected on the Collection Page of AUA Exhibit 22.  AUA Ex. 22 at AUA002855; Transcript (Green), 3:413:23-423:10.

> EC $22,908,374.09 (prior payment) +
> EC $104,862.91 (current request) = EC$ 23,013,237.00
>
> EC $23,013,237.00 (total payment sought)/
> EC $23,603,320.00 (Contract Sum claimed) = 97.5%

91.     These three versions of the Draft Final Account conclusively establish that Leeward understood on October 2009 that the total amount due for the Project (and therefore the 97.5% of the total due upon Substantial Completion) was based upon the Project "as built" in accordance with the "final measure" and that Leeward was not entitled to be paid for work it did not perform.  Leeward failed to present any evidence to the contrary.

92.   In total, the Contract Sum was adjusted for "additions and deductions" as follows:

| | |
|---|---|
| Contract Sum as of September 2008 | EC $ 27,436,824.00 |
| *Less* Reduced Measured Works | (EC $   5,258,042.63) |
| *Plus* Additional Preliminaries | EC $   1,030,157.60 |
| *Plus* "Change Orders" Above EC $1 million | EC $      232,008.91 |
| *Plus* Claims | EC $      162,372.12 |
| **Revised Contract Sum as of October 2009** | **EC $ 23,603,320.00** |

Antony Statement, ¶ 68.

93.   Leeward was paid 97.5% of the revised Contract Sum of EC $23,603,320, at the

end of October 2009.  AUA Ex. 22; Transcript (Green), 3:432:7-16.  The remaining 2.5% (EC

$590,083) was held by AUA as retainage pursuant to the Contract Documents, which was to be

released upon Leeward's satisfaction of the obligations set forth in Section 9.10.02 of the

General Conditions.  AUA Ex. 1 at AUA 000045; Transcript (Winwood), 2:253:17-254:8;

2:262:4-263:2; 2:311:20-313:18.  Leeward failed to present any evidence at trial demonstrating

that it fulfilled its contractual prerequisite to receive the release of the retainage and/or "final

payment."

### Mr. Green's October 26, 2009 Letter Detailing EC $1.072 Million in Outstanding Claims

94.   On October 22, 2009, AUA advised Leeward that it was paying Leeward EC

$104,861.09, to bring its payments up to 97.5% of the Contract Sum certified by the Architect as

being due Leeward.  AUA Ex. 22; Transcript (Green), 3:421:21-423:23.  That same day, Mr.

Green emailed AUA and the Architect seeking resolution of the outstanding payment claims,

"most notably" the Preliminaries.  AUA Ex. 64.  Leeward did not receive a response to this

email, but a few days later did receive the payment promised in AUA Ex. 22. Transcript (Green), 3:426:10-432:16.

95.     On October 26, 2009, Andy Green sent a letter to Col. Antony detailing the outstanding payment claims. AUA Ex. 33; Transcript (Green), 3:436:10-441:22. These amounted to the three disputed items in Leeward's Draft Final Account that were not accounted for in what the Architect certified and AUA paid to date: Leeward's claim for Additional Preliminaries (EC $955,554.08), its claim for time lost due to the Whitsuntide Holiday (EC $19,457.40), and its claim for overhead and profits (EC $97,064.40). *Id.*; Antony Statement, ¶ 69. Leeward indicated its intention to commence arbitration "immediately" for EC $1,072,093.88 in aggregate on these three items. AUA Ex. 33.

96.     These claims had been pending since at least May 29, 2009 (AUA 33 at AUA003253-3254; Transcript (Green),438:7-441:22), and correspond with specific differences between the Draft Final Account initially submitted by Leeward and the Draft Final Account approved by AUA. *Compare* AUA Ex. 30 *with* AUA Ex. 21. Leeward sought Preliminaries of EC $5,891,857.68, but AUA only approved and paid EC $4,936,303.60. The difference between the two is EC $955,554.08. Antony Statement, ¶ 70; Transcript (Green), 3:440:6-22.

97.     In its October 8, 2009 version of the Draft Final Account, Leeward sought EC $278,911.92 in Claims, but AUA only approved and paid EC $162,372.12. The EC $116,539.80 difference is precisely the aggregate of Leeward's Whitsuntide Holiday claim and its Overhead and Profits claim at the time (EC $19,475.40 + EC $97,064.40 = EC $116,539.80). Antony Statement, ¶ 70.

### Leeward's Delay Claim (Additional Preliminaries)

98.    Leeward seeks to recover the EC $955,554.08 in Additional Preliminaries sought in its Draft Final Account, but rejected by AUA.  Leeward's claim for Additional Preliminaries is rooted in its belief that it should have been granted an extension of time to complete its work because AUA, or other events outside of Leeward's control, prevented it from achieving the Substantial Completion deadlines in the Contract Documents.  Antony Statement, ¶ 76.

99.    The parties negotiated the length of the Project and ultimately agreed upon a 52 week construction period, commencing as of May 1, 2008 and ending on April 30, 2009.  While Leeward initially sought a longer construction schedule, it ultimately agreed that the 52 week schedule was appropriate after AUA removed the MEP (Mechanical, Electrical and Plumbing) works from Leeward's proposed scope of work.  Antony Statement, ¶ 77.

100.    The Contract Documents established May 1, 2008 as the Commencement Date of Project and provided that Leeward was to complete its Work 364 days thereafter, *i.e.*, by April 30, 2009 (the "Contract Time").  AUA Ex. 1 at AUA 000006 (Contract §§ 3.1 and 3.3).  The Contract Documents further provided that time the limits were of the "essence of the Contract" and that Leeward agreed the Contract Time was "a reasonable period for performing the Work." AUA Ex. 1 at AUA 000041 (General Conditions, § 8.2.1).  Finally, Leeward was required to "proceed expeditiously with adequate forces" and "achieve Substantial Completion within the Contract Time."  AUA Ex. 1 at AUA 000041 (General Conditions, § 8.2.3).

101.    Leeward failed to achieve Substantial Completion within the Contract Time, and did not do so until July 31, 2009.  While the Contract Time had been extended until May 14, 2009, AUA Ex. 56, Leeward did not obtain any further extension of the Contract Time.[5]

102.    On May 11, 2009, three days before the extended deadline for Substantial Completion, Leeward submitted a "Claim for Extension of Time for Completion of the Works due to restriction of working hours." LC 211.  Leeward sought to extend the Contract Time by 15 weeks "together with reimbursement of costs expended."  The sole basis for this Claim was Leeward's contention that EC $500,000 was set aside for Non-Productive Overtime costs in the Contract Documents "necessary to reduce the construction period by 16 weeks" from 68 weeks to 52 weeks. Antony Statement, ¶ 83.; LC 211 at LC003723.  Leeward claimed that it was denied access to this money, and that Mr. Nagesh only approved EC $36,511.68 in overtime, which it equated to be 1.2 weeks out of the 16 weeks of time this alleged fund was supposed to compensate.  Leeward claimed that the lack of access to these funds denied it "the ability to finish the Works on time, and [ ] created a delay to the construction programme in the order of 14.8 weeks." Id.

103.    The Contract Documents permitted Leeward to assert a Claim for an extension of time pursuant to Section 4.3.7.1 of the General Conditions, so long as it provided timely notice, AUA Ex. 1 at AUA 000035; Transcript (Winwood), 2:240:5-242:2; LC 84 at LC 003032, and substantiated the Claim as required by Section 4.3.1 of the General Conditions.  AUA Ex. 1 at AUA 000034; Transcript (Winwood), 2:281:15-17.

104.    The Contract Documents define a "Claim" as a "demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment

---

[5] While Leeward made Claims for an extension of time based on weather delays and various holidays, those were all resolved through the payment of additional money, without extension of time. Antony Statement, ¶¶ 76, 117-118; AUA Ex. 33.  Transcript (Antony), 5:860:24-862:23; 869:1-872:12, 879:11-881:9.

of money, extension of time or other relief with respect to the terms of the Contract." AUA Ex. 1 at AUA 000034 (General Conditions, § 4.3.1).

105.    "Claims" must be initiated promptly, *i.e.*, "within 21 days from the claimant knowing he's got a claim to claim for." Transcript (Winwood), 2:239:3-11. Section 4.3.2 of the General Conditions provides:

> Time Limits on Claims: Claims by either party must be initiated with 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

106.    The 21-day notice provision was "important," and Leeward understood that if a Claim was not asserted promptly, it would be waived. Transcript (Winwood), 2:242:3-243:4.

107.    The Contract further provides that any Claims asserted by Leeward must be formally served by written notice to the Architect and AUA in the manner proscribed in the Contract Documents. AUA Ex. 1 at AUA 000051 (General Conditions, § 13.3.1). Pursuant to Section 13.3.1 of the General Conditions, "[w]ritten notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice." *Id.*

108.    Leeward understood the importance of providing written notice timely and in accordance with the Contract Documents. Mr. Winwood, who managed Leeward's document system with respect to the Project, expressly told those administering Claims to "GET A RECEIPT." LC 84 at LC003034. Mr. Winwood did so to foreclose any argument that proper notice had not been given, as Leeward would be able to challenge such an assertion with documentary evidence. Transcript (Winwood), 2:244:11-248:2. Mr. Winwood further admitted

that providing notice of a Claim to AUA and the Architect was a contractual precondition to asserting an arbitration and, if Leeward had not provided notice properly, then it had not satisfied that precondition.  Transcript (Winwood), 2:248:24-249:16.

109.    Here, Leeward's May 11, 2009 Claim for an extension of the Contract Time due to the alleged limited access to Non-Productive Overtime stems back to at least January 2009 and, thus, was not initiated timely.  Leeward emailed Col. Antony on January 11, 2009 to complain about a series of issues that it alleged to have caused delay and claimed that the denial of overtime was one item that prevented it from getting back on schedule.  LC 206.  Leeward thereafter issued a revised schedule on January 23, 2009 that proposed extending the schedule into June 2009.  LC 227.

110.    Finally, Claims are to be substantiated by the party asserting the Claim.  AUA Ex. 1 at AUA 000034 (General Conditions, § 4.3.1).  With respect to Claims for an extension of the Contract Time, substantiation required demonstrating that the delay at issue impacted the critical path of the construction schedule.  Transcript (Winwood), 2:281:15-17.

111.    The Contract Documents do not contain an EC $500,000 dedicated fund for Non-Productive Overtime.  Antony Statement, ¶ 84.  *See generally*, AUA Ex. 1.  Although Leeward requested that such a fund be included in the "Preliminaries" section of the Contract Sum the week before the parties signed the Contract (AUA Exs. 34 and 36), AUA rejected that request, content to rely upon the mechanism for overtime applications provided by the EC $1,000,000 Cash Allowance.  Antony Statement, ¶ 85; AUA Ex. 35.  The parties then signed the Contract Documents without a provision for EC $500,000 in Non-Productive Overtime in the contract Preliminaries or any reference to the need for overtime to meet the 52 week schedule.  Antony

31

Statement, ¶ 86. AUA Ex. 1. Instead, Leeward agreed the Contract Time was "a reasonable period for performing the Work." AUA Ex. 1 at AUA 000041 (General Conditions, § 8.2.1)

112.  In its May 11, 2009 Claim, Leeward did not otherwise substantiate the basis for its Claim for an extension of the Contract Time. Leeward did not identify any specific overtime applications that had been denied, nor did it demonstrate either how or the extent to which the denial of overtime impacted the critical path of the Project. Antony Statement, ¶ 94-98.

113.  At trial, Leeward submitted numerous emails (*e.g.*, LC 175 to LC 192) and substantial direct testimony with respect to a host of other issues that it claimed caused it delay. However, Leeward admitted that these emails were not "formal Claims" (Transcript (Winwood), 2:274:6-12) and were "merely examples from the correspondence files that indicate that design alterations or lack of information was causing delay and disruption" (Transcript (Winwood), 2:273:18-25).

114.  Under the Contract Documents, Leeward had the right to assert a Claim for an extension of the Contract Time or an increase in the Contract Sum. To assert a Claim for an extension of time, Mr. Winwood conceded, "one would have to demonstrate that [the] specific example affected the critical path of the schedule of work." Transcript (Winwood), 2:281:15-17. Leeward further conceded that if any of the issues identified in these emails caused a delay to the critical path, it was required to have asserted a formal Claim within 21 days by providing proper notice to the Architect and AUA. Transcript (Winwood), 2:281:23-282:15.

115.  Robert Winwood identified several issues in his direct testimony (Winwood Statement, ¶¶ 18-26, 30) that he claims caused Leeward delay, including scheduling and sequencing problems, project administration, design issues, late design drawings, and customs

delays, but failed to cite to any formal Claims made by Leeward seeking an extension of the Contract Time for any of these issues.  Transcript (Winwood), 2:283:7-302:14.

116.    For example, Mr. Winwood claimed that contractors hired directly by AUA caused Leeward delay, Winwood Statement, ¶¶ 18-20, and admitted that Leeward could have asserted a claim for delay as a result under Section 6.1 of the General Conditions.  Transcript (Winwood), 2:232:25-234:3; 2:283:7-286:23.  Mr. Winwood also claimed that Leeward had been delayed by the Architect failing to issue design revisions timely, Winwood Statement, ¶¶ 19 and 23-25, and admitted that Leeward could have asserted a claim for delay as a result under Section 8.3. of the General Conditions.  Transcript (Winwood), 2:234:4-235:18.  However, Mr. Winwood conceded that "[t]hese are just examples…of what made the job difficult," and that they had not been issued as a formal Claim.  Transcript (Winwood), 2:296:6-12.

117.    Not only did Leeward concede that the delay examples it cited were not formal Claims, but Leeward also failed to rebut at trial the evidence presented by AUA that Leeward was responsible for such delay.  Col. Antony testified that before the parties executed the Contract Documents, Leeward was already behind schedule.  Leeward was supposed to pour the concrete slab for the Classroom Block in August 2008.  However, the supporting columns Leeward had constructed for that concrete slab were defective and had to be dismantled and rebuilt.  LC 31.  This was the state of works when Leeward agreed to the 52 week construction schedule in September 2008 and issued a schedule to complete its work by April 30, 2009.  Anthony Statement, ¶¶ 90.

118.    Despite Leeward being behind schedule from the beginning, its 52 week schedule staggered the construction of the Classroom and Laboratory buildings, instead of scheduling them to be constructed simultaneously.  Antony Statement, ¶ 91.  Leeward then failed to meet its

33

schedule.  Leeward planned to commence the concrete work on the Classroom Building by the end of October 2008, LC 40, but it did not pour concrete for the Classroom slab until November 22, 2008.  LC 43.  Leeward planned to proceed with pouring concrete for the Laboratory building after it finished the Classroom building, LC 44, but given the delays getting the Classroom building done, that work was pushed back to early January, and further delays pushed the work back to January 31, 2008.  LC 47.  This delay carried through to the rest of the Project, and Leeward never caught up.  Antony Statement, ¶ 92.  In order to complete the work as designed on schedule, Leeward needed to be producing work at a rate that would equate to about EC $3,000,000 per month from November 2008 through April 2009, which it fell far short of achieving.  Antony Statement, ¶ 89.

119.    While Leeward agreed that it would "proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time," General Conditions, § 8.2.3 (AUA Ex. 1 at AUA 000041), the unrebutted evidence reflects that it failed to do so.

120.    Under the Contract Documents, AUA is entitled to Liquidated Damages of US $1,500 for each additional day beyond the Contract Time that it takes Leeward to achieve Substantial Completion.  AUA Ex. 1 at AUA 000006 (Contract, § 3.3.1); Witness Statement of Prabhu Marudheri ("Marudheri Statement"), ¶ 10.

121.    Leeward achieved Substantial Completion on July 31, 2009, 78 days after the May 14, 2009 adjusted Contract Time, resulting in US $117,000 in Liquidated Damages.  Marudheri Statement, ¶ 11.  Leeward contested its liability for, but did not challenge AUA's calculation of, the amount due for Liquidated Damages.

### *Whitsuntide Holiday*

122.    Leeward seeks to recover EC $19,475.40 for monies lost as a result of the Whitsuntide Holiday in July 2009.  LC 216 and LC 218.  The Claim was denied because the holiday fell after the expiration of the Contract Time and would not have impacted the schedule had Leeward met its obligations to complete its Work timely.  Antony Statement, ¶ 122.

### *Overhead and Profits for Finishing Works*

123.    As a result of Leeward's delay in performing the Work, in late April 2009, AUA decided to remove certain of the finishing works from Leeward's scope of Work, including the Doors and Windows Work, the Flooring Work, and the Painting Work.  Antony Statement, ¶ 123.  According to Col. Antony, AUA's hope was that Leeward would be able to focus its resources on completing the structural works, and not concern itself with completing doors, windows, floors, and painting within the Contract Time.  Antony Statement, ¶ 123.

124.    On April 21, 2009, AUA informed Leeward of its decision to remove these finishing works.  LC 48.  Leeward served a Claim on May 12, 2009 seeking its overhead and profits for the Doors and Windows Work and Painting Work removed from Leeward's scope of work, claiming it was entitled to 18% of the amounts set forth in the BOQ for this work.  LC 213.

125.    Had AUA not removed the finishing works from Leeward's scope of work, Leeward would not have achieved Substantial Completion until December 2009, at least 125 days after July 31, 2009.  Under those circumstances, Leeward would have been at risk of an additional US $187,000 in Liquidated Damages, which alone exceeds the amount Leeward seeks in this action for overhead and profits.  Anthony Statement, ¶ 127.

126.   Months after asserting its Claim for overhead and profits, Leeward submitted a proposal to be awarded the Doors and Windows Work and Flooring Work under separate contracts.  Leeward was awarded both contracts on July 13, 2009, a few weeks before Leeward achieved Substantial Completion.  Antony Statement, ¶ 127; LC 228 and LC 229.  Leeward did not enter into a separate contract for the Painting Work.

127.   The Doors and Windows Works awarded Leeward under a separate contract differed significantly from what was detailed in the BOQ.  The BOQ unit rates that serve as the basis for Leeward's claim for overhead and profits (totaling EC $191,090) were provisional and based upon incomplete details.  Antony Statement, ¶ 25; LC 84 at LC003034 ("Rates for door and windows are provisional").  AUA completely changed the materials used.  The BOQ called for U/PVC doors, windows and ventilators, but those were replaced with metal doors and aluminum windows and ventilators.  Transcript (Antony), 5:840:21-841:5.  Moreover, the separate contract was for EC $419,932.68, more than double the provisional amount set forth in the BOQ.  Transcript (Antony), 5:839:14-840:3.  While the new materials were more expensive than those called for in the original design, that did not account for this price increase, as AUA ordered the doors directly, as opposed to ordering them through Leeward, as was to be done under the Contract Documents.  Dickinson Statement, ¶ 86.

128.   AUA performed the Doors and Windows Work and Flooring Work awarded under these separate contracts from July 2009 through December 2009, and was paid in full for the actual work performed, as required under these contracts.  Antony Statement, ¶¶ 128 and 138-139; Nagesh Statement, ¶¶ 45-47.  This work did not impact the critical path of the work Leeward was performing under the Contract Documents.  Antony Statement, ¶ 129.

**From the Conclusion of the Project Through December 2010,
Leeward Claimed Only an Additional EC $1.072 Million Based Upon
the Three Claims Detailed in Mr. Green's October 26, 2009 Letter**

129.     As set forth in FOF Paragraphs 90 to 93 above, at the end of October 2009, AUA

paid Leeward 97.5% of the Contract Sum, based upon the amount that had been agreed upon by

the parties.  At the same time that Leeward received this payment, Mr. Green submitted

Leeward's October 26, 2009 letter threatening to commence arbitration on the three payment

claims that were in dispute, totaling EC $1,072,093.88 in aggregate.

130.     In early November 2009, Col. Antony met with representatives of Leeward,

including Andy Green, in an effort to resolve these three remaining issues identified in Mr.

Green's October 26, 2009 letter and avoid arbitration.  Antony Statement, ¶ 71; AUA Ex. 65 at

AUA002871; Transcript (Green), 3:442:8-444:12.  During those meetings, Leeward only sought

to recover monies based on the three claims identified in Mr. Green's letter.  Leeward never

claimed it was owed anything else under the Contract Documents, nor did it indicate that it was

entitled to be paid the balance of the initial Contract Sum, as it now claims.  Antony Statement, ¶

71.

131.     On November 19, 2009, Col. Antony advised Leeward that the parties were not

going to be able to amicably resolve the three remaining payment claims, and thus "the way

forward is through arbitration."  AUA Ex. 65 at AUA 002870.

132.     In his November 20, 2009 responding e-mail, Mr. Green referenced the three

claims set forth in his October 26, 2009 letter, stated that the "outstanding issues totaling over a

million dollars have not been addressed by yourselves in the past months," indicated that he

already contacted his counsel, and advised Col. Antony that AUA should expect to "hear from

them shortly."  AUA 65; Transcript (Green), 3:446:15-447:6.

133.    Despite Leeward's threats, AUA did not hear from Leeward or its counsel "shortly," and Leeward did not commence the arbitration process "as soon as possible." *See* Transcript (Green), 3:445:17-448:3.

**In December 2010, Leeward Increased Its Claim
By a Factor of Thirteen and Soon After Commenced Arbitration**

134.    Mr. Green did not forward his November 20, 2009 threat of arbitration to his counsel, Lewis & Greer, P.C., until May 2010, six months later. LC 221. On December 17, 2010, 14 months after Leeward issued and received payment on the Draft Final Account and 14 months after Mr. Green confirmed the three payment issues remaining in dispute, Leeward sent AUA and the Architect a demand for final payment in the amount of EC $13,161,136, with a copy being sent to its counsel. AUA Ex. 72.

135.    The December 2010 claim increased, by a factor of approximately 13, the amount that Leeward sought in October 2009. *Compare* AUA Ex. 72 *with* AUA Ex. 33; Transcript (Green), 3:452:22-453:11. Leeward's December 17, 2010 letter did not provide any detail or explanation as to how it arrived at this figure. AUA Ex. 72; Transcript (Green), 3:449:19-451:1; 3:452:22-453:11. Nor did Leeward offer any explanation at trial for this dramatic increase.

136.    Leeward commenced arbitration on February 3, 2011 for this precise amount, in a two page demand letter that also lacked any detail as to the factual basis for Leeward's claims, or any explanation as to how Leeward transformed a payment dispute totaling EC $1,072,093.88 upon the completion of the Project in October 2009 into a claim for EC $13,161,136. Stipulations, ¶ 9.

137.    In October 2011, after being required to submit a more definite statement of its claim, Leeward submitted an Amended Demand for Arbitration. Leeward's Amended Demand

significantly reduced its initial demand from EC $13,161,136 to EC $6,800,572.28.  Stipulations, ¶ 10.  The Amended Demand still failed to detail the factual basis for Leeward's claim.

138.    At trial, Leeward reduced its claim to EC $6,701,390.33, but still did not break down the various components of its claim.  Green Statement, ¶ 51.

139.    Leeward's Witness Statements did, however, reveal for the first time that Leeward was seeking to recover EC $202,943.00 for monies it claims it was not paid under separate contracts that fall outside the scope of the Contract Documents.  Dickinson Statement, ¶ 80; Green Statement, ¶ 51.  This claim included monies allegedly not paid on the separate contracts for the Doors and Windows Work and the Flooring Work.  *Id.*  Leeward was paid in full for all of the work performed under these separate contracts.  Nagesh Statement, ¶ 47.

140.    In its opening statement at trial, AUA presented a detailed chart breaking down the components of Leeward's claim, including its claim under the separate contracts, as follows:

| | LEEWARD'S CLAIMS | EC $6,701,390.33 |
|---|---|---|
| 1. | Omitted Work | EC $1,604,617.00 |
| 2. | Deleted Work Delta | EC $1,718,955.68 |
| 3. | Modified Work Delta | (EC $ 14,294.10) |
| 4. | Additional Preliminaries | EC $955,554.08 |
| 5. | Change Order Delta | EC $190,210.19 |
| 6. | Claims Delta (Whitsuntide) | EC $19,475.40 |
| 7. | Cash Allowance Double Count | EC $1,000,000.00 |
| 8. | Overhead & Profits | EC $350,775.96 |
| 9. | Separate Contracts | EC $202,943.00 |
| 10. | Retainage | EC $590,083.00 |
| 11 | ABST Error | EC $83,059.56 |

141.    Leeward did not dispute this breakdown at trial.[6]

---

[6]   Leeward's Claim of EC $6,701,390.33 and the total of the components listed above differ by about EC $9.00, but that discrepancy is due to rounding errors in the BOQ. *See* AUA Ex. 24.

## II.   CONCLUSIONS OF LAW

### A.   Leeward Failed to Satisfy the Contractual Preconditions to Commence an Arbitration under the Contract Documents.

1.     A "Claim" is a defined term in the Contract Documents.  It is "demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract."  AUA Ex. 1 at AUA 000034 (General Conditions, § 4.3.1).  A "Claim" also includes "other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract."  *Id.*

2.     The contractual preconditions for asserting a Claim and initiating a demand for arbitration with respect to a Claim not resolved favorably are set forth with particularity in the General Conditions.

3.     "Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later."  AUA Ex. 1 at AUA 000034 (General Conditions, § 4.3.2).

4.     "Claims must be initiated by written notice to the Architect and the other party." *Id.* § 4.3.2.  "Written notice shall be deemed to have been duly served if delivered in person to the individual or a member of the firm or entity or to an officer of the corporation for which it was intended, or if delivered at or sent by registered or certified mail to the last business address known to the party giving notice."  AUA Ex. 1 at AUA 000051 (General Conditions, §13.3.1).

5.     Compliance with the 21-day notice of claim requirement is a condition precedent to resolution of any Claim.  American courts interpreting the same 21-day notice provision at issue here have ruled that strict compliance with the notice provision is a condition precedent,

41

and the failure to provide written notice timely constitutes a waiver of that claim. *Kingsley Arms v. Sano Rubin*, 16 A.D.3d 813, 814 (N.Y. App. Div. 3d Dept. 2005); *American Nat'l Elec. Corp. v. Poythress Comm. Contractors Inc.*, 604 S.E. 2d 315, 317 (N.C. Ct. App. 2004) (holding delay claim was time-barred because the claimant was admittedly aware of grounds for its claim in April but did not notify defendant of the claim in writing until September)[7].

6.     Courts bar untimely claims because the plain and unambiguous language of notice provisions must be given effect. *American Nat'l Elec. Corp. v. Poythress Comm. Contractors Inc.*, 604 S.E. 2d 315, 317 (N.C. Ct. App. 2004). Express provisions in a building contract "must be literally met or exactly performed in order to create liability on the contract, and the fact that nonperformance of the condition or incomplete performance of it has caused no injury to the promisor is immaterial." 13 Lord, Williston on Contracts 38:6.

7.     Mr. Green virtually admits Leeward's inattention to and failure to observe the contractual Notice of Claim procedures, and contends, contrary to well-established law, that precision in asserting claims does not matter.

> Perhaps the issues asserted in this arbitration were not articulated in the exact same manner in Leeward's claims on the Project. That does not change the fact the claims were filed and all of the issues raised herein were raised through Leeward's Project claims.

Green Statement, ¶ 46; *E.g., Kingsley*, 16 A.D.3d at 814 (in dismissing claims for failing to strictly comply with same 21-day notice provision at issue here, Court rejected the argument that "defendant was generally aware, from oral conversations, that there were delays which induced additional costs to plaintiff," and held that failure to strictly comply with the "condition precedent" was a "waiver of the claim.").

---

[7] Unless otherwise noted, the American cases cited herein are cases construing AIA forms or contractual provisions used in AIA forms. Because the AIA forms are designed to be, and typically are, used in American construction, we also cite to some non-AIA American cases and treatises for general principles of contract and construction law in America that typically govern the interpretation of AIA forms.

### *Leeward Did Not Comply with the 21-Day Notice Provision.*

8.      Leeward's largest Claim is to be paid for work it did not perform, *i.e.*, Omitted Work and Deleted Work, on the theory that the deductions were not documented by formal Change Orders in the manner provided in Article 7 of the General Conditions.  As set forth in FOF Paragraphs 77 to 93, after achieving Substantial Completion, Leeward sought and was paid 97.5% of the Contract Sum in October 2009.  This amount was based, in part, on the Measured Works actually built by Leeward, and the additional work and charges that AUA agreed, and the Architect certified, to be due and owing.  *Compare* AUA Ex. 30 *with* AUA Ex. 21.

9.      Leeward did not seek to be paid for any of the items in the initial BOQ that had been omitted or deleted from its scope of work, as those deductions to the Contract Sum had already been agreed upon.  *See* AUA Ex. 21; FOF ¶¶ 49-69; 80-83.

10.      Leeward was aware of the amount AUA was going to pay it on the Draft Final Account on October 22, 2009 (AUA Ex. 22), and was paid that amount days later.  If Leeward believed it was entitled to any other monies under the Contract Documents, it had 21 days thereafter to make such a Claim.

11.      On October 26, 2009, Leeward specifically identified three unresolved claims – its Claim for Additional Preliminaries, its Claim for Overhead and Profits, and its Claim for the Whitsuntide Holiday, totaling EC $1,072,093.88.  AUA Ex. 33.  Leeward did not initiate a Claim contending that it was entitled to any other monies under the Contract Documents at that time or any time within the next 21 days.  *See* FOF ¶¶ 129-130.

12.      Leeward did not assert such a Claim until December 17, 2010, 14 months later.  AUA Ex. 72.

13.     Because Leeward failed to assert a Claim timely in accordance with Section 4.3 of the General Conditions, these claims are barred.

14.     Leeward also did not assert its Claim for Additional Preliminaries timely.

15.     As set forth in FOF Paragraphs 92 to 102, Leeward's Claim for Additional Preliminaries is based upon AUA's alleged failure to provide Leeward with Non-Productive Overtime, resulting in its inability to complete its Work within the Contract Time.  Leeward initiated this Claim on May 11, 2009, three days before the end of the Contract Time, but clearly was aware that AUA had denied it access to overtime long before that time.  LC 206 (in a January 2009 email, Dickinson tells Col. Antony "[Leeward's] attempts to bring the original programme back on line have consistently been frustrated and hampered by your direct refusal to meet with the requirements necessary ... includ[ing] ... required overtime." *See generally*, Dickinson Statement, ¶ 50; Winwood Statement, ¶ 17.  Leeward also knew, long before May 11, 2009, that it was not going to be able to complete its Work within the Contract Time. *E.g.*, LC 206; LC 227 (Revised Programme circulated in January 2009 extending work into June 2009).

16.     Claims for an extension of the Contract Time and increases in the Contract Sum are subject to the 21-day notice provision.  AUA Ex. 1 at AUA 000034-35 (General Conditions, §§ 4.3.5 and 4.3.7).  Leeward conceded as much at trial.  FOF, ¶ 103.

17.     Because Leeward did not initiate a Claim for Additional Preliminaries within the time limits of Section 4.3 of the General Conditions, this Claim is barred.

18.     Finally, as set forth in COL Paragraphs 29 to 44, the parties waived formal adherence to the Change Order formalities in Article 7 of the General Conditions.  This waiver, however, does not relieve Leeward from its duty to adhere to the formalities of the Claims Procedure detailed in Article 4 of the General Conditions.

44

19.     A waiver of one provision does not affect obligations contained in other provisions. *American Cont'l Life Ins. v. Rainer Constr.*, 607 P.2d 372, 374-75 (Az. 1980) (even if there is an extensive course of conduct justifying waiver of the change order provision, the other requirements of the contract are not therefore waived); *Besseler Waechter Glover & Co., Ltd. v. South Derwent Coal Co., Ltd.,* 59 Lloyd's List Law Report 104, 108 (King's Bench 1937) (forbearing to insist on a right in the contract leaves "the original contract remain[ing] unaffected, and the obligation to deliver and accept the full contract quantity still continu[ing]."); Sean Wilken, Wilken and Villiers: The Law of Waiver, Variation and Estoppel 2d ("Wilken"), § 3.10 ("although a party may be forced to accept different performance under the contract by virtue of a waiver, the obligations under the contract have not in fact changed.").

### Leeward Did Not Make a Demand for Arbitration in a Reasonable Time.

20.     The party asserting a Claim is responsible for substantiating the Claim in its Claim submission. AUA Ex. 1 at AUA 000034 (General Conditions, § 4.3.1). Claims are initially referred to the Architect for decision. AUA Ex. 1 at AUA 000036 (General Conditions, § 4.4). "Any Claim arising out of or relating to the Contract … shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration." AUA Ex. 1 at AIA 000036 (General Conditions, § 4.6.1).

21.     "A demand for arbitration shall be made … within a reasonable time after the Claim has arisen…." AUA Ex. 1 at AIA 000036 (General Conditions, § 4.6.3). A demand is made by filing the demand in writing with the American Arbitration Association and the Architect. AUA Ex. 1 at AUA 000036 (General Conditions, § 4..6.2).

22.     Courts applying this provision in AIA form contracts differ as to how many months constitute a reasonable time, but the breaking point is in the six month range. *See Lyons v. Krathen*, 368 So.2d 906, 908 (Fla. Dist. Ct. App. 3d 1979) ("[demand made] nine months after

the first written notice ... has not been filed within a reasonable time"); *Riggi v. Wade Lupe Constr. Co.*, 176 A.D.2d 1177 (App. Div. 1991) (six months found reasonable); *Bickerstaff v. Frazier*, 232 So. 2d 190, 191 (Fla. Dist. Ct. App. 1st 1970) (five months found unreasonable). Here, Leeward waited far longer than six months to demand arbitration.

23.     As stated above, Leeward's Claim for anything allegedly due under the Contract Documents not included in the Draft Final Account arose no later than the end of October 2009, when Leeward completed its Work and received payment on the Draft Final Account amounting to 97.5% of the Contract Sum.

24.     Because Leeward did not file a demand for arbitration until February 3, 2011, 15 months later, it failed to demand arbitration in a reasonable amount of time, and thus the Claims initiated on December 17, 2010 are not only barred under the 21-day notice provision, but also because Leeward waited unreasonably long to file an arbitration demand.

25.     Leeward also failed to commence arbitration on its other Claims in a reasonable time. Leeward initiated its Claim for Additional Preliminaries on May 11, 2009 (LC 211), its Claim for Overhead and Profits on May 12, 2009 (LC 213) and its Claim for the Whitsuntide Holiday on June 2, 2009 (LC 216).  Leeward reiterated each of these Claims on May 29, 2009 and threatened to commence arbitration promptly.  It did not.

26.     Leeward once again reiterated each of these Claims on October 26, 2009, and once again threatened to commence arbitration promptly.  AUA Ex. 33.  Leeward reiterated its threat to commence arbitration "as quickly as possible" in November 2009.  AUA Ex. 65.  It still did not.  Had Leeward followed through on its threat, it would have commenced arbitration roughly six months after giving notice of these Claims.

27.     However, Leeward did not file its demand for arbitration until more than a year later, on February 3, 2011, which was at least 20 months after its Claims for Additional Preliminaries, Overhead and Profits, and the Whitsuntide Holiday arose, and 15 months after Leeward completed its Work on the Project.  This delay is patently unreasonable.

28.     Because Leeward failed to file its demand for arbitration in a reasonable time, these Claims are barred as well.

### B.     The Parties Waived the Use of Change Orders in the Specific Manner Set Forth in the Contract Documents, And Replaced It With the Monthly Payment Applications, Which Thoroughly Documented All Additions and Deductions to the Contract Sum.

29.     Leeward contends that it is entitled to be paid for work it did not perform on the theory that the Contract was a Stipulated Sum contract with a set Contract Sum, "subject to additions and deductions pursuant to the Contract Documents," and those adjustments could only be made by Change Orders or Construction Change Directives issued in the manner detailed in Article 7 of the General Conditions.

30.     However, the testimony at trial conclusively demonstrated that the Contract is not a flat fee contract, and that Leeward was only entitled to be paid for its Work "as built" based on the "final measure."  FOF ¶¶ 68-69.  Thus Leeward's argument rises and falls on whether the parties' practice of documenting additions and deductions through the monthly measurement and requisition process rather than issuing Change Orders in the manner specified in the Contract Documents entitles Leeward to a windfall.

31.     As set forth in FOF Paragraphs 40 to 76, the parties waived the formal procedures detailed in Article 7 of the General Conditions in favor of an alternative method to document "additions and deductions" to the Contract Sum, as evidenced by their course of conduct

47

throughout the duration of the Project, the documents submitted in evidence, and the consistent trial testimony of both Leeward and AUA witnesses.

32.     It is well recognized, under American and British common law, that parties to a construction contract may waive provisions requiring formal change orders. *Meyer v. Gilmer*, 18 NZLR 129, 136-37 (1899) (owner waived right to refuse payment for additional work on grounds that changes were not documented in written order; directions conveyed orally and documented in certificates for progress payments)[8]; Wilken, § 19.13 (citing *Meyer v. Gilmer*); *Circle Y Const., Inc. v. WRH Realty Serv.*, 721 F.Supp.2d. 1272, 1274-1279 (N.D. Ga. 2010) (in context of AIA form contract, ruling that scope of work was validly increased despite lack of change orders), *aff'd*, 2011 U.S. App. LEXIS 10629 (11th Cir. May 24, 2011); Michael T. Callahan, Construction Change Order Claims 2d § 4.04 at p. 95 (2005) ("Like any contract requirement, the requirement for written change order may be waived by a party.").

33.     At common law, a contractual provision is waived when a party represents, in word or deed, that it 1) will forbear to enforce a right it holds by that provision or 2) that it will not insist on the other party's performance of an obligation under that provision, and the other party acts accordingly. Wilken, § 3.15; *Motor Oil Hellas (Corinth) Refineries SA v. Shipping Corp. of India ("The Kanchenjunga")*, 1 Lloyd's Rep. 391, 397-98 (House of Lords 1990) (explaining that waiver occurs when a party forbears from exercising a right upon the other party's breach); 1 Chitty on Contracts ("Chitty"), § 22-040 ("Where one party voluntarily accedes to a request by the other that he should forbear to insist on the mode of performance

---

[8]  The Contract Documents are governed by Antiguan Law. Antigua is an independent state, having formally disassociated from the British Commonwealth but nevertheless retaining British heritage in its legal system. As the vast majority of the West Indies island countries have the same heritage, nine of these countries have joined as members of a superior court system called the Eastern Caribbean Supreme Court ("ECSC"). As a common law state, Antigua's law is comprised of statutes, case law, and the English common law. Law cited in ECSC decisions often comes from other decisions from anywhere in the ECSC system, as well as from the larger body of British case law and that of its current and former colonies.

fixed by the contract, the Court may hold that he has *waived* this right to require that the contract

be performed in this respect according to its original tenor")(emphasis in original); *Besseler,*

*supra*, 59 Lloyd's List Report at 108.  *See Meyer v. Gilmer*, 18 NZLR 129, 136-37.

34.     The parties' conduct, or course of dealing, can constitute a waiver of change order

formalities.  *Meyer*, 18 NZLR at 136 (finding waiver of change order formalities in parties'

course of dealing); *Schmulbach v. Caldwell*, 196 F. 16, 23-24 (4th Cir. W. Va. 1912) (non-AIA

case; concluding that "by course of conduct [there was] a waiver of the terms of the contract,"

given that "neither of the parties were adhering strictly to all of the terms of the contract in

respect to these items of extra work," for "which [it] would have been impracticable for the

architects to have given a written order."); *Brockman v. Soltysiak*, 49 S.W.3d 740, 745 (Mo. Ct.

App. 2001) (non-AIA case; "Habitual acceptance of work done on oral change orders in

connection with a contract, and payment therefore, results in waiver of a contract clause

providing that all orders must be signed."); *Moore Constr. Co., Inc. v. Clarksville Dep't of Elec.*,

707 S.W.2d 1, 12-13 (Tenn. Ct. App. 1985) ("the waiver of written change order requirement …

may be the result of the parties' conduct.").  *See* Wilken, § 4.07; Chitty, § 22-041 ("A waiver

may be oral or written or inferred from conduct.").

35.     Conduct constitutes a waiver if, in light of all circumstances, it clearly evinces a

party's decision to forbear from insisting on its rights.  Wilken, §§ 4.07-4.08.  *See, e.g., Bremer*

*Handelsgesellschaft v. C. Mackprang Jr.*, 1 Lloyd's Rep 221, 230 (Court of Appeal 1979).

36.     In commercial circumstances, a party's conduct constitutes a waiver where the

party "persists in the residual contractual relationship" and/or continues to accept benefits arising

therefrom, notwithstanding the other party's nonconforming performance of an obligation.

*Bremer* at 230; Wilken, § 4.08 (unequivocal conduct constituting a waiver includes "[v]oluntary

acceptance after breach of benefits arising from the contract"). Courts recognize that "insistence on full performance may be commercially inexpedient and may prove less profitable than the result of relaxing the right to and the demand for strict performance." *Bremer* at 230; *see Meyer v. Gilmer*, 18 NZLR 129, 136-37.

37.     When an AIA form contract is used, the parties' course of dealings is the most important factor in interpreting ambiguities or replacing provisions that were waived. *Fletcher v. Laguna Vista Corp.*, 275 So.2d 579, 580-1 (Fla. Ct. App. 1st 1973) (ruling that the parties replaced the change order formalities of the AIA general conditions with a process that simply gave the architect the "final authority" to authorize increases and decreases in the contract sum). *See also Meyer v. Gilmer*, 18 NZLR 129, 133-36 (ruling the parties waived formal requirements for adjusting scope of work, and the price was set through their informal method of making alterations and paying for the work as built at each progress payment).

38.     The parties may validly modify the scope of work through an informal method rather than the formal method in the contract. *Meyer v. Gilmer*, 18 NZLR 129, 133-36 (defendant could not withhold portion of as built contract sum on the basis of lack of formal change orders where it routinely sought modifications in the scope and then issued periodic progress payments equaling cost of project as built); *Circle Y Const.*, 721 F. Supp. 1272, 1278 (the parties may modify the scope "through their course of conduct and regular business practices") (quoting *American Car Rentals, Inc. v. Walden Leasing*, 469 S.E.2d 431, 433 (Ga. App. 1996)); Wilken, § 19.13 ("[T]he waivor loses … the right to contest payment where the work had not been certified as per the contract.)

39.     As detailed in FOF Paragraphs 40 to 76, here Leeward knowingly waived the formal Change Order process detailed in the Contract Documents by its conduct. *See Meyer v.*

*Gilmer*, 18 NZLR 129, 136 (finding the owner knowingly waived the contract formalities, reasoning that the owner "must be presumed to have known the terms of his own contract, and [to] have known that no orders had been given in writing.").

40.     That is not to say that the parties failed to document "additions and deductions" to the Contract Sum. On the contrary, these adjustments were detailed in the monthly Payment Applications. Every addition, deduction, and modification was accounted for by the parties in each monthly payment application. Antony Statement, ¶¶ 30-34; Dickinson Statement, ¶¶ 47 and 55; Transcript (Dickinson), 1:112:4-20. At the end of the Project, Leeward submitted its Draft Final Account seeking to be paid 97.5% of the adjusted Contract Sum, confirming its understanding and acknowledgment that the absence of formal Change Orders was not material.

41.     At that time, Leeward did not seek to be paid for the work it did not perform, nor did Leeward assert that it was entitled to such payment on the theory that AUA failed to comply with the formalities of Article 7. It was not until December 2010, 14 months later (and after engaging counsel), that Leeward belatedly sought to be paid for work it did not perform and to enforce the contractual formalities for change orders.

42.     A party that waives a provision of a contract loses "his right to require that the contract be performed in this respect according to its original tenor," and cannot recover it (*i.e.*, revoke his waiver) except with adequate notice in limited circumstances. Chitty, §§ 22-040 and 22-043; Wilken, § 4.01 (the waiving party's "choice of future remedies arising from the [other party's] default [on a provision] will be curtailed."); *Moore Constr. Co.*, 707 S.W.2d at 13.

43.     Where the parties implement an informal method, a party acts in bad faith if it disregards the informally adjusted contract sum and insists that the parties needed to follow textual formalities. *Circle Y*, 781 F.Supp.2d at 1281-82.

44.     In sum, Leeward is not entitled to be paid for what it did not build, and thus those portions of its arbitration demand based upon the Omitted Work (EC $1,604,617), Modified Work (- EC $ 14,294.10), and the Deleted Work Delta (EC $ 1,718,955.68) should be denied.

###     C.     The Change Order Delta and Cash Allowance Double Count.

45.     Leeward seeks to recover in this arbitration the total amount of Change Orders it initially sought in the Draft Final Account, EC $1,422,219.10.

46.     After reviewing the Draft Final Account with the Architect to account for the work Leeward actually performed, Leeward reduced its Change Order total to EC $1,232,008.91 and was paid that amount.  AUA Exs. 21 and 22.

47.     Leeward did not seek to be paid the EC $190,210.19 difference (the "Change Order Delta") in Mr. Green's October 26, 2009 letter, and cannot seek payment now.

48.     As set forth in FOF Paragraph 76, Leeward also is not entitled to recover the EC $1,000,000 Cash Allowance Double Count.  The Cash Allowance was included in the initial EC $27,436,824 Contract Sum, and was to be drawn against to pay for additional costs for, among other things, changes, overtime, scaffolding and craneage.  Leeward drew down the entire Cash Allowance account and was actually paid an additional EC $1,262,166.51 for these contingent costs.

49.     However, because Leeward's Claim seeks to recover the initial EC $27,436,824 Contract Sum, plus all additional costs assessed (including the EC $2,262,166.51 in contingent costs it was paid), it seeks to recover the EC $1,000,000 Cash Allowance account twice.

**D.      Leeward Failed to Substantiate its Claim for Delay (Additional Preliminaries).**

50.      Even if the Tribunal were to find that Leeward initiated its Claim for Additional Preliminaries timely and commenced arbitration in a reasonable amount of time, Leeward's Claim for Additional Preliminaries is still subject to dismissal because Leeward did not prove that AUA was responsible for the delay, nor did it prove the amount of the delay and the resultant costs with particularity.

51.      Robert Winwood confirmed that to assert a Claim for an extension of the Contract Time under General Conditions, § 4.3.7, Leeward "would have to demonstrate that [the] specific example affected the critical path of the schedule of work." Transcript (Winwood), 2:281:15-17. Mr. Winwood's testimony is consistent with the Commentary on AIA Document A201-1997, which provides that "[o]nly delays impacting the critical path of the work entitles the contractor to additional time," in its comments on § 4.3.7. *See* p. 40.

52.      The claimant must identify the specific sources of actual delay. "Detailed evidence of delay and disruption" caused by specific events is necessary; "generalities," such as claiming "vast amounts of disruption," "utter confusion," or an "impossible situation," is not sufficient. *McAlpine Humberoak Ltd. v. McDermott Int'l Inc.*, 58 Build LR 1, 12 (Eng. Ct. of App. 1992); *Walton Const. Pty. Ltd. v. Illawarra Hotel Co. Pty. Ltd.* 2011 NSWSC 534 at [33] (Supreme Ct. New S. Wales 2011); *Kane Constr. v. Sopov*, 2005 VSC 237 at [673-74] (Supreme Ct. Victoria 2005); Barry B. Bramble & Michael T. Callahan, Construction Delay Claims 3d ("Bramble & Callahan"), § 11.01 ("Proof of the delay and its impact on the performance schedule is the claimant's burden.").

53.      A complex dispute involving multiple sources of delay requires scrutiny of programmes and progress reports to demonstrate the sources of delay on which a claim for

damages is based. *McAlpine* at 12-15; *Walton Const.* at [33]; *Kane Constr. v. Sopov* at [673-74]. "Inevitably, extension of time claims involve the immersion of the court in the minutiae of the building site." *Kane Constr.* at [680]

54.     A contractor seeking delay damages must "present a drawing by drawing, beam by beam, column by column, gutter by gutter factual analysis to show how a particular event had the effect of delaying other identified work." *Walton Constr.* at [33]; *Kane Constr.* at [675]. That is, the claimant must, with particularity, link each action causing delay to an identifiable period of delay.  It must show that a specific amount of delay is attributable to each certain act of delay. *E.g., McAlpine* at 28.

55.     A method with sufficient detail and factual support to "withstand [an] audit" is required. *See* Bramble and Callahan § 12.01.  Courts look for claimants to rely on schedules, critical path analysis, and expert testimony based on logical assumptions and equations. *See generally, id.*, §§ 11.01-11.04. *E.g., Kane Constr.*, at [676-728] (reviewing each delay claim presented through expert testimony in detail and ruling individually on whether there was sufficient evidence of actual delay caused).

56.     Leeward fell woefully short of the above standards.  First, Leeward failed to demonstrate that AUA was responsible for Leeward's failure to complete its Work within the Contract Time.  Leeward's Claim is based on AUA's alleged failure to provide Leeward with access to an EC $500,000 Non-Productive Overtime account.  As set forth in FOF Paragraph 111, AUA rejected Leeward's demand that such account be included in the Contract Documents, and none ever was.  More importantly, however, Leeward failed to demonstrate how the denial of overtime caused delay, and if so, how much.

57.     Leeward made no effort at trial to demonstrate how each alleged denial of overtime impacted the critical path of the construction schedule, as it was required to do.

58.     While Leeward alleged that a number of other issues caused it delay, such as customs delays, lack of a construction schedule, late design drawings and interference with other contractors, Leeward conceded that these events did not give rise to a Claim for an extension of the Contract Time, and were merely examples of the problems Leeward alleged it was having performing its Work.  FOF, ¶¶ 113 to 116.  In any event, Leeward failed to demonstrate how these individual issues impacted the critical path.

59.     Moreover, the evidence presented at trial demonstrated that Leeward was responsible for at least some of the delay it claims to have experienced.  FOF, ¶¶ 117 to 118. Leeward did not differentiate between the delay it caused and the delay it alleged was caused by AUA, and did not connect either to the critical path.

60.     For all of the above reasons, Leeward is not entitled to its Claim for Additional Preliminaries.

**E.     Leeward's Claim for the Whitsuntide Holiday Was Properly Rejected.**

61.     While Leeward's Amended Demand contends that Leeward was not paid a total of $181,847.52 in "Claims," the evidence at trial conclusively established that Leeward was paid all but EC $19,475 of that amount, and this unpaid portion is attributable to the Whitsuntide Holiday.

62.     The Whitsuntide Holiday at issue occurred on June 1, 2009, after the expiration of the Contract Time.  Had Leeward been granted an extension of the Contract Time by AUA or demonstrated in this arbitration that AUA caused delay that prevented Leeward from completing its work timely, Leeward's Whitsuntide Claim might have some merit.  However, because Leeward was not granted an extension of the Contract Time and, as set forth above, that decision

was appropriate, Leeward is not entitled to recover on this Claim. *E.g., Kane Constr.*, at [697-704] (rejecting specific delay claims based on events that occurred after the date of practical completion).

**F.   AUA is Entitled to Liquidated Damages Because Leeward Failed to Achieve**
<u>**Substantial Completion within the Contract Time.**</u>

63.   A contractor who fails to complete its work on time becomes liable for liquidated damages, which will be assessed to the extent the contractor cannot prove an excuse for its delay. AUA Ex. 1 at AUA 000006 (Contract, § 3.3.1).  As demonstrated in COL Paragraphs 50 to 60, above, Leeward failed to excuse its delay in completing its Work within the Contract Time.

64.   A liquidated damages clause is to be strictly enforced as long as it constitutes a reasonable estimate of damages that were difficult to predict at the time of contracting. *Carrothers Constr. Co. v. City of S. Hutchinson*, 288 Kan. 743, 754-759 (Kan. 2009) (enforcing AIA Form A101 liquidated damages clause).  For large construction projects, a liquidated damages clause is warranted because of the difficulty of predicting the magnitude of damages that may arise. *Id.* at 756.

65.   A party challenging the validity of a liquidated damages clause bears the burden of proving that it is an unreasonable, unwarranted "penalty." *Id.* at 755.  Leeward has not submitted any evidence that the liquidated damages provision is unenforceable.

66.   Here, the parties agreed that AUA would suffer financial damage if Leeward did not complete the project on time, and that AUA would be entitled to liquidated damages of US $1,500 each day beyond the Contract Time it took Leeward to achieve Substantial Completion. AUA Ex. 1 at AUA 000006 (Contract, § 3.3.1).

67.     As set forth in FOF Paragraphs 119 to 121, Leeward achieved Substantial Completion on July 31, 2009, 78 days after the expiration of the Contract Time. Thus, AUA is entitled to US $117,000 in Liquidated Damages (US $1,500 * 78 days).

### G.     Leeward is Not Entitled to Overhead and Profits for the Doors and Windows Work and the Painting Work.

68.     Leeward contends it is entitled to overhead & profits for the Painting Work and the Doors and Windows Work, calculated to be 18% of the amounts set forth in the BOQ, based on Section 7.3.7 of the General Conditions. Even if Leeward commenced arbitration of this claim in a reasonable amount of time, it is not entitled to recover Overhead and Profits.

69.     With respect to the Doors and Windows Work, Leeward is not entitled to overhead and profits because the amounts set forth in the BOQ were provisional in nature and the specifications changed dramatically. In other words, Leeward is seeking to be paid 18% of a provisional sum for work never performed.

70.     Leeward also is not entitled to overhead and profits for the Doors and Windows Work because Leeward entered into a separate contract to install the newly designed doors and windows. LC 228. Leeward earned overhead and profit on the actual work it performed pursuant to this separate contract. Leeward is not entitled to a double recovery.

71.     With respect to the Painting Work, Leeward benefitted from its removal. The Painting Work was last in the sequence of Leeward's Work. Without the burden of performing the Painting Work, Leeward achieved Substantial Completion on July 31, 2009. Had the Painting Work not been deleted, Leeward would have been at risk of being liable for more in Liquidated Damages than it claims to be entitled to recover in overhead and profits. FOF, ¶ 125. Under these circumstance, equity militates against awarding Leeward overhead and profits for the Painting Work.

**H.      The Separate Contracts Are Not Subject to Arbitration and, Even if They Were, Leeward Is Not Entitled To Damages.**

72.      Under both American and British law, a party may not be compelled to arbitrate a dispute that it has not expressly agreed to arbitrate.  *See People v. Coventry First LLC*, 13 N.Y.3d 108, 113 (2009) ("the obligation to arbitrate depends on an agreement to arbitrate; arbitration "is a matter of consent, not coercion."); *Granite Rock Co. v. International Bhd. of Teamsters*, 130 S. Ct. 2847, 2857 (2010) ("Arbitration 'is a way to resolve those disputes -- but only those disputes -- that the parties have agreed to submit to arbitration'"); *Premium Nafta Products Ltd. v. Fili Shipping Co. Ltd.*, 2007 UKHL 40, at [5] (House of Lords 2007)("Arbitration is consensual.  It depends upon the intention of the parties as expressed in their agreement").

73.      The arbitration provision only applies to any "Claim arising out of or relating to the Contract."  AUA Ex. 1 at AUA 000036 (General Conditions § 4.6.1) (emphasis added).

74.      Here, the separate contracts were just that – separate.  They did not arise out of or relate to the Contract, and nothing in the separate contracts evidences an intent that they would be subject to the arbitration provision in the Contract Documents.  *See* LC 228-239; AUA Exs. 41-54.

75.      Even if disputes regarding the separate contracts were subject to the arbitration clause in the Contract Documents, Leeward failed to submit any evidence that it complied with the contractual prerequisites for commencing an arbitration, namely that it initiated a Claim for payment in writing to the Architect and AUA within 21 days from when the Claim arose.

76.      Not only did Leeward fail to provide evidence that it complied with the contractual prerequisites for arbitrating a Claim, as set forth in FOF Paragraph 139, it was not

until Leeward submitted its witness statements in February 2012 that Leeward even made AUA aware that it was seeking to recover monies under these contracts.

77.     In any event, the evidence submitted at trial confirms that Leeward was to be paid based on the actual work performed under each of these separate contracts and Leeward was paid that amount in full.  Nagesh Statement, ¶ 47 and the documents cited therein.

### I.     AUA Does Not Contest Leeward's Right to Recover EC $83,059.56 Attributable to a Mutual Mistake in Calculation Prior Payments.

78.     As AUA noted in its opening statement at trial, the Payment Applications reflect that at the very end of the Project, the parties made a mutual calculation error, resulting in Leeward getting credit for receiving EC $83,059.56 more than it did.  Specifically, AUA approved EC $553,888.27 for payment on September 26, 2009 (exclusive of ABST).  AUA Ex. 19.  However, when Leeward submitted its Draft Final Account, it claimed that it had been paid EC $ 636,947.83 as and for this payment.  AUA Ex. 30 at AUA 000264 (Payment 25).  The difference is EC $83,059.56, roughly the ABST amount associated with Payment 25.

79.     Neither party noticed the error.  *See* AUA Exs. 21 and 22.

80.     While Leeward is entitled to this money, because it never notified AUA of the error, specifically demanded payment, or asserted any Claim to recover this amount, Leeward is not entitled to an "award" of this amount.  AUA will arrange to pay Leeward to correct this small mutual mistake outside the context of this arbitration.

### J.     Leeward is Not Yet Entitled to Retainage.

81.     It is undisputed that AUA still holds EC $590,083 in retainage, representing 2.5% of the Contract Sum, that is ultimately due and owing to Leeward.

82.     AUA's obligation to release the retainage, however, does not arise until Leeward complies with its obligation under Section 9.10.2 of the General Conditions.  Leeward did not

provide any evidence at trial that it provided "an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or the Owner's property might be responsible or encumbered ... have been paid or otherwise satisfied, as required by General Conditions, § 9.10.2(1).  Compliance with this section is a contractual prerequisite to recovering the retainage.  AUA Ex. 1 at AUA 000045 (General Conditions, § 9.10.2) ("Neither final payment nor any remaining retained percentage shall become due until the Contractor submits ... ").

83.    Accordingly, Leeward is not entitled to an award of the retainage.

**K.    AUA Is Entitled to Recover its Fees and Expenses; Leeward is Not.**

84.    In Antigua, which is a part of the Eastern Caribbean Supreme Court system, the general rule is that the unsuccessful party pays the fees and costs of the successful party. *Rochamel Constr. Ltd. v. National Ins. Corp.*, Civ. App. No. 10 of 2003 at [8] (Ct. App. 2003).

85.    However, in deciding which party is to pay costs, the court has discretion to consider certain factors, and must give "regard to all the circumstances." *Rochamel* at [8].  For example, a court is "required to consider whether it was reasonable for a party to pursue a particular allegation or raise a particular issue[,] and whether the claimant gave reasonable notice of intention to pursue a claim." *Rochamel* at [8].

86.    By determining whether a party should be awarded costs in light of these considerations, the court discourages parties "from bringing proceedings or making allegations which are spurious, in the sense that they are unsupported by the evidence." *Rochamel* at [10].

87.    As demonstrated above, Leeward's claims, which increased by a factor of 13 from the time Leeward completed it work until the time to commenced arbitration 16 months, lack merit.  Accordingly, the Tribunal should deny Leeward's claim for attorney's fees and costs.

88.    On the other hand, AUA was required to exert considerable effort, both to decipher Leeward's claims, and then to defend them.  Therefore, the Tribunal should exercise its discretion to award AUA its attorneys' fees and costs in defending the Claims asserted by Leeward.  To the extent the Tribunal awards AUA its attorney's fees and costs, AUA requests that it be permitted to make a separate fee application to the Tribunal.

## CONCLUSION

89.    In sum, the Tribunal hereby dismisses Leeward's Claims based on Leeward's threshold failure to initiate its Claims within the contractual 21-day notice period and/or failure to file this arbitration in a reasonable amount of time.  Leeward also failed to prove any portion of its EC $6,701,390.33 Claim.  Accordingly, Leeward's Claims are denied in their entirety and AUA is awarded US $117,000 in Liquidated Damages to be paid from Leeward's Retainage, together with attorney's fees.[9]

Dated:  April 20, 2012

SILLS CUMMIS & GROSS, P.C.
30 Rockefeller Plaza
New York, New York 10112
(212) 643-7000
*Attorneys for Respondent*

By: _____
     Mark S. Olinsky
     Jonathan S. Jemison

---

[9] Leeward also claimed a right to interest pursuant to Section 13.6 of the General Conditions, which provides that "payments due and unpaid pursuant to the Contract Documents shall bear interest from the date payment is due at such rate as the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time at the place where the Project is located."  AUA Ex. 1 at AUA 000052.  Leeward did not submit any factual evidence at trial as to the amount of interest due and/or the application legal rate.  On March 1, 2012, days before the commencement of the hearing, the Tribunal held the Final Prehearing Conference, during which Leeward raised for the first time its belief that any interest due should be based on the bank rate in Antigua.  The parties agreed that they would deal with the interest issue after the hearing.  Although AUA submits this issue is moot because Leeward is not owed any money, if Leeward seeks to introduce any factual evidence to support its claim for interest, AUA request that the hearing be continued to take evidence on this issue.