# EXHIBIT F

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES

| | |
|---|---|
| LEEWARD CONSTRUCTION COMPANY, Ltd.<br><br>Claimant,<br><br>v.<br><br>AMERICAN UNIVERSITY OF ANTIGUA COLLEGE OF MEDICINE C/O GCLR, LLC,<br><br>Respondent. | Case No. 50 110 T 00075 11<br><br><br>**RESPONDENT'S REBUTTAL OF CLAIMANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The Respondent, American University of Antigua ("AUA"), hereby submits the following Rebuttal Submission ("Rebuttal") to the proposed Findings of Fact and Conclusions of Law submitted by Claimant Leeward Construction Co., Ltd. ("Leeward") on April 20, 2012 ("Leeward's Post-Trial Brief" or "LC Br. ").

## PRELIMINARY STATEMENT

1.      Leeward commenced this arbitration in February 2011 by submitting a laundry list of complaints and demanding EC $13,161,136.88 from AUA.  Leeward did not specify the factual basis for its claims, content to rely upon its general allegations and the argument that all that was required at that early stage of the proceedings was a short statement of its claim.  Even when ordered by the Tribunal to provide a more definite statement -- resulting in halving its original demand -- Leeward still avoided connecting its claims and alleged damages to the evidence.

2.      Leeward no longer has that luxury.  As Claimant, Leeward bears the burden to prove each of its claims through the evidence presented to the Tribunal.  It is therefore incumbent upon Leeward in its Post-Trial Brief to demonstrate that it carried this burden by

detailing the factual evidence to prove each specific claim asserted, and then connecting each claim to the damages Leeward allegedly suffered at the hands of AUA.

3.    Leeward's Post-Trial Brief starts with the same laundry list contained in its original demand (*see* LC Br., ¶ 12), but rather than connecting record evidence (*i.e.*, specific exhibits or trial testimony) to the claims asserted and damages alleged, Leeward submits a collection of sweeping (and usually erroneous) factual allegations and legal conclusions disconnected from the actual evidence presented to the Tribunal.  Leeward barely cites to the record evidence and makes no specific reference to the live testimony taken at the hearing, even though it obtained a copy of the hearing transcript.[1]  Despite the difficulties presented by Leeward's failure to cite record evidence, AUA has identified a substantial number of Leeward's proposed findings of fact that are inconsistent with the actual evidence presented by the parties at the hearing.

4.    By failing to cite record evidence -- *i.e.*, witness statements, oral testimony, and trial exhibits -- to support nearly all of its factual contentions, Leeward evades accountability for their accuracy.  Neither AUA nor the Tribunal can check or challenge an evidentiary citation when none is provided.  And the reason no citation is provided is that, in most instances, no credible evidence exists to support the proposed contention.

5.    Leeward's Post-Trial Brief is not only disconnected from the evidence, but also from its own arbitration demand.  Specifically, through the March 2012 evidentiary hearing, Leeward sought to be paid in full for work it did not perform, namely the Omitted Work and the Flooring Work, asserting that it was entitled to the entire Contract Sum listed in the Contract Documents unless adjusted by change order.  This was the primary issue litigated at the hearing.

---

[1]  Although Leeward refused to share the costs of preparing a stenographic record of the hearing, on March 21, 2012, Leeward advised that it was ordering a copy of the transcript from AUA's Court Reporter.

Six weeks after the hearing, Leeward has now submitted brand new claims to recover the overhead and profits it would have earned on the Omitted Work and the Flooring Work had that work been performed, even though no evidence was presented on these new claims.

6.      The above examples only scratch the surface of the fundamental flaws with Leeward's Post-Trial Brief, but reflect Leeward's practice throughout this arbitration to play fast and loose with the evidence and to use its own inaccuracy as a weapon.

7.      Leeward's evasion of detail in its Post-Trial Brief once again requires AUA to undertake the significant time and expense first to deconstruct Leeward's sweeping assertions, and then, in painstaking factual detail, to demonstrate why Leeward is not entitled to any of the money it now seeks to recover.

8.      As demonstrated in AUA's proposed Findings of Fact and Conclusions of Law ("AUA's Post-Trial Brief" or "AUA Br.") and below, the sharp knife of factual precision slices through Leeward's gauzy submission, demonstrating that Leeward has failed to satisfy its burden of proof, and that its arbitration demand should be rejected in its entirety.

## I.      THE EVIDENCE PRESENTED AT THE HEARING REFUTES LEEWARD'S POST-TRIAL SUBMISSION

9.      As demonstrated below, the pervasive misstatements in Leeward's proposed Findings of Fact misconstrue the evidentiary record.

### A.      Leeward's Flawed Findings of Fact

10.      The primary problem with Leeward's Post-Trial Brief is that it contains statements that are flatly contradicted by record evidence. A clear example is Leeward's continued assertion that AUA failed to pay a total of EC $181,847.52 for costs incurred by Leeward in connection with certain "extra work." LC Br., ¶¶ 80, 104 and 128. The evidence presented at the hearing confirmed that Leeward was paid $162,372.12 of this amount, with the

EC $19,475.40 balance attributable to Leeward's Whitsuntide Holiday claim. *See* AUA's Findings of Fact ("FOF"), ¶¶ 74-75. Leeward made no attempt to rebut AUA's evidence of payment, yet continues to press its claim that it was not paid this money.

11.     Similarly, in Paragraph 129 of its Post-Trial Brief, Leeward contends that "throughout the Project the AUA routinely forced Leeward to accept reductions in its preliminaries costs, including arbitrary reductions in the preliminaries rates." Leeward then claims it was damaged as a result. This statement has two major flaws.

12.     First, the evidence is undisputed that Leeward was not damaged by any rate reductions. Despite Leeward's having spent the good portion of one day of the hearing trying to establish that AUA wrongfully reduced contractually agreed upon preliminary rates in one of the monthly payment applications, AUA established that this dispute was resolved the very next month, and that Leeward was paid all monies at the contractually-agreed upon rates. Transcript (Antony), 4:685:15-690:16 and 5:821:6-825:10. Leeward's counsel conceded as much. Transcript (Antony), 4:696:18-698:5 and 4:700:1-5 ("Yes they got caught and they stopped doing it. But they did and they did get caught … and I don't think there's much more to it").

13.     Second, Leeward's claim for additional preliminaries is limited to the preliminaries it claims it should have been paid for the time spent on the Project after May 14, 2009 (the date when it was supposed to achieve Substantial Completion). *See* LC ¶¶ 112-113. It is not seeking any damages for any reductions allegedly forced upon it by AUA.

14.     Leeward also misrepresents the terms of the Contract Documents in its Post-Trial Brief. For example, Leeward states that "Article 5.1.3 of the Contract requires the AUA to pay Leeward's monthly payment applications by the twenty-second day of each month for applications submitted by the seventh day of the month." LC Br., ¶ 59. Leeward omits the

clause specifically added by the parties to this provision that requires the Owner to agree with the amount of the payment application <u>before</u> the clock begins to run on AUA's time to pay each invoice. This omission is material, as it directly impacts the due date of each payment application, and in turn, Leeward's interest claim on alleged late payments. The omission is also particularly glaring given that during contract negotiations Leeward repeatedly objected, but ultimately relented, to altering Section 5.1.3 to require Leeward to agree with AUA on the payment application before submitting it to the Architect. *See* LC 80 at LC003008.

15.     Leeward's claim for interest highlights another problem with Leeward's Post-Trial Brief -- Leeward's reliance on facts that are not supported by record evidence. In calculating its claim for interest on AUA's alleged late payments, Leeward submits a chart containing the dates AUA allegedly paid each payment application. No evidence was presented at trial to establish the payment dates. While Leeward attempted to submit the chart contained in its Post-Trial Brief as a trial exhibit (LC 245), that proposed exhibit was stricken from the record after AUA objected to its admission, and not admitted in evidence. *See* Post-Hearing Motion on Exhibits, ¶ 1(r).

16.     Finally, Leeward's Post-Trial Brief gets verifiable details wrong. For example, Leeward claims that the Contract Time was extended until May 10, 2009, when the evidence confirms it was extended until May 14, 2009. *See* AUA Ex. 67.

**B.     <u>Leeward's Flawed Alternate Damages Calculations</u>**

17.     Equally flawed are the various charts contained within Leeward's Post-Trial Brief setting forth Leeward's alternative damages theories. *See* LC Br., ¶¶ 162-164.

18.     Leeward's Post-Trial Brief carries forward the same top-down approach to calculating its alleged damages that Leeward employed in its Amended Demand for Arbitration and in Paragraph 51 of Andy Green's Witness Statement. Specifically, Leeward starts with the

original Contract Sum, adds to that all extra work allegedly performed, deducts some (but not all) of the work it did not perform, and subtracts from that total the amount it claims was paid by AUA.

19.     Leeward's top-down analysis ignores the individual components of its claim. Among other things, this results in double-counting.  For example, the evidence at the hearing conclusively established that Leeward drew down the $1,000,000 Cash Allowance account entirely and was paid an additional $1,262,166.51 in contingent costs, resulting in a total payment of EC $2,262,166.51 in contingent costs.  *See* FOF, ¶¶ 38-39, 76.  Leeward accounted for all of these costs in the monthly payment applications it submitted as either Change Orders (*i.e.*, paid overtime) or Preliminaries (*i.e.*, additional craneage and scaffolding).  FOF, ¶¶ 70-76.

20.     Leeward's top-down analysis starts with the initial EC $27,436,824 Contract Sum, which sum includes the EC $1 million Cash Allowance account.  Leeward then adds to the Contact Sum the entire EC $2,262,166.51 in extra costs charged to AUA.  However, because Leeward does not then deduct the EC $1 million in extra costs embedded within the Contract Sum, Leeward's damages calculation is double-counting the EC $1 million Cash Allowance. This fundamental error exists in each iteration of Leeward's damages charts.  *See* LC Br., ¶¶ 130-133, 162-164.

21.     A second flaw is Leeward's treatment of the ABST error.  During its opening, AUA explained its discovery of the mutual mistake that resulted in the parties crediting Leeward with having received EC $83,059.62 more than it actually had been paid.  This error is embedded within Leeward's top-down analysis as one of the components of Leeward's claim for general damages because it is part of the difference between the total amount Leeward claims it should have been paid and the amount it was actually paid.  *E.g.*, LC Br., ¶ 130.  However, in each

iteration of its damages summary chart (LC Br., ¶¶ 162-164), Leeward seeks to recover the ABST error a second time by adding it as a separate line item.

22.    A third flaw with Leeward's damages charts is that each is infected with the damages sought on Leeward's new claims for overhead and profits, which are both procedurally barred and contrary to the record evidence, as demonstrated below.

## II.    LEEWARD FAILED TO SATISFY ITS BURDEN OF PROOF ON EACH ASPECT OF ITS EC $6,701,390.33 CLAIM.

23.    At the hearing, the Tribunal requested that the post-trial submissions not only address the primary issue presented at the hearing -- *i.e.*, whether Leeward was entitled to get paid for work it did not perform -- but also thoroughly explain the basis for the balance of the monies sought by Leeward.  Transcript, 3:515:21-516:21.

24.    As an initial matter, Leeward's Post-Trial Brief does not proffer any evidence adduced at the hearing to demonstrate that Leeward timely asserted each of its claims in accordance with the Contract Documents.  As set forth in AUA's Conclusions of Law ("COL") at ¶¶ 1-28, Leeward either did not initiate each of its Claims timely (*i.e.*, within the 21 day period set forth in the Contract Documents) or did not commence arbitration within a reasonable amount of time.  Having failed to satisfy these contractual preconditions to commencing this arbitration, Leeward's claims must be denied.

25.    Even if Leeward had complied with the contractual preconditions to commencing arbitration, however, its claims still must be denied.  AUA showed a chart during its opening that broke down Leeward's claim into 11 component parts.  That chart provided as follows:

7

| | LEEWARD'S CLAIMS | EC $6,701,390.33 |
|---|---|---|
| 1. | Omitted Work | EC $1,604,617.00 |
| 2. | Deleted Work Delta | EC $1,718,955.68 |
| 3. | Modified Work Delta | (EC $ 14,294.10) |
| 4. | Additional Preliminaries | EC $955,554.08 |
| 5. | Change Order Delta | EC $190,210.19 |
| 6. | Claims Delta (Whitsuntide) | EC $19,475.40 |
| 7. | Cash Allowance Double Count | EC $1,000,000.00 |
| 8. | Overhead & Profits | EC $350,775.96 |
| 9. | Separate Contracts | EC $202,943.00 |
| 10. | Retainage | EC $590,083.00 |
| 11 | ABST Error | EC $83,059.56 |

AUA's Post-Trial Brief demonstrated that Leeward failed to satisfy its burden of proof on each aspect of its claim. We review of each component of Leeward's EC $6,701,390.33 claim below to show that Leeward's Post-Trial Brief does not change that analysis.

### A.   Omitted Work (EC $1,604,617.00)

26.    As detailed in AUA's Post-Trial Brief, the evidence presented at the hearing conclusively established that Leeward was not entitled to be paid for work it did not perform, namely the Omitted Work and the Flooring Work. The evidence further confirmed that the absence of change orders issued in the manner provided in Section 7 of the General Conditions did not warrant awarding Leeward a windfall. This is so because witnesses proffered by both parties and contemporaneous documents confirmed that in lieu of such change orders, the parties tracked adjustments to the Contract Sum through the monthly requisition process. The absence

8

of any claim to the contrary by Leeward during or immediately after the completion of the Project further confirms that Leeward understood it was not entitled to be paid for the work it did not perform. *See* FOF, ¶¶ 16-69, 77-97.

27.     Faced with this mountain of evidence against it, Leeward decided to raise a new claim for the first time in its Post-Trial Brief. Specifically, Leeward contends that if it is not entitled to be paid for work it did not perform, it should at least be awarded the overhead and profit it would have earned on that work pursuant to Section 7.3.7 of the General Conditions. Leeward attempts to sneak this new claim into one paragraph of its proposed Findings of Fact (LC Br. ,¶ 84) and one paragraph of its proposed Conclusions of Law (LC Br., ¶ 133), despite the fact that Leeward did not previously assert such a claim and no evidence was presented in support of it at the hearing. As detailed below, Leeward's claim for Overhead and Profits was, at all times, expressly limited to the Painting Work and the Doors and Windows Work. Similarly, at all times, Leeward only sought to be paid in full for the Omitted Work.

28.     Leeward's new claim for Overhead and Profits on Omitted Work is barred by the terms of the Contract. Pursuant to Section 4.3.2 of the General Conditions, "Claims" must be initiated promptly, *i.e.*, "within 21 days from the claimant knowing he's got a claim to claim for." Transcript (Winwood), 2:239:3-11. Leeward understood that if a Claim was not asserted promptly, it would be waived. Transcript (Winwood), 2:242:3-243:4.

29.     The Contract Documents further provide that any Claims asserted by Leeward must be formally served by written notice to the Architect and AUA in the manner proscribed in the Contract Documents. AUA Ex. 1 at AUA 000051 (General Conditions, § 13.3.1).

30.     While Leeward did assert a Claim to recover Overhead and Profits on the Painting Work and Doors and Windows Work that AUA deleted from the Contract, that Claim was

expressly limited to these two areas of the Project, nothing more. *See* LC 213.  Leeward did not

then, and has not since, asserted a Claim to recover its Overhead and Profits on the Omitted

Work (*i.e.*, the work removed from Leeward's scope of work due to design changes and/or site

conditions).

      31.     When Leeward submitted its Draft Final Account in October 2009 and sought

97.5% of the Contract Sum, it sought neither to paid in full for the Omitted Work nor to be paid

18% as and for its Overhead and Profits on the Omitted Work.  Leeward knew then that AUA

was not paying Leeward any compensation for the Omitted Work (including Overhead and

Profits). *See* AUA Ex. 21 at AUA 002905 to AUA 002933.  At best, Leeward had 21 days from

its submission of the Draft Final Account thereafter to initiate a Claim to recover its Overhead

and Profits on the Omitted Work.  Leeward did not make such a Claim, and has not submitted

any evidence to the contrary.  Because Leeward failed to assert a Claim for Overhead and Profits

on the Omitted Work within 21 days of its accrual, as required by Section 4.3.2 of the General

Conditions, Leeward has waived the right to do so. *See* Transcript (Winwood), 2:242:3-243:4

("Q: It is important to remind people to assert their claims within 21 days, because if not,

Leeward might waive that claim.  A.  Absolutely.").

      32.     The Contract Documents bar Leeward from asserting a new claim for Overhead

and Profits on the Omitted Work at this late juncture for a separate reason.  Section 4.6.5 of the

General Conditions provides that the "party filing a notice of demand for arbitration must assert

in the demand all Claims then known to that party on which arbitration is permitted to be

demanded."  AUA Ex. 1 at AUA 000037.

      33.     Leeward filed this arbitration on February 3, 2011 seeking EC $13,161,136.88.

Leeward's arbitration claim was vague and confusing, and the itemized list of its claims seemed

to bear no resemblance to what Leeward claimed to remain at issue in Mr. Green's October 26, 2009 letter (AUA Ex. 33).

34.    On September 8, 2011, the Tribunal conducted a Preliminary Hearing. Prior to the Preliminary Hearing, AUA requested that Leeward be required to submit a more detailed and definite statement of its claims and damages because the EC $13,161,136.88 sought by Leeward in arbitration was so inconsistent with the EC $1,071,944.88 claimed by Leeward in October 2009, and the EC $13,161,136.88 demand was neither documented nor cogently explained in Leeward's arbitration demand. Leeward opposed this request, but the Tribunal granted AUA's request and required Leeward to submit a more particularized claim by October 14, 2011.

35.    Leeward submitted its Amended Demand on October 14, 2011. Forced to explain the basis for its various claims, Leeward abandoned a number of them, reducing its demand from EC $13,161,136.88 to EC $6,800,572.28 as detailed in its "Revised Statement of Claim" attached to its Amended Demand.

36.    Neither the Amended Demand nor the Revised Statement of Claim attached thereto asserted a Claim for Overhead and Profits on the Omitted Work. Rather, Leeward's Claim for Overhead and Profits was limited to the "the items of work that the AUA removed from Leeward's contract and awarded other contractors." Amended Demand, ¶ 24. Leeward then specifically referred to its May 12, 2009 Claim (LC 213) and the Deleted Work Summary attached to its Amended Demand as encompassing the scope of this Claim, both of which were limited to the Painting Work and the Doors and Windows Work. *Id.*

37.    The parties then proceeded to litigate the Claims asserted in Leeward's Amended Demand for Arbitration, culminating in a five-day evidentiary hearing. At the evidentiary hearing, Leeward submitted as an exhibit another copy of its claim summary, including the very

same Deleted Work Summary that it attached to its May 12, 2009 Claim and its October 14,

2011 Amended Demand. *See* LC 244. Indeed, at no time during the hearing did Leeward seek

Overhead and Profits on Omitted Work and neither party submitted any evidence in support of or

in defense of such a Claim. Rather, Leeward only sought to be paid the entire EC $1,604,617 in

the Omitted Work that it did not perform. Were Leeward permitted to add this new claim now,

AUA would be deprived of the opportunity to submit evidence in response, as it did not have a

reason to do so at the hearing.

    38.     Because Leeward did not include its new claim for Overhead and Profits for

Omitted Work in its Demand for Arbitration or its Amended Demand for Arbitration, Section

4.6.5 precludes Leeward from doing so now.

    39.     Leeward's claim for Overhead and Profits on Omitted Work is also barred under

the Construction Industry Arbitration Rules of the American Arbitration Association ("CIAR")

that govern this arbitration. See AUA Ex. 1 at AUA 000036 (General Conditions, § 4.6.2).

Specifically, once the arbitrators are appointed, the Rules do not permit a party to submit a "new

or different claim" without the arbitrator's consent. CIAR, R-6(b). Given that Leeward

expressly and repeatedly limited its Overhead and Profits Claim to the Painting Work and Doors

and Windows Work, there can be no dispute that Leeward's claim for Overhead and Profits on

the Omitted Work, asserted for the first time in Leeward's Post-Trial Brief, is a new claim.

    40.     As set forth in Leeward's Post-Trial Brief, this Tribunal was appointed "on or

about June 9, 2011." LC Br., ¶ 9. Leeward never sought the Tribunal's consent to assert this

new claim.

    41.     Not only is Leeward's new claim for Overhead and Profits on Omitted Work

barred on procedural grounds, but -- even though it was not properly presented so as to provide

AUA with a full and fair opportunity to defend against it -- it is still refuted by the record

evidence. The evidence presented at the hearing conclusively established that the parties never

understood Section 7.3.7 of the General Conditions to have the meaning Leeward now urges,

namely that Leeward would be entitled to recover the overhead and profits on all work that it did

not perform, including work removed due to changes in design or site conditions (like the chain

link fence).

42.     First, in his contemporaneous summary of the Contract Documents, Robert

Winwood confirmed that Leeward was to be paid for work "as built" in accordance with the

"final measure." LC 84 at LC003034. Mr. Winwood's summary did not indicate that Leeward

would be entitled to overhead and profits on the difference between the original BOQ and the

"final measure" if the project "as built" required less work than the original design contemplated.

43.     Second, whatever effect Section 7.3.7 might have when not combined with non-

AIA forms or language, the evidence presented at the hearing confirmed that the parties

combined the AIA form documents, which are primarily used in American construction projects,

with a Bill of Quantities, which are primarily used in the United Kingdom and not typically used

with AIA contracts. McLeod Statement, ¶ 21; Transcript (McLeod), 1:137:9-11 and 1:193:17-

194:5.

44.     Both Peter McLeod and Neil Dickinson testified that the parties used the agreed-

upon unit rates in the Bill of Quantities to adjust the Contract Sum upwards or downwards to

account for changes in the scope of the work. Transcript (McLeod), 1:194:11-195:19; Transcript

(Dickinson), 1:99:22-100:2. As Mr. McLeod explained, the BOQ was akin to a "shopping list,"

where the parties agreed upon the price to be paid for each specific item of work the parties

contemplated being performed, and this "shopping list" gave the parties "a very fair way of

determining what you do and don't pay for" when there is a change in the scope of the work. Transcript (McLeod), 1:193:12-16 and 1:194:7-195:5. Neither testified that Leeward was entitled to overhead and profits on the work that was not performed due to changes in design or site conditions.[2]

45.     Third, at no time before Leeward submitted its Post-Trial Brief did Leeward claim it was entitled to Overhead and Profits on the EC $1,604,617 in Omitted Work. Leeward did not make any such assertion in any of its monthly payment applications, in its Draft Final Account, or in the October 26, 2009 letter. *See* AUA Ex. 21; Transcript (Dickinson), 1:101:12-18; AUA Ex. 33. Leeward did not even make such a claim when it submitted its December 17, 2010 claim for EC $13,161,136. AUA Ex. 72.

46.     By way of comparison, exactly 21 days after AUA advised Leeward it was taking away the Painting Work and Doors and Windows Work altogether, Leeward served a written Claim for overhead and profits under Section 7.3.7 detailing the precise amount sought on those specific items of deleted work. LC 213.

47.     Given that Andy Green testified that he wanted Leeward to receive "as much as it is legally entitled to be paid ... as soon as it is legally entitled to be paid" (Transcript (Green), 3:370:6-16), it is inconceivable that Leeward would have withheld seeking its Overhead and Profits on the Omitted Work had it ever believed that it was entitled to them under the Contract Documents.

48.     In sum, Leeward has failed to satisfy its burden of proof on its claim to be paid for work it did not perform, and cannot, at this late juncture, salvage 18% of this amount under the

---

[2]  Leeward seeks to preclude portions of Mr. McLeod's trial testimony to the extent he offers expert, as opposed to fact, testimony. LC Br., ¶¶ 154-161. Specifically, Leeward seeks to bar Paragraphs 23, 24, 25, 28 and 29 of Mr. McLeod's Witness Statement. *Id.* AUA has cited only factual testimony by Mr. McLeod  and is not relying upon any of the challenged testimony in its Post-Trial submissions. Therefore, AUA does not need to, and will not, address Leeward's arguments regarding those portions Leeward claims to be improper expert testimony.

theory that it is entitled at least to be paid its overhead and profits. Leeward is not entitled to any portion of the EC $1,604,617 in Omitted Work.

**B.      Deleted Work Delta (EC $1,718,985.68)**

49.     The Deleted Work Delta consists almost exclusively of the Flooring Work removed from the Contract by AUA. At the hearing, and at all times prior to the hearing, Leeward contended that it was entitled to be paid in full for the Flooring Work in the same manner that it claimed it was entitled to be paid in full for the Omitted Work.

50.     While Leeward agreed that the Contract Sum had been reduced by the Painting Work and Doors and Windows Work deleted from Leeward's scope of work (*see* Amended Demand, ¶ 23; Green Statement, ¶ 51), it refused to treat the Flooring Work in the same manner.

51.     In its Post-Trial Brief, Leeward for the first time admits that the Contract Sum should be reduced to account for the Flooring Work deleted from Leeward's scope of work (LC Br., ¶¶ 86 and 123), but also contends, for the first time, that it was entitled to 18% as and for its overhead and profits on the deleted Flooring Work. *See* LC Br., ¶¶ 127 and 130 (including the Flooring Work in its calculation of Overhead and Profits).

52.     As was the case, however, with Leeward's attempt to recover Overhead and Profits on the Omitted Work, its new claim for Overhead and Profits on the Flooring Work is asserted far too late, in violation of the Contract Documents (Sections 4.3.1, 4.3.2 and 4.6.5 of the General Conditions) and R-6(b) of the CIAR.

53.     Among other things, Leeward did not comply with the 21-day notice of claim provision in the Contract Documents. Leeward's Post-Trial Brief concedes that AUA removed the Flooring Work on April 21, 2009, at the same time it took away the Painting Work and Doors and Windows Work. LC Br., ¶ 36. Yet, when Leeward asserted its Claim for Overhead and Profits on May 12, 2009, the Claim was expressly limited to the Painting Work and Doors and

Windows Work. LC 213. Leeward did not seek Overhead and Profits on the Flooring Work then or at any time thereafter. Given that Leeward did not previously seek to recover its overhead and profits on the Flooring Work, it cannot do so now.

54. Leeward's new claim for overhead and profits on the Flooring Work also fails on substantive grounds. Specifically, Leeward entered into a new contract with AUA to perform the Flooring Work in July 2009. LC 229. Leeward was paid in full for that work and earned overhead and profit on the actual work it performed pursuant to this separate contract. Antony Statement, ¶ 128 and 138-139; Nagesh Statement, ¶¶ 45-47. Leeward submitted no evidence at the hearing to the contrary.

55. In sum, given that Leeward now concedes that the Contract Sum should be reduced by at least EC $3,667,711 to account for all of the work deleted from the contract (*i.e.*, the Painting Work, the Doors and Windows Work and the Flooring Work) (LC Br., at ¶ 86), and given that Leeward's attempt to seek its Overhead and Profits on the Flooring Work is both procedurally barred and substantively wrong, Leeward is not entitled to recover any portion of the EC $1,718,955.68 Deleted Work Delta.

**C.    Modified Work Delta (- EC $14,294.10)**

56. Leeward does not address the Modified Work Delta in its Post-Trial Brief. The evidence submitted at the hearing, however, conclusively established that Leeward was only to be paid for the work it performed "as built" and in accordance with the "final measure." *See* FOF, ¶¶ 23-34. When Leeward submitted its Draft Final Account, it only sought to be paid for the Measured Works "as built." *See generally*, AUA Ex. 21. Leeward is not entitled to any damages as a result of the fact that the "as built" measurements differed from the quantities listed in the initial Bill of Quantities.

**D.**     **Additional Preliminaries (EC $955,554.08)**

57.     In its Post Trial Brief, Leeward contends that it was entitled to be paid EC

$1,985,711.68 over and above the EC $3,906,146 in Preliminaries embedded within the original

Contract Sum as and for its delay damages. LC Br., ¶ 113. According to Leeward, this amount

compensates it for the Preliminaries incurred operating the construction site for an additional 19

weeks beyond the Contract Time. *Id.* Leeward's claim is not supported by the record evidence.

58.     First, Leeward's Post-Trial Brief is unclear as to whether it is seeking to recover

EC $1,985,711.68 or EC $955,554.08 in Additional Preliminaries. The evidence presented at the

hearing conclusively established that Leeward was paid a total of EC $4,936,303.60 in

Preliminaries, which is EC $1,030,157.60 more than the amount provided for in the original

Contract Sum. AUA Ex. 22 at AUA 002855; Antony Statement, ¶ 54. Accordingly, Leeward's

claim is for EC $955,554.08, the precise amount identified by Leeward in Andy Green's October

26, 2009 letter. AUA Ex. 33. *See* Transcript (Green), 3:415:14-419:24.

59.     Second, in order to establish its right to Additional Preliminaries, Leeward must

prove that delays allegedly caused by AUA impacted the critical path and required Leeward to

spend more time to complete its Work. *See* Transcript (Winwood), 2:281:15-17. As set forth in

AUA's Post-Trial Brief, Leeward must "present a drawing by drawing, beam by beam, column

by column, gutter by gutter factual analysis to show how a particular event had the effect of

delaying other identified work." AUA's COL ¶ 54 (citing *Walton Constr.* at [33]; *Kane Constr.*

at [675]).

60.     Leeward's Claim for Additional Preliminaries, as stated in its May 11, 2009

Claim, was limited to its contention that Leeward was deprived access to an EC $500,000 Non-

Productive Overtime account in the Contract Documents that was added to reduce the Contract

Time from 68 to 52 weeks. LC 211. *See* Dickinson Statement, ¶ 18. The evidence presented at

trial conclusively established that this set aside did not exist, as AUA refused to include it in the Contract Documents despite Leeward's request during contract negotiations.  FOF, ¶ 111.[3]

61.     Leeward did not submit any specific evidence at the hearing that the denial of overtime applications impacted the critical path.  In the absence of such evidence, the delay claim actually asserted by Leeward must be denied.

62.     Third, Leeward's Post-Trial Brief essentially abandons its "non-Productive Overtime" claim in favor of a series of proposed factual findings regarding other alleged delay issues, none of which cite to record evidence.  LC Br., ¶¶ 106-111.  Among other things, Leeward contends that its performance of the Contract work was delayed by unanticipated weather conditions, design changes, delays in issuing design drawings, delays in endorsing customs documents, delays in paying mobilisation fees, and delays in purchasing materials for the doors and windows, *id.*, much of which was supported by Leeward's trial exhibits, LC 175-LC 192 (Winwood Statement, ¶ 22).

63.     The evidence submitted at trial, and in particular the admissions made by Robert Winwood during his cross-examination, established that Leeward did not submit any Claims for an extension of the Contract Time or increase in the Contract Sum on account of any of these alleged delays in accordance with Section 4.3 of the General Conditions.  FOF, ¶¶ 113-116; Transcript (Winwood), 2:272:12-273:25 (LC 175-192 "are merely examples from the correspondence file that indicate design alterations or lack of information causing delay and disruption.  They're not formal claims.  They're not claims submitted as such."); and 2:275-23-281:22 (confirming LC 175 to 192 are not claims with a capital "C").

---

[3]   While Leeward argued that the $1,000,000 Cash Allowance account was to be used exclusively for Overtime (Dickinson Statement, ¶ 30), Leeward's Post-Trial Brief admits that other charges, such as scaffolding and craneage, were to be drawn against this account as well.  LC Br., ¶ 50.

64.     Moreover, Leeward's Post-Trial Brief ignores the evidence submitted by AUA in response to each of the above delay claims (*see* Antony Statement ¶¶ 75 to 119 and Nagesh Statement, ¶¶ 24 to 44), as well as the evidence AUA presented that Leeward was to blame for any delay (FOF ¶¶ 117-119), content to rely on its conclusory contentions without record citations.  Leeward fell far short of establishing that AUA was responsible for any delay.

65.     In any event, Leeward failed to demonstrate how any of these alleged delays impacted the critical path, and if so, to what extent. *See* COL, ¶¶ 50-60.  The absence of such evidence is fatal to Leeward's claim for delay.

### E.     Change Order Delta (EC $190,210.19)

66.     Leeward's Post-Trial Brief contends that it performed $1,604.066.62 in "extra work."  LC Br. ¶ 79.  This amount is the sum of the extra "Change Order" Leeward claims it performed (EC $1,422,219.10) and the "Claims" Leeward contends it was entitled to recover (EC $181,847.52).  According to Leeward, it was not paid any of the $181,847.52 in Claims, consisting of "hurricane safety measures; works carried out to shut down and secure the site on October 23-24, 2008; customs storage charges; election day close down costs; Labour Day close down costs; Whit Monday close down costs; and other adverse weather costs."  LC Br., ¶¶ 80, 104 and 128.  Leeward's contention is contradicted by the evidence submitted at the hearing.

67.     First, AUA and Leeward agreed that Leeward was only entitled to EC $1,232,008.91 for "Change Orders," and not the EC $1,422,219.10 Leeward now seeks to recover.  *See* AUA Ex. 21 at AUA 002896 and AUA 002945; FOF, ¶ 75.  Leeward did not submit any evidence at the hearing that it was entitled to the EC $190,210.19 difference (the "Change Order Delta").  Having failed to do so, Leeward is not entitled to recover any portion of the Change Order Delta.

68.     Second, Leeward's contention that is was not paid $181,847.52 for the "Claims" is in direct conflict with the record evidence. *See* FOF, ¶¶ 74-75. The Draft Final Account confirms that AUA paid Leeward $162,372.12 in Claims, which specifically covered the monies sought for "Hurricane Omar Site Preparation" (Item No. 17.02), "Site Shutdown" (Item No. 18.02), "Custom Storage Charges" (Item No. 47), "Election Close Down Costs" (Item No. 48), "Labour Day Close Down Costs" (Item No. 54) and "Adverse Weather" (Item No. 58). *See* AUA Ex. 21 at AUA 002896 and AUA 002935 to AUA 002945; AUA Ex. 22. The EC $19,725 difference is Leeward's Whitsuntide Holiday claim (discussed below). While Leeward still continues to contend -- but without any proof -- that it was not paid these amounts, the only one of these "Claims" identified in Andy Green's October 26, 2009 letter, sent one week after Leeward submitted the final iteration of the Draft Final Account, was the Whitsuntide Holiday claim. *See* AUA Ex. 33.

**F.      Claims Delta (Whitsuntide) (EC $19,475.40)**

69.     The evidence at trial conclusively established that AUA paid Leeward for all Claims with the exception of the Whitsuntide Holiday. Leeward's Post-Trial Brief does not separately address this Claim, other than to include it within the "Claims" AUA allegedly did not pay. Nevertheless, because Leeward failed to satisfy its burden of proof on its delay claim, not only is Leeward not entitled to charge AUA for Additional Preliminaries after May 14, 2009, so too is Leeward precluded from recovering additional costs for the June 1, 2009 Whitsuntide Holiday because it occurred after May 14, 2009.

**G.      Cash Allowance Double Count (EC $1,000,000)**

70.     One of the components of the Contract Sum is the $1,000,000 Cash Allowance account for approved changes, overtime, scaffolding, craneage and other contingent costs. AUA Ex. 1 at AUA 000113 (Specifications, Section 12000, Part 1.3A); LC Br., ¶ 50.

20

71.     Leeward's itemization of Preliminaries and Changes Orders included all contingent expenses that were to be drawn against the EC $1 million Cash Allowance.  Antony Statement, ¶ 51.  The approved extra costs totaled EC $2,262,166.51, *i.e.*, EC $1,262,166.51 more than the Cash Allowance contained within the original Contract Sum.  *Id.*

72.     As stated above, in calculating its claim for damages, Leeward employs a top-down method that starts with the original Contact Sum of EC $27,436,824, and, among other things, adds to that number all the "extra work" performed and "additional preliminaries" expended.

73.     Leeward's damages calculation, therefore, includes the EC $1,000,000 Cash Allowance twice:  once, as part of the Contract Sum, and a second time when Leeward adds all EC $2,262,166.51 in "extra work" to the Contract Sum.  Leeward is not entitled to recover this money twice.

74.     Because Leeward did not produce any evidence at the hearing to demonstrate it was not double-counting the EC $1,000,000 Cash Allowance in its damages calculation, each iteration of Leeward's claim for damages must be reduced by EC $1,000,000.

**H.     Overhead and Profits on Painting Work and Doors and Windows Work (EC $350,775.96)**

75.     Leeward relies upon Section 7.3.7 of the General Conditions in support of its claims that it is entitled to recover its Overhead and Profits on the Painting Work and the Doors and Windows Work.

76.     Leeward's Post-Trial Brief does not address any of the defenses raised by AUA at the hearing with respect to this Claim, including the evidence that Leeward entered into a separate contract for the Doors and Windows Work, or that the removal of the Painting Work

avoided Leeward's being assessed more in liquidated damages than it seeks in overhead and profits.

77.     For the reasons set forth in AUA's Post-Trial Brief, Leeward is not entitled to any award for Overhead and Profits on the Painting Work and the Doors and Windows Work.

**I.     Separate Contracts (EC $202,943)**

78.     Leeward's claim to recover monies under the Separate Contracts raises two fundamental issues:  (i) whether the claims are subject to arbitration; and (ii) if so, whether Leeward is owed any money.

79.     With respect to the first issue, Leeward's Post-Trial Brief contends that all of the work performed under the Separate Contracts "arose out of and relates to the Contract work on the Project" because "the additional works were initially part of the original contract ... that the AUA subsequently removed from that contract and gave back to Leeward under separate contracts." LC Br., ¶¶ 134 and 135.  Leeward does not cite to any record evidence to support this statement, nor does any such evidence exist for all but two of the Separate Contracts ("Doors and Windows" and "Tiling").

80.     In any event, whether the Separate Contracts involved work that was within the original scope of the Contract or not, the record is simply devoid of any evidence that AUA agreed to arbitrate payment disputes under the Separate Contracts.  For this reason alone, Leeward's Claims under the Separate Contracts are subject to dismissal.

81.     Moreover, even if Claims asserted under the Separate Contracts were subject to arbitration, as set forth in AUA's Post-Trial Brief, Leeward submitted no evidence at the hearing that it timely asserted a Claim for payment.  FOF ¶ 139 and COL, ¶¶ 72-76.

82.     Finally, Leeward's contention that it is still owed EC $201,757.43 under the Separate Contracts (LC Br., ¶ 91) is contrary to the record evidence.[4]  First, the amount claimed is wrong.  In the aggregate, the difference between the estimated amount Leeward would earn under each contract and the amount it was paid was only EC $60,844.88.  Nagesh Statement, ¶ 47; AUA Exs. 41-54; LC 228-239.  For example, Leeward claims that it was paid EC $448,054.30 on its contract with AUA for tile work.  LC Br., ¶ 91.  However, its own document advanced at the hearing, LC 229 at LC 003844, shows that it was paid EC $557,435.77 (by check in the amount EC $68,332.01 made subsequent to EC $489,109.76 in payments), exactly as AUA states (on the basis of the same document). *See* AUA Ex. 42; Nagesh Statement, ¶ 47. Similarly, Leeward continues to assert that its Concrete Band Work contract was for EC $74,491 (LC Br., ¶ 91) when its evidence actually shows that the contract was only for $36,463.13. *See* LC 234 at LC003889.

83.     Second, the record evidence at the hearing reflected that Leeward was to be paid based on the work actually performed, and that Leeward was in fact paid all that it was owed under the Separate Contracts.  Nagesh Statement, ¶ 47.  Leeward did not produce any evidence to the contrary, including a contemporaneous demand for final payment.

84.     Thus, even if Leeward's claims under the Separate Contracts were properly before this Tribunal, Leeward is not entitled to recover any damages.

### J.     Retainage (EC $590,083)

85.     Leeward contends that AUA admitted it owes Leeward EC $590,083 in retainage. LC Br., ¶ 26.  Leeward does not cite any record evidence to support this statement, nor does any exist because Leeward misstates AUA's position with respect to the retainage.

---

[4]  This amount is slightly lees than the amount (EC $202,943) that Leeward claimed it was owed at the hearing. *See* Green Statement, ¶ 51.

86.    In its Opening Statement, AUA explained that it still held EC $590,083 in retainage, but that Leeward was not yet entitled to recover that money because it had not complied with its obligation to submit an affidavit due under Section 9.10.2 of the General Conditions.  Transcript (Opening), 1:70:18-71:25.  *See* COL, ¶¶ 81-83.

87.    Leeward failed to produce any evidence at the hearing that is submitted the requisite affidavit, and thus, until it does so, AUA has no obligation to turn over any of the retainage to Leeward.

**K.    ABST Error (EC $83,059.62)**

88.    Leeward also contends that AUA admitted it owes Leeward EC $83,000 "due to an error in the calculation of Antigua and Barbuda Sales Tax ("ABST") on the Contract payments."  LC Br., ¶ 27.  Once again, Leeward misstates the record.

89.    In its Opening Statement, AUA volunteered that the painstaking process of determining the components of Leeward's EC $6,701,390.33 claim revealed a mutual mistake in the payment applications.  Transcript (Opening), 1:72:4-73:2.  The payment applications indicated that Leeward was paid EC $83,059.62 more than it actually had been.  The arithmetic error appeared to be attributable to the parties having credited Leeward as receiving roughly $83,000 of ABST as compensation.

90.    Leeward was unaware of the mutual error, as indicated by the fact that it never sought to recover this amount until AUA pointed it out at the hearing, and the error can and should be corrected outside of the context of this arbitration because the ABST error has never been the subject of a Claim or arbitration demand.  *See* COL, ¶¶ 78-80.

\*        \*        \*

91.    In sum, Leeward is not entitled to recover any portion of its claim for $6,701,390.33.

III.   **LEEWARD'S CLAIM FOR INTEREST IS FACTUALLY AND LEGALLY FLAWED**

92.    Leeward seeks an award of interest, at a rate of 10%, for all monies it claims it should have been paid, running from October 23, 2009 (15 days after it first submitted its Draft Final Account). LC Br., ¶¶ 143-145.  Further, Leeward seeks an award of interest, also at a rate of 10%, for each payment application that AUA allegedly paid late. *Id.*  As set forth below, Leeward is not entitled to any interest, and even if it were, the rate would be at the judgment rate of 5%, considered to be the "legal rate" of interest in Antigua.

A.   **Interest on the Allegedly Unpaid Claims**

93.    The Contract Documents call for interest if, and only if, "payments are due and unpaid."  Section 7.2 of the Contract and Section 13.6.1 of the General Conditions both provide: "payments due and unpaid under the Contract Documents shall bear interest from the date payment is due at such a rate the parties may agree upon in writing or, in the absence thereof, at the legal rate prevailing from time to time [in Antigua]."  AUA Ex. 1 at AUA 000052.

94.    Because AUA does not owe Leeward any money, Leeward is not entitled to an award of interest.  Even if Leeward were to prevail on some portion of its claim, however, any interest awarded should be far less than Leeward contends it is entitled to receive.

95.    First, Leeward applies the wrong rate of interest.  The Contract Documents call for interest at the "legal rate" prevailing in Antigua.  Leeward erroneously contends that Antigua does not have a "legal rate" of interest, and seeks to recover interest at the commercial lending rate, which Leeward claims to be about 10%. LC Br., ¶ 143.  In Antigua, a country governed by the Eastern Caribbean Supreme Court ("ECSC"), the "legal rate" is considered to be the judgment rate. *Benoit Leriche v. Francis Maurice*, [2008] UKPC 8, [2], [17] (Privy Council

2008, on Appeal from ECSC Ct. of App.).  The judgment rate in Antigua is 5%.  See Laws of Antigua and Barbuda, Ch. 227 § 7 (Interest on Judgments).

96.     In *Benoit Leriche*, an ECSC construction case in Saint Lucia, the lower Court awarded interest on the judgment at the 6% judgment rate.  The appellate court granted pre-judgment interest as well, and applied the "legal rate," which it held to be the judgment rate. This case reflects that when the parties agreed to apply the "legal rate" of interest in Antigua, they were agreeing to interest at the judgment rate of 5%.  Leeward, the party seeking an award of interest, has not submitted any factual evidence to the contrary.

97.     Rather, based on the incorrect premise that Antiguan law does not contain a "legal rate" of interest, Leeward contends that the Tribunal should substitute the commercial lending rate, which fluctuated around 10% during the time period at issue. LC Br., ¶¶ 141-143.  Leeward relies upon a footnote in *Roxanne Frederich as Administratrix of Steve Fraser v. Richard Lam*, Antigua and Barbuda Suit No. ANUHCV 2008/0322 at [45] n.33, which suggests *in dictum* that the commercial lending rate may be the appropriate measure of pre-judgment interest where the parties have not designated a rate.

98.     That case does not apply because, here, the parties agreed that interest would be at the "legal rate," not the commercial lending rate.  Had the parties wished to use the commercial lending rate, they could -- and would – have done so expressly, either by "agree[ing] in writing" or using that phrase in lieu of "legal rate" in Section 7.2 of the Contract and Section 13.6.1 of the General Conditions.

99.     Therefore, to the extent Leeward is entitled to any interest on the claims asserted in the arbitration, it should be calculated at the rate of 5%, not 10%.

100.     Leeward's claim for interest is also flawed because it starts the clock on interest far too early by contending that it should be awarded interest "on the unpaid contract balance … running from no later than October 23, 2009 … until the date of payment."  LC Br., ¶ 145.

101.     The only monies Leeward claimed to have been due in October 2009 are the three Claims detailed in Andy Green's October 26, 2009 Letter -- Additional Preliminaries, Overhead and Profits on the Painting Work and Doors and Windows Work, and the Whitsuntide Holiday claim -- totaling EC $1,072,093.88.  AUA Ex. 33; Transcript (Green), 3:436:10-441:22.

102.     Were the Tribunal to determine that Leeward is entitled to an award on any of these three claims, under Antiguan law it has wide discretion in determining not only the rate to apply, but whether and when to apply it.  *E.g., Benoit Leriche*, at [17] (the Court found it may be appropriate to refuse to award pre-judgment interest in a construction case if "there is some reason to the contrary in the circumstances of the case.");  *Quorum A/S v. Schramm (No. 2)*, [2002] 2 Lloyd's Rep. 72 at [11] (Queen's Bench Div. Comm. Ct. 2001) (where the claimant unreasonably delays in bringing his action, a tribunal may reduce the time period during which interest accrues, in accord with such delay).

103.     Here, Leeward did not commence arbitration on these three claims "as soon as possible," as it threatened it would in late 2009.  *See* AUA Ex. 65.  Rather, Leeward chose to wait an additional 14 months before finally commencing arbitration on February 3, 2011.  Even then, Leeward's demand for arbitration was so vague and confusing -- in part because it inexplicably increased its claim from EC $1.072 million to EC $13.161 million -- that AUA was unable to decipher what claims Leeward sought relief upon in arbitration.  In reality, it was not until October 14, 2011, when Leeward submitted its Amended Demand for Arbitration upon

order to do so by the Tribunal, that AUA was aware Leeward was seeking payment for, among other things, the three items in Andy Green's October 26, 2009 letter.

104.    At a minimum, interest should not begin to run on any award of Additional Preliminaries, Overhead and Profits on Painting Work and Doors and Window Work or the Whitsuntide Holiday claim until February 3, 2011, given Leeward's unreasonable delay in commencing arbitration.[5] *See Quorum A/S* at [11] (the discretion to limit interest in a case of unreasonable delay may be exercised "to encourage plaintiffs to prosecute their claims with diligence, and also because such conduct may lull a defendants into a false sense of security, leading him to think the claim will not be pursued against him … .")(citations omitted). However, because Leeward's February 3, 2011 demand was too vague to decipher, AUA submits that any interest on these claims should not begin to run until Leeward adequately defined its claims in its October 14, 2011 Amended Demand for Arbitration.

105.    As for the balance of Leeward's EC $6,701,390.33 claim, no basis exists to commence running interest as of October 23, 2009, as Leeward contends, because Leeward did not demand payment for any of the monies until December 17, 2010, at the earliest, and AUA was unable to decipher these claims until Leeward submitted its Amended Demand for Arbitration on October 14, 2011.

106.    Interest on these remaining claims (except retainage and the ABST error) should not being to run until October 14, 2011, because both the December 17, 2010 claim and the February 3, 2011 Arbitration Demand were so lacking in detail that AUA had no way to determine what Leeward claimed it was owed.  Indeed, AUA was not in a position to attempt to

---

[5] Leeward's unreasonable delay in commencing arbitration is grounds to dismiss the arbitration altogether, pursuant to Section 4.6.3 of the General Conditions. COL, ¶¶ 20-28.  But if the Tribunal declines to do so, at a minimum, AUA should not have to incur interest during this period of delay.

decode the balance of Leeward's claim until Leeward submitted its Amended Demand for Arbitration on October 14, 2011.

107.     As for retainage, Leeward is not entitled to any interest because AUA does not currently owe Leeward this money because Leeward still has failed to comply with the contractual prerequisites set forth in Section 9.10.2 of the General Conditions.  COL, ¶¶ 81-83.

108.     As for the ABST error, no interest can be awarded on this small amount because Leeward never demanded payment.  AUA identified the error, a product of a mutual mistake, and volunteered to reimburse Leeward this money.  COL, ¶¶ 78-80.

109.     Finally, Leeward's claim for interest includes interest on the two new claims it has asserted for the first time in its Post-Trial Brief.  Needless to say, Leeward is not entitled to any interest on these claims, let alone interest dating back to October 2009, as Leeward seeks to recover.

**B.     <u>Interest On Late Payments</u>**

110.     Leeward also seeks interest for each day AUA allegedly delayed in making payments due under certain payment applications.  LC Br., ¶ 144.  Leeward bases its claim on Section 5.1.3 of the Contract.  LC Br., ¶¶ 59-60, 139 and 144.  According to Leeward, that provision requires AUA to pay Leeward's payment applications by the 22nd day of the month if they are submitted by the 7th day of the month.  LC Br., ¶ 139.  Leeward's Post-Trial Brief includes a chart purporting to show when Leeward submitted each payment application, when payment was due, and when payment was made.  LC Br., ¶ 144.  Leeward's interest calculations are incorrect, are based upon facts not in evidence, and conflict with record evidence.

111.     First, in the chart purporting to demonstrate Leeward's entitlement to late payment interest, Leeward asserts dates on which AUA allegedly made its payments.  *See* LC Br., ¶ 144.  Yet, no evidence was submitted regarding payment dates.  While Leeward sought to

introduce a compilation similar to the chart reproduced at Paragraph 96 of Leeward's Post-Trial Brief, that proposed exhibit (LC 245) was stricken and not admitted in evidence. *See* Joint Motion on Exhibits, ¶ 1(r). For this reason alone, Leeward has failed to satisfy its burden of proof on its claim for interest on late payments.

112.    Second, the same chart states incorrect "Due Dates" for these payments, rooted in the fact that Leeward set these due dates by measuring 15 days after the date Leeward first submitted each application for payment, or by setting the 22nd of the month as the due date for applications submitted before the 7th of the month. *Id.* In so doing, Leeward misapplies Section 5.1.3 of the Contract, which deviates from the AIA form provision by requiring that AUA agree to the amount of each payment application before the time begins to run on AUA's time to make payment. *See* AUA Ex. 1 at AUA 000007. *See also*, Rebuttal, ¶ 14, *supra*. It was only after AUA agreed to the payment amount that the Architect certified each application for payment. Nagesh Statement, ¶ 20. By failing to properly apply Section 5.1.3 of the Contract, Leeward's interest claim is fundamentally flawed. Below are a few examples.

113.    With respect to Application No. 13, Leeward seeks 31 days of interest totaling EC $6,579.75, claiming that the due date for payment was November 22, 2008 because Leeward initially submitted its payment application on November 5, 2008. *See* LC 13 at LC000804. However, the record evidence reflects that the Architect did not receive Application No. 13 until December 5, 2008 (*id.*), and the Architect did not certify it for payment until December 16, 2008. *Id.* at LC000805. Thus, the payment which AUA allegedly rendered on December 23, seven days later, was timely.

114.    Similarly, with respect to Application No. 18, Leeward seeks 4 days of interest totaling EC $1,434.96, claiming that the due date for this payment was May 22, 2009 because

Leeward initially submitted the claim on May 2, 2009. *See* LC Ex. 18 at LC001793. However, the record evidence reflects that the Architect did not receive Application No. 18 until May 5, 2009, and did not certify it for payment until May 11, 2009. *Id.* at LC001795. Thus, the payment which AUA allegedly rendered on May 26, 15 days later, was timely.

115.    Leeward commits the same error with respect to the Draft Final Account. Leeward claims that payment was rendered 5 days late, entitling it to $143.65 in interest, based on the fact that it first submitted its Draft Final Account on October 9, 2009. However, as the evidence submitted at the hearing demonstrated, Leeward resubmitted its Draft Final Account on October 19, 2009, after Leeward, AUA and the Architect made mutual revisions. *See* AUA Ex. 21; FOF, ¶¶ 77-91. Leeward claims it was paid on October 27, 2009, 8 days later. Leeward was therefore paid timely on the Draft Final Account, as well.

116.    The flaws inherent in Leeward's interest claim are exemplified in its claim for interest with respect to Application Nos. 25 and 26. Leeward all but admits that no factual basis exists for its interest claims as to these payments because the entries on Leeward's chart fail to identify what amount Leeward sought for payment and when. *See* LC Br., ¶ 144.

117.    Finally, Leeward is not entitled to interest on Mobilisation payments. Leeward seeks a total of EC $39,234.95 for two Mobilisation payments it claims were due to be paid on October 1, 2008, but were not paid until November 6, 2008 and December 22, 2008, respectively. *See* LC Br., ¶ 144.

118.    The dispute over whether AUA failed to pay Mobilisation when due was the reason why Leeward shut down the construction site in October 2008. *See* Antony Statement, ¶¶ 133-137. After agreeing to return to the job site, in November 2008 Leeward submitted a claim to recover, among other things, the costs of the shutdown and a release of the outstanding

Mobilisation, including interest. Leeward then sent a "Demand for Arbitration" on December 15, 2008, which included its claim to recover Mobilisation, with interest. AUA Ex. 66. As Leeward admits, AUA paid Leeward the remaining Mobilisation on December 22, 2009. Thereafter, on January 13, 2009, the parties settled the disputes raised in Leeward's December 15, 2009 letter. AUA Ex. 67. Among other things, AUA compensated Leeward for the late Mobilisation payments as part of the settlement by agreeing to extend the time in which it would recover the advance by three months. *See* AUA Ex. 67 at AUA 003269. Having settled the dispute over Mobilisation in January 2009, Leeward cannot now, three years later, seek to recover interest on alleged late payments.

## IV. AUA, NOT LEEWARD, IS ENTITLED TO RECOVER ITS COSTS

119.   The parties agree that Construction Industry Arbitration Rule R-45 permits the Tribunal to award costs in its discretion. Without providing any concrete guidance on how the Tribunal should exercise this discretion, Leeward contends that it should be awarded 100% of its costs and fees. LC Br., ¶ 150. At the same time, Leeward's Post-Trial Brief is silent as to AUA's Counterclaim for fees. As demonstrated in AUA's Post-Trial Brief, and below, this case presents the paradigm for fee-shifting, which is designed to deter Claimants, like Leeward here, from asserting and then continuing to press spurious claims in the face of irrefutable evidence that they lack merit.

120.   While Leeward cited no authority regarding the breadth or scope of the Tribunal's discretion, such guidance is widely available, and it demonstrates that AUA, not Leeward, is entitled to an award of costs.

121.   Included in the scope of the Tribunal's discretion in determining entitlement to costs is its ability to consider:

a.    Which party was more successful in asserting or defending against the claims at hand. Redfern at §9.93; *Rochamel Constr.Ltd. v. National Ins. Corp.*, Civ. App. No. 10 of 2003 at [8] (Ct. App. 2003); Eastern Caribbean Supreme Court Civil Procedure Rules (2000) ("ECSC Rules"), R. 64.6(1).

b.    The degree of success relative to the amount claimed. Murray L. Smith, *Costs in International Commercial Arbitration*, in American Arbitration Association Handbook on International Arbitration Practice at 313, 318 (2010).

c.    "Whether it was reasonable for a party to pursue a particular allegation or raise a particular issue[,] and whether the claimant gave reasonable notice of intention to pursue a claim." *Rochamel* at [8]; ECSC Rules, R. 64.6(6).

d.    That claimant's "claims were misconceived from the outset," that claimant "initiated the arbitral proceedings without any examination of the jurisdictional basis of its claims," and/or that claimant's "pleadings were lackadaisical and failed entirely to address the questions [at issue]." *Telenor Mobil Communications A.S. v. Republic of Hungary*, ICSID Case No. Arb/04/15, at ¶¶ 104, 107 (September 13, 2006) (cited in José Rosell, Arbitration Costs as Relief and/or Damages, Journal of International Arbitration 28(2): 115, 120 (2011)).

e.    Whether costs for only certain parts of the proceedings should be awarded. ECSC Rules, R. 64.6(3) and R. 65.5(4)(b).

122.    The point of this discretion is to discourage parties "from bringing proceedings or making allegations which are spurious, in the sense that they are unsupported by the evidence." *See Rochamel* at [10].

123.    Leeward's strategy since the inception of this arbitration has been to seek as much in damages as possible, regardless of whether the evidence supported its claims. Leeward's claims were not vetted before they were asserted, as shown by Leeward's ever-changing claims. Leeward reduced its arbitration demand from EC $13.136 million to EC $6.8 million when forced to provide a more specific statement of its Claim. Leeward reduced the claim further when it submitted its Witness Statements just before the hearing. And now, six weeks after the evidentiary hearing, Leeward decided to add two new claims not previously asserted because the

33

ones it did assert lacked merit, requiring AUA to spend more time and money to demonstrate why Leeward's new claims are procedurally barred and substantively flawed.

124.     Leeward's conduct goes beyond a lack of the high level of due diligence called for in international arbitration.  It reflects a strategy to provide as little detail as possible about its claims, affording it the opportunity to constantly shift gears as AUA demonstrated the flaws in Leeward's contentions.  This lack of specificity caused AUA to spend much more in defense costs than it otherwise should have.  For example, Leeward's Amended Demand for Arbitration, while more detailed than the prior demand, by and large failed to assert the basis for Leeward's claim.  As a result, AUA had to methodically deconstruct Leeward's Amended Demand, at great expense, to first understand, based on the limited information then provided, what Leeward was claiming, and then respond to it.  In fact, Leeward has never been willing or able to accurately and clearly demonstrate how its multitude of claims add to EC $6.7 million, leaving it for AUA to take on the task itself.

125.     Defending an international arbitration should not require a respondent to hit a constantly moving target.  Ultimately, this arbitration revealed that Leeward's claims are spurious at best, and in some instances plainly frivolous.  For this reason, it is AUA, not Leeward, that should recover 100% of its fees and expenses.  Leeward failed to initiate any Claim in accordance with the Contract Documents for the vast majority of the EC $6,701,390.33 sought in this arbitration.  Indeed, most of the claims now asserted were raised for the first time 14 months after Leeward completed the Project and submitted its Draft Final Account for 97.5% of the Contract Sum.  When Leeward commenced arbitration on February 3, 2011, it took what was an EC $1.072 million dispute and increased it by a factor of thirteen, without any

explanation or justification.  AUA unnecessarily has had to incur enormous expenses defending Leeward's inflated claims.

126.    For example, AUA conclusively established that Leeward wrongfully claimed that AUA had not paid it for some $181,847.52 in Claims.  Despite this evidence, Leeward continued to pursue its frivolous claim, and continues doing so to this day, perhaps hoping that if it keeps making the claim, the Tribunal will make a mistake and issue an award to which Leeward clearly is not entitled.  Of course, AUA has had to continue to spend the time and money proving, time and time again, why Leeward's claim is without merit.

127.    In stark contrast with Leeward, AUA recognized that it had not carried its burden of proof on its alternative claim for actual delay damages at trial, and properly dropped it before post-hearing submissions were due.  Leeward argues that AUA's withdrawal of this claim justifies awarding Leeward 100% of its fees and expenses. LC Br., ¶ 151.  AUA's withdrawal of its alternative claim actually proves the opposite.  The contrast between AUA's candid evaluation, and hence withdrawal, of its alternative damages claim and Leeward's attitude of "Damn the torpedoes, full speed ahead!" to the evidence -- as well as to the Tribunal and AUA -- encapsulates why this Tribunal should award AUA its fees and expenses.

128.    In sum, fee-shifting is designed to deter claimants from asserting inflated and baseless claims that require those responding to them unnecessarily to incur significant legal expense.  That is precisely what Leeward did here, and precisely why this Tribunal should exercise its discretion and award AUA the lion's share of its legal fees and expenses.[6]

---

[6] Leeward suggests as an alternative to exercising discretion that it turn to Eastern Caribbean Supreme Court (ECSC) Civil Procedure Rule 65.65 (Appendix B) as a basis for making its award.  Doing so would undercut the discretionary approach called for by the CIAR that govern this arbitration, and deprive AUA of obtaining an appropriate award of fees.  While certain portions of the ECSC rules contain principles that assist in defining the scope of the discretion vested by the Rules, as noted above, the portion relied on by Leeward does not.  Leeward asks the Tribunal to adopt a local court practice that would improperly dictate (and, in fact, nullify) the Tribunal's exercise of discretion by swapping discretion with a formula.  *See* Redfern at §9.100 (stating that national court rules

## CONCLUSION

129.    In sum, and for the reasons set forth below and in AUA's Post-Trial Brief, the

Tribunal should dismiss Leeward's Claims in their entirety, award AUA US $117,000 in

Liquidated Damages to be paid from Leeward's retainage, together with attorney's fees.

Dated:  May 4, 2012

> SILLS CUMMIS & GROSS P.C.
> 30 Rockefeller Plaza
> New York, New York 10112
> (212) 643-7000
> *Attorneys for Respondent*
>
> By: _____
>     Mark S. Olinsky
>     Jonathan S. Jemison

---

are not "compelling guidelines for the way in which a Tribunal should exercise its discretion," but that substantive law may assist in defining the scope of Tribunal discretion).  Accordingly, the Tribunal should reject Leeward's invitation to award "prescribed" costs in accord with Appendix B of the ECSC Civil Procedure Rules.