# Exhibit E

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
------------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

Claimant,

-against-

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

Respondent.
------------------------------------------------------------------------x

**CLAIMANT'S REPLY
PROPOSED FINDINGS
OF FACTS AND
CONCLUSIONS OF LAW**

Case No. 50 110 T 00075 11

Claimant, Leeward Construction Company, Ltd. ("Claimant" or "Leeward") submits this

Reply Proposed Findings of Facts and Conclusions and Law in accordance with the Tribunal's

Resolution, dated March 2, 2012, and directive at the conclusion of the evidentiary hearing held

on March 5 - 9, 2012.

<b><u>INTRODUCTION</u></b>

1.      The purpose of this "Reply" is not to address each and every statement in the

Proposed Findings of Fact and Conclusions of Law submitted by the Respondent, American

University of Antigua -- College of Medicine ("Respondent" and/or "AUA").[1] The Tribunal has

reviewed the Witness Statements and exhibits, heard the live testimony of the witnesses, and

observed the demeanor of the witnesses at the hearing. We trust the Tribunal's ability in reading

the post-hearing submissions to separate fact from fiction and half-truths, and to give appropriate

weight to the evidence.

2.      Just because Leeward does not address a particular statement in the RFOF or

---

[1] The Respondent's Proposed Findings of Fact and Conclusions of Law, dated April 20, 2012, are cited herein as follows: Respondent's Findings of Fact -- "RFOF"; Respondent's Conclusions of Law -- "RCOL." Leeward's Proposed Findings of Fact and Conclusion of Law, dated April 20, 2012, are cited herein as follows: Leeward's Findings of Fact -- "LFOF"; Leeward's Conclusions of Law -- "LCOL."

RCOL, does not mean that Leeward concedes the alleged fact or legal argument. Rather, the respective positions of the parties are evident from the witness statements, testimony, and exhibits and Leeward's intent is not to retry the case in the post-hearing submissions.

3.      Leeward objects to the AUA's submission of excerpts from the "unofficial" stenographic transcript of the evidentiary hearing with its Proposed Findings of Fact and Conclusions of Law. The Tribunal has already ruled by Resolution, dated March 13, 2012, that the Tribunal's notes are the official record of the evidentiary hearing. By cutting and pasting parts of the stenographic transcript into its post-hearing submission, the AUA has effectively circumvented the Tribunal's ruling by making parts of the unofficial transcript an official part of the record of this proceeding in the event the AUA appeals the Tribunal's decision through the judicial system. If Leeward submits parts of the transcript in response to the AUA's submissions, then the "unofficial" stenographic record effectively becomes the "official" record of the evidentiary hearing -- which is exactly what the AUA requested and the Tribunal denied by resolution, dated March 13, 2012. If Leeward does not submit excerpts from the "unofficial" stenographic transcript, then the self-serving and out-of-context excerpts that the AUA has submitted will stand un-rebutted to the disadvantage of Leeward should the AUA continue to litigate this dispute in the court system. In the interest of fundamental fairness and equity, Leeward respectfully requests that the Tribunal strike the unofficial stenographic transcript from the AUA's post-hearing submissions so that the "unofficial" stenographic transcript does not become an official part of the record.

## REPLY FINDINGS OF FACT

a.     **Overhead and Profit on Changes of the Scope of Work**

4.     In RFOF ¶ 14, the AUA selectively emphasizes Contract §4.3 in concluding that the negotiated unit prices, inclusive of overhead and profit, are used to determine additions or deductions to the stipulated contract sum as a result of changes to the scope of work. The AUA ignores the last sentence of the quoted provision of Contract §4.3, which states that the use of unit prices in determining additions and deductions are "subject to the provisions of Article 7 of the General Conditions of the Contract." (LC 1, p. LC000007)

5.     Article 7.3.7 of the General Conditions reads in relevant part that the "amount of credit to be allowed by the Contractor to the Owner for a deletion or change which results in a net decrease in the contract sum shall be ***actual net cost*** as confirmed by the Architect. [emphasis added]." (LC1, p. LC000040) According to the Official AIA Commentaries to the General Conditions (AIA A201-1997), the phrase "actual net costs" means that "[w]here a change results in a credit [to the Owner], the amount of the credit is determined by the cost that would have incurred in executing the change by the Contractor ***without decreasing the Contractor's overhead and profit*** [emphasis added]." (Official AIA Commentary, p. 58-59) (A copy of the relevant portions of the Official AIA Commentaries are submitted herewith as Appendix E.)[2]

6.     Contract §4.3, read in harmony with the General Conditions Article 7.3.7, provides that the unit rates and other prices in the Project Manual, excluding that part of the unit rate or price that constitutes the contractor's overhead and profit, shall be used to determine the value of changes to the scope of work that result in a decrease in the stipulated contract sum.

---

[2] Appendix A-D are submitted as part of Leeward's Proposed Findings of Facts and Conclusions of Law, dated April 20, 2012.

7.      The agreed overhead and profit on Leeward's work is 18% (LC 1, p. LC000072) and therefore, the AUA's credit on the changes to the scope of the contract work that resulted in a decrease in the stipulated contract sum is the unit rate or other price in the Project Manual for the items of work at issue, less 18% overhead and profit.

8.      While the AUA contends that Leeward never sought payment for overhead and profit on the deleted works (RFOF ¶ 57), its statement is patently false.  In a letter to the Architect, dated May 12, 2009, Leeward requested payment for overhead and profit on the doors, windows, and painting work removed from the Contract (LC 213, p. LC003732).  The AUA admits Leeward made this claim (RFOF ¶ 124).  Moreover, overhead and profit on deleted or omitted work is something the parties should have addressed in negotiating and processing change orders, except that the AUA and its Architect failed and refused to issue change orders as required by the contract documents.

**b.      The Stipulated Contract Sum is Subject to Additions and Deductions by Change Order**

9.      The AUA repeatedly cites to provisions in the Contract that state that the stipulated contract sum is "subject to additions and deductions," but in doing so, the AUA repeatedly deemphasizes the operative language "as provided in the Contract Documents." (*See e.g.,* RFOF ¶ 16, 18, and 19)  In RFOF ¶ 16, for example, the AUA selectively quotes Contract §4.1, stating that the contract sum payable to Leeward is "subject to additions and deductions," when in fact, §4.1 provides that the contract sum is "subject to additions and deductions as provided in the Contract Documents." (LC 1, p. LC000006)  After selectively and deceptively quoting Contract §4.1, the AUA then has the audacity to state "Leeward agrees" with the AUA's mischaracterization of the Contract and even mis-cites the Dickinson Witness Statement ¶ 21 in support of its position.  In fact, Mr. Dickinson states in paragraph 21 of his witness statement that

4

the fixed contract sum is "subject to additions and deduction **by change order** [emphasis added]."

10.    Similarly, the AUA misquotes Robert Winwood's summary of the contract terms (LC 84, p. LC003034) in claiming that Mr. Winwood "acknowledged that the total payment for the Measured Works was to be 'as built' and in accordance with the 'final measure'." (RFOF ¶ 23, 68)  What Mr. Winwood actually stated in his summary of the contract terms is that a "change order will be required when the final measure differs from the Contract BOQ." (LC 1, p. LC003034)

11.    Leeward repeatedly requested Nagesh, as the Project Architect, to issue change orders as provided in the contract documents with respect to additions, deletions, and modifications to the contract work, but Nagesh, on his own or at the direction of the AUA's representative, Lt. Colonel Antony ignored Leeward's request and refused to issue even a single change order notwithstanding literally dozens of changes to the scope of the contract work. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17)

### c.    The AUA Unilaterally Changed the Contractually Agreed Method for Documenting Additions and Deductions to the Stipulated Sum Contract

12.    The AUA contends that the "*parties* did not use formal change orders in the manner set forth in the Article 7 of the General Conditions to document 'additions and deductions' to the contract sum [emphasis added]." (RFOF  ¶ 40)  The AUA has misstated throughout its post-hearing submission that the parties mutually agreed to dispense with the formal change order process for documenting changes to the scope of work and the contract sum in favor of the informal "true-up" process that the AUA describes in its witness statements and post-hearing submission. (RFOF ¶ 16-34, 40-48; 64-65, 68-69, 91; RCOC ¶ 18-19, 29-44)

13.     The undisputed fact is that the AUA did not use formal or informal change orders in the manner set forth in Article 7 of the General Conditions. The AUA submitted no evidence whatsoever establishing that this informal "true-up" process was a mutually agreed upon modification to the Contract in accordance with the requirements set forth in General Conditions §1.1.1 (LC 1, p. LC000025) or that Leeward knowingly, intentionally, and unequivocally waived the use of change orders in favor of the true-up process notwithstanding the "no waiver clause" in General Conditions §13.4.2 (LC1, p. 000051). (*See* ¶ 41-45, herein)

14.     Both Lt. Colonel Antony and Nagesh acknowledged during the hearing that they had no prior experience with AIA contract documents, such as the Contract (AIA A101-1997) and the General Conditions (AIA A201-1997). (Lt. Col. Antony Testimony, March 7, 2012; Nagesh Testimony, March 9, 2012) The concept of change orders seemed completely foreign to them. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33; Winwood Witness Statement, ¶ 17) Nagesh and Lt. Colonel Antony ignored Leeward's repeated requests for change orders and they decided on their own, without Leeward's consent, to use the so called "true-up" process instead of contractually mandated change orders. Even Peter McLeod, who assisted the parties in negotiating the Contract, acknowledged that the Contract requires the AUA/Architect to issue change orders for changes to the contract work. (McLeod Testimony, March 5, 2012)

15.     The AUA selectively quotes from Dickinson Witness Statement ¶ 47 as evidence that Leeward agreed to the "true-up" process. (RFOF ¶ 41) Read in its entirety, Dickinson Witness Statement ¶ 47 unequivocally demonstrates that the decision to use the informal "true-up" process instead of change orders was a decision that Lt. Colonel Antony and/or Nagesh made and forced upon Leeward. Leeward did not agree to modify or waive the contract terms

6

with respect to change orders.  Rather, if it wanted to get paid for the contract work, it had no choice but to submit to the so-called "true-up" process in accordance with the "Golden Rule."[3]

16.    The AUA states in RFOF ¶ 45 that in reviewing the monthly requisitions, Nagesh would first reach agreement with Leeward and then review the revised payment requisition again with Lt. Colonel Antony to obtain the AUA's consent to the revised payment application.  What really happened is that after Nagesh and Leeward came to terms on the payment requisitions, Lt. Colonel Antony would make additional changes to the payment requisitions without Leeward's consent and without even discussing the changes with Leeward, and then Nagesh would rubber-stamp Lt. Colonel Antony's changes, rather than exercise his contractual obligation to objectively review and certify the monthly requisitions.  (LC 1, p. LC000032-34)  Leeward was at the mercy of Lt. Colonel Antony in terms of what it would be paid on a monthly basis.  (Dickinson Witness Statement, ¶ 56-58; LC 73)

17.    In making changes to Leeward's monthly payment requisitions, Lt. Colonel Antony ignored the unit prices in the Contract and changed the quantities that Leeward and Nagesh had agreed upon even though Lt. Colonel Antony acknowledged during cross-examination that he has no training or experience as a quantities surveyor.  (Lt. Col. Antony Testimony, March 8, 2012)

18.    The same is true with regard to the October, 2009 Draft Final Account. (AUA 30)  Throughout the RFOF, the AUA alleges that Leeward agreed to the October 2009 Draft Final Account as paid (AUA 22) and that it represents the AUA's final payment on the Project.  (RFOF ¶ 94-97, 129-133)  Leeward complained about the AUA's last payment following its receipt. (AUA 33)  Leeward did not, as the AUA contends, limit its claim to those items listed in

---

[3] According to the Golden Rule, "he who has the gold, makes the rules."  In this case, the AUA had the gold and it made the rules.  If Leeward wanted to get paid, then it had no choice but to acquiesce to this so-called "true-up" process given the AUA's failure and refusal to issue change orders.

its October 26, 2009 correspondence. (AUA 33)  In fact, in its July 7, 2010 correspondence to

the AUA, Leeward indicated that its final application for payment would be submitted in due

course. (Green Witness Statement, ¶ 49-50; LC 200)

     19.    Citing Robert Windwood's cross-examination testimony at the hearing, the

Respondent states at RFOF ¶ 106, that "Leeward understood that if a Claim was not asserted

properly, it *would* be waived [emphasis added]."  According to the AUA's excerpts from the

unofficial stenographic transcript of the hearing, Mr. Winwood testified as follows:

> Page 242
>
> | | |
> |---|---|
> | 14 | Q. And it was important that you -- the |
> | 15 | people administering the contract abide by the |
> | 16 | 21-day time period. Correct? |
> | 17 | A. Absolutely. It's written in the contract. |
> | 18 | Q. And if they didn't abide by it, Leeward |
> | 19 | *might* waive their claim. Correct? |
> | 20 | A. Either party *might*. As you say, it |
> | 21 | applies to the contractors and the owner. |
> | 22 | Q. Well, if we could turn back to 4.3.7.1, |
> | 23 | that's referring to a contractor claim. Correct? |
> | 24 | A. Yes. |
> | 25 | Q. Okay. So my question is, it was important |
>
> Page 243
>
> | | |
> |---|---|
> | 1 | to remind people to assert their claims within 21 |
> | 2 | days, because if not, Leeward *might* waive that |
> | 3 | claim. |

(Winwood Transcript 242:14-243:4 [emphasis added])  The AUA has changed Mr. Winwood's

testimony from the mere possibility that a claim *might* be waived to an absolute certainty that the

claim *would* be waived.  Regardless, as explained in ¶ 29, herein, what constitutes a proper

notice of claim is a question of law for the Tribunal to decide, not a question of fact for a witness

to opine.

**d.    The AUA Has Not Demonstrated That Leeward Delayed The Project**

20.    In RFOF ¶ 117, the Respondent incorrectly states that "Leeward also failed to rebut at trial the evidence provided by AUA that Leeward was responsible for such delay." The only testimony the AUA has presented with respect to delays allegedly attributable to Leeward is in Lt. Colonel Antony's witness statement ¶ 90-91, where he claims that the "supporting columns Leeward had constructed for the concrete slab were defective and had to be dismantled and rebuilt." (Lt. Col. Antony Witness Statement ¶ 90) The AUA failed to present any evidence whatsoever identifying the nature and location of the alleged defect and whether the defect was a result of design errors, construction errors, weather, earthquake, or other factors attributable to the AUA, the Project Architect, the structural engineer, Nagesh, Lt. Colonel Antony, Leeward, or anyone else. The AUA failed to submit any evidence establishing that the alleged, but unidentified defects delayed Leeward in the performance of its contract work. The AUA failed to proffer any evidence establishing the length of the alleged delay resulting from the defect or whether the alleged defect had any impact upon Leeward's schedule. Indeed, the Tribunal cannot determine from Lt. Colonel Antony's Witness Statement whether the delay, if any, resulting from the alleged defect lasted a minute, an hour, a day, a week, or a month, or whether the alleged defect had any impact upon Leeward's schedule at all.

21.    The only documentary evidence that the AUA cites in support of its claim that the alleged defect in the supporting columns delayed Leeward's performance of the contract work is "LC 31," which is an email, dated July 21, 2008, from Lt. Colonel Antony concerning the Project meeting held on July 19, 2008. This email is as benign and uninformative as Lt. Colonel Antony's Witness Statement in that it contains only a vague reference to the "concrete strength at the column that had failed," without even using the word "defect" or blaming Leeward or anyone

9

else for the alleged failure. (LC 31, p. LC 002819, ¶ 6)  What Lt. Colonel Antony's email does

show, however, is that as early as July 19, 2008, Leeward expressed concern about the lack of

design information and details for "doors, windows, finishing items, MEP, etc.," and that Lt.

Colonel Antony responded that "all outstanding items will be resolved during the progress of the

project…" (LC 31, p. LC002819, ¶ 5; *see also* LC 31, p. LC002820, ¶ e)  As Nagesh testified

during cross-examination, the AUA did not even start shopping for windows and doors until

October 2008, and did not place the order for the windows and doors until "January, February, or

March 2009," and the windows and doors were not delivered to the Project until July, 2009,

approximately two months after the substantial completion date set forth in the Contract.

(Nagesh Testimony, March 9, 2012; *see also* Dickinson Witness Statement, ¶ 81-86; LC 139-

174)  The evidence also establishes that the flooring that Lt. Colonel Antony and the AUA

ordered did not arrive at the Project until July, 2009, and that the AUA was still designing the

MEP works in June, 2009, all of which occurred after the May 15, 2009,  the substantial

completion date in the Contract, as extended by the AUA.  (Dickinson Witness Statement, ¶ 73-

74, 87-90; Winwood Witness Statement, ¶ 19)

     22.     In RFOF ¶ 118, the AUA continues to claim that Leeward was responsible for

delays on the Project because it was not working at an adequate pace.  In support of this claim,

the AUA offers the non-sensical contention that Leeward should have been producing at least EC

$3,000,000.00 per month in work between November, 2008 and April, 2009.  Its only support for

this contention is Lt. Colonel Antony's Witness Statement, ¶ 89.  However, the AUA's claim

makes no sense in light of its own statement that the total value of all work Leeward performed

under the Contract throughout the Project was less than EC $18,000,000.00.   (AUA 23)

Moreover, the Project's records are replete with examples of what slowed Leeward's pace on the

Project: The AUA's ineffective and incompetent administration of the Contract.

**e.      The AUA's Opening Statement and Off-Color Comments are Not Evidence**

23.      In RFOF ¶ 140-144, the AUA references the "detailed chart breaking down the components of Leeward's claim" that AUA's lawyer presented to the Tribunal during his opening statement and asserts that "Leeward did not dispute this breakdown at trial." Opening statements are not evidence and do not prove anything. Leeward had absolutely no obligation during the hearing or in its post-hearing submissions to respond to counsel's opening statement because AUA's counsel was not a witness and his opening statement has no probative value whatsoever.

24.      The AUA states in its conclusions of law that at the time Leeward submitted the Draft Final Account in October 2009, "Leeward did not seek to be paid for the work it did not perform, nor did Leeward assert that it was entitled to such payment on the theory that AUA failed to comply with the formalities of Article 7. It was not until December 2010, (fourteen months later *and after engaging counsel*) that Leeward belatedly sought to be paid for work it did not perform and to enforce the contractual formalities through change orders." (RCOL ¶ 41 [emphasis added]) The obvious implication is that Leeward revised its claim upward on the advice of counsel. The AUA's counsel made similar comments in his opening statement and at other times during the hearing, and quite frankly, Leeward and its counsel were as offended then as they are now by these unwarranted, irrelevant and inflammatory remarks. As the AUA's counsel ought to know, Leeward cannot respond to this accusation without violating the attorney-client privilege. If AUA's counsel had made the comment in his opening statement before a jury in a United Stated District Court, there is a good chance that the Court would have declared a mistrial and sanctioned counsel for misconduct.

25.    The bottom line is that Leeward has never demanded payment for work it did not perform; rather, Leeward has requested payment of the stipulated contract sum "subject to additions and deductions as provided in the Contract documents." (LC 1, p. LC000006)  Change orders, as provided in Article 7 of the General Conditions, Section 1200, Part I, Section 1.7 of the Specifications, and other provisions in the Contract Documents (LC 1, p. LC000039 - LC000040, LC000113-LC000118), are the only agreed upon method in the Contract for increasing or decreasing the stipulated contract sum, and since the AUA and its Project Architect knowingly and intentionally failed and refused to issue change orders, Leeward has every right to the payment of the stipulated contract sum.  Moreover, Leeward is not required to forfeit upward adjustments to the contract price as a result of extra work that Leeward performed at the AUA's request simply because the AUA and the Project Architect refused to issue change orders as required under the Contract.  Nor should Leeward be required to accept downward adjustments in the contract price as a result of modifications and deletions to the contract work without a formal change order that properly credits Leeward for overhead and profit on deleted works as required under Article 7.3.7 of the General Conditions, given the undisputed fact that the AUA is the party that breached the Contract by failing to issue change orders.  Indeed, to do so would effectively punish Leeward for the AUA's errors and omissions.[4]

f.    **Leeward Accounted for All Deleted Work in its Damage Calculation**

26.    At RFOF ¶ 60, the AUA complains that Leeward failed to completely reduce the

---

[4] An argument could be made that as a result of the AUA's failure and refusal to issue formal change orders in accordance with the Contract documents, the stipulated Contract Sum should not be adjusted upward or downward from the original fixed price in the amount of US $10,162,599.61/EC $27,436,824.00.  If the Tribunal accepts this argument, then Leeward is entitled to the unadjusted Contract price, less payments received, including interest on the balance due, as follows:

    US $10,162,599.61/ EC $27,436,824.00 (original contract sum, LFOF ¶ 41)
  - US $  8,493,337.37/ EC $22,930,176.49 (contract payments, LFOF ¶ 60, 62)
    US $  1,669,262.24/ EC $  4,506,647.51
  + US $     431,226.09/ EC $  1,164,217.30 (Interest @ 10%/yr. from October 23, 2009
  = US $  2,100,488.33/ EC $  5,670,864.81  through May 31, 2012)

contract sum by all deleted work by omitting the flooring work. The Tribunal should note that Leeward addressed this oversight in its post-hearing submissions at LFOF ¶ 130, 131, and 133. Leeward has included deductions for all deleted work, including flooring work. AUA 26 is a compilation of deleted work on the Project. The total from that exhibit, US $1,358,520.15/EC $3,667,711.00, is the amount deducted for deleted work in each of Leeward's general damages calculations.

g. **Leeward's Claim For The Balance Due And Owing on The Additional Works Contracts is Not a New Claim**

27.   At RFOF ¶ 139, the AUA claims that Leeward did not "reveal" that it was seeking payment for the balance due and owing on the additional works contracts until it filed its Witness Statements in this matter. However, Paragraph "23" of Leeward's Amended Demand for Arbitration contained a summary of Leeward's claim. The seventh line of the summary referred to "Additional Work (Revised Statement of Claim and BS 258-282)" and set forth the amount due and owing. Paragraph "27" of the Amended Demand for Arbitration also defined the phrase "Additional Work" as follows:

> "Additional Work" refers to work that was included in the original contract, that the AUA removed from the Contract then awarded the work back to Leeward in a separate contract. A summary of the Contract work that the AUA removed from the Contract and then awarded back to Leeward in a separate contract is set forth at Revised Statement of Claim, annexed hereto, and at BS 258-282.

In addition, annexed to the Amended Demand for Arbitration was a document entitled "Revised Statement of Claim." The fourth page of that document laid out Leeward's claim for "Additional Work" and specifically references the contracts for additional work set forth at BS 258-282 of that document. The dollar amount of that part of the claim correlated with the amount as set

forth in Paragraph "23" of the Amended Demand for Arbitration. Thus, Leeward has made clear that its claim included the unpaid balance on the additional works contracts since the beginning of this proceeding.

## REPLY CONCLUSIONS OF LAW

a.   **Leeward Complied With The Notice of Claim Provisions in The Contract And Timely Commenced This Arbitration**

28.   In RCOL ¶ 1-28, the AUA argues that Leeward's claims herein are barred because it did not comply with the notice of claim provision in the Contract and it failed to timely commence this arbitration. The AUA is wrong on both counts. Leeward has satisfied the requirements of the notice of claim provision and this proceeding was timely commenced.

i.   **Leeward Complied With The Contract's Notice of Claim Provision**

29.   RCOL ¶ 8-19 are devoted to the AUA's argument that Leeward did not comply with the Contract's notice of claim provision. Initially, we note that the interpretation of the Contract is a question of law, which the Contract specifies must be decided under Antigua law. (LC1, p. LC000051) Conversely, whether the notice of claim provision, as interpreted under Antiguan law, was properly followed is a question of fact, to be decided by the Tribunal. While the Tribunal must interpret this provision in accordance with Antigua law, the AUA has curiously neglected to cite Antiguan law in support of its argument. Moreover, Mr. Winwood's testimony in this matter was solely factual in nature. He was not an expert witness and his testimony, however misconstrued by the AUA, is not dispositive. (*See* ¶ 19 herein)

30.   Instead, the AUA relies on *Kingsley Arms v. Sano Rubin*, 16 A.D.3d 813, 814 (N.Y. App. Div. 2005). However, in addition to being New York law and not binding on the Tribunal, the AUA's description of the holding in *Kingsley* is extremely misleading. In *Kingsley*, the court held that the failure to comply with the notice provision was a waiver of

14

claim because the Plaintiff, a subcontractor suing for breach of contract, could not produce any evidence, that the general contractor had been provided written notice of the subcontractor's claims. The only evidence of a timely claim was the subcontractor's self-serving assertion that it had "orally" notified the general contractor of its claims.   So too in *American Nat'l Elec. Corp. v. Poythress Comm. Contractors Inc.*, 604 S.E.2d 315, 317 (N.C. Ct. App. 2004), a North Carolina case on which the AUA relies. In *American Nat'l Elec. Corp.*, the contractor provided oral notice of a claim and then followed it up with written notice months later. *See Id.*  In the case at hand, Leeward provided the AUA with written notices as claims arose during the Project. *See* LC 201-222. Therefore, this case is clearly distinguishable.

31.     In relying on inapplicable precedent to argue that a "formal notice" is required under the Contract (RCOL ¶ 13), the AUA ignores the Official AIA Commentaries to the General Conditions (AIA A201-1997), which make clear that a notice of claim under General Conditions §4.3.2 *need not* contain all the information pertaining to the claim. *See* Official AIA Commentary, page 38 (Appendix E). The purpose is simply to put the other side on notice. In so doing, the AUA ignores the 22 exhibits Leeward admitted into evidence all of which constitute notices of claim because they gave the AUA notice of a variety of issues encountered on the Project contemporaneously with the occurrence of those events. (Green Witness Statement, ¶ 46; LC 201-222) This includes Leeward's claim for additional Preliminaries.  As the AUA admits, Leeward had been sending it emails since January 2009 regarding its need for additional Preliminaries. (RCOL ¶ 15)  Thus, Leeward put the AUA on notice of its claim for additional Preliminaries contemporaneously with the occurrence giving rise to the claim.

32.     LC 206 is an example of the AUA's knowledge of problems on the Project.  LC 206 is a chain of emails in which Leeward notified the AUA about issues impacting the Project's

progress such as concrete supply issues, customs problems, and delivery of necessary materials like windows and doors. These items were not within Leeward's control, but adversely affected its work on the Project. (LC 206) Even after LC 206 was written, Leeward continued to notify the AUA of the same issues (LC 211) as the Project continued and the AUA failed to resolve the issues.

33.     The AUA also argues that Leeward's October 26, 2009 correspondence was its only notice of claim and as such, it is limited by what was contained in that correspondence. (RCOL ¶11)   However, Official AIA Commentaries to the General Conditions indicate otherwise. *See* Official AIA Commentary, page 38 (Appendix E).   Under the Contract, the October 26, 2009 communication served as a notice of the fact that Leeward had claims arising from the payment of the Draft Final Account, regardless of whether they were specifically identified or not. In addition, during the pendency of the 21 day time period after the payment of the Draft Final Account, Leeward and the AUA exchanged multiple emails where Leeward notified the AUA and the Architect's representative of other claims that it had, including those arising as a result of the AUA's payment of the Draft Final Account. (AUA 64, 65, 66)

34.     The timing of Leeward's December 2010 claim does not alter the fact that the AUA was already on notice of the issues on the Project by virtues of Leeward's timely notices of claim. Leeward's December 2010 claim document amplified previous, timely notices. Nothing in the Contract prohibits an amplification of notice, even after the time limit for the notice has passed.

### ii.     The Arbitration Was Timely Commenced

35.     In RCOL ¶ 20-28, the AUA argues that Leeward failed to commence this arbitration within a "reasonable" period of time. Section 4.6.3 of the General Conditions states:

[a] demand for arbitration shall be made within the time limits specified in Subparagraphs 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and **in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations** as determined pursuant to Paragraph 13.7.

(LC 1, p. LC 000036, emphasis added). Neither the Contract nor the Commentaries define the term "reasonable." However, according to the Contract's terms, the demand for arbitration could not have been made after the expiration of the applicable statute of limitations. According to the Antigua and Barbuda Limitation Act 1997, §§7 and 33, the statute of limitations is six years. (A copy of The Antigua and Barbuda Limitation Act 1997 is submitted herewith as Appendix F.) Thus, Leeward's demand for arbitration is timely under the terms of the Contract since it was made within six years of the AUA's breach.

36.     In contrast, the AUA claims that a "reasonable" period of time to commence this arbitration was six months. *See* RCOL ¶ 22. As support for its argument, the AUA selectively and disingenuously quotes the Contract language regarding the demand for arbitration to conveniently omit the language setting the end limit for the demand to be filed at the expiration of the applicable statute of limitations. *See* RCOL ¶ 21. When the clause is read as a whole, the AUA's argument holds no merit as the applicable statute of limitations for breach of contract under Antigua law is six years. *See* Antigua and Barbuda Limitation Act 1997, §§7, 33 (Appendix F).

37.     The AUA's conclusion that a "reasonable" time to commence the arbitration would be six months is inconceivable when, without the arbitration clause, Leeward would have had six years to commence a litigation for the same claim. Moreover, were Leeward to follow the procedure the AUA advocates as proper, Leeward would have had to commence multiple

17

arbitrations throughout the course of the Contract. This would have been extremely burdensome and would have affected the critical path of the work. It was more prudent and, indeed, proper under the Contract, to wait to commence arbitration until Leeward had completed the Project and could adjudicate all of its timely claims against the AUA within a single arbitration. The AUA was not prejudiced in any way by the timing of Leeward's commencement of arbitration. Indeed, the AUA was aided by the fact that all timely claims were adjudicated under a single arbitration. As a result, the timing of Leeward's commencement of arbitration was certainly reasonable.

38.     In addition, the AUA's citations in support of its contention that six months is the "reasonable" time limit to commence arbitration (RCOL ¶ 22) should not be considered by the Tribunal for two reasons. First, the cases are not binding precedent within this Arbitration. The Contract provides that Antigua law governs the interpretation of the Contract, including the arbitration provision. LC1, p. LC000051. None of the cases the AUA cites are based on Antigua law.

39.     Second and most importantly, the cases the AUA cites are easily distinguished from the present case. In *Bickerstaff v. Frazier,* 232 So.2d 190, 191 (Fla. Dist. Ct. App. 1st 1970), a breach of contract lawsuit was filed by the complaining party prior to filing a demand for arbitration. As a result of the five (5) month delay created by filing of the lawsuit, the court found the demand for arbitration to be untimely.

40.     In *Lyons v. Krathen,* 368 So.2d 906, 908 (Fla. Dist. Ct. App. 3d 1979), the claim at issue was submitted to the architect, who made a decision on the claim, and the subject demand for arbitration was filed four (4) months **after** the architect's decision. In *Riggi v. Wade Lupe Constr. Co.,* 176 A.D.2d 1177 (App. Div. 1991), the court specifically found the owner's

18

argument that the demand for arbitration was untimely to be "meritless" due to the fact that "the architect's decision [did] not state '(1) that the decision is final but subject to appeal, and (2) that any demand for arbitration must be made within thirty days after the date on which the party making the demand receives the written decision.'" Riggi, *supra*, at 1179. In the instant matter, Nagesh, the Project Architect, never made a decision on many of Leeward's claims. Where Nagesh arguably made a decision, the decision did not state, as required by the Contract that (1) the decision was final and subject to appeal, and (2) a demand for arbitration must be made within 30 days. (*See* LC1, p. LC 000036)   Therefore, Leeward was certainly reasonable to commence its arbitration when it did.

b.   **Leeward Never Waived its Contractual Right to Change Orders to Affect Additions and Deductions to the Contract Price**

41.   The AUA argues at RCOL ¶ 29-44 that the parties waived the use of change orders as provided in the Contract and opted instead to use monthly requisitions to document additions and deductions to the contract sum. The AUA's argument conflicts with the plain and unequivocal language in the Contract. General Condition §13.4.2 reads as follows:

> No action or failure to act by the Owner, Architect or Contractor shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

(LC 1, p. LC000051) Similarly, General Conditions §1.1.1 provides that the Contract may not be modified except by (a) written amendment to the Contract signed by both parties, (b) a Change Order, (c) a Construction Change Directive or (d) a written order for a minor change in the Work issued by the Architect. (LC 1, p. LC000025) Thus, under the terms of the Contract, Leeward could not have waived or modified its contractual right to receive change orders for additions, modifications, or deletions to the Contract work -- particularly when the change results

19

in an addition or deductions to the stipulated Contract price -- unless the waiver is specifically agreed to in writing (General Conditions §13.4.2) or the modification is in a written amendment to the Contract that is signed by both parties (General Conditions §1.1.1).

42.     With two exceptions, none of the authorities that the AUA cites in support of its waiver argument address the effects of the no waiver/no modification clause in the Contract. The two exceptions are the AUA's citation to the treatises Wilken and Villiers: The Law of Waiver, Variation and Estoppel 2d ("Wilken"), §19.13 and Chitty on Contracts ("Chitty"), §22-045.  (The relevant portion of Chitty and Willken are set forth in the Proposed Findings of Fact and Conclusions of Law at Tabs 26 and 27 respectively.)  Specifically, Wilken, §19.13 states that "[i]n considering waiver... care must be taken as it is common for standard form construction contracts to contain express provisions as to when and in what circumstances a party will be taken to have waived its rights." Chitty, §22-040 is even more to the point:

> **Contracting out of waiver.** It would appear that there is no general principle of law that parties to a contract cannot restrict the operation of the doctrine of waiver by the terms of their contract.

The AUA does not address the impact of the no modification/no waiver clauses in the Contract or their effect upon the AUA's waiver argument.  The obvious reason for the AUA's omission is that the no modification/no waiver provisions in the Contract do not support the AUA's theory of the case.

43.     In many of the cases that the AUA cites in support of its waiver argument, the Court found that the owner of the project waived the right to insist upon a change order as a prerequisite for the payment of extra work, because the owner was responsible, under the contract, for issuing change orders for the extra work that the owner requested and accepted. *See, e.g., Moore Constr. Co. Inc. v. Clarksville Dep't of Elec.*, 707 S.W.2d 1 (Tenn. Ct. App.

1985); *Circle Y Constr. Inc. v. WRH Realty Serv.*, 721 F. Supp. 1272 (N.D. Ga. 2010). In other words, having failed to issue a change order for extra work that it requested and accepted, the owner cannot deny payment for the extra work because of its failure to issue a change order. If these cases are at all relevant, then it is because they show that the AUA waived the right to withhold payment for extra work because of its own failure to issue change orders. The cases do not support the AUA's waiver argument with respect to Leeward.

44.      Under the cases and treatises that the Respondent cites, a person can only waive contractual right by words or conduct that are knowing, intentional, and unequivocal. *See generally, Moore Constr. Co. Inc., supra; Bremer Handelsgesellschaft v. C. Mackprang Jr.,* 1 Lloyd's Rep 221 (Court of Appeal 1979); *Circle Y Constr. Inc., supra.,*; Wilken, §3.15. Here, the overwhelming evidence shows that Leeward repeatedly demanded change orders as provided in the Contract, but the AUA and its Architect repeatedly ignored Leeward's requests. (Dickinson Witness Statement, ¶ 47-48; Green Witness Statement, ¶ 33-34; Winwood Witness Statement, ¶ 17) Leeward's clear intent was not to waive the right to change orders, but to enforce the right to change orders.

45.      Most importantly, the AUA failed to raise a defense of waiver in its Answering Statement and Counterclaim to the Amended Demand for Arbitration, dated November 30, 2011, and we respectfully submit that the AUA should not be allowed to raise a waiver defense for the very first time after the evidentiary hearing.

c.      **Leeward is Entitled to Its Unpaid Change Orders and Unpaid Claims and Has Not Double-Counted**

46.      In RCOL ¶45-47, AUA argues that Leeward is not entitled to recover the amount of its unpaid change orders because the amounts were not listed in its October 26, 2009 correspondence. Further, in RCOL ¶61-62 the AUA claims that Leeward is not entitled to

recover for its unpaid claims, including the Whitsuntide Holiday because the AUA paid and/or denied in the Draft Final Account. As Leeward has already extensively explained in ¶ 18 and 33 herein as well as in its Proposed Findings of Fact and Conclusions of Law, Leeward's claims are not limited to the items contained in its October 26, 2009 correspondence or by how the AUA chose to fashion the last payment paid on the Project. Throughout this proceeding, Leeward has continuously disputed the method by which the AUA calculated its last payment on the Project. Regardless of how the AUA chooses to characterize it, Leeward has not been paid for these items. As such, Leeward is entitled to recover for its unpaid change orders and unpaid claims as asserted herein, including the Whitsuntide Holiday.

47.    In RCOL ¶ 48-49, AUA claims that Leeward has somehow double-counted in its claim for damages. Without explanation for its conclusion, AUA claims that the EC $1,000,000.00 contingency in the Contract was drawn down in full and Leeward "was actually paid an additional EC $1,262,166.51 for these contingent costs." (RCOL ¶ 48) The AUA offers no support for this conclusion. (RCOL ¶ 76) Leeward has not double-counted in its damages calculation and is entitled to all that it has requested.

d.    **Leeward is Entitled to Additional Preliminaries as a Result of Project Delays**

48.    The AUA contends in RCOL ¶ 50-61 that Leeward is not entitled to additional Preliminaries for the nineteen week period of running from the May 15, 2009 substantial completion date in the Contract, as extended by the AUA, through the completion of the Project on or about September 18, 2009, because Leeward did not offer expert testimony at trial to establish "drawing by drawing, beam by beam, column by column, gutter by gutter" how a specific event delayed a particular item of work. (RCOL ¶ 54) The case authorities that the AUA cites in support of its position are easily distinguished from the present controversy in that

22

none of the cases involved an arbitration where the tribunal consisted of professional engineers and lawyers who are experts in the field and fully familiar with claims for extension of time. Indeed, one of the reasons that parties to a construction contract agree to arbitrate disputes through the American Arbitration Association ("AAA") pursuant to its Construction Industry Rules is because of the AAA's ability to assign arbitrators who have extensive knowledge and experience as arbitrators and as practicing professionals in the construction industry with respect to construction related issues and disputes such as claims for extension of time.  Parties to an arbitration should not be compelled to spend a hundred thousand dollars or more on expert witnesses to explain to the arbitrators what they already know and understand and are capable of analyzing on their own.  This is particularly true in the present case where Leeward's claim for additional Preliminaries as a result of project delays is relatively small.   Indeed, under Rule 702 of the Federal Rules of Evidence, expert testimony is neither required not admissible where the trior of fact is capable of comprehending the evidence and drawing the correct conclusions. *See Pfeifer v. Lewis County*, 308 F.Supp.2d 88, 95-96 (N.D.N.Y. 2004) (Appendix G); F.R.E. Rule 702 (text of Rule 702 is quoted in *Pfeifer*, 308 F.Supp.2d at 96)

49.    In addition, the case authorities that the AUA cites involve claims that were significantly larger and more complicated than the claims at issue in the present case. *See, e.g., McAlpine Humberoak Ltd. V. McDermott Int'l Inc.*, 58 Build LR 1 (Eng. Ct. of App. 1992) (Plaintiff made delay claim with respect to construction of an offshore oil rig for $5,740,688.98/£3,548,848, and alleged that the revision of more than 60 drawings, the failure of defendants to promptly answer over 45 technical queries, and the issuance of over 83 changes orders caused their delay.  The trial lasted 92 days and over 37,000 pages of documents were entered into evidence.).  Leeward respectfully submits that expert testimony is not required to

23

establish its claim for additional Preliminaries when the AUA, as the owner of the Project failed to provide the design details, information, and specifications that the contractor required to substantially complete the Project on time until several weeks and months after the Substantial Completion date.  (Dickinson Witness Statement, ¶ 66-77; Winwood Witness Statement, ¶ 23-26)

e.      **The AUA is Not Entitled to Liquidated Damages**

50.     The AUA claims liquidated damages in the amount US $117,000.00.  (RCOL ¶ 63-67)   The AUA is not entitled to liquidated damages because the credible evidence overwhelmingly establishes that the AUA was responsible for the project delays.

51.     In addition, the AUA failed to establish at the hearing or even allege compliance with the notice of claim provisions in Article 4.3.2 of the Contract, which apply equally to the AUA. (LC1, p. 000034)

52.     The AUA also failed to meet its own standards for establishing delay claims (RCOL ¶ 50-62)  by the use of expert testimony to link cause and effect on a drawing by drawing, beam by beam, column by column and gutter by gutter basis.

f.      **Leeward is Entitled to Retainage**

53.     The AUA contends that Leeward is not yet entitled to the Contract retainage in the amount of US $218,566.74/EC $590,083.00 because Leeward has yet to comply with General Conditions §9.10.2.  (RCOL ¶ 981-83)  The AUA is wrong for two reasons.

54.     First, the obligations under General Conditions §9.10.2 do not even come into play until the Architect certifies the project as substantially complete and issues a certificate of substantial completion as required under General Conditions §9.8.4. (LC 1, p. LC000044)  As of this date, the AUA's Architect has yet to issue a Certificate of Substantial Completion

notwithstanding Leeward's repeated demands. (Dickinson Witness Statement, ¶ 63-64; Green Witness Statement, ¶ 40, 50)

55.      Second, the AUA presented no evidence establishing that it has ever requested Leeward to submit documents identified in General Conditions §9.10.2 or that they are even applicable to this particular Project. For example, Antigua does not appear to have a lien law that would encumber the AUA's property in the event Leeward failed to pay a indebtedness connected with the work; nothing in the Contract requires Leeward to maintain insurance after final payment; and there was no surety with respect to Leeward's work. If the AUA had concerns about the applicability of General Conditions §9.10.2, then Lt. Colonel Antony or Nagesh could have simply sent Leeward an email or walked the short distance across the Project site to Leeward's office and discuss the close out documentation. They did not because the AUA had no intent of paying Leeward the Contract retainage.

g.      **Leeward is Entitled to Overhead and Profit for the Doors and Windows, Painting and Flooring Work deleted from the Contract**

56.      In RCOL ¶ 68-71 of the RCOL, the AUA argues that Leeward is not entitled to overhead and profit on the painting work or the doors and windows works deleted from the Contract. Despite the AUA's contention that the deleted flooring work should be included in Leeward's calculation (RFDF ¶ 60), it has not addressed the flooring work in its argument concerning Leeward's entitlement to overhead and profit for deleted work. Leeward regards this omission as the AUA's admission that Leeward is entitled to overhead and profit on the deleted flooring work pursuant to Section 7.3.7 of the General Conditions.

57.      The AUA claims that Leeward is not entitled to overhead and profit on the doors and windows work deleted from the scope of its work because these items were provisional sums. However, Section 7.3.7 of the General Conditions provides that Leeward will be

compensated for its overhead and profit on items deleted from the scope of work. (LC 1, p. LC 000040)  The doors and window items deleted from the BOQ were for labor to be provided for the installation of the doors and windows.  The items were added into the fixed price sum for the Contract.  Consequently, if they are deducted from the fixed price sum of the Contract, Leeward should be awarded overhead and profit on the items.

58.     The fact that Leeward installed the doors and windows under a separate additional works contract does not alter this conclusion.  By the time the installation of the doors and windows was deleted from Leeward's scope of work (April 21, 2009), it had already expended considerable resources on the Project.  Thus, it was entitled to its overhead and profit.  Moreover, Leeward had to competitively bid the additional works contract for the installation of the doors and windows with no guarantee of being awarded the work.  (Dickinson Testimony, March 5, 2012) And, as Lt. Col. Antony acknowledged during cross-examination, he has no idea whether Leeward's bid included overheard and profit at the 18% rate in the Contract or at a significantly lower rate to stay competitive.  (Lt. Col. Antony Testimony, March 7, 2012)

59.     The AUA also claims that "equity militates against awarding Leeward overhead and profit for the Painting Work" because the AUA did Leeward a favor by deleting the work from Leeward's scope of work thereby allowing Leeward to reach substantial completion sooner.  As Leeward has demonstrated throughout this matter, the delays on the Project were the result of several factors none of which were Leeward's responsibility, including but not limited to the AUA's representatives complete inability to administer the Contract and coordinate the work of various trades on the Project.  The AUA was not doing Leeward a favor by deleting the painting work, it was trying to save money on Preliminaries.  (Dickinson Witness Statement, ¶ 78-79; Winwood Witness Statement, ¶ 28-29)  In addition to being a contractual requirement, equity

26

militates that Leeward be awarded overhead and profit on all deleted work and omitted work on the Project.

**h.     The Additional Works Contracts are Subject to Arbitration**

60.     Throughout the course of the Project, Leeward was awarded additional works contracts for work that was deleted from the Contract's scope as well as additional work required for the Project.   These additional works contracts arose out of and related to the Contract. (Dickinson Witness Statement, ¶ 78-90; LC 228-241)

61.     Section 4.6.1 of the General Conditions to the Contract provides that that parties agree to submit to arbitration "[a]ny Claim arising out of or related to the Contract..." (LC 1, p. LC 000036)  The additional works contracts arise out of and related to the Contract in that the additional works were initially part of the Contract, including design documents, specifications, and project schedule, that the AUA subsequently removed from the Contract and given back to Leeward under separate contracts.

62.     In addition, Section 6.1.1 of the General Conditions to the Contract provides that "[t]he Owner reserves the right ... to award separate contracts in connection with other portions of the Project or other construction or operations on the site under Conditions of the Contract identical or substantially similar to these [General Conditions]..." (LC 1, p. LC 000038)  While the additional works contracts may not have contained separate arbitration provisions, they are included within Sections 4.6.1 and 6.1.1 of the General Conditions to the Contract and as such, are subject to arbitration herein.

63.     Should the Tribunal decide that the additional works contracts are not subject to arbitration, the claim for the amount due and owing on those contracts is easily removable from Leeward's total claim.  As the Tribunal will note at LCOL ¶ 162-164, Leeward has separated the

amount due on the additional works contracts from the other damages demanded herein.  The Tribunal can easily strike this amount should it decide that the balance due and owing on the additional works contracts is not subject to arbitration herein.

**i.      If Leeward Prevails in this Arbitration, then it is Entitled Under the Contract to Interest on Payments Due and Unpaid Pursuant to the Contract Documents from the Date Payment is Due at the Prevailing Legal Rate in Antigua**

68.     In RCOL ¶ 89, n. 9, the AUA complains that Leeward failed to offer any factual evidence at trial as to the amount of interest due and/or the applicable legal rate and that Leeward did not raise the applicable interest rate as an issue until the pre-hearing conference on March 1, 2012.  The AUA demands a continuation of the evidentiary hearing and even more litigation to determine the legal rate of interest in Antigua in the event the Tribunal rules in favor of Leeward.

69.     Although Leeward was prepared to offer documentary evidence as to the prevailing legal rate of interest in Antigua during the relevant time periods, the parties agreed to address this issue in their respective post hearing submissions.  A factual hearing is not required to establish the prevailing legal rate in Antigua because the information is widely and publicly available on the Internet to anyone who bothers to look.  We respectfully request the Tribunal to take the equivalent of "judicial notice" of the legal rate of interest in accordance with Antiguan law, as set forth in the LCOL ¶ 137-145 and Appendix B.

70.     Contrary to the AUA's assertion, Leeward did not wait until the prehearing conference to raise the issue of the appropriate rate of interest on payments due and owing under the contract. "Claim Two" in Leeward's Amended Demand for Arbitration is dedicated to the recovery of interest on the unpaid contract balance at the "legal rate" in Antigua from the date that the payment is due to the date the payment is made as provided in the Contract.  Leeward had no obligation to share its research with the AUA as to what constitutes the "legal rate."

Dated:  May 4, 2012

LEWIS & GREER, P.C.
510 Haight Avenue, Suite 202
Poughkeepsie, New York  12603
*Counsel for Claimant,*
*Leeward Construction Company, Ltd.*

By:  _____

J. Scott Greer, Esq.
Veronica A. McMillan, Esq.

| **DOCUMENT TEXT** | **COMMENTS** |
|---|---|

In most jurisdictions, the law provides for such immunity even in the absence of this language.

**4.2.12** Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. **When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.**

4.2.13 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

4.3    CLAIMS AND DISPUTES

4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

The word *initiated* underscores the fact that notice of a claim need not contain all the information pertaining to the claim.

**4.3.2   Time Limits on Claims.** Claims by either party must be **initiated** within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim,

| COMMENTS | DOCUMENT TEXT |
|---|---|

**COMMENTS**

This is intended to mitigate damages that might otherwise be waived by both parties because it avoids the expense of shutting down the project and later restarting it. The exceptions cover situations justifying suspension or termination.

This covers physical conditions not specifically addressed in the contract documents, but those that differ materially from conditions that might reasonably be assumed to exist at the site. For example, the actual bedrock encountered may fracture much more readily than is typical and expected for that type of rock, or a concealed structure may include iron connections when only wood joints were expected. If deviation is material to the required work, a claim would be allowable.

The observing party must give notice before disturbing the conditions *and* within 21 days of first observing them in order to give the architect the opportunity to investigate the conditions.

Changed conditions may result in either an increase or decrease in the contract sum or contract time. Owners as well as contractors may take advantage of these provisions if circumstances so warrant.

**DOCUMENT TEXT**

whichever is later. Claims must be initiated by written notice to the Architect and the other party.

**4.3.3        Continuing        Contract Performance.** Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Subparagraph 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

**4.3.4    Claims for Concealed or Unknown Conditions.** If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party **promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions.** The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an **equitable adjustment** in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the

---

**A201 Commentary**                    39

| COMMENTS | DOCUMENT TEXT |
|---|---|
| | Directive for determining the proposed adjustment in the Contract Sum or |
| | **7.3.6** If the Contractor does not respond promptly or disagrees with the method for adjustment in the Contract Sum, the method and the adjustment shall be determined by the Architect on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase in the Contract Sum, a reasonable allowance for overhead and profit. In such case, and also under Clause 7.3.3.3, the Contractor shall keep and present, in such form as the Architect may prescribe, an itemized accounting together with **appropriate supporting data**. Unless otherwise provided in the Contract Documents, costs for the purposes of this Subparagraph 7.3.6 shall be limited to the following: |
| This might include invoices with similar breakdowns from subcontractors, slips from material suppliers and similar data. The architect may request the assistance of the owner's accountant in reviewing the adequacy of such financial data. | |
| | **.1**   costs of labor, including social security, old age and unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance; |
| It is appropriate to identify in the supplementary conditions the basis for determining the rental values (e.g., the contractor's normal rates, the Associated General Contractors' published rates or others) applicable to contractor-owned equipment. Retail rental rates may include elements of overhead and profit. Duplication of these cost items should be avoided. | **.2**   costs of materials, supplies and equipment, including cost of   transportation, whether incorporated or consumed; |
| | **.3**   **rental costs** of machinery and equipment, exclusive of hand tools, whether rented from the Contractor or others; |
| | **.4**   costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and |
| | **.5**   additional costs of supervision and field office personnel directly attributable to the change. |
| Where the change results in a credit, the amount of the credit is determined by the cost that would have been incurred in executing the change by the contractor without decreasing the contractor's overhead and profit. | **7.3.7** The amount of credit to be allowed by the Contractor to the Owner for a deletion or **change which results in a net decrease in the Contract Sum** shall |

| DOCUMENT TEXT | COMMENTS |
|---|---|

be actual net cost as confirmed by the Architect. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**7.3.8** Pending final determination of the total cost of a Construction Change Directive to the Owner, amounts not in dispute for such changes in the Work shall be included in Applications for Payment accompanied by a Change Order indicating the parties' agreement with part or all of such costs. For any portion of such cost that remains in dispute, **the Architect will make an interim determination for purposes of monthly certification for payment for those costs.** That determination of cost shall adjust the Contract Sum on the same basis as a Change Order, subject to the right of either party to disagree and assert a claim in accordance with Article 4.

**7.3.9** When the Owner and Contractor agree with the determination made by the Architect concerning the adjustments in the Contract Sum and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and shall be recorded by preparation and execution of an appropriate Change Order.

## 7.4   MINOR CHANGES IN THE WORK

**7.4.1** The Architect will have authority to order minor changes in the Work not involving adjustment in the Contract Sum or extension of the Contract Time and not inconsistent with the intent of the Contract Documents. Such changes shall

When work required by a construction change directive spans several payment periods, the contractor is paid on the basis of work performed during each such period. If the parties disagree about the amount due the contractor for any payment period, the matter is referred to the architect, who makes an interim determination. The owner then compensates the contractor on the basis of the architect's interim determination. If either party disagrees with that determination, that party may assert a claim.

Evidence of the costs must be assembled by the contractor and submitted to the architect as part of the contractor's application for payment. The architect is under no obligation to audit these costs, but is only required to exercise reasonable professional judgment in reviewing the submitted information.

AIA Document G710, Architect's Supplemental Instructions, may be used to document minor changes. A change that is inconsistent with the intent of the contract documents must be documented as a change order or construction change directive rather than as a minor change in the work, even if the contract sum and contract time are unaffected.

Problems often arise when the parties disagree as to what constitutes a minor change. Therefore, before a minor change order is issued, the contractor's agreement that the proposed minor change will not affect the contract sum or contract time should be documented.

No. 8 of 1997.            *Limitation Act 1997.*            1        ANTIGUA
                                                                    AND
                                                                 BARBUDA



[ L.S. ]

I Assent,

**Joseph Myers,**
*Governor-General's* Deputy.

1lth March, 1997.


ANTIGUA AND BARBUDA


1997, No. 8

AN ACT to make provision for the limitation of actions.

[ *12th* June, *1997* ]

ENACTED by the Parliament of Antigua and Barbuda as follows—

PART I

Preliminary

1. This Act may be cited as the Limitation Act 1997.          Short title.

2. (1) In this Act —

"action" includes my proceedings in a court of law;          Interpretation.

"land" includes corporeal hereditaments, rent charges and any legal or equitable estate or interest therein, including an interest in the proceeds of the sale of land held on trust for sale, but except as provided above in this definition does not include any incorporeal hereditament;

"personal estate" and "personal property" do not include chattels real;

"personal injuries" includes any disease and any impairment of a person's physical or mental condition, and "injury" and cognate expressions shall be construed accordingly;

"rent" includes a rentcharge and a rentservice;

"rentcharge" means any annuity or periodical sum of money charged upon or payable out of land, except a rentservice or interest on a mortgage on land.

(2) For the purposes of this Act a person is under a disability while he is an infant, or of unsound mind.

(3) For the purposes of subsection (2) a person is of unsound mind if he is a person who, by reason of being of unsound mind within the meaning of the Mental Treatment Act (Cap 274) is incapable of managing and administering his property and affairs.

(4) Without prejudice to the generality of subsection (3), a person shall be conclusively presumed for the purposes of subsection (2) to be of unsound mind —

    *(a)*    while he is liable to be detained under the Mental Treatment Act; and

    *(b)*    while he is receiving treatment as an inpatient in any mental hospital or licensed house within the meaning of that Act without being liable to be detained under that Act, being treatment which follows without any interval a period during which he was liable to be detained under that Act.

(5) Subject to subsection (6), a person shall be deemed to claim through another person if he became entitled by, through, under, or by the act of that other person to the right claimed.

(6) A person becoming entitled to any estate or interest by virtue of a special power of appointment shall not be deemed to claim through the appointor.

(7) References in this Act to a right of action to recover land include references to a right to enter into possession of the land or, in the *case* of rentcharges, to distrain for arrears of rent, and references to the bringing of such an action include references to the making of such an entry or distress.

No. 8 of 1997.          *Limitation Act 1997.*          **3**          ANTIGUA
AND
BARBUDA

(8) References in this Act to the possession of land shall, in the case of rentcharges, be construed as references to the receipt of rent, and references to the date of dispossession or discontinuance of possession shall be construed as references to the date of the last receipt of rent.

(9) References in Part III to a right of action include references to —

    *(a)*  a cause of action;

    *(b)*  a right to receive money secured by a mortgage or charge on any property;

    *(c)*  a right to recover proceeds of the sale of land; and

    *(d)*  a right to receive a share or interest in the personal estate of a deceased person.

(10) References in Part III to the date of the accrual of a right of action be construed —

    *(a)*  in the case of an action upon a judgment, as references to the date on which the judgment became enforceable: and

    *(b)*  in the case of an action to recover arrears of rent or interest, or damages in respect of arrears of rent or interest, as references to the date on which the rent or interest became due.

## PART II

## ORDINARY TIME LIMITS FOR DIFFERENT CLASSES OF ACTION

3. (1) This Part gives the ordinary time limits for bringing actions of the various classes mentioned in the following provisions.

(2) The ordinary time limits given in this Part are subject to extension or exclusion in accordance with the provisions of Part III.

*Time limits under Part II subject to extension under Part III.*

4. An action founded on tort shall not be brought after the expiration of six years from the date on which the cause of action accrued.

*Time limit for actions founded on tort.*

ANTIGUA
AND
BARBUDA

4

Limitation Act 1997

No. 8 of 1997.

Time limit in case
of successive
conversions and
extinction of title
of owner of
converted goods.

**5. (1)** Where any cause of action in respect of the conversion of a chattel has accrued to any person and, before he recovers possession of the chattel, a further conversion takes place, no action shall be brought in respect of the further conversion after the expiration of six years from the accrual of the cause of action in respect of the original conversion.

**(2)** Where any such cause of action has accrued to any person and the period prescribed for bringing that action has expired and he has not during that period recovered possession of the chattel, the title of that person to the chattel shall be extinguished.

Special time limit
in case of larceny.

**6. (1)** The right of any person from whom a chattel is stolen to bring an action in respect of the larceny shall not be subject to the time limits under section 4 and 5 (1), but if his title to the chattel is extinguished under section 5 (2) he may not bring an action in respect of a larceny preceding the loss of his title unless the larceny in question preceded the conversion from which time began to run for the purposes of section 5 (2).

**(2)** Subsection (1) shall apply to any conversion related to the larceny of a chattel as it applies to the larceny of a chattel; and except as provided below, every conversion following the larceny of a chattel before the person from whom it is stolen recovers possession of it shall be regarded for the purposes of this section as related to the larceny.

**(3)** If anyone purchases a stolen chattel in good faith, neither the purchase nor any conversion following it shall be regarded as related to the larceny.

**(4)** Any cause of action accruing in respect of the larceny, or any conversion related to the larceny, of a chattel to any person from whom the chattel is stolen shall be disregarded for the purposes of applying section 5 (1) or (2) to his case.

**(5)** Where in any action brought in respect of the conversion of a chattel it is proved that the chattel was stolen from the plaintiff or anyone through whom he claims it shall be presumed that any conversion following the larceny is related to the larceny unless the contrary is shown.

**(6)** In this section "larceny" includes —

*(a)*  any conduct outside Antigua and Barbuda which would be larceny if committed in Antigua and Barbuda; and

No. 8 of 1997.         *Limitation Act* 1997.         5         ANTIGUA
                                                               AND
                                                            BARBUDA

   **(b)**  obtaining any chattel (in Antigua and Barbuda or elsewhere) in the circumstances described in section 27 of the Larceny Act, or by blackmail within the meaning of section 34 of that Act; and references in this section to a chattel being "stolen" shall be construed accordingly.

   7. An action founded on simple contract shall not be brought after the expiration of six years from the date on which the cause of action accrued.

<em>Time limit for actions founded on simple contract.</em>

   8. (1) Subject to subsection (3), section 7 shall not bar the right of action on a contract of loan to which this section applies.

<em>Special time limit for actions in respect of certain loans.</em>

   (2) This section applies to any contract of loan which —

   **(a)**  does not provide for repayment of the debt on or before a fixed or determinable date; and

   **(b)**  does not effectively (whether or not it purports to do so) make the obligation to repay the debt conditional on a demand for repayment made by or on behalf of the creditor or on any other matter,

except where in connection with the taking the loan the debtor enters into any collateral obligation to pay the amount of the debt or any part of it (as, for example, by delivering a promissory note as security for the debt) on terms which would exclude the application of this section to the contract of loan if they applied directly to repayment of the debt.

   (3) Where a demand in writing for repayment of the debt under a contract of loan to which this section applies is made by or on behalf of the creditor (or, where there are joint creditors, by or on behalf of any one of them) section 7 shall thereupon apply as if the cause of action to recover the debt had accrued on the date on which the demand was made.

   (4) In this section "promissory note" has the same meaning as in the Bills of Exchange Act.

<em>Cap.</em> 48.

   9. An action to enforce an award, where the submission is not by an instrument under seal, shall not be brought after the expiration of six years from the date on which the cause of action accrued.

<em>Time limit for actions to enforce certain awards.</em>

ANTIGUA
AND
BARBUDA

*Limitation Act 1997*     No. 8 of 1997.

**Time limit for actions on a specialty.**

**10.** (1) An action upon a specialty shall not be brought after the expiration of twelve years from the date on which the cause of action accrued.

(2) Subsection (1) shall not affect any action for which a shorter period of limitation is prescribed by any other provision of this Act.

**Time limit for actions for sums recoverable by statute.**

**11.** (1) An action to recover any sum recoverable by virtue of any enactment shall not be brought after the expiration of six years from the date on which the cause of action accrued.

(2) Subsection (1) shall not affect any action to which section 12 applies.

**Special time limit for claiming a contribution.**

**12.** (1) Where under any Act, any person becomes entitled to a right to recover contribution in respect of any damage from any other person, no action to recover contribution by virtue of that right shall be brought after the expiration of two years from the date on which that right accrued.

(2) For the purposes of this section the date on which a right to recover contribution in respect of any damage accrues to any person (referred to below in this section as ("the relevant date") shall be ascertained as provided in subsections (3) and (4).

(3) If the person in question is held liable in respect of that damage —

(a)   by a judgment given in any civil proceedings; or

(b)   by an award made on any arbitration; the relevant date shall be the date on which the judgment is given, or the date of the award, as the case may be; and for the purposes of this subsection no account shall be taken of any judgment or award given or made on appeal in so far as it varies the amount of damages awarded against the person in question.

(4) If, in any case not within subsection (3), the person in question makes or agrees to make any payment to one or more persons in compensation for that damage (whether he admits any liability in respect of the damage or not), the relevant date shall be the earliest date on which the amount to be paid by him is agreed between him (or his representative) and the person (or each of the persons, as the case may be) to whom the payment is to be made.

(5) An action to recover contribution shall be one to which sections 28, 32 and 35 apply, but otherwise Parts III and IV (except sections 34 and 37) shall not apply for the purposes of this section.

13. (1) This section applies to any action for damages for negligence, nuisance or breach of duty (whether the duty exists by virtue of a contract or of provision made by or under a statute or independently of any contract or any such provision) where the damages claimed by the plaintiff for the negligence, nuisance or breach of duty consist of or include damages in respect of personal injuries to the plaintiff or any other person.

*Special time limit for actions in respect of personal injuries.*

(2) None of the time limits given in the preceding provisions of this Act shall apply to an action to which this section applies.

(3) An action to which this section applies shall not be brought after the expiration of the period applicable in accordance with subsection (4) or (5).

(4) Except where subsection (5) applies, the period is three years from —

   *(a)*   the date on which the cause of action accrued; or

   *(b)*   the date of knowledge (if later) of the person injured.

(5) If the person injured dies before the expiration of the period mentioned in subsection (4), the period applicable as respects the cause of action surviving for the benefit of his estate shall be three years from —

   *(a)*   the date of death; or

   *(b)*   the date of the personal representative's knowledge; whichever is the later.

(6) For the purposes of this section "personal representative" includes any person who is or has been a personal representative of the deceased including an executor who has not proved the will (whether or not he has renounced probate) but not anyone appointed only as a special representative in relation to settled land; and regard shall be had to any knowledge acquired by any such person while a personal representative or previously.

(7) If there is more than one personal representative, and their dates of knowledge are different, subsection (5)(b) shall be read as referring to the earliest of those dates.

Special time limit for actions under fatal accidents legislation.

Cap. 166.

14. (1) An action under the Fatal Accidents Act shall not be brought if the death occurred when the person injured could no longer maintain an action and recover damages in respect of the injury (whether because of a time limit in this Act or in any other Act, or for any other reason). Where any such action by the injured person would have been barred by the time limit in section 13, no account shall be taken of the possibility of that time limit being overridden under section 33.

Cap. 166.

(2) None of the time limits given in the preceding provisions of this Act shall apply to an action under the Fatal Accidents Act, but no such action shall be brought after the expiration of four years from —

    *(a)*   the date of death, or

    *(b)*   the date of knowledge of the person for whose benefit the action is brought;

whichever is the later.

(3) An action under the Fatal Accidents Act, shall be one to which section 28, 33 and 35 of this Act apply but otherwise parts III and IV shall not apply to any such action.

Operation of time limit under section 14 relation to different dependents.

15. (1) Where there is more than one person for whose benefit an action under the Fatal Accidents Act is brought, section 14 (2) *(b)* of this Act shall be applied separately to each of them.

(2) Subject to subsection (3), if by virtue of subsection (1) the action would be outside the time limit given by section 14 (2) as regards one or more, but not all, of the persons for whose benefit it is brought, the court shall direct that any person ʒ  regards whom  ̣t       ion would be outside that limit shall be excluded from those for whom the action is brought.

(3) The court shall not give such a direction if it is shown that if the action were brought exclusively for the benefit of the person in question it would not be defeated by a defence of limitation (whether in consequence of section 28 or an agreement between the parties not to raise the defence, or otherwise).

Definition of date of knowledge for purposes of sections 13 and 14.

16. (1)  In sections 13 and 14 references to a person's date of knowledge are references to the date on which he first had knowledge of the following facts —

    (a)   that the injury in question was significant;

No. 8 of 1997.          *Limitation Act* 1997.          9          **ANTIGUA**
                                                                          **AND**
                                                                        **BARBUDA**

(b)   that the injury was attributable in whole or in part to the act or omission which is alleged to constitute negligence, nuisance or breach of duty;

(c)   the identity of the defendant; and

(d)   if it is alleged that the act or omission was that of a person other than the defendant, the identity of that person and the additional facts 13 supporting the bringing of an action against the defendant;

and knowledge that any acts or omissions did or did not, as a matter of law, involve negligence, nuisance or breach of duty is irrelevant.

(2) For the purposes of this section an injury is significant if the person whose date of knowledge is in question would reasonably have considered it sufficiently serious to justify his instituting proceedings for damages against a defendant who did not dispute liability and was able to satisfy a judgment.

(3) For the purposes of this section a persons knowledge includes knowledge which he might reasonably have expected to acquire —

(a)   from facts observable or ascertainable by him; or

(b)   from facts ascertainable by him with the help of medical or other appropriate expert advice which it is reasonable for him to seek;

but a person shall not be fixed under this subsection with knowledge of a fact ascertainable only with the help of expert advice so long as he has taken all reasonable steps to obtain (and, where appropriate, act on) that advice.

### Action to recover land and rent

17. (1)  No action shall be brought by any person to recover any land after the expiration of twelve years from the date on which the right of action accrued to him or, if it first accrued to some person through whom he claims, to that person.

Time limit for actions to recover land.

(2)  Subject to the following provisions of this section, where —

ANTIGUA
AND
BARBUDA

*Limitation Act 1997*

No. 8 of 1997.

*(a)* the estate or interest claimed was an estate or interest in reversion or remainder or any future estate or interest and the right of action to recover the land accrued on the date on which the estate or interest fell into possession by the determination of the preceding estate or interest; and

*(b)* the person entitled to the preceding estate or interest (not being a term of years absolute) was not in possession of the land on that date;

no action shall be brought by the person entitled to the succeeding estate or interest after the expiration of twelve years from the date on which the right of action accrued to the person entitled to the preceding estate or interest or six years from the date on which the right of action accrued to the person entitled to the succeeding estate or interest, whichever period last expires.

(3) No person shall bring an action to recover any estate or interest in land under an assurance taking effect after the right of action to recover the land had accrued to the person by whom the assurance was made or some person through whom he claimed or some person entitled to a preceding estate or interest, unless the action is brought within the period during which the person by whom the assurance was made could have brought such an action.

(4) Where any person is entitled to any estate or interest in land in possession and, while so entitled, is also entitled to any future estate or interest in that land, and his right to recover the estate or interest in possession is barred under this Act, no action shall be brought by that person, or by any person claiming through him, in respect of the future estate or interest, unless in the meantime possession of the land has been recovered by a person entitled to an intermediate estate or interest.

(5) This section does not apply to Crown Lands.

Time limit for redemption actions.

**18.** When a mortgagee or chargee of land has been in possession of any of the mortgaged or charged land for a period of twelve years no action to redeem the land of which the mortgagee or chargee has been so in possession shall be brought after the end of that period by the mortgagor or chargor or any person claiming through him.

Extinction of title to land after expiration of time limit.

**19.** Subject to section 20, at the expiration of the period prescribed by this Act for any person to bring an action to recover land (including a redemption action) the title of that person to the land shall be extinguished.

No. 8 of 1997. *Limitation Act 1997.* 11 ANTIGUA
AND
BARBUDA

20. (1)  Subject to section 23(1) and (2), the provisions of this <span style="float:right">Settled land and<br>land held on trust.</span>
Act shall apply to equitable interests in land, including interests
in the proceeds of the sale of land held upon trust for sale, as
they apply to legal estates; and accordingly a right of action to
recover the land shall, for the purposes of this Act but not
otherwise, be deemed to accrue to a person entitled in possession
to such an equitable interest in the like manner and circumstances,
and on the same date, as it would accrue if his interest were a legal
estate in the land.

(2) Where the period prescribed by this Act has expired for the
bringing of an action to recover land by a tenant for life or a
statutory owner of settled land –

(a)  his legal estate shall not be extinguished if and so long
as the right of action to recover the land of any person
entitled to a beneficial interest in the land either has
not accrued or has not been barred by this Act; and

(b)  the legal estate shall accordingly remain vested in the
tenant for life or statutory owner and shall devolve in
accordance with the Sealed Estates Act;     Cap. 398

but if and when every such right of action has been barred by this
Act, his legal estate shall be extinguished.

(3) Where any land is held upon trust (including a trust for sale)
and the period prescribed by this Act has expired for the bringing
of an action to recover the land by the trustees, the estate of the
trustees shall not be extinguished if and so long as the right of
action to recover the land of any person entitled to a beneficial
interest in the land or in the proceeds of sale either has not accrued
or has not been barred by this Act; but if and when every such right
of action has been so barred the estate of the trustees shall be
extinguished.

(4) Where —

(a)  any settled land is vested in a statutory owner; or

(b)  any land is held upon trust (including a trust for sale)

an action to recover the land may be brought by the statutory
owner or trustees on behalf of any person entitled to a beneficial
interest in possession in the land or in the proceeds of sale whose
right of action has not been barred by this Act, notwithstanding
that the right of action of the statutory owner or trustees would

**ANTIGUA**
**AND**
**BARBUDA**

12          *Limitation Act 1997*          No. 8 of 1997.

apart from this provision have been barred by this Act.

Time limit for
actions to recover
rent.

21. No action shall be brought, or distress made, to recover arrears of rent, or damages in respect of arrears of rent, after the expiration of six years from the date on which the arrears became due.

Time Limit for
actions to recover
money secured by
a mortgage or
charge or to
recover proceeds
of the sale of land.

22. (1) No action shall be brought to recover —

    *(a)*   any principal sum of money secured by a mortgage or other charge on property (whether real or personal); or

    *(b)*   proceeds of the sale of land;

after the expiration of twelve years from the date on which the right to receive the money accrued.

(2) No foreclosure action in respect of mortgaged personal property shall be brought after the expiration of twelve years from the date on which the right to foreclose accrued; but if the mortgagee was in possession of the mortgaged property after that date, the right to foreclose on the property which was in his possession shall not be deemed to have accrued for the purposes of this subsection until the date on which his possession discontinued.

(3) The right to receive any principal sum of money secured by a mortgage or other charge and the right to foreclose on the property subject to the mortgage or charge shall not be deemed to accrue so long as the property comprises any future interest or life insurance policy which has not matured or been determined.

(4) Nothing in this section shall apply to a foreclosure action in respect of mortgaged land, but the provisions of this Act relating to actions to recover land shall apply to such an action.

(5) Subject to subsections (6) and (7), no action to recover arrears of interest payable in respect of any sum of money secured by a mortgage or other charge or payable in respect of proceeds of the sale of land, or to recover damages in respect of such arrears shall be brought after the expiration of six years from the date on which the interest became due.

(6) Where—

No. 8 of *1997*.          *Limitation Act 1997.*          13          ANTIGUA
                                                                      AND
                                                                      BARBUDA

   *(a)*   a prior mortgagee or other incumbrancer has been in
possession of the property charged; and

   *(b)*   an action is brought within one year of the discontinu-
ance of that possession by the subsequent incum-
brancer;

the subsequent incumbrancer may recover by that action all the
arrears of interest which fell due during the period of possession
by the prior incumbrancer, or damages in respect of those arrears,
notwithstanding that the period exceeded six years.

   *(7)* Where—

   *(a)*   the property subject to the mortgage or charge com-
prises any future interest or life insurance policy; and

   *(b)*   it is a term of the mortgage or charge that arrears of
interest shall be treated as part of the principal sum
of money secured by the mortgage or charge;

interest shall not be treated as becoming due before the right to
recover the principal sum of money has accrued or is treated as
having accrued.

### Actions in respect of trust property or the
### personal estate of deceased persons

23. (1) No period of limitation prescribed by this Act shall
apply to an action by a beneficiary under a trust, being an action—      Time limit for
                                                                         actions in respect
                                                                         of trust property.

   *(a)*   in respect of any fraud or fraudulent breach of trust
to which the trustee was a party or privy; or

   *(b)*   to recover from the trustee trust property, or the
proceeds of trust property in the possession of the
trustee, or previously received by the trustee and
converted to his use.

   (2)*(a)*   Where a trustee who is also a beneficiary under the
trust receives or retains trust property or its proceeds
as his share on a distribution of trust property under
the trust, his liability in any action brought by virtue
of subsection (1) *(b)* to recover that property shall be
limited to the excess over his proper share;

ANTIGUA AND BARBUDA     **14**     *Limitation Act 1997*     No. 8 of 1997.

*(b)* This subsection only applies if the trustee acted honestly and reasonably in making the distribution.

(3) Subject to the preceding provisions of this section, an action by a beneficiary to recover trust property or in respect of any breach of trust, not being an action for which a period of limitation is prescribed by any other provision of this Act, shall not be brought after the expiration of six years from the date on which the right of action accrued. For the purposes of this subsection the right of action shall not be treated as having accrued to any beneficiary entitled to a future interest in the trust property until the interest fell into possession.

(4) No beneficiary as against whom there would be a good defence under this Act shall derive any greater or other benefit from a judgment or order obtained by any other beneficiary than he could have obtained if he had brought the action and this Act had been pleaded in defence.

**Time limit for actions claiming personal estate of a deceased person.**

24. Subject to section 23 (1) and (2) —

*(a)* no action in respect of any claim to the personal estate of a deceased person or to any share or interest in any such estate (whether under a will or on intestacy) shall be brought after the expiration of twelve years from the date on which the right to receive the share or interest accrued; and

*(b)* no action to recover arrears of interest in respect of any legacy, or damages in respect of such arrears, shall be brought after the expiration of six years from the date on which the interest became due.

**Time limit in respect of actions for an account.**

25. An action for an account shall not be brought after the expiration of any time limit under this Act which is applicable to the claim which is the basis of the duty to account.

**Time limit for actions to enforce judgments.**

26. (1) An action shall not be brought upon any judgment after the expiration of six years from the date on which the judgment became enforceable.

(2) No arrears of interest in respect of any judgment debt shall be recovered after the expiration of six years from the date on which the interest became due.

No. 8 of 1997.          *Limitation Act* 1997.          15          ANTIGUA
                                                                      AND
                                                                      BARBUDA

27. For the purposes of 'the provisions of this Act relating to          Administration to
actions for the recovery of land, an administrator of the estate of     relate back to
a deceased person shall be treated as claiming as if there had been     death.
no interval of time between the death of the deceased person and
the grant of the letters of Administration.

### PART III

### EXTENSION OR EXCLUSION OF

### ORDINARY TIME LIMITS

### Disability

28. (1) Subject to the following provisions of this section, on          Extension of
the date when any right of action accrued for which a period of         limitation period
limitation is prescribed by this Act, the person to whom it accrued     in case of
was under a disability, the action may be brought at any time            disability.
before the expiration of six years from the date when he ceased
to be under a disability or died (whichever first occurred)
notwithstanding that the period of limitation has expired.

(2) This section shall not affect any case where the right of
action first accrued to some person not under a disability through
whom the person under a disability claims.

(3) When a right of action which has accrued to a person under
a disability accrues, on the death of that person while still under
a disability, to another person under a disability, no further
extension of time shall be allowed by reason of the disability of
the second person.

(4) No action to recover land or money charged on land shall
be brought by virtue of this section by any person after the
expiration of thirty years from the date on which the right of action
accrued to that person or some person through whom he claims.

(5) If the section is one to which section 12 applies, subsection
(1) shall have affect as if for the words "six years" there were
substituted the words "two years".

(6) If the action is one to which section 13 or 14(2) applies,
subsection (1) shall have effect as if for the words "six years" there
were substituted the words "three years".

ANTIGUA        16        Limitation Act 1997        No. 8 of 1997.
AND
BARBUDA

## Acknowledgement and part payment

**Fresh accrual of action on acknowledgement or part payment.**

29. (1) Subsection (2) and (3) apply where any right of action (including a foreclosure action) to recover land or any right of a mortgage of personal property to bring a foreclosure action in respect of the property has accrued.

(2) If the person in possession of the land or personal property in question acknowledges the title of the person to whom the right of action has accrued, the right shall be deemed to have accrued on and not before the date of the acknowledgement.

(3) In the case of a foreclosure or other action by a mortgagee, if the person in possession of the land or personal property in question or the person liable for the mortgage debt makes any payment in respect of the debt (whether of principal or interest) the right shall be deemed to have accrued on and not before the date of payment.

(4) Where a mortgagee is by virtue of the mortgage in possession of any mortgaged land and either —

   *(a)*   receives any sum in respect of the principal or interest of the mortgage debt; or

   *(b)*   acknowledges the title of the mortgagor or his equity of redemption;

an action to redeem the land in his possession may be brought at any time before the expiration of twelve years from the date of payment or acknowledgement.

(5) Subject to subsection (6), where any right of action has accrued to recover —

   *(a)*   any debt or other liquidated or pecuniary claim; or

   *(b)*   any claim to the personal estate of a deceased person or to any share or interest in any such estate;

and the person liable or accountable for the claim acknowledges the claim or makes any payment in respect of it, the right shall be deemed to have accrued on and not before the date of the acknowledgement or payment.

(6) A payment of a part of the rent or interest due at any time shall not extend the period for claiming the remainder then due, but any payment of interest shall be treated as a payment in respect of the principal debt.

(7) Subject to subsection (6), a current period of limitation may be repeatedly extended under this section by further acknowledgements or payments but a right of action, once barred by this Act, shall not be revived by any subsequent acknowledgement or part payment.

30. (1) To be effective for the purposes of section 29, an acknowledgement must be in writing and signed by the person making it.

Formal provisions as to acknowledgements and part payments.

(2) For the purposes of section 29, any acknowledgement or payment —

    *(a)* may be made by the agent of the person by whom it is required to be made under that section; and

    *(b)* shall be made to the person, or to an agent of the person, whose title or claim is being acknowledged or, as the case may be, in respect of whose claim the payment is being made.

31. (1) An acknowledgement of the title to any land or mortgaged personality by any person in possession of it shall bind all other persons in possession during the ensuing period of limitation.

Effect of acknowledgement or part payment that also makes recipient.

(2) A payment in respect of a mortgage debt by the mortgagor or any other person liable for the debt, or by any person in possession of the mortgaged property, shall, so far as any right of the mortgagee to foreclose or otherwise to recover the property is concerned, bind all other persons in possession of the mortgaged property during the ensuing period of limitation.

(3) Where two or more mortgagees are by virtue of the mortgage in possession of the mortgaged land, an acknowledgement of the mortgagor's title or of his equity of redemption by one of the mortgagees shall only bind him and his successors and shall not bind any other mortgagee or his successors.

(4) Where, in a case within subsection (3), the mortgagee by whom the acknowledgement is given is entitled to a part of the

mortgaged land and not to any ascertained part of the mortgage debt the mortgagor shall be entitled to redeem that part of the land on payment, with interest, of the part of the mortgage debt which bears the same proportion to the whole of the debt as the value of the part of the land bears to the whole of the mortgaged land.

(5) Where there are two or more mortgagors, and the title or equity of redemption of one of the mortgagors is acknowledged as mentioned above in this section, the acknowledgement shall be treated as having been ma& to all the mortgagors.

(6) *An* acknowledgement of any debt or other liquidated pecuniary claim shall bind the acknowledger and his successors but not any other person.

(7) A payment made in respect of any debt or other liquidated pecuniary claim shall bind all persons liable in respect of the debt or claim.

(8) *An* acknowledgement by one of several personal representatives of any claim to the personal estate of a deceased person or to any share or interest in any such estate, or a payment by one of several personal representatives in respect of any such claim, shall bind the estate of the deceased person.

(9) In this section "successor", in relation to any mortgagee or person liable in respect of any debt or claim, means his personal representatives and any other persons on whom the rights under the mortgage or, as the case may be, the liability in respect of the debt or claim devolve whether on death or bankruptcy or the disposition of property or the determination of a limited estate or interest in settled property or otherwise.

**Fraud concealment and mistake**

Postponement of limitation period in case of fraud concealment of mistake.

32. (1)   Subject to subsection (3), where in the case of any action for which a period of limitation is prescribed by this Act, either —

(a)   the action is based upon the fraud of the defendant; or

(b)   any fact relevant to the plaintiff's right of action has been deliberately concealed from him by the defendant; or

No. 8 of 1997. *Limitation Act 1997.* 19 **ANTIGUA AND BARBUDA**

   *(c)* the action is for relief from the consequences of a mistake;

the period of limitation shall not begin to run until the plaintiff has discovered the fraud, concealment or mistake (as the case may be) or could with reasonable diligence have discovered it.

   (2) For the purposes of subsection (1), deliberate commission of a breach of duty in circumstances in which it is unlikely to be discovered for some time amounts to deliberate concealment of the facts involved in that breach of duty.

   (3) Nothing in **this** section' shall enable any action —

   *(a)* to recover, or recover the value of, any property; or

   *(b)* to enforce any charge against, or set aside any transaction affecting, any property;

to be brought against the purchaser of the property or any person claiming through him in any case where the property has been purchased for valuable consideration by an innocent third part since the fraud or concealment or, as the case may be, the transaction in which the mistake was made took place.

   (4) A purchaser is an innocent third party for the purposes of this section —

   *(a)* in the case of fraud or concealment of any fact relevant to the plaintiff's right of action, if he was not a party to the fraud or, as the case may be, to the concealment of that fact and did not at the time of the purchase know or have reason to believe that the fraud or concealment had taken place; or

   *(b)* in the case of mistake, if he did not at the time of the purchase know or have reason to believe that the mistake had been made,

   (5) References in this subsection to the defendant include references to the defendant's agent and to any person through whom the defendant claims and his agent.

ANTIGUA
AND
BARBUDA

20

*Limitation Act 1997*

No. 8 of 1997.

PART IV

MISCELLANEOUS AND GENERAL

Application of Act
and other
limitation
enactments to
arbitrations.

33. (1) This Act and any other limitation enactment shall apply to arbitrations as they apply to actions in the High Court.

(2) Notwithstanding any term in an arbitration agreement to the effect that no cause of action shall accrue in respect of any matter required by the agreement to be referred until an award is made under the agreement, the cause of action shall, for the purposes of this Act and any other limitation enactment (whether in their application to arbitrations or to other proceedings), be deemed to have accrued in respect of any such matter at the time when it would have accrued but for that term in the agreement.

(3) For the purposes of this Act and of any other limitation enactment an arbitration shall be deemed to be commenced —

(a) when one party to the arbitration serves on the other party or parties a notice requiring him or them to appoint an arbitrator or to agree to the appointment of an arbitrator; or

(b) where the arbitration agreement provides that the reference shall be to a person named or designated in the agreement, when one party to the arbitration serves on the other party or parties a notice requiring him or them to submit the dispute to the person so named or designated.

(4) Any such notice may be served either —

(a) by delivering it to the person on whom it is to be served;

(b) by leaving it at the usual or last-known place of abode in Antigua and Barbuda of that person; or

(c) by sending it by post in a registered letter addressed to that person at his usual or last-known place of abode in Antigua and Barbuda,

as well as in any other manner provided in the arbitration agreement.

(5) Where the High Court —

    *(a)*   orders that an award be set aside; or

    *(b)*   orders, after the commencement of an arbitration,
that the arbitration agreement shall cease to have
effect with respect to the dispute referred,

the court may further order that the period between the com-
mencement of the arbitration and the date of the order of the court
shall be excluded in computing the time prescribed by this Act or
by any other limitation enactment for the commencement of
proceedings (including arbitration) with respect to the dispute
referred.

    (6) This section shall apply to an arbitration under an Act of
Parliament as well as to an arbitration pursuant to an arbitration
agreement. Subsections (3) and (4) shall have effect, in relation
to an arbitration under an Act, as if for the references to such of
the arbitration agreement there were substituted references to such of
the provisions of the Act or of any order, scheme, rules, regula-
tions of bylaws made under the Act as relate to arbitration.

    34. Nothing in this Act shall affect any equitable jurisdiction
to refuse relief on the ground of acquiescence or otherwise.      Acquiescence.

    35. (1)  Except as otherwise provided in this Act, and without     Application to the
prejudice to section 36, this Act shall apply to proceedings by or     Crown.
against the Crown in like manner as it applies to proceedings
between subjects.

    (2)  Notwithstanding subsection (1), this Act does not apply
to —

    *(a)*   any proceedings by the Crown for the recovery of any
tax or duty or interest thereon;

    *(b)*   any forfeiture proceedings under any enactment
relating to customs and excise; or

    *(c)*   any proceedings in respect to the forfeiture of a ship.

    (3) For the purposes of this section, proceedings by or against
the Crown include proceedings by or against any Government

ANTIGUA        22·        *Limitation Act* 1997        No. *8* of 1997.
AND
BARBUDA

department or any officer of the Crown acting as such or any
person acting on behalf of the Crown.

**Saving for other**        36. (1)This Act does not apply to any action or arbitration for
**limitation**             which a period of limitation is prescribed by or under any other
**enactments.**            enactment (whether passed before or after the coming into force
of this Act) or to any action or arbitration to which the Crown is
a party and for which, if it were between subjects, a period of
limitation would be prescribed by or under any such other
enactment.

**cap. 352.**              (2) This Act does not affect the Public Authorities Rotection
Act.

**Transitional.**          37. This Act does not apply to any action brought upon a right
of action which accrued before the commencement of this Act or
to any arbitration in which a party to the arbitration relies upon
such a right of action.

**Barred actions.**        38. Nothing in this Act shall enable any action to be brought
which was barred before the commencement of this Act by any
enactment repealed by this Act.

**Repeal Cap. 367.**       39. The Real Property Limitation Act is repealed.

Passed the House of Representatives this 26th        Passed the Senate this 5th day
day of February, 1997.                               of March, 1997.

B. Harris,                                           M. Percival,
*Speaker.*                                           *President.*

S. Walker,                                           S. Walker,
*Clerk to the House of Representatives.*             *Clerk to the Senate.*

Printed at the Government Printing Office, Antigua and Barbuda,
by Donovan Southwell, Acting Government Printer
— By Authority, 1997.

800—6.97                                             [ *Price* $8.90 ]

Westlaw.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

▷

United States District Court,
N.D. New York.
Sharon PFEIFFER, Plaintiff,
v.
LEWIS COUNTY; Joann Doney, Ralph Farney,
Roxainna Hurlburt, John LaDuc, Devere Rumble &
Dale Roberts, all in their individual capacities &
Lewis County Sheriff, Gary Jock, in his official ca-
pacity, Defendants.

No. 01–CV–1053.
March 17, 2004.

**Background:** Female sheriff's department dispatch-
er/corrections officer brought action against county,
sheriff, and others, alleging claims under § 1983,
Title VII, the Equal Pay Act (EPA), the New York
Equal Pay Act, and the New York State Human
Rights Law. Defendants moved for summary judg-
ment.

**Holdings:** The District Court, McAvoy, J., held that:
(1) expert testimony was inadmissible to help Court
review job descriptions, but was admissible on the
issue of internal pay equity;
(2) officer did not establish claim under the Equal
Pay Act or the New York Equal Pay Act;
(3) officer failed to establish claim of discriminat-
ory wage setting;
(4) genuine issues of material fact precluded sum-
mary judgment on hostile work environment and
retaliation claims;
(5) temporal proximity between officer's complaints
and alleged adverse employment actions raised in-
ference of causal connection between protected
activities and adverse actions; and
(6) county legislators were entitled to absolute im-
munity from some § 1983 claims.

Motions granted in part, and denied in part.

West Headnotes

**[1] Evidence 157 ☞508**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k508 k. Matters involving scientific or
other special knowledge in general. Most Cited
    It is within the discretion of the trial court to
determine whether expert testimony will assist the
trier of fact, for purposes of determining admissibil-
ity. Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[2] Evidence 157 ☞515**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k515 k. Conduct of business. Most
Cited Cases
    Expert testimony was inadmissible to help dis-
trict court to review job descriptions and determine
whether dispatcher/corrections officer positions
were substantially equal to higher paid county cor-
rections officer position, for purposes of county
employee's claim under the Equal Pay Act (EPA);
court was capable of reviewing the job descriptions,
job functions, and pay equality issues, and forming
its own conclusions concerning the relative equality
of the positions. Fair Labor Standards Act of 1938,
§ 6, as amended, 29 U.S.C.A. § 206; Fed.Rules
Evid.Rule 702, 28 U.S.C.A.

**[3] Evidence 157 ☞515**

157 Evidence
    157XII Opinion Evidence
        157XII(B) Subjects of Expert Testimony
            157k515 k. Conduct of business. Most
Cited Cases
    Expert testimony on the issue of internal pay
equity was admissible to aid District Court in de-
termining whether accepted procedures called for
an institutional classification and compensation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

process to address internal salary consistency, in county corrections officer's action under the Equal Pay Act (EPA). Fair Labor Standards Act of 1938, § 6, 29 U.S.C.A. § 206; Fed.Rules Evid.Rule 702, 28 U.S.C.A.

**[4] Labor and Employment 231H ⟳2461**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(C) Equal Pay
         231Hk2460 Discrimination in General
           231Hk2461 k. In general. Most Cited Cases
    (Formerly 232Ak1333 Labor Relations)
New York's Equal Pay Act is analyzed under the same standards applicable to the federal Equal Pay Act. Fair Labor Standards Act of 1938, § 6, 29 U.S.C.A. § 206 et seq.; N.Y.McKinney's Labor Law § 194.

**[5] Labor and Employment 231H ⟳2483(2)**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(C) Equal Pay
         231Hk2472 Actions
           231Hk2483 Trial
              231Hk2483(2) k. Questions of law or fact. Most Cited Cases
    (Formerly 232Ak1562.1 Labor Relations)
Often, whether two positions are "substantially equivalent," for Equal Pay Act purposes, is a question for the jury. Fair Labor Standards Act of 1938, § 6, 29 U.S.C.A. § 206 et seq.

**[6] Labor and Employment 231H ⟳2463**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(C) Equal Pay
         231Hk2460 Discrimination in General
           231Hk2463 k. Equal work; skill, effort, and responsibility. Most Cited Cases
    (Formerly 232Ak1333 Labor Relations)
Sheriff's department female dispatcher/correc-

tions officers did not perform work of equal skill, effort and responsibility to higher-paid male corrections officers, and therefore, dispatcher/corrections officer did not establish claim under the Equal Pay Act (EPA) or the New York Equal Pay Act; male officers had primary responsibility for interacting with inmates and supervising the jail, while female officers were primarily responsible for dispatching duties. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; N.Y.McKinney's Labor Law § 194; 29 C.F.R. § 1620.13(e).

**[7] Labor and Employment 231H ⟳2464**

231H Labor and Employment
   231HXIII Wages and Hours
      231HXIII(C) Equal Pay
         231Hk2460 Discrimination in General
           231Hk2464 k. Similar working conditions. Most Cited Cases
    (Formerly 232Ak1333 Labor Relations)
Sheriff's department female dispatcher/corrections officers did not perform their jobs under similar working conditions to higher-paid male corrections officers, and therefore, dispatcher/corrections officer did not establish claim under the Equal Pay Act (EPA) and the New York Equal Pay Act; male officers worked directly with inmates in the cell blocks, while female officers worked primarily in secure control room. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; N.Y.McKinney's Labor Law § 194; 29 C.F.R. § 1620.18(a).

**[8] Civil Rights 78 ⟳1118**

78 Civil Rights
   78II Employment Practices
      78k1118 k. Practices prohibited or required in general; elements. Most Cited Cases
Claims under Title VII and the New York Human Rights Law are analyzed under the same legal standards. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; N.Y.McKinney's Executive Law § 296.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

**[9] Civil Rights 78 ⬅1175**

78 Civil Rights
    78II Employment Practices
        78k1164 Sex Discrimination in General
            78k1175 k. Compensation; comparable worth. Most Cited Cases
    County employee failed to establish claim of discriminatory wage setting under Title VII and the New York Human Rights Act, absent any evidence that county intentionally set wages for female employees lower than those of male employees; wages were set out of concern for the respective contents of the job, not based upon gender. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; N.Y.McKinney's Executive Law § 296.

**[10] Federal Civil Procedure 170A ⬅2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving
                170Ak2497.1 k. In general. Most Cited Cases
    Genuine issues of material fact as to whether male undersheriff's references to female employee wearing shorter dresses and lower-cut attire, and to coworkers as "bitches" precluded summary judgment for county on female employee's hostile work environment claim under Title VII and the New York Human Rights Law. Civil Rights Act of 1964, § 701, 42 U.S.C.A. § 2000e; N.Y.McKinney's Executive Law § 296; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[11] Federal Civil Procedure 170A ⬅2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
            170AXVII(C)2 Particular Cases
                170Ak2497 Employees and Employment Discrimination, Actions Involving

                170Ak2497.1 k. In general. Most Cited Cases
    Genuine issues of material fact as to whether male undersheriff and officers participated in the creation of a hostile work environment precluded summary judgment for undersheriff and officers on female employee's claim that they were subject to personal liability under the New York Human Rights Law. N.Y.McKinney's Executive Law § 296 (6).

**[12] Civil Rights 78 ⬅1736**

78 Civil Rights
    78V State and Local Remedies
        78k1734 Persons Protected, Persons Liable, and Parties
            78k1736 k. Employment practices. Most Cited Cases
    Members of county legislature were not personally liable to female county employee under the New York Human Rights Law, absent any evidence that they aided, abetted or otherwise participated in the creation of a hostile work environment. N.Y.McKinney's Executive Law § 296(6).

**[13] Civil Rights 78 ⬅1116(2)**

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1116 Public Employers and Employees
                78k1116(2) k. Individuals as "employers". Most Cited Cases

**Civil Rights 78 ⬅1736**

78 Civil Rights
    78V State and Local Remedies
        78k1734 Persons Protected, Persons Liable, and Parties
            78k1736 k. Employment practices. Most Cited Cases
    Sheriff was not liable to female county employee under the New York Human Rights law, absent

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

any evidence that sheriff was a joint employer with the county, or that he participated in the creation of a hostile work environment. N.Y.McKinney's Executive Law § 296(1, 6).

**[14] Civil Rights 78 🔗 1113**

78 Civil Rights
    78II Employment Practices
        78k1108 Employers and Employees Affected
            78k1113 k. Individuals as "employers".
Most Cited Cases
    Individual defendants may not be held personally liable under Title VII. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[15] Civil Rights 78 🔗 1528**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1526 Persons Liable
            78k1528 k. Vicarious liability; respondeat superior. Most Cited Cases

**Civil Rights 78 🔗 1736**

78 Civil Rights
    78V State and Local Remedies
        78k1734 Persons Protected, Persons Liable, and Parties
            78k1736 k. Employment practices. Most Cited Cases
    County could be held liable under Title VII or the New York Human Rights Law for any hostile work environment created by sheriff's department, where alleged sexual harassment of female employee was perpetrated by her supervisor. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; N.Y.McKinney's Executive Law § 296.

**[16] Civil Rights 78 🔗 1189**

78 Civil Rights
    78II Employment Practices
        78k1181 Sexual Harassment; Work Environment

            78k1189 k. Knowledge or notice; preventive or remedial measures. Most Cited Cases
    Employer may escape liability for sexual harassment under Title VII by pleading and proving, as an affirmative defense, that: (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative measure provided by the employer or to avoid harm otherwise. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

**[17] Civil Rights 78 🔗 1243**

78 Civil Rights
    78II Employment Practices
        78k1241 Retaliation for Exercise of Rights
            78k1243 k. Practices prohibited or required in general; elements. Most Cited Cases

**Labor and Employment 231H 🔗 788**

231H Labor and Employment
    231HVIII Adverse Employment Action
        231HVIII(A) In General
            231Hk787 Wages and Hours
                231Hk788 k. In general. Most Cited Cases
    (Formerly 255k30(6.10) Master and Servant)
    To establish a prima facie case of retaliation under Title VII, the Equal Pay Act (EPA), and § 1983, employee must demonstrate that: (1) she engaged in protected activity and/or protected speech known to employer; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

**[18] Constitutional Law 92 🔗 1929**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

Press
    92XVIII(P) Public Employees and Officials
        92k1929 k. Public or private concern; speaking as "citizen". Most Cited Cases
    (Formerly 92k90.1(7.2))
    To constitute "protected activity" under the First Amendment, as required for public employee's retaliation claim, the speech must be of public concern. U.S.C.A. Const.Amend. 1.

**[19] Counties 104 ⬤⟷67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
    Female county employee's claimed public advocacy for pay equality and complaints to her supervisor did not constitute protected activity supporting retaliation claim under the Equal Pay Act (EPA); employee's complaints were not formal complaints or proceedings, as required under the EPA. Fair Labor Standards Act of 1938, § 6, 29 U.S.C.A. § 206.

**[20] Constitutional Law 92 ⬤⟷1955**

92 Constitutional Law
    92XVIII Freedom of Speech, Expression, and Press
        92XVIII(P) Public Employees and Officials
        92k1955 k. Police and other public safety officials. Most Cited Cases
    (Formerly 92k90.1(7.2))

**Counties 104 ⬤⟷67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases
    Female county employee's complaints to sheriff about her pay as a dispatch supervisor were not protected speech for purposes of First Amendment retaliation claim, since her complaints were related solely to her own personnel issues, rather than matters of public concern. U.S.C.A. Const.Amend. 1.

**[21] Federal Civil Procedure 170A ⬤⟷2497.1**

170A Federal Civil Procedure
    170AXVII Judgment
        170AXVII(C) Summary Judgment
        170AXVII(C)2 Particular Cases
        170Ak2497 Employees and Employment Discrimination, Actions Involving
        170Ak2497.1 k. In general. Most Cited Cases
    Genuine issues of material fact as to whether non-renewal of female county employee's administrative services agreement, denial of her application to use sick bank leave time, and the abolishment of her supervisory position were adverse employment actions, as required for prima facie case of retaliation, precluded summary judgment for county on employee's claims of retaliation under Title VII, the Equal Pay Act (EPA), and § 1983. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 56(c), 28 U.S.C.A.

**[22] Civil Rights 78 ⬤⟷1405**

78 Civil Rights
    78III Federal Remedies in General
        78k1400 Presumptions, Inferences, and Burdens of Proof
        78k1405 k. Employment practices. Most Cited Cases

**Civil Rights 78 ⬤⟷1541**

78 Civil Rights
    78IV Remedies Under Federal Employment Discrimination Statutes
        78k1534 Presumptions, Inferences, and Burden of Proof
        78k1541 k. Retaliation claims. Most Cited Cases

**Counties 104 ⬤⟷67**

104 Counties
    104III Officers and Agents
        104k67 k. Removal. Most Cited Cases

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

Temporal proximity between female county employee's complaints to the Equal Employment Opportunity Commission (EEOC) and her continual complaints concerning pay and the non-renewal of administrative services agreement, the denial of her application to use sick bank leave time, and the abolishment of her supervisory position, all within a period of nine months, raised inference of causal connection between her alleged protected activities and the alleged adverse employment actions, as required for her prima facie case of retaliation under Title VII, the Equal Pay Act (EPA) and §1983. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

[23] Civil Rights 78 ☞1324

78 Civil Rights
  78III Federal Remedies in General
    78k1323 Color of Law
      78k1324 k. In general. Most Cited Cases
An individual acts under color of state law, for purposes of § 1983 claim, when exercising power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. 42 U.S.C.A. § 1983.

[24] Civil Rights 78 ☞1376(10)

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(10) k. Employment practices. Most Cited Cases

Civil Rights 78 ☞1529

78 Civil Rights
  78IV Remedies Under Federal Employment Discrimination Statutes
    78k1529 k. Defenses in general. Most Cited Cases

Labor and Employment 231H ☞2458

231H Labor and Employment
  231HXIII Wages and Hours
    231HXIII(C) Equal Pay
      231Hk2458 k. Persons and employments within regulations. Most Cited Cases
County legislators' decisions concerning the creation and subsequent abolition of county dispatch supervisor position were legislative functions, and therefore, legislators were entitled to absolute immunity from civil county employee's § 1983 claim; although there were comments regarding employee's connection with the positions, the overall question was whether to authorize such a position. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.; 42 U.S.C.A. § 1983.

[25] Civil Rights 78 ☞1376(1)

78 Civil Rights
  78III Federal Remedies in General
    78k1372 Privilege or Immunity; Good Faith and Probable Cause
      78k1376 Government Agencies and Officers
        78k1376(1) k. In general. Most Cited Cases

Civil Rights 78 ☞1529

78 Civil Rights
  78IV Remedies Under Federal Employment Discrimination Statutes
    78k1529 k. Defenses in general. Most Cited Cases

Labor and Employment 231H ☞2458

231H Labor and Employment
  231HXIII Wages and Hours
    231HXIII(C) Equal Pay
      231Hk2458 k. Persons and employments

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

within regulations. Most Cited Cases
    County legislators' refusal to permit sheriff to provisionally appoint employee to dispatch supervisor position and their refusal to renew agreement pursuant to which she continued to perform some functions of chief civil deputy were not legislative acts protected by absolute immunity from claims under Title VII, Equal Pay Act and § 1983, but rather were discretionary personnel decisions. Fair Labor Standards Act of 1938, § 6 et seq., 29 U.S.C.A. § 206 et seq.; Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000 et seq.; 42 U.S.C.A. § 1983.

*92 Koob & Magoolaghan, (Joan Magoolaghan, Esq., Katherine R. Rosenfeld, Esq., of Counsel), New York City, for Plaintiff.

Hicock, Barclay Law Firm (Alan R. Peterman, Esq., of Counsel), Syracuse, NY, for Defendants Lewis County Joann Doney, Ralph Farney, and Roaxainna Hurlburt.

Petrone, Petrone Law Firm (David A. Bagley, Esq., of Counsel), Utica, NY, for Defendant Jock.

Sugarman Law Firm (Kevin Todd Hunt, Esq., of Counsel), Syracuse, NY, for Defendant LaDuc.

Melvin, Melvin Law Firm (Michael R. Vaccaro, Esq., of Counsel), Syracuse, NY, for Defendants Rumble and Roberts.

*MEMORANDUM—DECISION and ORDER*
McAVOY, Senior District Judge.
    Plaintiff Sharon Pfeiffer commenced the instant action asserting various claims pursuant to 42 U.S.C. § 1983; 42 U.S.C. § 2000e, et seq. ("Title VII"), 29 U.S.C. § 206, et seq. (the "Equal Pay Act" or "EPA"), N.Y. Labor Law § 194 (the "New York Equal Pay Act") and N.Y. Exec. Law § 296 (the "New York State Human Rights Law" or "HRL"), arising out of her employment with Defendant Lewis County (the "County"). Plaintiff also asserts a common law claim of defamation. Currently pending before the Court are: (1) Defendant

John LaDuc's ("LaDuc") motion for summary judgment; (2) Defendants Devere Rumble ("Rumble") and Dale Roberts' ("Roberts") motion for summary judgment; (3) Defendant Gary Jock's ("Jock") motion for summary judgment; (4) Defendants Lewis County, Joann Doney ("Doney"), Ralph Farney ("Farney"), and Roxainna Hurlburt's ("Hurlburt") motion for summary judgment; and (5) Plaintiff's appeal of the January 30, 2004 Order of the Magistrate Judge denying Plaintiff leave to file a Supplemental Second Amended Complaint.

**I. FACTS**
    Plaintiff was hired by the Lewis County Sheriff's Department ("LCSD") as a "Dispatcher/Jail Guard" in 1986. In 1994, the title of Plaintiff's position was changed from "Dispatcher/Jail Guard" to "Dispatcher/Correction Officer" ("D/CO"). Plaintiff's position is a civil service position. Jock. SMF at ¶ 8. [FN1] The D/CO position requires Plaintiff to perform the duties of an emergency services dispatcher, serve in the control room (or dispatch center), and to perform certain duties pertaining to the supervision and monitoring of female inmates at the Lewis County Jail. Plaintiff received training as a corrections officer and as an emergency medical dispatcher.

> FN1. "SMF" refers to the statement of material facts required by N.D.N.Y.L.R. 7.1(a)(3). Defendant Lewis County's SMF will be referenced as "LC SMF", Defendant Jock's SMF will be referenced as "Jock SMF." Plaintiff's SMF will be referenced as "Pl.'s SMF." Unless otherwise noted, Defendants' SMFs are cited only where Plaintiff has admitted the allegation. For further discussion of this issue, see note 2 *infra*.

*93 The primary responsibility of full-time corrections officers ("COs") is to oversee, monitor and supervise inmates being held in the Public Safety Building. LC SMF ¶ 4. Male inmates are housed in the cell block. *Id.* at ¶ 6. COs are assigned to the cell block and spend their work day in the common

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

area of the cell block. *Id.* ¶ 5. Female inmates are housed in holding cells. *Id.* at ¶ 7. The holding cells are located outside the cell block across a hallway from the dispatchers' location. *Id.* at ¶ 8. COs make routine rounds of the cell block and the holding cells outside of the formal cell block. *Id.* at ¶ 9. COs perform body and strip searches on all male inmates when they return to the cell block. *Id.* at ¶ 11.

As the name suggests, D/COs have a dual function—dispatching duties and corrections officer duties. The vast majority of the D/COs day is spent in the dispatch center, a secure room located outside of the cell block. *Id.* at ¶ 15. [FN2] D/COs normally sit in an office chair at a telephone console that they use to perform their functions. *Id.* at ¶ 16. The D/COs also monitor the female inmates in the holding cells. *Id.* at ¶ 19. The holding cells are visible from the dispatch center and can be monitored without the D/COs leaving the dispatch center. *Id.* at ¶ 20. The only time that a D/CO has any contact with a prisoner is if a female prisoner needs to be strip searched or if a female prisoner has a problem that would not be appropriate for a male CO to handle. *Id.* at ¶ 21. D/COs do not routinely performs rounds of the cell blocks or the holding cells, they do not routinely interact with the male prisoners, and they rarely enter the cell block. *Id.* at ¶¶ 22–23.

FN2. In numerous instances, Plaintiff admits to only a portion of one of Defendants' statement of material facts. For example, in statement 15, Lewis County asserts that "Dispatcher/Correction Officers spend the vast majority of their day in the Dispatch Center, an air conditioned room outside of the cell block...." LC SMF at ¶ 15. In response, Plaintiff states that she "[a]dmits that the entire jail, including the Control Room, is air conditioned." Plaintiff's response to LC SMF ¶ 15. This is an incomplete admission/denial. In those instances where Plaintiff makes an incom-

plete admission/denial, the evidentiary support for Plaintiff's position does not relate to the matters not admitted by Plaintiff. *Id.* In the absence of a citation to any evidence directly refuting Defendants' assertions in their statements of material facts, the entirety of Defendants' statement will be deemed to be true, regardless of the fact that Plaintiff attempts to make a partial admission. *See* N.D.N.Y.L.R. 7.1(a)(3) (" *Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.* ") (bold emphasis added, underlining in original). Thus, in the above example, the Court will deem Plaintiff to have admitted that D/COs spend the vast majority of their day in the dispatch center, outside of the cell block.

For purposes of compensation, D/COs are classified as Grade 18 positions and receive between $13.13 and $15.15 per hour. *Id.* at ¶ 25. COs are classified as Grade 23 positions and receive between $14.92 and $17.55 per hour. *Id.* at ¶ 26. The pertinent collective bargaining agreement ("CBA") in effect from 1997–1999 provided that "[a] $2.00/hr. increase shall be added to the dispatchers regular rate of compensation while acting as guard to a female inmate. A minimum of 4 hours must be worked exclusive of call in time before compensation will be granted." Pl.'s Ex. 10, p. 7. The 2002–2004 CBA changed this section. That CBA provides that "[i]n the event that a [D/CO] ... is acting as a Correction Officer with respect to a female inmate, the [D/CO] ... on duty with the most seniority shall receive a $2.00/hr. increase in her regular rate of compensation." Pl.'s Ex. 18, p. 7. The 2002–2004 CBA further provides that: "[i]n the absence of a ... shift supervisor in dispatch, ... the employee ... with the highest seniority shall receive Sergeant's rate of pay, at the same step as the employee's regular pay." *Id.*

*94 In October 1999, then Lewis County Sher-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

iff Gary Jock provisionally appointed Plaintiff to be the dispatch supervisor.[FN3] Jock SMF at ¶ 14. At that time, Plaintiff discontinued performing the job responsibilities of a D/CO. Plaintiff was moved out of the control room and placed in an office. Plaintiff did not receive a salary increase for the new position. Jock SMF at ¶ 15. Shortly thereafter, Dennis Lawlee ("Lawlee"), the Sheriff Department's Chief Civil Deputy, announced his intention to retire. Pl.'s SMF at ¶ LC 28. Jock directed Plaintiff to assume some of the work that had been performed by Lawlee. To compensate Plaintiff for this additional work, in February 2000, Plaintiff was given the part-time position of "Secretary to the Sheriff" and paid additional wages. Pl.'s SMF at ¶ 36. During this time, Plaintiff also maintained her position as dispatch supervisor. *Id.*

> FN3. It is disputed whether Plaintiff was formally appointed to be the dispatch supervisor. Defendants contend that no such position existed in 1999. Defendants do not, however, deny the ensuing facts concerning the change in Plaintiff's job responsibilities and her relocation to an of- fice.

In March 2000, the union filed a grievance alleging that the Sheriff had given Plaintiff a $10,000 per year increase above the negotiated salary level without bargaining with the union. LC SMF at ¶ 29. The union and the County ultimately reached a resolution whereby the County discontinued paying Plaintiff "any wages or salary in excess of that specified by the Collective Bargaining Agreement." Peterman Aff., Ex. K. Pursuant to the settlement, the County could contract with Plaintiff to perform duties in addition to those performed as a D/CO. *Id.* In June 2000, Plaintiff and the County entered into an Administrative Services Agreement ("ASA") pursuant to which Plaintiff continued to perform some of the functions of the Chief Civil Deputy and, in exchange, received $10,000 annually. Peterman Aff., Ex. L.

By its terms, the ASA expired in May 2001. *Id.*

Although Plaintiff continued to perform work under the ASA beyond May 2001, the County declined to renew the agreement and Plaintiff did not receive any additional compensation for work performed in May, June and July, 2001.

Plaintiff contends that, throughout her employment at the LCSD, she actively and openly campaigned for pay equality for the D/COs, for supervisor's pay for herself, and for other equal terms and conditions of employment for female employees of the LCSD. Plaintiff alleges that, in response to her efforts, she was confronted by hostility, aggression and malevolence by male members of the LCSD. Plaintiff maintains that, commencing at the time that LaDuc was appointed Undersheriff in June 2000, she was subjected to a campaign of harassment against her and other female employees by LaDuc and Defendants Rumble and Roberts. Plaintiff states that she was subjected to: daily offensive and malicious comments about her appearance; condescending remarks about her and her office; comments referring to her office as the "Barbie House;" comments referring to the female workers as "cute bitches", "ugly bitches" and/or "fat bitches;" disparaging remarks concerning the dispatchers' ages, weight and/or dress; having her work "sabotaged;" demands that she be removed from her supervisory position and replaced with a male employee; and allegations that she was having an affair with Jock, which was claimed to be the reason she was appointed to the dispatch supervisor position. Plaintiff further alleges that LaDuc recommended that she wear a #95 D/CO uniform, instead of be permitted to wear "street" clothes.[FN4]

> FN4. Upon being elevated from the D/CO position to the dispatch supervisor position, Plaintiff was no longer required to wear a uniform.

In August 2001, Plaintiff requested to use sick bank time from the Lewis County Sick Leave Bank. Plaintiff contributed to the sick leave bank for over ten years. Her request was denied. In November 2001, Plaintiff was returned to her position as a D/

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

CO and resumed performing the duties attendant to that position.

As of January 1, 2004, LaDuc again became Undersheriff. On one of his first days back at the LCSD, LaDuc stated to Plaintiff that "I used to be a little prick, but now I'm taking Viagra." LaDuc also has "tapped" Plaintiff in the head. Plaintiff also has been required to work weekends, whereas prior to January 2004, she consistently had all weekends off.

## II. STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams*, 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." F ED. R. CIV. P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525–26 (2d Cir.1994), or on conclusory allegations or unsub-

stantiated speculation. *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). With this standard in mind, the Court will address the defendant's motion.

## III. DISCUSSION

### a. Expert Witness

Lewis County seeks to exclude the opinions of Plaintiff's proffered expert witness. Plaintiff retained an expert to provide an opinion concerning whether the D/CO and CO positions are substantially equal, one of the elements of her EPA claim. In support of her conclusion, the expert relied upon the 2002–2004 CBA, documents produced by Defendants pursuant to Plaintiff's discovery demands, the D/CO and CO job descriptions, certain pages from a New York State Commission of Corrections investigation of the LCSD, the LCSD's chain of command, job descriptions from surrounding counties, Plaintiff's Second Amended Complaint, and the expert's one day inspection of the LCSD.

*96 [1] Rule 702 of the Federal Rules of Evidence provides that:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Rule itself provides, the initial inquiry is whether "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." *See United States v. Cook*, 922 F.2d 1026, 1036 (2d Cir.1991) ("Expert testimony is only admissible when such testimony is helpful to the trier of fact.... Such testimony is unnecessary where the jury is

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

capable of comprehending the facts and drawing the correct conclusions from them.... Indeed, the judge in his discretion may exclude expert testimony when it is not helpful to the jury."). The Second Circuit has instructed that "the district court should not admit testimony that is 'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.' " *United States v. Mulder,* 273 F.3d 91, 101 (2d Cir.2001) (quoting *United States v. Castillo,* 924 F.2d 1227, 1232 (2d Cir.1991)), *cert. denied,* 535 U.S. 949, 122 S.Ct. 1344, 152 L.Ed.2d 247 (2002); *see United States v. Amuso,* 21 F.3d 1251, 1263 (2d Cir.1994) ("A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror."). It is within the discretion of the trial court to determine whether expert testimony will assist the trier of fact. *United States v. Aminy,* 15 F.3d 258, 261 (2d Cir.1994) ("The decision to admit testimony under this Rule is left to the trial court's discretion and will be overturned only if 'manifestly erroneous.' ") (quoting *United States v. Diaz,* 878 F.2d 608, 616 (2d Cir.1989)).

[2] In this case, the Court finds that, with one limited exception, the proposed expert witness would not be helpful to the trier of fact. The trier of fact is perfectly capable, on its own, to evaluate the various information relied upon by the expert (as outlined above) to ascertain whether the D/CO and CO jobs are substantially equal. *See, e.g., Patterson v. McLean Credit Union,* 805 F.2d 1143, 1147 (4th Cir.1986) (holding that a jury does not need aid in determining the relative qualifications of clerical employees at a credit union), *vacated in part on other grounds,* 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). There is nothing complicated about the evidence in this case such that it would be helpful to the trier of fact to have assistance from an "expert." For example, the first item in the expert's report is an "Analysis of the Lewis County Sheriff's Department's CO and D/CO Job Descrip-

tions." In this section, Plaintiff's proffered expert simply compares the two job descriptions and then offers her opinion that certain responsibilities imposed only upon the D/CO position "more than offset" certain responsibilities only imposed upon the CO position. The trier of fact is perfectly capable of reviewing the job descriptions and forming its own conclusions concerning the relative equality of the positions without help.

In the second section of the report, the expert next analyzes "working conditions and hazards." In this section of the report, the expert offers her opinion concerning*97 the relative stresses and hazards of the D/CO and CO positions. Once again, there is nothing in this section that is helpful to the trier of fact. Plaintiff can submit evidence to the trier of fact concerning the risks attendant to the D/CO and CO positions and the trier of fact can weigh any differences. A trier of fact is perfectly capable of understanding the stresses associated with handling emergency calls, multi-tasking, strip searching female inmates, etc. The trier of fact similarly can make its own conclusion concerning whether the stresses and hazards faced by D/COs are equivalent to those faced by the CO. Significantly, the expert's conclusion in this regard is not purported to be based upon any scientific, technical or other specialized knowledge, but purely upon the expert's personal opinion. [FN5]

FN5. The second section of the report also raises reliability issues. In fact, the expert's conclusion with respect to this section appears to be based upon conjecture and surmise—an insufficient basis upon which to admit expert testimony. The expert states in paragraph 14 of her report as follows:

Although I am **not specifically educated** on the **Inherent dangers** for Control Room Officers, it appears to me that while the dangers from inmates might be less than for the COs, the dangers from those on the outside of the facility **could be greater**. Any revengeful former in-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

mate or other person planning to gain forced entry to the jail facility and/or the Sheriff's offices would first need to confront the Control Room Officer and staff. In this day of much talk about terrorism and explosives, the Control Room staff could be targeted.

(emphasis added).

These conclusions are entirely unsupported and, thus, unreliable. First, the expert admits lacking knowledge concerning the dangers facing control room officers. Second, the proffered expert offers no factual or other basis (other than conjecture) upon which to conclude that there are any real dangers from outside the facility such that the harm faced by D/COs is equal to or greater than that faced by COs. Third, the expert makes no effort to quantify the differences in hazards facing D/CO as opposed to COs. For example, there is evidence in the record that Plaintiff spent approximately 20 minutes per week strip-searching the few female inmates housed in the jail. Assuming female and male inmates pose the same danger (an assumption that is admittedly questionable), the risk associated with this task is necessarily greater for the COs who spend a greater portion of their time performing strip searches.

The third, and final, section of the report pertains to how the LCSD establishes its salaries. The proffered expert notes that employers frequently look to other employers to ascertain "external equity" and establish their own internal procedures to assure "internal equity." With respect to "external equity," the proffered expert looked at the job description and pay of similar positions in surrounding counties. Once again, the trier of fact is perfectly competent to review this same information and draw its own conclusions concerning the similarity of job requirements and the equality of pay for similar jobs.

[3] With respect to "internal equity," the expert notes that because "the LCSD has provided no documents concerning their institutional processes for deciding internal equity ... it appears that Lewis County lacks any system for classifying jobs and determining the internal consistency of compensation. In my opinion, the absence of institutional classification and compensation processes addressing internal salary consistency is a deviation from accepted procedures for both public and private sector employers that leaves the County's salary setting open to subjectivity and could lead to the discriminatory assignment of compensation levels to job titles." It likely is not within the ordinary purview of lay triers of fact whether accepted procedures call for an institutional classification and compensation process to address internal salary consistency. In this regard, expert testimony may be helpful.*98 Accordingly, the Court will allow the expert to testify on this limited issue.

In sum, the LC Defendants' motion to preclude the expert testimony is granted in part and denied in part. The trier of fact is perfectly capable, without assistance, of reviewing and comparing the various job descriptions and analyzing any evidence concerning the actual job functions of the D/CO and CO and to formulate its own conclusions concerning the similarity (or dissimilarity) of these positions. The trier of fact is similarly capable of understanding and analyzing any external pay equity issues without the help of an expert.[FN6] It would, however, be helpful to the trier of fact to have expert assistance concerning the accepted procedures for determining internal pay equity. Thus, the expert will be permitted to testify on this limited issue of internal pay equity.[FN7]

FN6. It is unclear how or why "external equity" has any relevance to this case involving alleged disparate pay between females and males within the LCSD.

FN7. This limited issue of internal pay

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

equity procedures and processes is not to be used as a "back door" into the issue of whether the D/CO and CO positions are substantially equal. The expert testimony should be limited to the significance of internal pay equity procedures, the accepted procedures for using (or not using) internal pay equity procedures, how such procedures are implemented, and whether the LCDS has implemented any such procedures.

**b. Equal Pay Act** [FN8]

FN8. New York's Equal Pay Act is analyzed under the same standards applicable to the federal Equal Pay Act. *See Kent v. The Paper Companies, Inc.,* 309 A.D.2d 234, 246, 764 N.Y.S.2d 675 (1st Dept.2003); *Mize v. State Div. of Human Rights,* 33 N.Y.2d 53, 56, 349 N.Y.S.2d 364, 304 N.E.2d 231 (1973). Accordingly, the ensuing discussion addresses Plaintiff's claims under both statutes.

[4] "To prove discrimination under the Equal Pay Act, a plaintiff must show that: 'i) the employer pays different wages to employees of the opposite sex; ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and iii) the jobs are performed under similar working conditions.' " *Lavin-McEleney v. Marist College,* 239 F.3d 476, 479 (2d Cir.2001) (quoting *Belfi v. Prendergast,* 191 F.3d 129, 135 (2d Cir.1999)); *see also* 29 U.S.C. § 206(d)(1).

[T]he EPA does not require a plaintiff to establish an employer's discriminatory intent.

Instead, the EPA makes it illegal for an employer to pay unequal compensation to those of different genders for equal work, "except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). Once the employer proves that the wage disparity is justified by one of the EPA's four affirmative defenses, "the plaintiff may counter the employer's affirmative defense by producing evidence that the reasons the defendant seeks to advance are actually a pretext for sex discrimination." *Belfi,* 191 F.3d at 136 (citing *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 526 (2d Cir.1992)).

*Ryduchowski v. Port Auth. of New York and New Jersey,* 203 F.3d 135, 142 (2d Cir.2000).

**1. Whether the LCSD Pays Different Wages to Employees of the Opposite Sex**
The first element of an EPA claim is whether the employer pays different wages to employees of the opposite sex. Here, there is evidence in the record from *99 which a fair-minded trier of fact could reasonably conclude that the LCSD pays different wages to employees of the opposite sex. For example, there are male COs who are paid at Grade Level 23 and female D/DOs who are paid at Grade Level 18. Thus, this first element is satisfied.

**2. Whether the Employees Perform Equal Work on Jobs Requiring Equal Skill, Effort, and Responsibility**
[5] The second element of an EPA claim is whether the employees perform equal work on jobs requiring equal skill, effort, and responsibility. "With regard to the second point, '[a] plaintiff need not demonstrate that her job is identical to a higher paid position, but only must show that the two positions are substantially equal' in skill, effort, and responsibility." *Lavin,* 239 F.3d at 479 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1310 (2d Cir.1995)). "[W]here jobs are merely comparable, an action under the Equal Pay Act will not lie." *Lambert v. Genesee Hosp.,* 10 F.3d 46, 56 (2d Cir.1993). "[T]he standard under the Equal Pay Act is job content and not job title or description." *Tomka,* 66 F.3d at 1310. Often, "[w]hether two positions are 'substantially equivalent' for Equal Pay Act purposes is a question for the jury." *Lavin-McEleney,* 239 F.3d 476, 480. Of course, there

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 14

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

will be circumstances where the evidence in the record is such that no fair-minded trier of fact could reasonably conclude that the two positions are substantially equivalent and, thus, summary judgment will be proper.

### a. The D/CO and CO Positions

Here, there is no question that there is substantial similarity between the *job descriptions* of the CO and D/CO positions. The D/CO Job description contains many of the same functions as the CO position. This is because D/COs are responsible for supervising female inmates. Indeed, the D/CO position contains many requirements not contained in the CO job description. However, as discussed, job descriptions are not dispositive. The relevant inquiry is what the employees actually do on the job. 29 C.F.R. § 1620.13(e).

[6] There also is no question that, while supervising female inmates, D/COs actually do perform some of the same job functions as COs such as, for example, performing strip searches. While this suggests that there is substantial equivalency in the skill required of the two positions, it does not mandate a finding that the positions are substantially similar. "While it is undisputed that there ... [is some] common ground in their general job tasks ... the performance of some common tasks does not make jobs substantially equal when material differences also exist." *Conigliaro v. Horace Mann School,* 2000 WL 45439, at *8 (S.D.N.Y.2000). The undisputed evidence before the Court is that, among other things, COs are required to book inmates, screen visitors, inspect cells and their occupants every half-hour, check cells for contraband, transport inmates, supervise the visitation and recreation areas, strip search male inmates, and perform checks on the female inmates every half-hour. LCSD's Ex. H at pp. 25–27, 32, 35–37. There is no evidence that Plaintiff or the other D/COs actually perform any of these functions. *See* LCSD SMF at ¶¶ 9, 10, 11, 12, 16, 20, 21, 22, 23; [FN9] Pl.'s Aff. at ¶¶ 4 ("I perform *particular* [CO] ... duties pertaining to *100 the supervision and monitoring of fe-

male inmates.") (emphasis supplied); 6, 9 ("D/COs spend the majority of their time in the Control Room, a/k/a Dispatch Office."). In fact, at her deposition, Plaintiff testified that she does not perform routine checks on the female prisoners, she is not required to enter the main cell block area (where the male prisoners are housed), she does not perform cell checks, and she does not move any inmates (male or female) to visitation, outdoor recreation, or elsewhere. LCSD Ex. I at 63–64, 66, 67, 73–74. While the D/COs are responsible for "maintaining constant visual supervision over the [female] inmates [in the holding cell area]," Pl.'s Aff. at ¶ 6, this consists of monitoring the cameras from the dispatch center, whereas the COs are required to operate from within the cell blocks or holding areas with physical contact with the inmates. LCSD Ex. I at p. 53. The undisputed testimony in the record is that the D/COs' only physical contact with prisoners is with female prisoners that need to be strip searched, "or if a female prison has a problem that would not be appropriate for a male Corrections Officer to handle." Rounds Aff. at ¶ 15, LCSD SMF at ¶ 21. Plaintiff testified that her contact with the female prisoners consists of performing approximately two to five strip searches a week, which takes approximately five minutes per inmate. LCSD Ex. I at pp. 60–61. Thus, she devotes approximately 25 minutes of her workweek strip searching female inmates. Significantly, aside from continually pointing to the job descriptions and her duties of strip searching female inmates and maintaining visual surveillance of various portions of the jail, Plaintiff does not specify any other functions she performs that are similar to the those of the CO position. *See, e.g.,* Pl.'s SMF at p. 4, ¶¶ 14, 15; pp. 26–28. To the contrary, the evidence in the record demonstrates that COs have primary responsibility for interacting with inmates and supervising the jail, while the D/COs are primarily responsible for performing dispatching duties. Moreover, there are significantly fewer female inmates than male inmates. The correctional facility can accommodate up to forty-two male inmates and two female inmates. Rounds Aff. at ¶ p 6, 17. Ac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

cording to Plaintiff, the most female inmates ever incarcerated in the holding cell area at one time was five. Pl.'s Aff. at ¶ 6. Thus, at the most, the D/COs would be required to *monitor* a maximum of five female inmates, whereas the COs would be required to *supervise* up to forty-seven male and female inmates.[FN10]

> FN9. It will be recalled that most of the facts contained in the Lewis County Defendants' SMFs are deemed admitted because either: (1) Plaintiff admitted to the fact; or (2) Plaintiff failed to specifically refute the fact and provide a citation to the record in support thereof as required by the local rules.

> FN10. It should be recalled that the D/COs merely monitor the female inmates from the control room. Aside from performing strip searches on female inmates and other gender sensitive functions, they do not have any hands-on interaction with any of inmates and they are not required to enter the cell block or holding areas.

Notwithstanding the similarities of the job descriptions and training requirements for the two positions, the only conclusion that could be reached from the evidence in the record is that there is a sharp divergence of actual job duties between the D/CO and CO positions. Although Plaintiff makes much of the fact that D/COs are ready and able to fill in as COs and that the D/COs training as corrections officers enables the LCSD to comply with various state law requirements, "[t]he EPA does not mandate equal pay for equal competence, effort or intrinsic worth." *Conigliaro*, 2000 WL 45439, at *5 .

Plaintiff also points to the fact that, pursuant to N.Y. County Law § 652(2), "[a] female correction officer or female deputy sheriff who is authorized to perform correctional duties and has completed training, as mandated by the state commission of correction, shall be in attendance*101 in a correc-tional facility when females are confined in the correctional facility and shall, when deemed necessary by the sheriff or keeper of the jail to maintain the order and security of the facility, be in attendance in any housing unit where females are confined." This statute says nothing about the duties actually performed by the LCSD's D/COs. By its plain terms, and as Plaintiff concedes in her memorandum of law, *see* Pl.'s Mem. of Law at 12 n. 6, all this statute requires is that a female CO be in attendance; it does not require her to actually do anything. The fact remains that there is no evidence from which a fair-minded trier of fact could reasonably conclude that the D/COs actually perform the same, or substantially equivalent, work as COs. This compels a finding that there is not substantial equality between the D/CO and CO positions and Plaintiff's EPA claim in this regard must, therefore, be dismissed.

**b. The Secretary and Dispatch Supervisor Positions**

Defendants did not move for summary judgment concerning the Secretary to the Sheriff and dispatch supervisor positions. In her memorandum of law in opposition to the motions for summary judgment, Plaintiff raises these claims and indicates what she intends to prove at trial. Pl.'s Mem. of Law at 16 n. 9. In reply, Defendants make arguments why these two other claims should be dismissed.

Although the Court frowns upon new arguments being raised in reply papers, the issue was raised by Plaintiff in her opposition papers. Defendants then attempted to respond to the issues raised by Plaintiff. Rather than consider the argument waived, the Court will exercise its discretion and permit further briefing limited to the issues concerning the Secretary to the Sheriff and the dispatch supervisor positions. *See Booking v. General Star Management Co.*, 254 F.3d 414, 418 (2d Cir.2001). If Defendants wish to pursue these issues, they may file and serve a memorandum of law not to exceed ten pages within eleven business days of the date of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:12-cv-06280-LAK   Document 16-8   Filed 10/16/12   Page 72 of 82

Page 16

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

this Decision & Order. Plaintiff shall then have eleven business days from the date Defendants file and serve their memorandum of law in which to file a memorandum of law in opposition. No reply will be permitted.

**3. Whether the D/CO and CO Jobs are Performed Under Similar Working Conditions**

[7] Assuming, *arguendo*, that the work of the D/CO and COs are substantially equal, their working conditions are not. "The term 'similar working conditions' encompasses two subfactors: 'surroundings' and 'hazards.' " 29 C.F.R. 1620.18(a). " 'Surroundings' measures the elements ... regularly encountered by a worker, their intensity and their frequency." *Id.* " 'Hazards' take into account the physical hazards regularly encountered, their frequency and the severity of injury they can cause." *Id.* It is difficult to conceive how the working conditions and, in particular, the hazards of the D/CO and CO positions can be considered to be similar. As discussed, the COs work directly with the inmates in the cell blocks, *see* LCSD's Ex. H at p. 26, whereas the D/COs work primarily in the secure control room. *See* LCSD SMF at ¶¶ 15, 16, 21. Plaintiff does not point to any evidence, admissible in form, from which a fair-minded trier of fact could reasonably conclude that the working conditions are similar.[FN11] For this *102 reason too, Plaintiff's EPA claim concerning the D/CO and CO positions must be dismissed.

> FN11. Plaintiff points to the report of her expert in support of her claims concerning the similarity of working conditions. As previously noted, the expert report is inadmissible in this regard. Even assuming the report was admissible, there is no foundation for the expert's conclusions concerning any hazards facing D/COs. As the expert herself admits, "I am not specifically educated on the inherent dangers for Control Room Officers." Pl.'s Ex. 7 at ¶ 14. The claimed hazards attributable to the D/CO position is based solely upon the ex-

pert's belief and suppositions and not upon any reliable basis. Accordingly, such "evidence" is inadmissible.

**c. TITLE VII AND THE NEW YORK HUMAN RIGHTS LAW** [FN12]

> FN12. Claims under Title VII and the HRL are analyzed under the same legal standards. *Tomka,* 66 F.3d at 1312–13. Thus, the following analysis applies equally to the Title VII and HRL claims.

**1. Discriminatory Wage Setting**

[8] Plaintiff claims that the County violated Title VII by intentionally paying discriminatory wages to the D/COs, including Plaintiff. In support of this argument, Plaintiff argues that the D/COs requested that the County Legislature raise their pay from grade 16 to grade 21 (the level at which COs are paid), that "male members of the Sheriff's Department became very outraged because they did not believe that dispatcher/correction officers, who were primarily female, should earn the same amount of money as them," the Legislature reviewed pay scales in surrounding areas, and the Legislature ultimately decided to raise the pay grade from 16 to 17. According to Plaintiff, the wage setting methodology was discriminatory because the wages were determined "on the basis of what 'upsets' male members of the Sheriff's Department." Pl.'s Mem. of Law at 20.

[9] To make out a Title VII claim in this regard, Plaintiff must "produce evidence of discriminatory animus." *Belfi,* 191 F.3d at 139 (quoting *Tomka,* 66 F.3d at 1313). Plaintiff has failed to submit any evidence from which a fair-minded trier of fact could reasonably conclude that the County intentionally set wages for female employees lower than those of male employees. In fact, the sole evidence relied upon by Plaintiff reveals that the concern in setting wages had nothing to do with gender, but whether D/COs should receive the same wages as the road patrol and/or corrections officers. Pl.'s Ex. 87 at pp. 108–120.[FN13] For example, De-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

http://web2.westlaw.com/print/printstream.aspx?utid=1&prft=HTMLE&vr=2.0&desti...   5/4/2012

Page 17

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

fendant Hurlburt, a County legislator, testified at deposition that:

> FN13. Plaintiff has not actually submitted all of the deposition pages found at pp. 108–120, but certain selected pages.

My whole feeling on it was right from the beginning was they objected to dispatch having the same pay scale as road patrol. Their statement to me was that as road patrol they were subject to personal injury at any time and dispatch did not have that exposure and they didn't feel that we should have—we should consider making dispatch and road patrol on the same level. It didn't have anything to do with who, you know, sex it was, they didn't want the pay the same because they didn't feel that the exposure was the same. Which is the reason we did the comparison with dispatch in other counties.
*Id.* at 108.

This is corroborated by the affidavit of Donald Sawyer, submitted by Plaintiff. In his affidavit, Sawyer states as follows:

I observed that male members of the Sheriff's Department became very outraged because they did not believe that [D/COs], who were primarily female, *103 should earn the same amount of money as them.

I was notified by Sheriff Jock that certain male members of the department went to the Board of Legislators and complained that the [D/COs] should not earn the same amount of money as the road patrol/correction officers.

Pl.'s Ex. 1 at ¶¶ 6–7.[FN14]

> FN14. It should be noted that there were no female members of the road patrol. This information is significant with respect to the Title VII pay claim because it explains why "male members of the Sheriff's Department" complained—they were the only ones in road patrol. It is difficult to con-

ceive why any female members of the LC-SD would complain regarding a salary increase for the D/COs. There is no claim of discriminatory hiring with respect to the road patrol or the COs.

Hurlburt further testified that the County conducted a survey of wages in surrounding counties and obtained wage figures for both dispatchers and for corrections officers. *Id.* at 113–118. Although Plaintiff complains that the study was flawed because surrounding counties did not have hybrid D/CO positions, the evidence in the record demonstrates that the County accounted for this fact. Hurlburt testified that the County picked a wage "somewhere in the middle [between the dispatch wage and the corrections officer wage] where it would be fair." *Id.* at 117.[FN15] Although the fact that there were no male D/COs and no female COs or road patrol officers could raise suspicions that there is some sort of discrimination going on,[FN16] the fact of the matter is that Plaintiff has failed to submit sufficient evidence of discriminatory animus upon which a jury could return a verdict in her favor. *See Aldrich v. Randolph Central Sch. Dist.,* 963 F.2d 520, 528 (2d Cir.1992). The only conclusion that can be drawn from the evidence submitted by Plaintiff is that the wage was set out of concern for the respective contents of the job; not based on gender. Accordingly, the Title VII wage claim must be dismissed.

> FN15. At deposition, Hurlburt was asked the following questions and gave the following answers:
>
> A. ... [S]omewhere in the middle where it would be fair.
>
> Q. Somewhere between the dispatcher position and correction officer position would be a fair comparison or dispatcher/correction officer?
>
> A. Correct.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

Q. Whose thought was that?

A. Us as a committee. We discussed that to try to be—to try to give them a fair wage without making it unfair to someone else as like road patrol.

Q. So the committee felt that you should compensate the dispatch/correction officers for their correctional duties?

A. Certainly.

Q. You looked for a way to compensate them for correctional duties without upsetting other members of the depart- ment?

A. If possible.... To start with, we actually, you know, had in our mind that they deserved Grade 21, but after having the meeting with them and road patrol, we felt that we really didn't know what we were talking about. We ought to canvas the area around us and find out what they were doing, because maybe they were right, maybe road patrol was right.

FN16. As previously noted, there is no claim of discriminatory hiring.

## 2. Hostile Work Environment

Plaintiff next contends that she was subjected to a hostile work environment. As the Second Circuit has explained,

In order to prevail on a hostile work environment claim under Title VII, a plaintiff must show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.... This test has objective and subjective elements: the misconduct must be severe or pervasive enough to *104 create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. Among the factors to consider

when determining whether an environment is sufficiently hostile are the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. In determining whether a hostile environment exists, we must look at the totality of the circumstances. As a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive. While the standard for establishing a hostile work environment is high, we have repeatedly cautioned against setting the bar too high, noting that while a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment altered for the worse. The environment need not be unendurable or intolerable. Nor must the victim's psychological well-being be damaged. In short, the fact that the law requires harassment to be severe or pervasive before it can be actionable does not mean that employers are free from liability in all but the most egregious cases.

*Terry v. Ashcroft,* 336 F.3d 128, 147–48 (2d Cir.2003) (internal citations, quotations and alterations omitted).

### a. LaDuc

[10] In support of her hostile work environment claim, Plaintiff contends that LaDuc constantly commented on her dress, saying things like "maybe tomorrow you should wear your dress a little bit shorter," "why can't we see your legs today," or "why don't you wear something low cut." Pl.'s Dep. at 99. LaDuc also is alleged to have commented on the sizes and weights of the D/COs on several occasions and to have commented that the young dispatchers were "cute bitches" and older dispatchers were "ugly bitches." *Id.* at 104. Although Plaintiff does not recall the exact frequency with which such comments were made, there is evidence in the re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

cord from which a fair-minded trier of fact could reasonably conclude that the comments were pervasive. Plaintiff states that, although the comments did not initially offend her, "it kept happening and I can't tell you how many times he had commented before I felt that way." *Id.* at 24. In her affidavit, Plaintiff contends that she and the other D/COs were subjected to "malicious comments about [her] appearance; [and] condescending remarks about [her] and [her] office" on a daily basis. Pl. Aff. at ¶ 36.

The references to wearing shorter dresses, lower cut attire, and "bitches" clearly can be considered to be gender-based. The evidence suggests that, although Defendants' actions were not physically threatening, they can be considered offensive and humiliating. The issue here is not so much the "quality" of the claimed offensive conduct, but the quantity of it. If true, a reasonable person could find that such comments made on a nearly daily basis are offensive and could unreasonably interfere with Plaintiff's work performance. Thus, there is sufficient evidence to satisfy the objective test.

It also is clear that the subjective test is satisfied. Although Plaintiff was not offended initially, there became a point in time when her feelings changed and she began to feel that the comments were malicious. Pl. Dep at p. 24. This is supported by Plaintiff's complaints to the Sheriff. Jock Dep. at pp. 190–92. Thus, **105 there is sufficient evidence upon which a fair-minded trier of fact could reasonably conclude that Plaintiff was subjected to a hostile work environment.

[11] LaDuc can be held personally liable under N.Y. Exec. Law § 296(6), which makes it an unlawful act to "aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article." N.Y. Exec. Law § 296(6). Under this section of the HRL, "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable." *Tomka,* 66 F.3d at 1317. Because there is sufficient evidence upon which a fair-minded trier of fact could

reasonably conclude that LaDuc actually participated in the conduct giving rise to a hostile work environment, under New York law, he is subject to personal liability.

**b. Rumble**

Plaintiff also contends that the various comments and actions of Rumble contributed to her hostile work environment and that he should be held personally liable therefor. Rumble is alleged to have called one D/CO a "fat bitch," called another "Nurse Goodbody," made comments about the D/COs' weights, and accused Plaintiff of having an affair with Jock. Pl.'s Dep. at 104–105; Pl.'s Ex. 109 at p. 89. The Court need not decide whether Rumble's alleged comments, taken alone, are sufficient to create a hostile work environment.[FN17] This is because the Court already found that there are genuine issues of material fact concerning whether Plaintiff was subjected to a hostile work environment and Rumble is sued pursuant to § 296 (6) for aiding and abetting the alleged discriminatory conduct. A fair-minded trier of fact could find that Rumble participated in the creation of a hostile work environment by making the above-referenced comments. Accordingly, Rumble's motion for summary judgment on the HRL claim is denied.

FN17. Taken alone, it is doubtful that Rumble's boorish, yet sporadic comments would be sufficient to constitute a hostile work environment. *See* Pl.'s Dep. at p. 106.

**c. Roberts**

Roberts' alleged comments are even less offensive and apparently less pervasive than those of Rumble. Nonetheless, Roberts is alleged to have referred to Plaintiff's office as the "Barbie house" on a daily basis and to have commented that Jock was Plaintiff's "boy toy." A trier of fact could conclude that these comments were part of the overall conduct contributing to a hostile work environment. Accordingly, Roberts may be subject to liability under § 296(6).

**d. Doney, Farney and Hurlburt** [FN18]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

FN18. Plaintiff has withdrawn her claims against Defendant Farney. *See* Pl.'s Mem. of Law at 88, n. 5. Accordingly, all claims against Farney are dismissed.

[12] Plaintiff also seeks to hold Doney and Hurlburt, members of the County legislature, liable under § 296(6). Plaintiff has failed to point to any evidence from which it may reasonably be concluded that Doney or Hurlbut aided, abetted or otherwise participated in the creation of a hostile work environment. Absent any such evidence, the HRL claims against Doney and Hurlburt must be dismissed.

### e. Jock

[13] Plaintiff seeks to hold Jock liable under N.Y. Exec. Law § 296(1) on the theory that Jock and the County were her "joint employers." The undisputed evidence in the record is that Plaintiff was an employee of the County. Jock SMF at ¶¶ 4–5. Plaintiff is part of the civil service system. *Id.* at ¶ 8. In fact, Plaintiff specifically*106 admitted that "Plaintiff was employed at all times referenced by Lewis County, and not by Sheriff Jock." *Id.* at ¶ 5. Although Jock necessarily had some authority over Plaintiff as her supervisor, he was not her employer. Plaintiff will not be entitled to argue in her memorandum of law against those facts that she admitted in her statement of material facts. Plaintiff also fails to demonstrate that Jock participated in the creation of a hostile work environment. Having failed to demonstrate any basis for imposing liability against Jock under the HRL, that claim is dismissed.

### f. Individual Liability Under Title VII

[14] It is well-settled that none of the individual Defendants may be held personally liable under Title VII. *See Clarke v. Flushing Manor Care Center,* 2003 WL 1338663, at *2 (S.D.N.Y.2003) (and cases cited therein). Accordingly, any such claims are dismissed.

### g. Lewis County

[15] The remaining question is whether Lewis County may be held liable for any hostile work environment. The County contends that the Sheriff's Department is a separate legal entity from the County and the County may not be held accountable for the Sheriff Department's actions absent legislation to the contrary. The Court rejects this argument for several reasons. First, New York State Constitution art. XIII § 13(a) was amended in 1989 to delete the provision providing that a "county shall never be made responsible for the acts of the sheriff." Second, the Second Circuit has repeatedly held counties to be held accountable for the actions of its sheriff that violate federal law. *See, e.g., Shain v. Ellison,* 273 F.3d 56, 66 (2d Cir.2001) (noting that the county is responsible for the sheriff department's illegal strip-search policy), *cert. denied,* 537 U.S. 1083, 123 S.Ct. 672, 154 L.Ed.2d 582 (2002); *Jeffes v. Barnes,* 208 F.3d 49 (2d Cir.2000) (holding that a sheriff is a final policymaker of the county). Third, the sexual harassment is not purported to have been caused by the Sheriff himself, but by corrections officers employed by the County. Fourth, it is doubtful that state law can exempt Plaintiff's employer (the County) from liability imposed pursuant to a federal statute. *See* U.S. Const. art. VI, cl. 2.

[16] Because the sexual harassment is claimed to have been perpetrated by Plaintiff's supervisor (LaDuc) and there is evidence supporting a finding that LaDuc was, in fact, Plaintiff's supervisor, the County is presumed to be liable therefor. *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). An employer may escape liability by pleading and proving, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and promptly correct any sexual harassment by such a supervisor, and (2) the employee unreasonably failed to avail herself of any corrective or preventative provided by the employer or to avoid harm otherwise. *Id.* The County has made no such showing here. Thus, if it is demonstrated that LaDuc was, in fact, Plaintiffs' supervisor, the County is presumptively liable for any sexual harassment.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

**d. RETALIATION CLAIMS**

[17][18] Plaintiff also has asserted retaliation claims pursuant to Title VII, the EPA and 42 U.S.C. § 1983. To establish a prima facie case of retaliation, Plaintiff must demonstrate: (1) that she engaged in protected activity/protected speech known to Defendants; (2) that she suffered an adverse employment action; and (3) that *107 there is a causal connection between the protected activity and the adverse employment action. *See Mandell v. County of Suffolk,* 316 F.3d 368, 382 (2d Cir.2003) (First Amendment); *Treglia v. Town of Manlius,* 313 F.3d 713, 719 (2d Cir.2002) (Title VII). What constitutes protected activity differs under each of the statutes invoked by Plaintiff. Protected activity under Title VII is rather broad, while protected activity under the EPA only includes "filing formal complaints, instituting a proceeding, or testifying, but does not encompass complaints made to a supervisor." *Lambert,* 10 F.3d at 55; *see also Deravin v. Kerik,* 335 F.3d 195, 204 (2d Cir.2003). To constitute protected activity under the First Amendment, the speech must be of public concern. *See Mandell,* 316 F.3d at 383 ("As a general rule, speech on 'any matter of political, social, or other concern to the community' is protected by the First Amendment.") (quoting *Connick v. Myers,* 461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)).

**1. Protected Activity**

[19][20] Here, Defendants have not argued that Plaintiff did not engage in protected activity. In any event, there is evidence that Plaintiff engaged in protected activity known to Defendants, including filing complaints with the New York State Division of Human Rights in March and July of 2001. These complaints could constitute protected activity under both Title VII and the EPA. Plaintiffs' other activities, however, such as her claimed public advocacy during 2000–2001 for pay equality and complaints to her supervisor do not constitute protected activity under the EPA. These were not formal complaints or proceedings as required under the EPA. *Lambert,* 10 F.3d at 55. These activities may, however, constitute protected activity under Title

VII and/or the First Amendment. *Eldred v. Consolidated Freightways Corp. of Delaware,* 898 F.Supp. 928, 940 (D.Mass.1995) ("Opposing the pay disparity, first with the terminal manager ... and then under the Equal Pay Act, is a protected activity within the meaning of Title VII."). Plaintiff's complaints to Jock about her pay as dispatch supervisor are not protected speech under the First Amendment. This is because her complaints in this regard were related solely to her own personnel issues (whether she was entitled to a supervisor's rate of pay), rather than matters of public concern. *Ezekwo v. NYC Health and Hosps. Corp.,* 940 F.2d 775, 780–81 (2d Cir.1991).

**2. Adverse Employment Action**

The County argues that Plaintiff did not suffer any adverse employment actions. As the Second Circuit has stated

A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir.2000) (internal quotation, citations and alterations omitted).

[21] Looking at the facts in the light most favorable to Plaintiff, a jury could reasonably conclude that she suffered an adverse employment action. In 1999, Jock provisionally appointed Plaintiff to the position of dispatch supervisor. At that *108 time, Plaintiff was viewed as a supervisor and took on supervisory functions. Pl.'s Aff. at ¶ 14. According to Plaintiff, as dispatch supervisor, she discon-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

tinued performing D/CO functions and, instead, took on other new, important duties. *Id.* at ¶ 15. Plaintiff no longer worked in the control room, but was transferred into an office. *Id.* She was no longer required to wear a uniform. Her compensation, however, did not change. In May 2001, the County approved the creation of the dispatch supervisor position. Although Plaintiff had been performing that function since 1999, she was not formally given the position and, thus, was ineligible for any increased wages or benefits. In November 2001, the County abolished the position of dispatch supervisor. Jock then took away Plaintiff's dispatch supervisor duties, she was returned to the control room, and she was required to resume performing as a D/CO. *Id.* at ¶ 45. A fair-minded trier of fact could conclude that the change in title and duties from performing supervisory functions as a dispatch supervisor to performing D/CO functions and being transferred back into the control room could constitute a materially adverse change in employment. *See, e.g., Signer v. Tuffey*, 66 Fed.Appx. 232, 235–36, 2003 WL 1240611 (2d Cir.2003); *de la Cruz v. New York City Human Resources Administration Dep't of Soc. Servs.*, 82 F.3d 16, 20 (2d Cir.1996); *Rodriguez v. Board of Educ.*, 620 F.2d 362, 366 (2d Cir.1980); *compare Galabya*, 202 F.3d at 641–42 (noting that evidence that a transfer was to an assignment that was materially less prestigious or materially less conducive to career advancement could constitute a finding of an adverse employment action).

A trier of fact also could conclude that the non-renewal of the ASA in May 2001 was an adverse employment action. It must be recalled that, at all relevant times, Plaintiff was a full-time employee of the LCSD. Upon the retirement of the chief civil deputy, Jock requested that Plaintiff fulfill some of the chief civil deputy's duties. Accordingly, Plaintiff worked under two hats—one has a dispatch supervisor and one as secretary to the chief. Plaintiff received additional compensation for her services as secretary to the sheriff. The union filed a grievance claiming that it was improper for the

County to pay Plaintiff an additional $10,000 above her negotiated salary schedule without negotiating the increase with the union. Accordingly, Plaintiff and the County entered into an ASA for a set period of time. It is evident that the purpose of the ASA was to circumvent the salary negotiation requirements under the CBA; not to split Plaintiff's duties into those as an employee (dispatch supervisor duties) and those as an independent contractor (secretary to the sheriff duties). Thus, the County's claim that it was not Plaintiff's employer for purposes of the non-renewal of the administrative services agreement must be rejected.

The non-renewal of the ASA had the effect of eliminating Plaintiff's secretary to the sheriff duties and eliminating the additional compensation she received. Understandably, the ASA had a specified term and was not subject to renewal. However, as noted, the entire ASA was a rouse to circumvent certain requirements imposed by the CBA. If Plaintiff had continued to work as secretary to the sheriff and not under an ASA, the elimination of her secretary to the sheriff duties and the concomitant pay reduction certainly would constitute an adverse employment action. Here, the County should not be able to escape the same conclusion simply because it engaged in some fanciful paperwork to satisfy the union while having Plaintiff perform the same work. Defendants are free to argue at trial that this was not, in fact, *109 an adverse employment action. The Court is simply holding that a fair-minded trier of fact could find that it was.

Plaintiff also claims that the denial of sick leave bank time constituted an adverse employment action. Plaintiff participated in the County's voluntary sick leave bank. Under that program, an employee could donate certain amounts of sick leave to the sick leave bank. In the event of a prolonged illness, an employee who had exhausted accumulated leave time "may be entitled to draw up to a maximum of 60 days or 15% of the Sick Leave Bank ... in a given year." Pl.'s Ex. 62. The sick leave bank, although voluntary, provides a signific-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

ant benefit for those who choose to participate in it. Moreover, to participate, an employee has to give up certain accrued sick leave time (3 days upon enrollment and 1 day each year thereafter). Under these circumstances, a fair-minded trier of fact could conclude that the refusal to allow an employee to reap the benefits of this program constitutes a materially adverse employment action.

### 3. Causal Connection

[22] The County does not argue that there is no causal connection between the alleged protected activity and the alleged adverse employment actions. In any event, the temporal proximity between Plaintiff's March and June 2001 complaints to the EEOC and her continual complaints concerning pay and the May 2001 non-renewal of the Administrative Services Agreement, the August 2001 denial of Plaintiff's application to use sick bank leave time, the November 2001 abolishment of the dispatch supervisor position, and the November 2001 removal of Plaintiff's dispatch supervisor responsibilities is sufficient to support an inference of causation. *See Treglia,* 313 F.3d at 720–21.

For the foregoing reasons, Plaintiff has established a prima facie case of retaliation. Because Defendants have not proffered any legitimate, non-retaliatory reasons for any alleged adverse employment actions, the Court need not wend its way through the remaining steps of the *McDonnell–Douglas* burden shifting methodology. Suffice it to say that there are sufficient triable issues of fact warranting a denial of the County's motion for summary judgment with respect to the retaliation claims.

### 4. Liability of Jock on Plaintiff's Claim Pursuant to 42 U.S.C. § 1983

In his statement of material facts, Jock states that he "did not knowingly retaliate against Plaintiff, and according to Plaintiff, the Sheriff's 'retaliation' against her consisted solely of not 'backing' her sufficiently." Jock SMF at ¶ 24. Plaintiff admitted to this statement. Based upon these admitted facts, it must be concluded as a mat-

ter of law that Jock did not engage in any retaliatory conduct. Plaintiff repeatedly admits that Jock was supportive of her efforts to obtain pay for work performed as secretary to the sheriff, supported the renewal of the administrative services agreement, supported Plaintiff's efforts to be promoted to the dispatch supervisor position, and sought a raise for Plaintiff as dispatch supervisor. Jock SMF at ¶¶ 14, 20, 22. Moreover, although it was Jock who transferred Plaintiff from the dispatch supervisor position to the D/CO position, he did so only because he was forced to do so when the County eliminated the position. *See* Jock SMF at ¶ 17 and Pl.'s response thereto. Thus, there is no evidence of any retaliatory conduct by Jock.

### e. Liability of Doney, Farney and Hurlburt

Doney and Hurlburt move to dismiss on the grounds that: (1) they were not acting *110 under color of state law; and (2) they are entitled to legislative immunity. Both of these claims must be rejected.

[23] Doney and Hurlburt contend that they are being sued as private individuals and, thus, they were not acting under color of state law. An individual acts under color of state law when exercising power " 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Polk County v. Dodson,* 454 U.S. 312, 317–18, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (quoting *United States v. Classic,* 313 U.S. 299, 326, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941)); *see also West v. Atkins,* 487 U.S. 42, 49, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Here, Doney and Hurlburt's actions were taken by virtue of their positions with the County legislature. As such, their actions were under color of state law.

With respect to the issue of legislative immunity, the Second Circuit has stated that

Legislators are entitled to absolute immunity from civil liability for their legislative activities. This Circuit has previously held that absolute legislative immunity for Section 1983 actions ex-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

tends to local legislators....

The test for determining whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. Under this functional test, immunity depends on the nature of the act itself, not the identity of the actor performing it.

The first step in our inquiry is whether the Board members' actions were legislative in function. In order for legislative immunity to attach, the act in question must be taken in the sphere of legitimate legislative activity. Discretionary personnel decisions, even if undertaken by public officials who otherwise are entitled to immunity, do not give rise to immunity because such decisionmaking is no different in substance from that which is enjoyed by other actors. In so holding, we do not mean to suggest that decisions regarding the elimination of a class of jobs for budgetary or policy reasons would not be legislative in nature simply because they relate to employment. To reiterate, it is the nature of the act that we examine to determine whether legislative immunity applies.

*Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 210–11 (2d Cir.2003).

[24][25] Here, the decisions concerning the creation and subsequent abolition of the dispatch supervisor position were legislative functions. The record reveals that, although there were comments regarding Plaintiff's connection with these positions, the overall question was whether to authorize such a position. This falls within the legislative function. *Harhay*, 323 F.3d at 211. Doney and Hurlburt's acts concerning whether to permit Jock to provisionally fill the dispatch supervisor position, however, cannot be said to be legislative in function. *Id.* at 210. Whether to permit Jock to fill the position was a discretionary personnel decision outside the scope of legislative acts. The same holds true with respect to the decision not to renew Plaintiff's ASA. Accordingly, Doney and Hurlburt

may be held liable to the extent it is found that their actions in refusing to permit Jock to provisionally appoint her to the dispatch supervisor position and/ or in refusing to renew the ASA were in retaliation for Plaintiff's protected activity.

**f. Defamation Claim**

Defendants Doney, Rumble and Roberts move to dismiss the defamation claim on *111 the ground that it is time-barred. These Defendants have submitted evidence that the alleged defamatory statements were made as early as June 2000. Rumble Ex. H. In her opposition papers, Plaintiff does not oppose the motion to dismiss the defamation claim. Significantly, Plaintiff has not pointed to any evidence from which it reasonably may be inferred: (1) that any of the alleged defamatory statements were made within the applicable statute of limitations; [FN19] or, more significantly, (2) that any of the Defendants actually made any defamatory statements. While such evidence may exist buried somewhere in the voluminous submissions to the Court, the burden of identifying such evidence for the Court in opposition to Defendants' motions lays with Plaintiff. The Local Rules require the litigant, not the Court, to sift through the record and bring to the Court's attention the pertinent information. *See Amnesty America v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir.2002)("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (citations omitted); *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 291 (2d Cir.2000) (Noting that the local rules are "designed to place the responsibility on the parties to clarify the elements of the substantive law which remain at issue because they turn on contested facts.... While the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out.") (internal quotations and citations omitted). Because Plaintiff has failed to identify any evidence of defamatory statements

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

made by these Defendants or any evidence that any such statements were made within the applicable statute of limitations, the defamation claims are dismissed.

> FN19. Under New York law, defamation claims are subject to a one year statute of limitations. N.Y.C.P.L.R. § 215. The evidence in the record is that any alleged defamatory statements were made beginning in June 2000. The initial Complaint was filed on June 26, 2001. The original Complaint named only Lewis County as a Defendant and asserted only claims under the EPA and for emotional distress. Plaintiff did not file an Amended Complaint naming Doney, Roberts and Rumble until June 2002. The defamation claims in the Amended Complaint do not arise out of the same conduct, transactions, or occurrences set forth or attempted to be set forth in the original pleading, Fed.R.Civ.P. 15(c)(2), and the failure to name Doney, Rumble or Roberts in the initial Complaint is not alleged to have been a mistake. *VKK Corp. v. Nat'l Football League*, 244 F.3d 114, 128 (2d Cir.2001). Accordingly, the Amended Complaint does not relate back to the original Complaint.

**g. Plaintiff's Appeal of the Magistrate Judge's Order Denying Leave to File a Supplemental Second Amended Complaint**

Plaintiff also appeals from the Magistrate Judge's January 30, 2004 Order denying her leave to file a supplemental second amended complaint asserting additional allegations of discrimination concerning an alleged denial of a promotional opportunity and to add an additional Defendant, the Lewis County Civil Service Commission. The Magistrate Judge denied the motion for leave to amend on the grounds that summary judgment motions were then pending, the case is slated for trial in June, the addition of new claims would requires additional discovery, and Defendants would be prejudiced by the amendment.

For the following reasons, the Court affirms the decision of the Magistrate *112 Judge. First, discovery in this action has been complete for quite some time now. Second, Plaintiff has already filed three different complaints (an original and two amendments). Third, the facts supporting the new claim were known by early September 4, 2003 at the latest.[FN20] Nonetheless, despite the fact that discovery was completed and the dispositive motion filing deadline was quickly approaching, Plaintiff waited until late November to raise the issue of another amended Complaint with Defendants and waited until mid-December 2003 to raise the issue with the Magistrate Judge. Plaintiff did not file a motion for leave to file an amended Complaint until December 29, 2003. Given the length of time this case had already been pending and the deadlines the parties were facing, the Court finds that Plaintiff waited too long in seeking to amend her Complaint.

> FN20. Although Plaintiff contends that she was in constant communication with the Civil Service Commission throughout September and October 2003 regarding its refusal to permit Plaintiff to sit for the exam, the fact remains that the Commission unequivocally denied Plaintiff's application to take the exam on September 4, 2003. Although Plaintiff may not have known all the facts surrounding the incident, she already felt the effects of it and had enough information to make a claim.

Fourth, although the facts giving rise to the new claims arose after the close of discovery, permitting new claims would require discovery to be reopened and will likely cause a significant delay in this litigation which is scheduled for trial in June. Although Plaintiff contends that no additional discovery would be required, the Court finds it difficult to agree with that proposition. Plaintiff is seeking to add an entirely new basis for liability—that the County and the County Civil Service Commis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

308 F.Supp.2d 88
(Cite as: 308 F.Supp.2d 88)

7. The motions to dismiss the New York Human Rights Law claims as to Defendants Lewis County, John LaDuc, Devere Rumble and Dale Roberts are DENIED;

8. Jock's motion to dismiss the claim pursuant to 42 U.S.C. § 1983 as against him is GRANTED;

9. Defendant Lewis County's motion to dismiss the retaliation claims pursuant to 42 U.S.C. § 1983, Title VII and the EPA is DENIED;

10. Defendants Doney and Hurlburt's motion to dismiss the retaliation claim pursuant to 42 U.S.C. § 1983 is DENIED;

11. The defamation claims against Doney, Rumble and Roberts are DISMISSED; and

12. All claims against Farney are DISMISSED WITHOUT PREJUDICE (all other claims previously identified are dismissed with prejudice).

IT IS SO ORDERED.

N.D.N.Y.,2004.
Pfeiffer v. Lewis County
308 F.Supp.2d 88

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.