CCHJLEEM                      Motions

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

LEEWARD CONSTRUCTION COMPANY, Ltd.,

                Petitioner,

          v.                        12 Civ. 6280 LAK

MANIPAL EDUCATION AMERICAS, LLC, et al.,

                Defendants.

------------------------------x

                                 December 17, 2012
                                 2:40 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                 District Judge

                         APPEARANCES

LEWIS & GREER, PC
     Attorneys for plaintiffs
BY:  VERONICA ANN McMILLAN, Esq.
                Of counsel

SILLS, CUMMIS et al.
     Attorneys for respondent Manipal Education
BY:  JONATHAN SCOTT JEMISON, Esq.
                Of counsel

SNR DENTON US, LLP
     Attorneys for respondent American University
BY:  KATHERINE MARGUERITE LIEB, Esq
                Of counsel

CCHJLEEM                          Motions

1              (In open court)

2              (Case called)

3              THE COURT:  Good afternoon.

4              MS. McMILLAN:  Good afternoon, your Honor.  My name is

5      Veronica McMillan.  I am here from the law firm of Lewis &

6      Greer on behalf of Leeward Construction Company, limited.

7              Today we are seeking under a petition to confirm an

8      arbitration award that was awarded in favor for the most part

9      in favor of Leeward Construction, in an arbitration that was

10     held in Puerto Rico in March of this year, March 15th, and

11     concerns a construction project performed in Antigua in the

12     period of 2008 to 2009.

13             In response to the petition to confirm, the

14     respondents have cross-moved to dismiss the petition for

15     failure to state a claim against Manipal as well as for forum

16     non conveniens.

17             THE COURT:  The total amount of the award is around a

18     million dollars?

19             MS. McMILLAN:  At this point it is because interest

20     continues to accrue on the award, but the base amount as of

21     August 14th --

22             THE COURT:  Have the legal fees yet exceeded it?

23             MS. McMILLAN:  Not that I am aware, your Honor.

24             THE COURT:  Judging by the weight of these papers,

25     they're close.

CCHJLEEM                    Motions

1        MS. McMILLAN:  We would submit that the forum is an

2   appropriate one.  The petitioners choice is entitled to a high

3   level of deference, as I am sure the court is aware of the

4   three point standard under which these motions are considered,

5   the first being level of deference awarded to the petitioner's

6   choice of forum.

7        THE COURT:  You don't quite get a high level of

8   deference, do you?  You're not a U.S. plaintiff.

9        MS. McMILLAN:  We are not, but we have a fairly strong

10  belief based on documentation we provided to the court that AUA

11  and certainly its parent organization Manipal has financial

12  assets in the jurisdiction, and as this Court held in September

13  of this year, that is an appropriate basis upon which to file a

14  petition to confirm inside the jurisdiction in the Sonera case.

15       So Manipal is also a New York limited liability

16  corporation and it has been the parent organization of AUA

17  since December of 2007.

18       THE COURT:  I have been curious about what exactly

19  that means.  Is AUA a corporation?

20       MS. McMILLAN:  As I understand it, your Honor, AUA is

21  some sort of corporate format that arises out of Antigua.

22  They're actually an Antiguan entity.  And Manipal, a New York

23  limited liability company, is the hundred percent parent owner

24  of the corporation.

25       THE COURT:  If that's what it is?

CCHJLEEM                    Motions

1          MS. McMILLAN:  Right, if it is, in fact, a

2     corporation.

3          THE COURT:  Go ahead.

4          MS. McMILLAN:  Your Honor, in addition to its parent

5     company being a New York corporation, AUA does conduct

6     operations in New York.  The web site has information regarding

7     its operations including the bursar admissions and financial

8     aid offices here in New York, contacts in online applications

9     go through New York and fees are paid in U.S. dollars.  In

10    fact, as part of the reimbursement for the hearing room costs

11    this past March, our firm was reimbursed by Manipal through a

12    check drawn on a New York Bank.

13          Throughout the conduct of the project, I would say

14    probably exclusively all the Manipal payments or certainly the

15    majority of them were made with wire transfers from bank

16    accounts in New York, a number of them to the extent we had

17    copies with the e-mails with wire reports we attached to

18    Mr. Green's declaration which is a part of our moving papers.

19          Like I mentioned before, the Sonera opinion indicates

20    that selecting the forum based on the presence of assets here

21    and, in fact, the good-faith basis for the belief that the

22    assets are here is an appropriate basis upon which to select

23    the venue.

24          In addition, the AUA has not in its opposing papers

25    provided a substantial basis to claim enforcement would be any

1    different in Antigua.  So, therefore, there is no reason that

2    Antigua is necessarily a more appropriate forum, and again from

3    the Sonera case, the court recognized there can be more than

4    one appropriate forum for the enforcement, but given that we

5    believe there are financial assets here in this jurisdiction,

6    we believe this one is the more appropriate.

7          Finally, I would say with regard to the forum non

8    conveniens argument, the balance of private and public factors

9    weighs in favor of permitting the application.

10         With regard to the motion to dismiss as against

11   Manipal, we would point out -- and much of it is laid out in

12   the brief -- we point out to the court that Manipal was the

13   owner of AUA for a substantial period of time before this

14   contract was entered into, and case law would suggest including

15   the Thompson case, that binding it to the arbitration

16   agreement, a summary proceeding like this could happen.  If

17   not, the court could certainly confirm the award with respect

18   to AUA and then proceed separately against Manipal under cases

19   like the Constellation case.

20         THE COURT:  Or I could dismiss it as to Manipal and

21   let you sue them, which is what the Second Circuit said I

22   probably ought to do in Orion, right?

23         MS. McMILLAN:  I believe that -- I am not sure if

24   Thompson, which came off the top of my head, if Thompson came

25   after Orion.  I would imagine that is true, but for the sake of

CCHJLEEM                    Motions

1    judicial economy we could proceed on this petition against

2    Manipal in a separate action since everything has already been

3    commenced here.

4            THE COURT:  What you're really talking about is doing

5    the government out of a filing fee, right, and giving me the

6    benefit of two lawsuits to deal with instead of one?

7            MS. McMILLAN:  I think under the bases of the

8    convention as well as the limited grounds of the FAA provides

9    for vacatur or modification of the award, the court, I don't

10   think there is much basis here to modify or vacate the

11   arbitration award with regard to AUA.  That part of the

12   proceeding could be quickly resolved and we would have to

13   address the issue with respect to Manipal.

14           With regard to modification or vacating the award --

15           THE COURT:  It could be AUA just pays the award,

16   right?

17           MS. McMILLAN:  It could be that AUA pays the award.

18           THE COURT:  Then you don't need any separate lawsuit?

19           MS. McMILLAN:  This is true.  We would like nothing

20   better.  With regard to some of the issues that the AUA has

21   raised with respect to the award itself, we would submit that

22   none of these rise to the level of something that requires

23   modification or vacatur of the award.

24           The AUA has claimed the issue of award damages under

25   the bad faith doctrine is something that is not permitted, but

CCHJLEEM                    Motions

1   as we all know, the covenant of good faith and fair dealing is

2   applied in any contract, and a breach of that can give rise to

3   damages.  Secondly --

4            THE COURT:  I don't understand that.  In what respect

5   was there a claim here that there was a breach of the covenant

6   of good faith and fair dealing that was in any respect

7   different from the breach of the explicit terms of the

8   contract?

9            MS. McMILLAN:  That is a great question, your Honor.

10           I think that the answer is that the arbitrators had

11  the issue of breach of the contract in front of them.  There

12  were a panoply of issues that went on on this project that

13  caused problems for the contractor.  I think that the

14  arbitrators, taking everything in the whole, saw this was

15  really bad faith and reduced it to a breach of that covenant,

16  and it is permissible.

17           THE COURT:  Did they say they reduced it to a breach

18  of that covenant?

19           MS. McMILLAN:  They termed it bad faith, the bad faith

20  doctrine.

21           THE COURT:  Which boils down to them saying they

22  really didn't like it.

23           MS. McMILLAN:  That may well be true.

24           THE COURT:  Is it any different from an arbitrator in

25  a dispute over a promissory note, where the claim is that there

1    was a promissory note and the defendant didn't pay, and the

2    note was for a hundred thousand dollars, saying we are going to

3    give you the hundred thousand dollars on the note, that is the

4    breach of contract, and we are going to give you $20,000 for

5    bad faith because you really should have paid?

6              Is what they did here any different than that?

7              MS. McMILLAN:  I am not sure that it is, your Honor,

8    except that the arbitrator saw the behavior that went on here

9    and believed that this was the AUA acting in bad faith, and the

10   monies that they awarded for that I think were --

11             THE COURT:  The problem I am having difficulty with is

12   the concept of bad faith in a context like this.  Somebody

13   signs a contract and says I promise to do X in a year in

14   exchange for certain consideration.  Then in a year doesn't the

15   party have the right to say to him or herself well, I know I

16   promised to do X, but it is inconvenient, oppressive or

17   whatever, I would rather pay damages?

18             Don't people have that right?  Is there any

19   requirement of moral fault in contracts?

20             MS. McMILLAN:  I don't know that there is a

21   requirement of moral fault, but there is certainly implied in

22   every contract a covenant of good faith and fair dealing.

23             THE COURT:  Would it be true that anybody who fails to

24   pay a bill and who has the money in his checking account and

25   fails to do it is guilty of bad faith and subject to damages

1  for breach of the implied covenant?

2          MS. McMILLAN:  I don't want to make a universal

3  statement, but I think that may well be true.  Here certainly

4  the activities rose to the level of bad faith.

5          THE COURT:  What activities specifically?

6          MS. McMILLAN:  They failed to adhere to the terms of

7  the contract.  They refused to issue --

8          THE COURT:  Let's stop you right there.

9          In what respect did they fail to adhere to the terms

10  of the contract?

11          MS. McMILLAN:  They failed to issue change orders,

12  failed to issue a certificate of substantial completion, they

13  ran afoul of a number of different -- those two jump to mind

14  off the top of my head.  They arbitrarily deleted work from the

15  contract after it had been negotiated and then made Leeward --

16          THE COURT:  Let's take any one of them.

17          They deleted work from the contract?  Is what you're

18  telling me there for the sake of argument, you had a

19  construction contract that said they build a gazebo out behind

20  who knows what, and they were going to pay $25,000 for the

21  gazebo, and they went into the deal and when construction got

22  underway, they said you know what, forget the gazebo?

23          Is, in principle, is that what you're talking about?

24          MS. McMILLAN:  To a degree.  It was a much larger

25  scale and it was one of a number of things.

CCHJLEEM                    Motions

1          THE COURT:  Under ordinary principles of contract

2     where there is a breach of that character, the contractor is

3     entitled to recover.  The benefit of the bargain, that is to

4     say, the profit that would have had made had the gazebo been

5     built and paid for and there are consequential and incidental

6     damages?

7          So, for example, if the cancellation came late and the

8     contractor had bought $10,000 worth of materials and then had

9     to get rid of them somewhere for five, then maybe the

10    contractor has a right to recover the difference in addition to

11    the lost profit, right?

12         MS. McMILLAN:  Yes.

13         THE COURT:  And the contractor on those facts is made

14    whole by the contractual remedy, right?

15         MS. McMILLAN:  Yes.

16         THE COURT:  Why on those facts would the other party

17    be obligated to pay anything else?

18         MS. McMILLAN:  I think if that, in that instance, if

19    the court found there was a breach of this covenant like these

20    arbitrators did, they could award damages on that basis because

21    of the derelict nature of the activities that happened.

22         THE COURT:  What you're really doing is in response to

23    the question of why, you're restating the proposition that I'm

24    asking why about.

25         MS. McMILLAN:  I think, your Honor, with respect to

CCHJLEEM                    Motions

these bad faith damages, I think they were in the nature of

compensation because they were part of a larger scheme of

damages that the arbitrator has laid out in their decision.

          THE COURT:  In other words, they are entitled -- what

the arbitrators did, they awarded a hundred percent of the

damage caused by the breach and something else for good measure

because they didn't like it?

          MS. McMILLAN:  I don't think it was an additional

amount for good measure.  As a matter of fact, the award was

for substantially less than was originally claimed, but I think

the way these arbitrators --

          THE COURT:  If they gave substantially less than

originally claimed, isn't the only rational conclusion for me

to draw that the amount originally claimed was not

substantiated?

          MS. McMILLAN:  No.  I think there was -- when Leeward

first started out, one of the -- in the amended demand for

arbitration, one of the claims was that the contract was a

fixed price contract.  The arbitrators found that not to be the

case, that it was subject to deductions and additions on a

measured basis.

          So I think that not necessarily Leeward --

          THE COURT:  On a measured basis?

          MS. McMILLAN:  Measured basis.

          THE COURT:  What does that mean?

CCHJLEEM                    Motions

1          MS. McMILLAN:  The work is measured on a monthly basis

2     and converted into a requisition based on amount of work

3     performed in that 30-day period.

4          I think that that's where some of the reduction in the

5     damages came in, the difference between a fixed price contract

6     and a measured works contract.  It wasn't that Leeward didn't

7     substantiate their claim; it is the arbitrators disagreed with

8     them on the basis of that contractual point.

9          THE COURT:  So they decided to give them a bonus

10    because they disagreed with them on that point?

11         MS. McMILLAN:  No, I don't think it was a bonus.  They

12    recognized the behavior here was horrendous on the part of the

13    AUA and it was a breach of this covenant and they were entitled

14    to damages as a result of that.

15         THE COURT:  What I don't follow is how it is a breach

16    of the covenant at all?  I don't get it.

17         MS. McMILLAN:  We contend it is a breach of the

18    covenant of good faith and fair dealing because --

19         THE COURT:  You really do.  That point I've gotten.

20         MS. McMILLAN:  -- because the arbitrators termed it as

21    bad faith damages, your Honor, and that must be where it

22    springs from because --

23         THE COURT:  Maybe it stems from a view on the part of

24    the arbitrators if they don't like the defendant's conduct and

25    think they weren't acting honorably, they can give more money

CCHJLEEM                    Motions

1   for that.  They certainly didn't say anything inconsistent with

2   what I just said.

3          MS. McMILLAN:  No, except that this panel was a --

4   these are long-standing arbitrators who have done many of these

5   actions before and --

6          THE COURT:  So what?

7          MS. McMILLAN:  I think they knew what they were doing.

8          THE COURT:  That is like saying judges who serve more

9   than 10 years on the Bench can't be reversed.

10          MS. McMILLAN:  I would support that, your Honor.

11          THE COURT:  I would, too.

12          MS. McMILLAN:  With respect to you anyway.

13          I think that this was an intelligent panel that has

14   been doing this a lot, and they recognize that there is this

15   covenant because it is applied in every contract and a breach

16   of contract claim.

17          THE COURT:  I believe what it means is that you can't

18   do something that would undermine the benefit of the bargain

19   the other side made.  I don't think it means that a judge, jury

20   or arbitrator has the right to award extra damages simply

21   because he didn't like the cut of the defendant's jib.

22          MS. McMILLAN:  I think that's what a breach of that

23   covenant equates to, compensatory damages because of the

24   wrongfulness of the conduct.

25          THE COURT:  I guess we have a difference of view about

1    that.  At least I think we do.

2              MS. McMILLAN:  I am not sure we do.  I think that you

3    get compensatory damages for breach of that covenant, and that

4    is what these arbitrators did here.

5              THE COURT:  That is not what they said they did, and

6    you have not suggested to me there is any evidence whatsoever

7    in the arbitration record that indicates that the defendant in

8    some way undermined the benefit of the bargain that was in any

9    sense distinguishable from any breach of an explicit term for

10   which the claimant was awarded full damages, in the views of

11   the arbitrators.

12             MS. McMILLAN:  I am sorry.  Can you read back the

13   first part of that?  I am trying to follow you.  I don't want

14   to answer you incorrectly.

15             THE COURT:  I will work with you, you know?

16             I want to understand it, too.  What you have not

17   suggested to me is that the defendant did anything that in any

18   way undermined the bargain that was struck.  The defendant

19   allegedly didn't live up to his obligations, but he didn't

20   undermine it so far as what you're telling me, and since the

21   arbitrators gave him a hundred cents on the dollar for whatever

22   damage was caused by the respects in which the defendant did

23   not perform as promised, there is no basis for any bad faith

24   damages.

25             MS. McMILLAN:  I think our disagreement is with

CCHJLEEM                    Motions

 1   whether or not the AUA undermined Leeward's ability to complete

 2   the work on the project.  That was a constant throughout the

 3   project.  They were constantly undermining the work.

 4            THE COURT:  Okay, but suppose, suppose we had a

 5   different kind of contract?  Leeward goes into a car showroom

 6   and says I'll take that Chevy Suburban and I will pay $75,000

 7   for it, rather too much.

 8            MS. McMILLAN:  I would agree.

 9            THE COURT:  All right.  And the day before he is to

10   pick up the new car and show up with the certified check, he

11   walks in and said, you know, this was a big mistake, I'm not

12   doing it.  Now, the car dealer has got an action against him

13   for the difference between $75,000 and whatever the car dealer

14   can sell the Chevy Suburban for, right?

15            MS. McMILLAN:  Yes.

16            THE COURT:  Do we agree?

17            MS. McMILLAN:  Yes.

18            THE COURT:  Does he have a claim for more damages

19   based on the theory that it was a nasty and dishonorable bit of

20   work on the part of the plaintiff to leave the car dealer

21   holding the bag and not to perform on the contract?

22            MS. McMILLAN:  If it rises to the level that it

23   breaches that covenant, I would say yes.

24            THE COURT:  Well, you're begging the question because

25   what you're saying is that maybe.

CCHJLEEM                    Motions

1              MS. McMILLAN:  Except here these arbitrators said yes,
2    it did.
3              THE COURT:  No, they didn't.
4              Where did they say that?
5              MS. McMILLAN:  They said it in the award.
6              THE COURT:  Show me exactly where.  Which piece of
7    paper in which one of these enormous pile of a thousand pages
8    here I should look at where they said it was a breach of this
9    covenant?
10             MS. McMILLAN:  They didn't use the words, "breach of
11   covenant," you're right.
12             THE COURT:  They didn't mention any such doctrine.
13             MS. McMILLAN:  They said bad faith doctrine.
14             THE COURT:  Bad faith doctrine?
15             MS. McMILLAN:  Yes.
16             THE COURT:  What is the bad faith doctrine?
17             MS. McMILLAN:  In the context of breach of contract, a
18   bad faith doctrine is breach of --
19             THE COURT:  If it Williston on Contracts or Corbin on
20   Contracts or Restatement on Contracts or Farnsworth on
21   Contracts, or any other treatise you can name and look in the
22   index for bad faith doctrine, I am not going to find it, am I?
23             MS. McMILLAN:  No, your Honor, you're not.
24             THE COURT:  You made that one up.  I am not casting
25   stones.  You are doing our best to try to defend what seems to

CCHJLEEM                       Motions

1  be a very hard-to-defend position by the arbitrators, and I

2  respect that.  That is what it is, right?

3          MS. McMILLAN:  It is probably not perfect wording,

4  your Honor, but --

5          THE COURT:  I think we can agree on that.

6          Now, is there any basis for it given that it is not

7  perfect wording?

8          MS. McMILLAN:  If it is construed as a breach of the

9  covenant --

10          THE COURT:  What are the characteristics of the breach

11  of the covenant of good faith and fair dealing?

12          When do you have it and where is it different from a

13  situation where you don't --

14          MS. McMILLAN:  It is different where the conduct is so

15  onerous, and throughout the life of the contract, as you had

16  here, it rises to the level not just of a breach, but good

17  faith.

18          THE COURT:  What is the difference?  What is the

19  difference?

20          MS. McMILLAN:  Well --

21          THE COURT:  Take my Chevy example.  The customer knew

22  he signed to buy that car for 75 grand, he knew it.  He was

23  there, he signed it, he thought it was great when he did it,

24  and then he said it was a dumb deal, I am just not going to

25  perform.  Is that a bad faith breach?

CCHJLEEM                    Motions

1          MS. McMILLAN:  If there is an element of

2    intentional --

3          THE COURT:  Of course it is intentional.  That is the

4    hypothesis.

5          MS. McMILLAN:  It may well be then.

6          THE COURT:  Well, suppose you go out and you sign a

7    contract to buy a house and you put 10 percent down, and the

8    market, in your perception, moves against you and you decide,

9    you know, I'm going to give up that deposit, but I'm not

10   closing on this, it is way overpriced.

11         Is that a bad faith breach?

12         MS. McMILLAN:  In that instance, then your Honor at

13   least in New York State you have the seller has a right of

14   specific performance.

15         THE COURT:  Sorry?

16         MS. McMILLAN:  Specific performance.  It is generally

17   an equitable remedy provided for in real estate contracts where

18   in the absence of a legitimate reason under the real estate

19   contract to not close, it is an equitable claim on which you

20   can basically force closing and title to real estate.

21         THE COURT:  Suppose the buyer hasn't got the money?

22         MS. McMILLAN:  Generally real estate contracts provide

23   for mortgage contingencies where they're not able to get the

24   money, they can legitimate --

25         THE COURT:  Suppose there is no mortgage contingency?

CCHJLEEM                    Motions

1          MS. McMILLAN:  Then you have a situation where the

2     seller is left with a specific performance claim.

3          THE COURT:  Against somebody who can't perform, so

4     what the seller does is court order me to give him this house

5     for half what I agreed to take for it, is that what you're

6     really telling me?

7          MS. McMILLAN:  No.  I think in a situation like that,

8     the court would have to probably -- I am not sure, to be honest

9     with you.  I know the remedy in that situation is specific

10    performance.  I have never litigated one of those claims to

11    conclusion where a sale was actually forced upon a purchaser.

12    I know that is the remedy there.

13         THE COURT:  You're sure of that?

14         MS. McMILLAN:  That is my experience in real estate

15    transactions.

16         THE COURT:  A defaulted buyer can get specific

17    performance?  A defaulted -- that is to say, a buyer who has a

18    defaulting seller --

19         MS. McMILLAN:  Defaulting seller, right.

20         THE COURT:  -- can get specific performance?

21         Are you really telling me the seller's remedy is

22    anything other than selling for the best price he can get and

23    suing the buyer for the difference?

24         MS. McMILLAN:  No.  I think I misheard you the first

25    time.  No, the seller probably would retain the down payment

CCHJLEEM                    Motions

1   and get a judgment for the difference between the contract and

2   sales price.

3          THE COURT:  Right.  Can he get more than a judgment

4   for the difference because the buyer deliberately refused to

5   close, in bad faith refused to close?  I don't think so.

6          MS. McMILLAN:  I am not sure, your Honor.

7          THE COURT:  Okay.  All right.  I think we have

8   explored this piece of this long enough.  So let's go on to any

9   other points you want to cover.

10         MS. McMILLAN:  I would say, your Honor, with regard to

11  the award for overhead and profit on omitted and floor work

12  that the AUA has raised as a basis for not --

13         THE COURT:  Sorry, I couldn't quite make out what you

14  said.

15         MS. McMILLAN:  The AUA has referenced in their papers

16  Leeward was not entitled to overhead and profit on omitted and

17  flooring work in the contract.  I would say that they've

18  claimed, basically those claims were not a part of the

19  arbitration and were only raised in the closing papers, but I

20  would submit to the court that they were part of the original

21  arbitration because when Leeward first commenced the

22  arbitration, they were seeking relief as a fixed price contract

23  which included overhead and profit on all the work that was

24  contemplated by the contract before the construction project

25  started.

CCHJLEEM                    Motions

1          Lastly, the AUA has also raised an issue with respect

2     to the award for change order work.  I think that is a very

3     simple call.  The AUA claimed Leeward had already been paid for

4     some change orders, but the tribunal, based on the evidence

5     before them, disagreed with the AUA.

6          Lastly, there is a claim that Leeward is not entitled

7     to the interest on late payments as awarded.  This, as well as

8     the other issues, were all part of a motion to the tribunal

9     post the initial decision for modification, and the tribunal

10    reaffirmed with regard to these because there is no discernable

11    computational errors in the award.

12         THE COURT:  Well, but wait a minute.  Did the contract

13    specify the interest rate?

14         MS. McMILLAN:  The contract specified the Antiguan

15    legal rate of interest.

16         THE COURT:  Which was what?

17         MS. McMILLAN:  Believe it or not, it is unclear and

18    can change rather frequently.  We had some information that

19    indicated it was 10 percent based on some information that we

20    had gotten from local banks.  The AUA suggested it was 5

21    percent, and the arbitrators came down in the middle at 7

22    percent.

23         THE COURT:  Okay.

24         MS. McMILLAN:  If the court doesn't have any other

25    questions, that is about all we would have for now.

CCHJLEEM                    Motions

1      THE COURT:  Okay, thank you.  Sir?

2      MR. JEMISON:  Yes, your Honor.

3      I want to begin my comments, I think logically we

4   should start with what is our threshold motion which is our

5   motion for forum non conveniens, and the key here to this

6   aspect of our motion is that if you look at --

7      THE COURT:  You would like to take another year or two

8   before it gets enforced?

9      MR. JEMISON:  No, no, no.  Leeward is doing, they have

10  come here and said we think that Manipal, who is the hundred

11  percent shareholder of AUA, is the real pocket.  They're in New

12  York.  We should be allowed to come to New York to enforce an

13  award against AUA, an Antiguan entity.  We are an Antiguan

14  entity.  Let's come here and --

15     THE COURT:  Let's take Manipal out of it altogether

16  for the sake of discussion.

17     MR. JEMISON:  Sure.

18     THE COURT:  I understand you're two Antiguan entities,

19  but this is a convention case, and why isn't that, for all

20  practical purposes, enough or close to enough to defeat your

21  forum non conveniens motion?

22     MR. JEMISON:  There are a few things to look at.

23     First, if you take Manipal out of the case, okay, you

24  have a non-U.S. entity coming to this forum which typically

25  gets little deference.  The sole reason that they contend they

CCHJLEEM                    Motions

should be afforded their deference is this idea they're coming

after the assets they think exist here.

        Again taking Manipal out, Manipal out of the equation,

they claim AUA is a shell, they think, and has no assets in

Antigua.  Why should we have to go there and confirm our award

there where we can't collect?  It would be a very good argument

potentially except that we all know they know that AUA has

assets in Antigua.  They built it.

        There is a $35 million medical school campus that

Leeward built.

        THE COURT:  Counsel --

        MR. JEMISON:  The suggestion that AUA is a shell down

there --

        THE COURT:  Look, if you like to talk over me, you are

welcome to do it, counsel, but it is not helpful.

        MR. JEMISON:  I apologize, your Honor.

        THE COURT:  Who owns the title to that campus?  Is

that in the record?

        MR. JEMISON:  I don't believe it is in the record.  My

understanding is it is AUA.  I never understood it to be

otherwise.

        THE COURT:  What is AUA?  I know it is a medical

school.  Is it a corporation?  What is it?

        MR. JEMISON:  It is a corporation incorporated under

the Antiguan Barbuda company.  We put the articles of

CCHJLEEM                    Motions

1   corporation in the --

2              THE COURT:  Counsel, you are going so fast, the court

3   reporter can't get it down.  I can't understand it.

4              Back up!

5              MR. JEMISON:  I'll back up.  Thank you, your Honor,

6   and thank you for reminding me.  I do have a tendency to speak

7   faster than I should.

8              AUA is an Antiguan Barbuda corporation, Incorporated

9   there under the Companies Act of 1995.  We have put into the

10  record at the Sclafani reply affirmation, Exhibit A, a copy of

11  the articles of incorporation.  The name of the company is

12  American University of Antigua, Inc.

13             THE COURT:  All right.  Is there anything in the

14  record that suggests it has no assets whatsoever in the United

15  States?

16             MR. JEMISON:  No.  My understanding is maybe there is

17  a bank account in the U.S., but they don't do any business

18  here.  They're not authorized to do business here, but we

19  didn't say they have assets.  We are not making that argument.

20             THE COURT:  Let me take a wild guess.  The bank

21  account would be in New York, would it?

22             MR. JEMISON:  In all honesty, your Honor, I can't

23  answer that question.

24             THE COURT:  They advertise for students in the United

25  States?

CCHJLEEM                    Motions

1         MR. JEMISON:  I believe they likely do.

2         THE COURT:  And they have a web site?

3         MR. JEMISON:  If they have a web site where it is

4    domained or registered I can't answer.

5         What I would say is again that they have a services

6    agreement with Manipal which is their owner, an arm's length

7    transaction.  We explained this in the Sclafani --

8         THE COURT:  Arm's length transaction with their owner?

9    That is a new concept of arm's length transaction.

10        MR. JEMISON:  That --

11        THE COURT:  Its management is done principally from

12   New York under this contract with Manipal, right?

13        MR. JEMISON:  Manipal handles --

14        THE COURT:  Is that right?

15        MR. JEMISON:  -- Manipal handles the administration.

16        THE COURT:  Maybe this isn't your best point,

17   counselor.

18        MR. JEMISON:  Okay, I can move on.

19        My second point is let's take, let's -- we'll assume,

20   and as we have discussed, there are assets here in the United

21   States for Leeward to attempt to attach should they have their

22   award confirmed here.  It is our position that that is not an

23   issue-dispositive finding.

24        Under the case law of the Second Circuit, first of

25   all, if that were enough, you would never in a situation where

1   you are coming to a forum because of the assets that may be

2   there, you would never dismiss on forum non conveniens grounds.

3   We know that that is not true because it has happened.

4        It is our position that there are assets in Antigua

5   and that is the more appropriate forum.

6        THE COURT:  I thought we were moving on.

7        MR. JEMISON:  Okay.  Understood.  I'll move on quickly

8   to the motion to dismiss Manipal that we've asserted.

9        In the amended petition Leeward has set forth some

10  very basic conclusory allegations as to a reason to pierce the

11  corporate veil.  We agree with the comments your Honor made

12  during the prior portion of the argument when Ms. McMillan was

13  arguing that the appropriate thing to do would be to dismiss

14  Manipal, and if they think they have a basis to assert a claim

15  against Manipal to collect on this judgment, Manipal wasn't a

16  party to the arbitration --

17        THE COURT:  Let's get to the merits of the award,

18  okay?

19        MR. JEMISON:  Sure.  As to the merits, your Honor, I

20  don't want to go back into the discussion on the bad faith

21  doctrine.  I wholeheartedly agree with your analysis of that

22  issue, and when we got the award --

23        THE COURT:  The real problem is not whether you agreed

24  or not with what you presume my analysis to be, but with

25  whether the arbitrators exceeded their proper scope in doing

1    what they did even if I might disagree with it as a personal

2    matter, taking your assumption for the moment.

3         MR. JEMISON:  Yes, your Honor.  It is our position

4    that, first, neither party raised an implied covenant claim,

5    any kind of bad faith doctrine claim.

6         THE COURT:  What is the bad faith doctrine?

7         MR. JEMISON:  I wish I knew, to be perfectly frank.  I

8    wish I knew.  I don't know where the tribunal got that.  I got

9    the same sense and reaction you expressed.  Whether it is your

10   view or not remains to be seen.  I got the sense from your

11   reaction and your questioning, that is the reaction I had which

12   is they're just wanting to punish or add something on because

13   there was something they didn't like with the way that AUA

14   acted in performing the contract.

15        What I do know is that the primary claim asserted by

16   Leeward was that they were entitled to be paid a fixed price of

17   $27 million and change in the Eastern Caribbean dollars for

18   this school.  The parties had put forward a very detailed

19   schedule of rates for all the different construction tasks that

20   they had planned to do based upon the project designs that

21   existed at the time they entered the contract, how it was

22   supposed to look when it was built.

23        It included, for example, your gazebo.  The contract

24   says that that rate, which is basically a function of what they

25   expected it to look like in terms of the size of it times

CCHJLEEM                    Motions

1    agreed upon and negotiated unit rates equals the amount per

2    item.  That totaled up to $27 million when you added that

3    measured part of the works with the other parts of the contract

4    including their overhead and the like and having the site set

5    up with scaffolding and rigs and renting all the equipment they

6    needed to be on the site for a year and a half to build the

7    school.

8            What happened was Leeward claimed that was a fixed

9    price contract.  It was subject contractually to additions and

10   deductions in the contract.  It had to be done by a formal

11   change order in writing signed off by --

12           THE COURT:  You're saying the arbitrators concluded it

13   was a fixed price contract?

14           MR. JEMISON:  There was never a debate, okay, on

15   either side that this was a fixed price contract.  We all

16   agreed on that.  There was some -- I think there was

17   terminology difference between the parties that led there to be

18   a belief at one time, one side said saying it was measured

19   versus fixed price.

20           The way it worked, the way we agreed it worked and we

21   argued it worked and the arbitrators ruled that it worked was

22   they had a fixed price.  It was built according to spec on day

23   one that is what you pay.  You had to build what you said you

24   were going to build.

25           The parties throughout the course of the contract,

CCHJLEEM                    Motions

1    construction contract changed the project.  The architect

2    decided they wanted to add another window in this room or put a

3    gazebo or take out the gazebo or whatever number of changes

4    there may have been.  The way they kept track of payments was

5    through requisitions where they measured every month to see

6    what they paid the prior month and paid progress payments based

7    on exacting measurements the architect and both sides went

8    through.  That is how the project worked.

9         The contract said this was supposed to be done, any

10   change by change order, and that is how you document the

11   changes and how you adjust the fixed price, okay?

12        The key defense we won, and the suggestion we largely

13   did not win on this case I do not agree with.  The key argument

14   of Leeward was that they were entitled to be paid full rate for

15   what they were supposed to build no matter whether they built

16   it, no matter what.  The reason they say that, there were no

17   change orders.  Therefore, the contract was as set on day one.

18        We argued that the parties, through their conduct,

19   through this requisition process, mutually waived the formal

20   change order process and did it a different way.  We had

21   witness, detailed witness statements from both sides on this

22   issue.  We had an individual who was the liaison between the

23   parties when they negotiated the contract on this issue, we had

24   five days of cross-examination at the hearing on this issue.

25        We won on that issue.  That was the sole issue.  That

1   was the major issue that we defended.  The other big issue in

2   the case was whether or not there should be delay damages, and

3   the arbitrators basically split the baby, finding both parties

4   at fault and awarding them half of what they asked for.

5          There are other claims as well.  The reason I am

6   explaining this to you, I understand what the arbitration was

7   and was not about.  The two biggest portions of the award we

8   come here to argue about and to seek to be vacated or modified

9   is this bad faith doctrine award which frankly we don't

10  understand where they came from, okay?

11         And this overhead and profit award, when we talk about

12  that, because it wasn't discussed earlier, I want to explain to

13  you my understanding of what was awarded and what happened and

14  hopefully that will help you understand if it is not clear

15  enough from the papers.  If it is, tell me and I'll stop.

16         There was a claim for overhead and profit on certain

17  work which we called, for lack of better terms, deleted work.

18  Leeward made a claim during the project that said you took away

19  our job to paint the building and you said we are not going to

20  give that to you because you're not getting this contract done

21  on time and we are going to put it out to bid again.

22         They made a claim under the contract documents to get

23  paid their overhead and profit what they would have earned on

24  that part of the project.  It wasn't like the gazebo that

25  wasn't performed.  It was something that we gave away to

1  somebody else, okay?

2          The arbitrators agreed with them on that issue and

3  they awarded them those overhead and profits.  We are not here

4  challenging that, okay?  What we are challenging is the gazebo.

5  I think it is in the Bush trial submission, so it is in the

6  record, the example I used, I remember using at the hearing was

7  there was this electrical box or area that they were originally

8  designed to build a chain link fence around it for security

9  purposes.  At some point when they got to the point of the

10 project where they were going to put up that fence, they asked

11 for request for information.  Are we building the fence?  There

12 was a unit --

13         THE COURT:  You're going too fast against.

14         MR. JEMISON:  There was unit rate in the contract for

15 the fence, a dollar amount assigned for the fence they intended

16 to build at the time it went to contract.  That was in the

17 contract.  That was part of the fixed price, and we said ah, we

18 don't need the fence.  We had some other method of security.

19 They decided they didn't want the fence or the architect

20 decided we didn't need to build the fence, Leeward, don't build

21 it.  They said okay.  They didn't build it.

22         They didn't bill us for it.  They never billed us for

23 it.  They never asked for overhead and profit they would have

24 earned on building the fence at any time during the project,

25 after the project when they commenced the arbitration, when

CCHJLEEM                    Motions

1    they amended their arbitration demand, when they went and

2    submitted witness statements before the arbitration, at any

3    time during the five days of the hearing they never raised that

4    claim.

5              THE COURT:  And then they did?

6              MR. JEMISON:  Then they did after.  We submit that

7    both that and the bad faith doctrine which nobody raised or

8    argued are things in which the arbitrators exceeded their

9    authority and going outside of what was before it.

10             THE COURT:  How did they exceed their authority?

11             If you tried this case nonjury or, indeed, for that

12   matter, jury in the United States District Court, you could

13   have completed the whole trial and just before the matter went

14   to the jury or just before the judge was to decide it, and I

15   can even cite you a case where it happened afterward, somebody

16   makes a motion under Rule 15 to conform the pleading to the

17   proof, bang, there's a new claim in the case, you lose.  That

18   is the way it works.  It can work that way.

19             Why should I conclude the arbitrators did anything

20   wrong if that's in substance what they did?

21             MR. JEMISON:  First, the rules that govern the

22   arbitration required you to raise any modifications to your

23   claim before that point in time.

24             THE COURT:  Where is that in the mountain of paper?

25             MR. JEMISON:  I don't know if the arbitration rules

1   are in the record, but --

2            THE COURT:  They're not in the record.

3            MR. JEMISON:  I am trying to answer your question.

4   That would be my first reaction to that question, okay?

5            THE COURT:  Rule 8 of the Federal Rule of Civil

6   Procedure says the complaint must contain a short and plain

7   statement of the claim.  On my hypothesis to you, it is not in

8   there, it is not in the pretrial order, it it is not in the

9   opening argument.  It is not even in the closing argument made,

10  but then somebody moves to conform the pleadings to the proof

11  and you have a new claim, new damages and the plaintiff is home

12  and dry.

13           MR. JEMISON:  There is a second place where I can make

14  that argument.  It is from the contract itself.  The contract

15  itself has a detailed provision how you can raise claims, and

16  you have to raise a claim in the proper manner, timely within a

17  certain period of time after it arose, and then you have to

18  commence an arbitration on the claims that you've asserted and

19  have been rejected either because the architect said no or

20  didn't respond and they didn't do that for this because they

21  never raised it.

22           THE COURT:  What is the legal standard that governs

23  the review-ability of the arbitrator's action on this point?

24           MR. JEMISON:  The legal standard is that was there a

25  basis for the award.

CCHJLEEM                    Motions

1          THE COURT:  That can't be right.

2          MR. JEMISON:  Did they exceed their authority in -- to

3   be frank, the way I --

4          THE COURT:  Did they have authority to decide this

5   case?

6          MR. JEMISON:  Yes.  This is a due process violation.

7   They didn't give us a possibility to mount a defense.

8          THE COURT:  They didn't what?

9          MR. JEMISON:  They never provided us with an

10  opportunity to present a defense on this claim.  This

11  lesser-included offense, that I guess the analogy I think of it

12  is, they say we asked for everything.  They asked for the whole

13  ball of wax.  They said you've got to pay us no matter what,

14  that is what the contract says.  In the alternative --

15         THE COURT:  This was raised in Leeward's post-hearing

16  submission.  Is that right?

17         MR. JEMISON:  It was.

18         THE COURT:  Was it a secret from you?

19         MR. JEMISON:  No.  We did simultaneous submissions, so

20  we got an opportunity, simultaneous reply.  We did submit a

21  reply.  We did make the due process argument.  The arbitrators

22  didn't agree with us.

23         THE COURT:  What is the legal standard that governs my

24  ability to upset that?

25         THE COURT:  What do you have to show?  There is a

CCHJLEEM                    Motions

1   statute here, you know?  You don't know?  We're here arguing to

2   confirm or upset an arbitration award, and you're telling me

3   you don't know what the legal standard is that governs this

4   matter?  I hope you're not telling me that.

5          MR. JEMISON:  No, I am not not telling you that.  I am

6   having a senior moment.

7          THE COURT:  I may have a senior moment.  You are not

8   old enough to have a senior moment.

9          MR. JEMISON:  I am drawing an analogy.  The standard

10  we are moving on is in our papers.  I can pull my brief to

11  confirm, refresh my recollection.  I am just drawing a blank at

12  the moment.

13         THE COURT:  Okay.

14         (Pause)

15         MR. JEMISON:  It is under Section 10 of Article IX of

16  the FAA.

17         THE COURT:  That governs here through the convention?

18         MR. JEMISON:  Yes.

19         THE COURT:  Okay.

20         MR. JEMISON:  Both parties agree Section 10 applies

21  here because the award was made within the United States

22  because of the Puerto Rican venue --

23         THE COURT:  Okay.  So?

24         MR. JEMISON:  -- where the arbitrators were guilty of,

25  among other things, any misbehavior by which the parties, any

CCHJLEEM                    Motions

1    party have been prejudiced.

2              THE COURT:  Are you equating misbehavior with error?

3              MR. JEMISON:  I am equating misbehavior with

4    adjudicating and allowing Leeward to present a claim that was

5    never asserted during the arbitration hearing.

6              THE COURT:  Do you have any authority whatsoever that

7    supports the view that that constitutes misbehavior?

8              MR. JEMISON:  We did not find a direct case on point,

9    no.

10             THE COURT:  Did you find anything that is even

11   analogically on point?

12             MR. JEMISON:  No, your Honor.

13             THE COURT:  Okay.  So I have to indulge all reasonable

14   presumptions in favor of the validity of the award, don't I?

15             MR. JEMISON:  You do.  I understand.

16             THE COURT:  Let's move on.  Is there anything else?

17             MR. JEMISON:  I discussed the bad faith doctrine

18   already.

19             With respect to the other matters, the change order

20   provision and the miscalculation, on the change order

21   provision, our objection to that portion of the award -- and we

22   understand that your Honor cannot substitute its own views as

23   to whether or not the evidence supported the award of the

24   tribunal or not -- our view is that the rules governing the

25   process required a reasoned award, and we think simply stating

1   that the evidence supported their claim is not a reasoned

2   award.  It is hard for me to understand how they reach that

3   conclusion since they didn't tell me.  I frankly don't agree

4   with their conclusion, but obviously that is not something I

5   can bring to your Honor.

6        The basis of that, again I don't have any authority

7   under the FAA where the failure to provide a reasoned award per

8   se is something that would be one of the factors we believe

9   could be argued that way.  I don't have authority to

10  specifically support me.  Again it is an argument that we think

11  that we have made.  Again I don't have a case for you.

12        The final piece of it on the mathematical issue, and

13  just to explain it if necessary, the decision on this, it is a

14  minor amount of money, a minor point.  The decision is

15  inherently inconsistent.  There was a number of payments that

16  they found sufficient evidence to show that they were not paid

17  timely.  Whether you agree with them or not is not material to

18  this proceeding.  However, the Mada finding within the post,

19  within their decision that one of the payments -- two of

20  them -- the largest part of them was this idea, thing for

21  mobilization which were advances that they said we didn't pay

22  them.

23        The tribunal agreed with us, the evidence we produced

24  at the hearing, that mobilization, those payments and that

25  dispute had been settled by the parties long before we got to

1   arbitration in the context of the construction project.

2           The petitioner's, Leeward's post-trial findings of

3   fact and conclusions of law, when they set forth every single

4   late payment they think was made and when it was made and what

5   interest should be awarded on it at the rate they thought

6   should be applied, and they chose 10 percent, they included all

7   those two mobilization payments which were the large majority

8   of the late fees in terms of dollar amounts when you add up the

9   numbers, so the court in one instance says that was already

10  settled, and the other breath they made it --

11          THE COURT:  Sorry.  I just lost all of that.  It is

12  just a stream of sound.

13          MR. JEMISON:  Sure.  When the arbitrators, when

14  Leeward submitted their post-trial findings of fact and

15  conclusions of law, they put in every single payment they

16  believed was late including these two larger payments for

17  mobilization which has been advanced.  During the construction

18  project there was a dispute over the payment of mobilization.

19          THE COURT:  And they settled the mobilization.

20          MR. JEMISON:  They settled the dispute.

21          The arbitrators agreed with us they settled the

22  dispute.  They said so in the final award.  Then when they

23  calculated the interest, they didn't back out those line items,

24  the way we read the award.  What they did was they reduced the

25  total amount of interest that Leeward sought at 10 percent rate

CCHJLEEM                    Motions

1    and reduced it to 7 percent.  When they did that, I think they

2    forgot, the way I read it, they didn't remove the mobilization

3    portion of that claim.

4              THE COURT:  What was the amount they awarded for the

5    interest in total?

6              MR. JEMISON:  Roughly, I think it totals 60-something

7    thousand.

8              THE COURT:  What would it have been if they had given

9    10 percent and backed out the mobilization payments?

10             MR. JEMISON:  Give me a moment.  I don't have the

11   numbers off the top of my head.  I know it is in our papers.

12             Had they backed it off -- well, I don't know what the

13   number would be offhand at 10 percent, but had they backed it

14   it out properly at 7 percent, it would have been the 17,000 and

15   not the 44,000 they awarded.  You have to run the math.  I am

16   sorry, I don't have it on me.  Do you have it?

17             (Off-the-record discussion)

18             MR. JEMISON:  Do you have it Katherine?

19             Leeward's original ask was for 63,000 in interest.

20             THE COURT:  And that assumes what rate?

21             MR. JEMISON:  At 10 percent.  Had the tribunal backed

22   out --

23             THE COURT:  If they backed out the mobilization, would

24   it have been at 10 percent?

25             MR. JEMISON:  Yes.

CCHJLEEM                    Motions

1              THE COURT:  If they backed out the mobilization, what

2     would it have been at 10 percent?

3              MR. JEMISON:  24,504.

4              THE COURT:  And they gave you, at 7 percent, they gave

5     you a total of what?

6              MR. JEMISON:  They charged us 44,000 because that

7     included the mobilization.  Had they backed it out, it would

8     have been 17.  The math on this, I knew it was in here, is in

9     our modification application.  That is in the record.

10             THE COURT:  I take it the interest rate was

11    controverted item at the arbitration.  Is that right?

12             MR. JEMISON:  It wasn't raised in the arbitration.

13             In post-trial papers Leeward took the position what

14    the contract should mean is the legal rate, the bank rate in

15    Antigua which is a fluctuating rate at or around 10 percent.

16    We had submitted authority, and I don't recall off the top of

17    my head right now, but from the Eastern Caribbean states, the

18    legal rate of interest typically means the judgment rate, 5

19    percent.  We argued the contract should be read, construed to

20    mean the judgment rate because the parties weren't any more

21    clear than that.  Leeward argued for the 10 percent.  The

22    arbitrator decided to make 7.  I don't know how they got there.

23             THE COURT:  And maybe it was just a means of giving

24    you the economic benefit of an adjustment for backing out the

25    mobilization without actually being very careful about how the

CCHJLEEM                    Motions

1   figures appeared in the award, right?  I mean they really kind

2   of split the difference.

3               MR. JEMISON:  I think they split the difference on the

4   rate.  I don't think they were intending to do what you

5   suggest, which is to use the 7 percent rate to somehow fix the

6   math because even if that's what they intended, we made it very

7   clear in our modification motion that they got the math wrong,

8   and they just didn't seem to care.

9               THE COURT:  Maybe --

10              MR. JEMISON:  They didn't explain why.

11              THE COURT:  -- maybe they didn't care because what

12  they were trying to do was cut the baby in half in view of both

13  substitutes over the interest rate and over the mobilization.

14              MR. JEMISON:  But then the way I look at it, why

15  specifically say that the mobilization claim was settled?

16              THE COURT:  I understand.  You know, Judge Friendly

17  said what people are entitled to is a fair trial, not a perfect

18  trial.

19              MR. JEMISON:  Agreed.

20              THE COURT:  Anything else?

21              MR. JEMISON:  No, your Honor, unless you have any

22  specific questions of me.

23              THE COURT:  No.  Thank you.  Anything else?

24              MS. McMILLAN:  If I can have a moment?

25              THE COURT:  I should have called on Ms. Lieb here

CCHJLEEM                     Motions

1    because she is representing the principal defendant.

2              MS. LIEB:  Your Honor, I just have one point.

3              THE COURT:  Mr. Jemison, after all, is only

4    representing the party he says shouldn't even have been sued

5    here.  The award isn't even against his client.

6              MR. JEMISON:  No, your Honor, I represent both, both

7    defendants, as is Ms. Lieb.

8              THE COURT:  You represent both?

9              MR. JEMISON:  Yes.  If that was unclear, I apologize.

10   I represent AUA.  I actually was one of the two attorneys that

11   tried the matter down in Puerto Rico.

12             MS. LIEB:  You asked earlier if there was anything in

13   the record about AUA's ownership of the campus in Antigua, and

14   there is in Paragraphs 9 and 10 of the reply declaration of

15   Leonard Sclafani.  It goes into AUA's ownership of the campus

16   as well as other property in Antigua.

17             THE COURT:  Okay.  Thank you.

18             Okay, Ms. McMillan, anything else?

19             MS. McMILLAN:  Just briefly, your Honor.

20             Just quickly, your Honor, I just wanted to briefly

21   respond to some things Mr. Jemison said with regard to the

22   overhead and profit on the omitted work and that not being a

23   part of the claim.  Leeward has always maintained that is part

24   of the claim.  In fact, as far back as May of 2009 there was

25   project correspondence discussing overhead and profit for

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   omitted and deleted work.

2          THE COURT:  It doesn't matter what there was long

3   before the arbitration.  The question from his point of view

4   was what was in your statement of claim.

5          MS. McMILLAN:  We submit both the original statement

6   and the amended demand for arbitration included overhead and

7   profit on omitted work because --

8          THE COURT:  Where would I find that?

9          MS. McMILLAN:  It is part of the overall contract

10  amount that was originally claimed as a fixed price contract.

11  It was included in the 27 million.

12         THE COURT:  There is something fundamentally different

13  between -- in other words, there is no separately identified

14  claim for that, is that right, until the very end of the

15  arbitration?

16         MS. McMILLAN:  It was based on what transpired at the

17  hearings.  It was separated out later in the proceedings.

18         THE COURT:  The answer to my question was "yes"?

19         MS. McMILLAN:  Yes.

20         THE COURT:  Thank you.

21         I would have loved to have ruled on this from the

22  Bench today.  In two respects, I am going to.  It is dismissed

23  as against Manipal.  In O'Ryan Shipping, the Second Circuit

24  made it abundantly clear that an action for confirmation is not

25  the proper time for a district court to pierce the corporate

1    veil.  I think that applies here.

2            That, of course, is without prejudice to an action by

3    Leeward against Manipal, and I am going to deny forum non

4    conveniens dismissal.  This is a convention case.  That might

5    even conceivably be enough to warrant denial of forum non

6    conveniens dismissal, but there is more here.

7            AUA has assets here against which Leeward wishes to

8    enforce.  That surely is enough.  The public and private

9    interest factors are sufficient to support the case for many

10   years.  Leeward is entitled to not too great deference with

11   respect to its choice of forum, but in the Second Circuit there

12   is a sliding scale of deference, and they're entitled to enough

13   deference given all of the other circumstances here to require,

14   in my view, denial of forum non conveniens dismissal.

15           That leaves us with the question of whether there is

16   any basis to tinker with the award.  As to that, I am going to

17   reserve decision.  I think counsel is well aware of my concern

18   with respect to the bad faith damages.  I want to give a little

19   more thought to the interest calculation point, although it

20   doesn't amount to a hill of beans in the overall scope of

21   things, and beyond that I will not offer any comments.

22           I will note this:  By my rough estimate, the motion

23   papers on this matter are about, I am just guessing from the

24   thickness, 1200 or 1300 pages long.  The whole amount in

25   controversy is a million dollars, plus or minus.  I can't begin

CCHJLEEM                    Motions

1    to imagine why this case hasn't been settled.  It clearly ought

2    to be, and I will not have a decision for you before the end of

3    2012, and in the holiday spirit, I hope you all talk to your

4    principals and tell them it may not be a home run for anybody

5    and get this thing resolved.

6            Okay.  Thank you very much.

7            (Court adjourned)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300