# EXHIBIT 11

## Jonathan Jemison

| | |
|---|---|
| **From:** | Leonard Sclafani <lsclafani@auamed.org> |
| **Sent:** | Wednesday, February 27, 2013 4:32 PM |
| **To:** | Carolina Cardenas |
| **Cc:** | jsgreer@lewisgreer.com |
| **Subject:** | 50 110 T 00118 13 Leeward Construction Company Ltd. v. American University of Antigua College of Medicine. |
| **Attachments:** | 20130227162138044.pdf |

Ms. Cardenas,

Please find annexed Respondent's Answer and Counterclaim in the above referenced matter. The filing fee in connection with the counterclaim has been sent by wire transfer this day. To the extent that you determine that this answer and counterclaim is untimely, I respectfully request that you return the fee that we are tendering in connection with it. AUA will file its own demand for arbitration and seek consolidation of its claim with the instant proceeding, if necessary.

In response to your inquiries, AUA does not believe that mediation or other method of dispute resolution would be successful.

We believe that arbitrators fully familiar with the laws of Antigua and Barbuda, preferably, residents of that country,  and also fully familiar with construction industry contracts is required. AUA specifically objects to the appointment as an arbitrator of any of the arbitrators who oversaw the prior arbitration between the parties. The claims here are not related to that arbitration and AUA believes that the award in that prior case was not reasoned in many respects. Claims to this effect are presently pending before the United States District Court for the Southern District of New York.

We request that the list method of appointment of arbitrators be employed.

Lastly, we respectfully assert that, in light of the amount of AUA's counterclaim herein, this matter should not be treated under the Fast Track rules.

LEONARD A. SCLAFANI, ESQ

Law Offices of Leonard A. Sclafani, Esq.
One Battery Park Plaza, 33rd Fl.
New York, New York 10004
212-696-9880

1

# EXHIBIT 12

# ༄ AIA® Document A201™ – 1997

## General Conditions of the Contract for Construction

for the following PROJECT:
*(Name and location or address):*
American University of Antigua
College of Medicine

THE OWNER:
*(Name and address):*
AUA College of Medicine
c/o Greater Caribbean Learning Center
New York, NY 10005

THE ARCHITECT:
*(Name and address):*
Sundaram Architects PVT, Ltd.
No. 19 Kumara Krupa Road.
Bangalore 560-001
India

**ADDITIONS AND DELETIONS:**
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

This document has been approved and endorsed by The Associated General Contractors of America

TABLE OF ARTICLES

1    GENERAL PROVISIONS

2    OWNER

3    CONTRACTOR

4    ADMINISTRATION OF THE CONTRACT

5    SUBCONTRACTORS

6    CONSTRUCTION BY OWNER OR BY SEPARATE CONTRACTORS

7    CHANGES IN THE WORK

8    TIME

9    PAYMENTS AND COMPLETION

10    PROTECTION OF PERSONS AND PROPERTY

11    INSURANCE AND BONDS

12    UNCOVERING AND CORRECTION OF WORK

13    MISCELLANEOUS PROVISIONS

14    TERMINATION OR SUSPENSION OF THE CONTRACT

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                    (2404291990)

1

LC000016

AUA 000016

This Agreement is entered into as of the day and year first written above and is executed in at least three original copies, of which one is to be delivered to the Contractor, one to the Architect for use in the administration of the Contract, and the remainder to the Owner.

OWNER *(Signature)*                                          CONTRACTOR *(Signature)*

American University of Antigu.                         Leeward Construction Co. Ltd.
*(Printed name and title)*                                    *(Printed name and title)*
LT COL ROCHE ANTONY                              NEIL DICKINSON    PROJECTS DIRECTOR
This Agreement entered into as of the day and year first written above

General Manager. layout

AIA Document A101™ – 1997. Copyright © 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1967, 1974, 1977, 1987, 1991 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:24:55 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                (1908669884)

Init.

11

continuation of the Work. After such evidence has been furnished, the Owner shall not materially vary such financial arrangements without prior notice to the Contractor.

§ 2.2.2 Except for permits and fees, including those required under Section 3.7.1, which are the responsibility of the Contractor under the Contract Documents, the Owner shall secure and pay for necessary approvals, easements, assessments and charges required for construction, use or occupancy of permanent structures or for permanent changes in existing facilities.

§ 2.2.3 The Owner shall furnish surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site. The Contractor shall be entitled to rely on the accuracy of information furnished by the Owner but shall exercise proper precautions relating to the safe performance of the Work.

§ 2.2.4 Information or services required of the Owner by the Contract Documents shall be furnished by the Owner with reasonable promptness. Any other information or services relevant to the Contractor's performance of the Work under the Owner's control shall be furnished by the Owner after receipt from the Contractor of a written request for such information or services.

§ 2.2.5 Unless otherwise provided in the Contract Documents, the Contractor will be furnished, free of charge, such copies of Drawings and Project Manuals as are reasonably necessary for execution of the Work.

## § 2.3 OWNER'S RIGHT TO STOP THE WORK
§ 2.3.1 If the Contractor fails to correct Work which is not in accordance with the requirements of the Contract Documents as required by Section 12.2 or persistently fails to carry out Work in accordance with the Contract Documents, the Owner may issue a written order to the Contractor to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Contractor or any other person or entity, except to the extent required by Section 6.1.3.

## § 2.4 OWNER'S RIGHT TO CARRY OUT THE WORK
§ 2.4.1 If the Contractor defaults or neglects to carry out the Work in accordance with the Contract Documents and fails within a seven-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may after such seven-day period give the Contractor a second written notice to correct such deficiencies within a three-day period. If the Contractor within such three-day period after receipt of such second notice fails to commence and continue to correct any deficiencies, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case an appropriate Change Order shall be issued deducting from payments then or thereafter due the Contractor the reasonable cost of correcting such deficiencies, including Owner's expenses and compensation for the Architect's additional services made necessary by such default, neglect or failure. Such action by the Owner and amounts charged to the Contractor are both subject to prior approval of the Architect. If payments then or thereafter due the Contractor are not sufficient to cover such amounts, the Contractor shall pay the difference to the Owner.

## ARTICLE 3  CONTRACTOR
## § 3.1 GENERAL
§ 3.1.1 The Contractor is the person or entity identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Contractor" means the Contractor or the Contractor's authorized representative.

§ 3.1.2 The Contractor shall perform the Work in accordance with the Contract Documents.

§ 3.1.3 The Contractor shall not be relieved of obligations to perform the Work in accordance with the Contract Documents either by activities or duties of the Architect in the Architect's administration of the Contract, or by tests, inspections or approvals required or performed by persons other than the Contractor.

## § 3.2 REVIEW OF CONTRACT DOCUMENTS AND FIELD CONDITIONS BY CONTRACTOR
§ 3.2.1 Since the Contract Documents are complementary, before starting each portion of the Work, the Contractor shall carefully study and compare the various Drawings and other Contract Documents relative to that portion of the

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                  (2404291990)

Init.

/

LC000027

AUA 000027

Work, as well as the information furnished by the Owner pursuant to Section 2.2.3, shall take field measurements of any existing conditions related to that portion of the Work and shall observe any conditions at the site affecting it. These obligations are for the purpose of facilitating construction by the Contractor and are not for the purpose of discovering errors, omissions, or inconsistencies in the Contract Documents; however, any errors, inconsistencies or omissions discovered by the Contractor shall be reported promptly to the Architect as a request for information in such form as the Architect may require.

§ 3.2.2 Any design errors or omissions noted by the Contractor during this review shall be reported promptly to the Architect, but it is recognized that the Contractor's review is made in the Contractor's capacity as a contractor and not as a licensed design professional unless otherwise specifically provided in the Contract Documents. The Contractor is not required to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations, but any nonconformity discovered by or made known to the Contractor shall be reported promptly to the Architect.

§ 3.2.3 If the Contractor believes that additional cost or time is involved because of clarifications or instructions issued by the Architect in response to the Contractor's notices or requests for information pursuant to Sections 3.2.1 and 3.2.2, the Contractor shall make Claims as provided in Sections 4.3.6 and 4.3.7. If the Contractor fails to perform the obligations of Sections 3.2.1 and 3.2.2, the Contractor shall pay such costs and damages to the Owner as would have been avoided if the Contractor had performed such obligations. The Contractor shall not be liable to the Owner or Architect for damages resulting from errors, inconsistencies or omissions in the Contract Documents or for differences between field measurements or conditions and the Contract Documents unless the Contractor recognized such error, inconsistency, omission or difference and knowingly failed to report it to the Architect.

## § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES
§ 3.3.1 The Contractor shall supervise and direct the Work, using the Contractor's best skill and attention. The Contractor shall be solely responsible for and have control over construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract, unless the Contract Documents give other specific instructions concerning these matters. If the Contract Documents give specific instructions concerning construction means, methods, techniques, sequences or procedures, the Contractor shall evaluate the jobsite safety thereof and, except as stated below, shall be fully and solely responsible for the jobsite safety of such means, methods, techniques, sequences or procedures. If the Contractor determines that such means, methods, techniques, sequences or procedures may not be safe, the Contractor shall give timely written notice to the Owner and Architect and shall not proceed with that portion of the Work without further written instructions from the Architect. If the Contractor is then instructed to proceed with the required means, methods, techniques, sequences or procedures without acceptance of changes proposed by the Contractor, the Owner shall be solely responsible for any resulting loss or damage.

§ 3.3.2 The Contractor shall be responsible to the Owner for acts and omissions of the Contractor's employees, Subcontractors and their agents and employees, and other persons or entities performing portions of the Work for or on behalf of the Contractor or any of its Subcontractors.

§ 3.3.3 The Contractor shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

## § 3.4 LABOR AND MATERIALS
§ 3.4.1 Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated in the Work.

§ 3.4.2 The Contractor may make substitutions only with the consent of the Owner, after evaluation by the Architect and in accordance with a Change Order.

§ 3.4.3 The Contractor shall enforce strict discipline and good order among the Contractor's employees and other persons carrying out the Contract. The Contractor shall not permit employment of unfit persons or persons not skilled in tasks assigned to them.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                 (2404291990)

Init.

/

13

LC000028

AUA 000028

## § 3.5 WARRANTY

§ 3.5.1 The Contractor warrants to the Owner and Architect that materials and equipment furnished under the Contract will be of good quality and new unless otherwise required or permitted by the Contract Documents, that the Work will be free from defects not inherent in the quality required or permitted, and that the Work will conform to the requirements of the Contract Documents. Work not conforming to these requirements, including substitutions not properly approved and authorized, may be considered defective. The Contractor's warranty excludes remedy for damage or defect caused by abuse, modifications not executed by the Contractor, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Architect, the Contractor shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

## § 3.6 TAXES

§ 3.6.1 The Contractor shall pay sales, consumer, use and similar taxes for the Work provided by the Contractor which are legally enacted when bids are received or negotiations concluded, whether or not yet effective or merely scheduled to go into effect.

## § 3.7 PERMITS, FEES AND NOTICES

§ 3.7.1 Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for the building permit and other permits and governmental fees, licenses and inspections necessary for proper execution and completion of the Work which are customarily secured after execution of the Contract and which are legally required when bids are received or negotiations concluded.

§ 3.7.2 The Contractor shall comply with and give notices required by laws, ordinances, rules, regulations and lawful orders of public authorities applicable to performance of the Work.

§ 3.7.3 It is not the Contractor's responsibility to ascertain that the Contract Documents are in accordance with applicable laws, statutes, ordinances, building codes, and rules and regulations. However, if the Contractor observes that portions of the Contract Documents are at variance therewith, the Contractor shall promptly notify the Architect and Owner in writing, and necessary changes shall be accomplished by appropriate Modification.

§ 3.7.4 If the Contractor performs Work knowing it to be contrary to laws, statutes, ordinances, building codes, and rules and regulations without such notice to the Architect and Owner, the Contractor shall assume appropriate responsibility for such Work and shall bear the costs attributable to correction.

## § 3.8 ALLOWANCES

§ 3.8.1 The Contractor shall include in the Contract Sum all allowances stated in the Contract Documents. Items covered by allowances shall be supplied for such amounts and by such persons or entities as the Owner may direct, but the Contractor shall not be required to employ persons or entities to whom the Contractor has reasonable objection.

§ 3.8.2 Unless otherwise provided in the Contract Documents:

    .1    allowances shall cover the cost to the Contractor of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;

    .2    Contractor's costs for unloading and handling at the site, labor, installation costs, overhead, profit and other expenses contemplated for stated allowance amounts shall be included in the Contract Sum but not in the allowances;

    .3    whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 3.8.2.1 and (2) changes in Contractor's costs under Section 3.8.2.2.

§ 3.8.3 Materials and equipment under an allowance shall be selected by the Owner in sufficient time to avoid delay in the Work.

## § 3.9 SUPERINTENDENT

§ 3.9.1 The Contractor shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project site during performance of the Work. The superintendent shall represent the Contractor, and communications given to the superintendent shall be as binding as if given to the Contractor. Important

**Init.**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                              (2404291990)

14

LC000029

AUA 000029

communications shall be confirmed in writing. Other communications shall be similarly confirmed on written request in each case.

## § 3.10 CONTRACTOR'S CONSTRUCTION SCHEDULES

§ 3.10.1 The Contractor, promptly after being awarded the Contract, shall prepare and submit for the Owner's and Architect's information a Contractor's construction schedule for the Work. The schedule shall not exceed time limits current under the Contract Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Contract Documents, and shall provide for expeditious and practicable execution of the Work.

§ 3.10.2 The Contractor shall prepare and keep current, for the Architect's approval, a schedule of submittals which is coordinated with the Contractor's construction schedule and allows the Architect reasonable time to review submittals.

§ 3.10.3 The Contractor shall perform the Work in general accordance with the most recent schedules submitted to the Owner and Architect.

## § 3.11 DOCUMENTS AND SAMPLES AT THE SITE

§ 3.11.1 The Contractor shall maintain at the site for the Owner one record copy of the Drawings, Specifications, Addenda, Change Orders and other Modifications, in good order and marked currently to record field changes and selections made during construction, and one record copy of approved Shop Drawings, Product Data, Samples and similar required submittals. These shall be available to the Architect and shall be delivered to the Architect for submittal to the Owner upon completion of the Work.

## § 3.12 SHOP DRAWINGS, PRODUCT DATA AND SAMPLES

§ 3.12.1 Shop Drawings are drawings, diagrams, schedules and other data specially prepared for the Work by the Contractor or a Subcontractor, Sub-subcontractor, manufacturer, supplier or distributor to illustrate some portion of the Work.

§ 3.12.2 Product Data are illustrations, standard schedules, performance charts, instructions, brochures, diagrams and other information furnished by the Contractor to illustrate materials or equipment for some portion of the Work.

§ 3.12.3 Samples are physical examples which illustrate materials, equipment or workmanship and establish standards by which the Work will be judged.

§ 3.12.4 Shop Drawings, Product Data, Samples and similar submittals are not Contract Documents. The purpose of their submittal is to demonstrate for those portions of the Work for which submittals are required by the Contract Documents the way by which the Contractor proposes to conform to the information given and the design concept expressed in the Contract Documents. Review by the Architect is subject to the limitations of Section 4.2.7. Informational submittals upon which the Architect is not expected to take responsive action may be so identified in the Contract Documents. Submittals which are not required by the Contract Documents may be returned by the Architect without action.

§ 3.12.5 The Contractor shall review for compliance with the Contract Documents, approve and submit to the Architect Shop Drawings, Product Data, Samples and similar submittals required by the Contract Documents with reasonable promptness and in such sequence as to cause no delay in the Work or in the activities of the Owner or of separate contractors. Submittals which are not marked as reviewed for compliance with the Contract Documents and approved by the Contractor may be returned by the Architect without action.

§ 3.12.6 By approving and submitting Shop Drawings, Product Data, Samples and similar submittals, the Contractor represents that the Contractor has determined and verified materials, field measurements and field construction criteria related thereto, or will do so, and has checked and coordinated the information contained within such submittals with the requirements of the Work and of the Contract Documents.

§ 3.12.7 The Contractor shall perform no portion of the Work for which the Contract Documents require submittal and review of Shop Drawings, Product Data, Samples or similar submittals until the respective submittal has been approved by the Architect.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                              (2404291990)

Init.

/

15

**LC000030**

AUA 000030

§ 3.12.8 The Work shall be in accordance with approved submittals except that the Contractor shall not be relieved of responsibility for deviations from requirements of the Contract Documents by the Architect's approval of Shop Drawings, Product Data, Samples or similar submittals unless the Contractor has specifically informed the Architect in writing of such deviation at the time of submittal and (1) the Architect has given written approval to the specific deviation as a minor change in the Work, or (2) a Change Order or Construction Change Directive has been issued authorizing the deviation. The Contractor shall not be relieved of responsibility for errors or omissions in Shop Drawings, Product Data, Samples or similar submittals by the Architect's approval thereof.

§ 3.12.9 The Contractor shall direct specific attention, in writing or on resubmitted Shop Drawings, Product Data, Samples or similar submittals, to revisions other than those requested by the Architect on previous submittals. In the absence of such written notice the Architect's approval of a resubmission shall not apply to such revisions.

§ 3.12.10 The Contractor shall not be required to provide professional services which constitute the practice of architecture or engineering unless such services are specifically required by the Contract Documents for a portion of the Work or unless the Contractor needs to provide such services in order to carry out the Contractor's responsibilities for construction means, methods, techniques, sequences and procedures. The Contractor shall not be required to provide professional services in violation of applicable law. If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Owner and the Architect will specify all performance and design criteria that such services must satisfy. The Contractor shall cause such services or certifications to be provided by a properly licensed design professional, whose signature and seal shall appear on all drawings, calculations, specifications, certifications, Shop Drawings and other submittals prepared by such professional. Shop Drawings and other submittals related to the Work designed or certified by such professional, if prepared by others, shall bear such professional's written approval when submitted to the Architect. The Owner and the Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals, provided the Owner and Architect have specified to the Contractor all performance and design criteria that such services must satisfy. Pursuant to this Section 3.12.10, the Architect will review, approve or take other appropriate action on submittals only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Contractor shall not be responsible for the adequacy of the performance or design criteria required by the Contract Documents.

§ 3.13 USE OF SITE
§ 3.13.1 The Contractor shall confine operations at the site to areas permitted by law, ordinances, permits and the Contract Documents and shall not unreasonably encumber the site with materials or equipment.

§ 3.14 CUTTING AND PATCHING
§ 3.14.1 The Contractor shall be responsible for cutting, fitting or patching required to complete the Work or to make its parts fit together properly.

§ 3.14.2 The Contractor shall not damage or endanger a portion of the Work or fully or partially completed construction of the Owner or separate contractors by cutting, patching or otherwise altering such construction, or by excavation. The Contractor shall not cut or otherwise alter such construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Contractor shall not unreasonably withhold from the Owner or a separate contractor the Contractor's consent to cutting or otherwise altering the Work.

§ 3.15 CLEANING UP
§ 3.15.1 The Contractor shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Contractor shall remove from and about the Project waste materials, rubbish, the Contractor's tools, construction equipment, machinery and surplus materials.

§ 3.15.2 If the Contractor fails to clean up as provided in the Contract Documents, the Owner may do so and the cost thereof shall be charged to the Contractor.

Init.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                      (2404291990)

16

LC000031

AUA 000031

§ 3.16 ACCESS TO WORK
§ 3.16.1 The Contractor shall provide the Owner and Architect access to the Work in preparation and progress wherever located.

§ 3.17 ROYALTIES, PATENTS AND COPYRIGHTS
§ 3.17.1 The Contractor shall pay all royalties and license fees. The Contractor shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and Architect harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Contract Documents or where the copyright violations are contained in Drawings, Specifications or other documents prepared by the Owner or Architect. However, if the Contractor has reason to believe that the required design, process or product is an infringement of a copyright or a patent, the Contractor shall be responsible for such unless such information is promptly furnished to the Architect.

§ 3.18 INDEMNIFICATION
§ 3.18.1 To the fullest extent permitted by law and to the extent claims, damages, losses or expenses are not covered by Project Management Protective Liability insurance purchased by the Contractor in accordance with Section 11.3, the Contractor shall indemnify and hold harmless the Owner, Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to or destruction of tangible property (other than the Work itself), but only to the extent caused by the negligent acts or omissions of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity which would otherwise exist as to a party or person described in this Section 3.18.

§ 3.18.2 In claims against any person or entity indemnified under this Section 3.18 by an employee of the Contractor, a Subcontractor, anyone directly or indirectly employed by them or anyone for whose acts they may be liable, the indemnification obligation under Section 3.18.1 shall not be limited by a limitation on amount or type of damages, compensation or benefits payable by or for the Contractor or a Subcontractor under workers' compensation acts, disability benefit acts or other employee benefit acts.

ARTICLE 4   ADMINISTRATION OF THE CONTRACT
§ 4.1 ARCHITECT
§ 4.1.1 The Architect is the person lawfully licensed to practice architecture or an entity lawfully practicing architecture identified as such in the Agreement and is referred to throughout the Contract Documents as if singular in number. The term "Architect" means the Architect or the Architect's authorized representative.

§ 4.1.2 Duties, responsibilities and limitations of authority of the Architect as set forth in the Contract Documents shall not be restricted, modified or extended without written consent of the Owner, Contractor and Architect. Consent shall not be unreasonably withheld.

§ 4.1.3 If the employment of the Architect is terminated, the Owner shall employ a new Architect against whom the Contractor has no reasonable objection and whose status under the Contract Documents shall be that of the former Architect.

§ 4.2 ARCHITECT'S ADMINISTRATION OF THE CONTRACT
§ 4.2.1 The Architect will provide administration of the Contract as described in the Contract Documents, and will be an Owner's representative (1) during construction, (2) until final payment is due and (3) with the Owner's concurrence, from time to time during the one-year period for correction of Work described in Section 12.2. The Architect will have authority to act on behalf of the Owner only to the extent provided in the Contract Documents, unless otherwise modified in writing in accordance with other provisions of the Contract.

§ 4.2.2 The Architect, as a representative of the Owner, will visit the site at intervals appropriate to the stage of the Contractor's operations (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                    (2404291990)

Init.

/

17

LC000032

AUA 000032

deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect will not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect will neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents, except as provided in Section 3.3.1.

§ 4.2.3 The Architect will not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect will not have control over or charge of and will not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or any other persons or entities performing portions of the Work.

§ 4.2.4 Communications Facilitating Contract Administration. Except as otherwise provided in the Contract Documents or when direct communications have been specially authorized, the Owner and Contractor shall endeavor to communicate with each other through the Architect about matters arising out of or relating to the Contract. Communications by and with the Architect's consultants shall be through the Architect. Communications by and with Subcontractors and material suppliers shall be through the Contractor. Communications by and with separate contractors shall be through the Owner.

§ 4.2.5 Based on the Architect's evaluations of the Contractor's Applications for Payment, the Architect will review and certify the amounts due the Contractor and will issue Certificates for Payment in such amounts.

§ 4.2.6 The Architect will have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect will have authority to require inspection or testing of the Work in accordance with Sections 13.5.2 and 13.5.3, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

§ 4.2.7 The Architect will review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action will be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review of the Contractor's submittals shall not relieve the Contractor of the obligations under Sections 3.3, 3.5 and 3.12. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 4.2.8 The Architect will prepare Change Orders and Construction Change Directives, and may authorize minor changes in the Work as provided in Section 7.4.

§ 4.2.9 The Architect will conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, will receive and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract and assembled by the Contractor, and will issue a final Certificate for Payment upon compliance with the requirements of the Contract Documents.

§ 4.2.10 If the Owner and Architect agree, the Architect will provide one or more project representatives to assist in carrying out the Architect's responsibilities at the site. The duties, responsibilities and limitations of authority of such project representatives shall be as set forth in an exhibit to be incorporated in the Contract Documents.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                          (2404291990)

Init.

18

§ 4.2.11 The Architect will interpret and decide matters concerning performance under and requirements of, the Contract Documents on written request of either the Owner or Contractor. The Architect's response to such requests will be made in writing within any time limits agreed upon or otherwise with reasonable promptness. If no agreement is made concerning the time within which interpretations required of the Architect shall be furnished in compliance with this Section 4.2, then delay shall not be recognized on account of failure by the Architect to furnish such interpretations until 15 days after written request is made for them.

§ 4.2.12 Interpretations and decisions of the Architect will be consistent with the intent of and reasonably inferable from the Contract Documents and will be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect will endeavor to secure faithful performance by both Owner and Contractor, will not show partiality to either and will not be liable for results of interpretations or decisions so rendered in good faith.

§ 4.2.13 The Architect's decisions on matters relating to aesthetic effect will be final if consistent with the intent expressed in the Contract Documents.

§ 4.3 CLAIMS AND DISPUTES
§ 4.3.1 Definition. A Claim is a demand or assertion by one of the parties seeking, as a matter of right, adjustment or interpretation of Contract terms, payment of money, extension of time or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Contractor arising out of or relating to the Contract. Claims must be initiated by written notice. The responsibility to substantiate Claims shall rest with the party making the Claim.

§ 4.3.2 Time Limits on Claims. Claims by either party must be initiated within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later. Claims must be initiated by written notice to the Architect and the other party.

§ 4.3.3 Continuing Contract Performance. Pending final resolution of a Claim except as otherwise agreed in writing or as provided in Section 9.7.1 and Article 14, the Contractor shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Contract Documents.

§ 4.3.4 Claims for Concealed or Unknown Conditions. If conditions are encountered at the site which are (1) subsurface or otherwise concealed physical conditions which differ materially from those indicated in the Contract Documents or (2) unknown physical conditions of an unusual nature, which differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Contract Documents, then notice by the observing party shall be given to the other party promptly before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Architect will promptly investigate such conditions and, if they differ materially and cause an increase or decrease in the Contractor's cost of, or time required for, performance of any part of the Work, will recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Architect determines that the conditions at the site are not materially different from those indicated in the Contract Documents and that no change in the terms of the Contract is justified, the Architect shall so notify the Owner and Contractor in writing, stating the reasons. Claims by either party in opposition to such determination must be made within 21 days after the Architect has given notice of the decision. If the conditions encountered are materially different, the Contract Sum and Contract Time shall be equitably adjusted, but if the Owner and Contractor cannot agree on an adjustment in the Contract Sum or Contract Time, the adjustment shall be referred to the Architect for initial determination, subject to further proceedings pursuant to Section 4.4.

§ 4.3.5 Claims for Additional Cost. If the Contractor wishes to make Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the Work. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.6.

§ 4.3.6 If the Contractor believes additional cost is involved for reasons including but not limited to (1) a written interpretation from the Architect, (2) an order by the Owner to stop the Work where the Contractor was not at fault, (3) a written order for a minor change in the Work issued by the Architect, (4) failure of payment by the Owner, (5) termination of the Contract by the Owner, (6) Owner's suspension or (7) other reasonable grounds, Claim shall be filed in accordance with this Section 4.3.

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                              (2404291990)

Init.

/

19

LC000034

AUA 000034

**§ 4.3.7** Claims for Additional Time

**§ 4.3.7.1** If the Contractor wishes to make Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Contractor's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay only one Claim is necessary.

**§ 4.3.7.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated and had an adverse effect on the scheduled construction.

**§ 4.3.8** Injury or Damage to Person or Property. If either party to the Contract suffers injury or damage to person or property because of an act or omission of the other party, or of others for whose acts such party is legally responsible, written notice of such injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

**§ 4.3.9** If unit prices are stated in the Contract Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Construction Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Contractor, the applicable unit prices shall be equitably adjusted.

**§ 4.3.10** Claims for Consequential Damages. The Contractor and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes:

.1    damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

.2    damages incurred by the Contractor for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 14. Nothing contained in this Section 4.3.10 shall be deemed to preclude an award of liquidated direct damages, when applicable, in accordance with the requirements of the Contract Documents.

**§ 4.4 RESOLUTION OF CLAIMS AND DISPUTES**

**§ 4.4.1** Decision of Architect. Claims, including those alleging an error or omission by the Architect but excluding those arising under Sections 10.3 through 10.5, shall be referred initially to the Architect for decision. An initial decision by the Architect shall be required as a condition precedent to mediation, arbitration or litigation of all Claims between the Contractor and Owner arising prior to the date final payment is due, unless 30 days have passed after the Claim has been referred to the Architect with no decision having been rendered by the Architect. The Architect will not decide disputes between the Contractor and persons or entities other than the Owner.

**§ 4.4.2** The Architect will review Claims and within ten days of the receipt of the Claim take one or more of the following actions: (1) request additional supporting data from the claimant or a response with supporting data from the other party, (2) reject the Claim in whole or in part, (3) approve the Claim, (4) suggest a compromise, or (5) advise the parties that the Architect is unable to resolve the Claim if the Architect lacks sufficient information to evaluate the merits of the Claim or if the Architect concludes that, in the Architect's sole discretion, it would be inappropriate for the Architect to resolve the Claim.

**§ 4.4.3** In evaluating Claims, the Architect may, but shall not be obligated to, consult with or seek information from either party or from persons with special knowledge or expertise who may assist the Architect in rendering a decision. The Architect may request the Owner to authorize retention of such persons at the Owner's expense.

**§ 4.4.4** If the Architect requests a party to provide a response to a Claim or to furnish additional supporting data, such party shall respond, within ten days after receipt of such request, and shall either provide a response on the requested supporting data, advise the Architect when the response or supporting data will be furnished or advise the Architect that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Architect will either reject or approve the Claim in whole or in part.

**Init.**

**/**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. **All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law.** This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                          (2404291990)

20

LC000035

AUA 000035

§ 4.4.5 The Architect will approve or reject Claims by written decision, which shall state the reasons therefor and which shall notify the parties of any change in the Contract Sum or Contract Time or both. The approval or rejection of a Claim by the Architect shall be final and binding on the parties but subject to mediation and arbitration.

§ 4.4.6 When a written decision of the Architect states that (1) the decision is final but subject to mediation and arbitration and (2) a demand for arbitration of a Claim covered by such decision must be made within 30 days after the date on which the party making the demand receives the final written decision, then failure to demand arbitration within said 30 days' period shall result in the Architect's decision becoming final and binding upon the Owner and Contractor. If the Architect renders a decision after arbitration proceedings have been initiated, such decision may be entered as evidence, but shall not supersede arbitration proceedings unless the decision is acceptable to all parties concerned.

§ 4.4.7 Upon receipt of a Claim against the Contractor or at any time thereafter, the Architect or the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If the Claim relates to a possibility of a Contractor's default, the Architect or the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

§ 4.4.8 If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the Claim by the Architect, by mediation or by arbitration.

## § 4.5 MEDIATION
§ 4.5.1 Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5 shall, after initial decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party.

§ 4.5.2 The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to the Contract and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

§ 4.5.3 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

## § 4.6 ARBITRATION
§ 4.6.1 Any Claim arising out of or related to the Contract, except Claims relating to aesthetic effect and except those waived as provided for in Sections 4.3.10, 9.10.4 and 9.10.5, shall, after decision by the Architect or 30 days after submission of the Claim to the Architect, be subject to arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with the provisions of Section 4.5.

§ 4.6.2 Claims not resolved by mediation shall be decided by arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to the Contract and with the American Arbitration Association, and a copy shall be filed with the Architect.  Location of any Arbitration will be Antigua.

§ 4.6.3 A demand for arbitration shall be made within the time limits specified in Sections 4.4.6 and 4.6.1 as applicable, and in other cases within a reasonable time after the Claim has arisen, and in no event shall it be made after the date when institution of legal or equitable proceedings based on such Claim would be barred by the applicable statute of limitations as determined pursuant to Section 13.7.

Init.

/

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                          (2404291990)

21

**LC000036**

AUA 000036

**§ 4.6.4** Limitation on Consolidation or Joinder. No arbitration arising out of or relating to the Contract shall include, by consolidation or joinder or in any other manner, the Architect, the Architect's employees or consultants, except by written consent containing specific reference to the Agreement and signed by the Architect, Owner, Contractor and any other person or entity sought to be joined. No arbitration shall include, by consolidation or joinder or in any other manner, parties other than the Owner, Contractor, a separate contractor as described in Article 6 and other persons substantially involved in a common question of fact or law whose presence is required if complete relief is to be accorded in arbitration. No person or entity other than the Owner, Contractor or a separate contractor as described in Article 6 shall be included as an original third party or additional third party to an arbitration whose interest or responsibility is insubstantial. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of a Claim not described therein or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to the Agreement shall be specifically enforceable under applicable law in any court having jurisdiction thereof.

**§ 4.6.5** Claims and Timely Assertion of Claims. The party filing a notice of demand for arbitration must assert in the demand all Claims then known to that party on which arbitration is permitted to be demanded.

**§ 4.6.6** Judgment on Final Award. The award rendered by the arbitrator or arbitrators shall be final, and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof.

## ARTICLE 5  SUBCONTRACTORS
### § 5.1 DEFINITIONS
**§ 5.1.1** A Subcontractor is a person or entity who has a direct contract with the Contractor to perform a portion of the Work at the site. The term "Subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Subcontractor or an authorized representative of the Subcontractor. The term "Subcontractor" does not include a separate contractor or subcontractors of a separate contractor.

**§ 5.1.2** A Sub-subcontractor is a person or entity who has a direct or indirect contract with a Subcontractor to perform a portion of the Work at the site. The term "Sub-subcontractor" is referred to throughout the Contract Documents as if singular in number and means a Sub-subcontractor or an authorized representative of the Sub-subcontractor.

### § 5.2 AWARD OF SUBCONTRACTS AND OTHER CONTRACTS FOR PORTIONS OF THE WORK
**§ 5.2.1** Unless otherwise stated in the Contract Documents or the bidding requirements, the Contractor, as soon as practicable after award of the Contract, shall furnish in writing to the Owner through the Architect the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Architect will promptly reply to the Contractor in writing stating whether or not the Owner or the Architect, after due investigation, has reasonable objection to any such proposed person or entity. Failure of the Owner or Architect to reply promptly shall constitute notice of no reasonable objection.

**§ 5.2.2** The Contractor shall not contract with a proposed person or entity to whom the Owner or Architect has made reasonable and timely objection. The Contractor shall not be required to contract with anyone to whom the Contractor has made reasonable objection.

**§ 5.2.3** If the Owner or Architect has reasonable objection to a person or entity proposed by the Contractor, the Contractor shall propose another to whom the Owner or Architect has no reasonable objection. If the proposed but rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute Subcontractor's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Contractor has acted promptly and responsively in submitting names as required.

**§ 5.2.4** The Contractor shall not change a Subcontractor, person or entity previously selected if the Owner or Architect makes reasonable objection to such substitute.

**Init.**

AIA Document A201™ – 1997. Copyright © 1911, 1915, 1918, 1925, 1937, 1951, 1958, 1961, 1963, 1966, 1970, 1976, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 13:26:35 on 09/24/2008 under Order No.1000356699_1 which expires on 5/16/2009, and is not for resale.
User Notes:                                                                                                                (2404291990)

**22**

# EXHIBIT
# 13



# SUNDARAM ARCHITECTS PVT. LTD.

ARCHITECTURE • ENGINEERING • PLANNING • INTERIORS • SERVICES

Fax : 001-845-454-3315                                      Date : 27.02.2013

### Kind attn: Veronica A. McMillan,

M/s. Lewis & Greer, P.C.
Attorneys at Law,
510 Haight Avenue
POUGHKEEPSIE,
NEW YORK 12603, USA

Dear Sirs,

### Leeward Claim with respect to ABST

It is verified that AUA paid the ABST charged by Leeward. The amount is
$3,614,552.41

As per contract Leeward has to pay all taxes including ABST.

It is a fact that AUA has paid Leeward ABST taxes although Leeward should pay
the taxes.

Please advise Leeward to return the ABST collected from AUA to AUA.

Thanking you,

Yours faithfully,
For Sundaram Architects Pvt. Ltd.

R. SUNDARAM



#19, Kumara Krupa Road, Bangalore - 560 001. India
Tel : +91 (0)80 2238 0701 / 2238 0702 / 2236 0703
Fax : +91 (0)80 2225 2339  Email : edp@sundaramarchitects.com

SUNDARAM CONSULTANTS
GROUP

# EXHIBIT
# 14

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
------------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                    Claimant,

            -against-

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

                                    Respondent.
------------------------------------------------------------------------x

**ANSWER AND
AFFIRMATIVE
DEFENSES TO
RESPONDENT'S
COUNTERCLAIMS**

Case No. 50 110 T 00118 13

       **PLEASE TAKE NOTICE THAT** Leeward Construction Company, Ltd., the Claimant in

the above-referenced matter responds to the Answering Statement and Counterclaims of

Respondent American University of Antigua College of Medicine ("AUA"), dated February 27,

20213, as follows:

       1.       The Claimant denies each and every party of Respondent's Counterclaims and

affirms that Respondent was obligated to pay Claimant ABST, a value-added tax, which was then

remitted to the Government of Antigua and Barbuda.

       2.       While the Respondent claims that prior to bringing its counterclaims herein it

asserted a claim with the Project architect questioning its obligation to pay Leeward Antigua and

Barbuda Sales Tax ("ABST") on the Project, Leeward was not provided with notice of such claim

or the opportunity to contest it before the architect as required under §4.3.2 of the General

Conditions to the Contract.  Accordingly, Leeward rejects the Project architect's decision (annexed

as an exhibit to Respondent's Answering Statement and Counterclaim) and denies each and every

part thereof.

       3.       Pursuant to Construction Industry Arbitration Rule 4(c), Leeward may properly

refuse to answer the Claimant's counterclaims and the same would be deemed denied.  Leeward

1

voluntarily asserts the affirmative defenses asserted herein and reserves the right to assert further affirmative defenses as they become apparent during the course of these proceedings.

### FIRST AFFIRMATIVE DEFENSE

4.      Leeward repeats and realleges each and every allegation contained in Paragraphs "1" and "3" hereof as if fully set forth herein.

5.      Respondents' counterclaims herein are barred because the parties modified the operative terms of the Contract in writing and/or by their conduct.

### SECOND AFFIRMATIVE DEFENSE

6.      Leeward repeats and realleges each and every allegation contained in Paragraphs "1" through "5" hereof as if fully set forth herein.

7.      Respondents' counterclaims herein as barred by the Respondents' failure to comply with the notice of claim provisions of the Contract, including §4.3.2 of the General Conditions thereto.

### THIRD AFFIRMATIVE DEFENSE

8.      Leeward repeats and realleges each and every allegation contained in Paragraphs "1" through "7" hereof as if fully set forth herein.

9.      Respondents' counterclaims herein as barred by the doctrines of waiver, laches, estoppel and unclean hands.

### FOURTH AFFIRMATIVE DEFENSE

10.     Leeward repeats and realleges each and every allegation contained in Paragraphs "1" through "9" hereof.

11.     Respondents' counterclaims herein are barred by the doctrine of *res judicata*.

**WHEREFORE,** Leeward Construction, Co. Ltd. respectfully requests the following

relief:

      1.     Grant Leeward an award of EC $83,059.56/US $30,762.80 on its claim asserted in its Demand For Arbitration dated February 7, 2013, plus the costs of arbitration and attorneys' fees.

      2.     Deny AUA' Counterclaims as asserted in its Answering Statement and Counterclaims dated February 27, 2013.

      3.     Such other and further relief as the Arbitrators may deem just and proper.

Dated: March 15, 2013
       Poughkeepsie, New York

                               LEEWARD CONSTRUCTION CO. LTD.

                               By: _____
                                   Veronica A. McMillan, Esq.
                                 **Lewis & Greer, P.C.**
                                 *Attorney for Claimant,*
                                 *Leeward Construction Co. Ltd.*
                                 510 Haight Avenue, P.O. Box 5990
                                 Poughkeepsie, New York  12603
                                 Tel:  (845) 454-1200
                                 Email:  vamcmillan@lewisgreer.com

To:
Leonard Sclafani, Esq.
Law Offices of Leonard Sclafani, Esq.
Attorneys for Respondent AUA
One Battery Park Plaza, 33rd Floor
New York, New York  10004
Email: l.a.s@mindspring.com

Carolina Cárdenas-Soto
Senior Case Manager
International Centre for Dispute Resolution
1633 Broadway, 10th Floor
New York, New York 10019
Email: cardenasc@adr.org

AMERICAN ARBITRATION ASSOCIATION

**COURT**
**STATE OF NEW YORK, COUNTY OF**

CONSTRUCTION INDUSTRY
ARBITRATION RULES

Index No.          Year

---

LEEWARD CONSTRUCTION COMPANY, LTD,

Claimant,

-against-

AMERICAN UNIVERSITY OF ANTIGUA - COLLEGE OF MEDICINE C/O GCLR, LLC,

Respondent.

---

## ANSWER AND AFFIRMATIVE DEFENSES TO RESPONDENT'S COUNTERCLAIMS

---

### LEWIS & GREER, P.C.

*Attorney(s) for*

*Claimant, Leeward Construction Company Ltd.*
**Office and Post Office Address, Telephone**

510 Haight Avenue, Suite 202
POUGHKEEPSIE, NEW YORK 12603
(845) 454-1200

---

**To**

Signature (Rule 130-1.1-a)

_____

Print name beneath

Service of a copy of the within is hereby admitted.

**Attorney(s) for**

**Dated:** _____

---

**PLEASE TAKE NOTICE:**

☐ **NOTICE OF ENTRY**

**that the within is a *(certified) true copy of a***
**duly entered in the office of the clerk of the within named court on**

☐ **NOTICE OF SETTLEMENT**

**that an order**                                                        of which the within is a true copy
**will be presented for settlement to the HON.**              one of the judges of the
**within named Court, at**
**on**                                    **at**                        **M.**

**Dated,**

Yours, etc.

LEWIS & GREER, P.C.

# EXHIBIT
# 15

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
LEEWARD CONSTRUCTION COMPANY, LTD.,

                                    Petitioner,

        -against-

AMERICAN UNIVERSITY OF ANTIGUA- COLLEGE
OF MEDICINE AND MANIPAL EDUCATION
AMERICAS, LLC f/k/a GCLR, LLC,

                                    Respondents.
-------------------------------------------------------------------X

Bond Number 3348489

Civil Action No. 12-CIV-6280

ECF CASE

UNDERTAKING TO STAY

    WHEREAS, **Petitioner Leeward Construction Company, Ltd. ("Leeward")** and

**Respondent American University of Antigua – College of Medicine ("AUA")** entered into a

Stay Agreement (copy attached as Exhibit 1) as of May 8, 2013 staying enforcement of the

Judgment of the United States District Court for the Southern District of New York entered on

March 28, 2013 and the Amended Judgment of the United States District Court for the Southern

District of New York entered on May 23, 2013 (the "Stay Agreement") pending resolution of an

arbitration currently pending between **Leeward** and **AUA** before the American Arbitration

Association International Center for Dispute Resolution under Case No. 50 110 T 00118 13 (the

"Second Arbitration"), as detailed in the attached Stat Agreement;

    WHEREAS, pursuant to the Stay Agreement, **AUA** is required to post a bond in the

amount of **ONE MILLION SEVENTY THREE THOUSAND AND 00/100ths ($1,073,000)**

to secure its obligations under the Stay Agreement;

    NOW, THEREFORE the **SureTec Insurance Company** having an office and principal

place of business at 1330 Post Oak Boulevard, Houston TX 77056 and authorized by the State of

New York to execute bonds in the State of New York having an office at 60 East 42nd Street,

1

Suite 965, New York, NY 10165, does hereby undertake pursuant to the said Stay Agreement in the sum of **ONE MILLION SEVENTY THREE THOUSAND AND 00/100ths ($1,073,000)**, that **AUA** will pay to the **Leeward** that portion of the Amended Judgment, if any, that may be due and owing to **Leeward** when due, in accordance with the terms of the Stay Agreement attached hereto, which is incorporated by reference herein.

PROVIDED, HOWEVER, that under no condition shall the liability hereunder exceed the sum of **ONE MILLION SEVENTY THREE THOUSAND AND 00/100ths ($1,073,000)**.

Dated:  New York, New York
       June 11th  2013

                         **SureTec Insurance Company**

                         By: _____

                          Margaret McLaughlin,   Attorney-In-Fact

**Surety Acknowledgment**

STATE OF        New York

COUNTY OF       New York

On the 11th day of June, 2013, before me personally came Margaret McLaughlin, resides at 60 East 42nd Street, New York, New York, State of New York, that she is Attorney-In-Fact of **SureTec Insurance Company**, described in and which executed the within instrument; that she knows the corporate seal of said corporation; that the seal affixed to said instrument is such corporate seal; that is was so affixed by the Board of Directors of said corporation, and that he signed his name thereto by like order; and that the **SureTec Insurance Company** is duly authorized to transact business in the State of New York in pursuance of the statues in such case made and provided; that the Superintendent of Insurance of the State of New York, has, pursuant to Chapter 28 of the Consolidated Laws of the State of New York, known as the Insurance Law, issued to the **SureTec Insurance Company** a Certificate of Solvency and of Qualification to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law; and that such certificate has not been revoked.

_____

Notary Public

ANITA HUNTER
Notary Public, State of New York
NO. 01HU4828371
Qualified in Richmond County
Commission Expires April 30, 20__

POA #: 3210004

# SureTec Insurance Company
## LIMITED POWER OF ATTORNEY

*Know All Men by These Presents,* That SURETEC INSURANCE COMPANY (the "Company"), a corporation duly organized and existing under the laws of the State of Texas, and having its principal office in Houston, Harris County, Texas, does by these presents make, constitute and appoint

Anita Hunter, Carol Levine, Sybil Levine, Margaret McLaughlin, Maria Sponza

its true and lawful Attorney-in-fact, with full power and authority hereby conferred in its name, place and stead, to execute, acknowledge and deliver any and all bonds, recognizances, undertakings or other instruments or contracts of suretyship to include waivers to the conditions of contracts and consents of surety for:

Three Million and 00/100 Dollars ($3,000,000.00)

and to bind the Company thereby as fully and to the same extent as if such bond were signed by the President, sealed with the corporate seal of the Company and duly attested by its Secretary, hereby ratifying and confirming all that the said Attorney-in-Fact may do in the premises. Said appointment shall continue in force until _____6/30/2015_____ and is made under and by authority of the following resolutions of the Board of Directors of the SureTec Insurance Company:

*Be it Resolved,* that the President, any Vice-President, any Assistant Vice-President, any Secretary or any Assistant Secretary shall be and is hereby vested with full power and authority to appoint any one or more suitable persons as Attorney(s)-in-Fact to represent and act for and on behalf of the Company subject to the following provisions:

*Attorney-in-Fact* may be given full power and authority for and in the name of and of behalf of the Company, to execute, acknowledge and deliver, any and all bonds, recognizances, contracts, agreements or indemnity and other conditional or obligatory undertakings and any and all notices and documents canceling or terminating the Company's liability thereunder, and any such instruments so executed by any such Attorney-in-Fact shall be binding upon the Company as if signed by the President and sealed and effected by the Corporate Secretary.

*Be it Resolved,* that the signature of any authorized officer and seal of the Company heretofore or hereafter affixed to any power of attorney or any certificate relating thereto by facsimile, and any power of attorney or certificate bearing facsimile signature or facsimile seal shall be valid and binding upon the Company with respect to any bond or undertaking to which it is attached. *(Adopted at a meeting held on 20th of April, 1999.)*

*In Witness Whereof,* SURETEC INSURANCE COMPANY has caused these presents to be signed by its President, and its corporate seal to be hereto affixed this 21st day of March, A.D. 2013.

SURETEC INSURANCE COMPANY

By: _____
John Knox Jr., President

State of Texas      ss:
County of Harris

On this 21st day of March, A.D. 2013 before me personally came John Knox Jr., to me known, who, being by me duly sworn, did depose and say, that he resides in Houston, Texas, that he is President of SURETEC INSURANCE COMPANY, the company described in and which executed the above instrument; that he knows the seal of said Company; that the seal affixed to said instrument is such corporate seal; that it was so affixed by order of the Board of Directors of said Company; and that he signed his name thereto by like order.



JACQUELYN MALDONADO
Notary Public
State of Texas
My Comm. Exp. 5/18/2017

_____
Jacquelyn Maldonado, Notary Public
My commission expires May 18, 2017

I, M. Brent Beaty, Assistant Secretary of SURETEC INSURANCE COMPANY, do hereby certify that the above and foregoing is a true and correct copy of a Power of Attorney, executed by said Company, which is still in full force and effect; and furthermore, the resolutions of the Board of Directors, set out in the Power of Attorney are in full force and effect.

Given under my hand and the seal of said Company at Houston, Texas this 11th day of June 2013, A.D.

_____
M. Brent Beaty, Assistant Secretary

Any instrument issued in excess of the penalty stated above is totally void and without any validity.
For verification of the authority of this power you may call (713) 812-0800 any business day between 8:00 am and 5:00 pm CST.

# SURETEC INSURANCE COMPANY
1330 Post Oak Blvd., Suite 1100
Houston, Texas   77056
(713) 812-0800

## Financial Information:

| As of: | Dec. 31, 2009 | Dec. 31, 2010 | Dec. 31, 2011 |
|---|---|---|---|
| Total Assets | $103,723,699 | $115,996,536 | $122,816,131 |
| Total Liabilities | $44,135,796 | $36,558,010 | $44,135,796 |
| Asset to Liability Ratio | 2.3 | 2.3 | 2.1 |
| Capital | $5,000,000 | $5,000,000 | $5,000,000 |
| Net Surplus | $54,587,902 | $62,400,576 | $61,447,182 |
| Net Life Ins | N/A | N/A | N/A |

## Premiums:

| As of: | Dec. 31, 2009 | Dec. 31, 2010 | Dec. 31, 2011 |
|---|---|---|---|
| Life and Annuities | N/A | N/A | N/A |
| Accident and Health | $0 | $0 | $0 |
| Property and Casualty | $25,548,522 | $22,482,231 | $18,257,067 |
| Total Texas Premium | $25,548,522 | $22,482,231 | $18,257,067 |
| National Premium | $41,572,718 | $46,273,274 | $50,023,232 |

CERTIFICATE OF SOLVENCY UNDER SECTION 1111 OF THE NEW YORK
INSURANCE LAW

STATE OF NEW YORK

DEPARTMENT OF FINANCIAL SERVICES

It is hereby certified that

SURETEC INSURANCE COMPANY

Of Houston, Texas

a corporation organized under the laws of the State of Texas and duly authorized to transact the business of insurance in this State, is qualified to become surety or guarantor on all bonds, undertakings, recognizances, guaranties and other obligations required or permitted by law, and that the said corporation is possessed of a capital and surplus including gross paid-in and contributed surplus and unassigned funds (surplus) aggregating the sum of $69,333,236 (Capital $5,000,000) as is shown by its sworn financial statement for the Third Quarter of September 30, 2012, on file in this Department, prior to audit.

The said corporation cannot lawfully expose itself to loss on any one risk or hazard to an amount exceeding 10% of its surplus to policyholders, unless it shall be protected in excess of that amount in the manner provided in Section 4118 of the Insurance Law of this State.



In Witness Whereof, I have hereunto set my hand and affixed the official seal of this Department at the City of Albany, this 20th day of November, 2012

Benjamin M. Lawsky
Superintendent

By *Jacqueline Catalfamo*

Jacqueline Catalfamo
Special Deputy Superintendent

www.dfs.ny.gov

<u>STAY AGREEMENT</u>

This Stay Agreement (the "Agreement") is made as of May 8, 2013, by and between Leeward Construction Company, Ltd., an Antiguan corporation ("Leeward") and American University of Antigua – College of Medicine, an Antiguan corporation ("AUA").

WHEREAS, Leeward and AUA conducted an arbitration before the American Arbitration Association International Center for Dispute Resolution under Case No. 50 110 T 00075 11 (the "First Arbitration");

WHEREAS, on June 22, 2012, the tribunal issued an arbitration award in the First Arbitration: (a) in favor of Leeward on certain claims it had asserted against AUA; and (b) in favor of AUA on certain counterclaims it had asserted against Leeward, which award was modified on August 8, 2012 (the "Award");

WHEREAS, the monies due and owing Leeward and AUA pursuant to the Award remain outstanding;

WHEREAS, on August 16, 2012, Leeward filed a Petition to confirm the Award in the United States District Court for the Southern District of New York in a proceeding styled entitled *Leeward Construction Company, Ltd. v. American University of Antigua – College of Medicine, et al.*, Case No. 12-CV-06280 (LAK) (the "Action");

WHEREAS, on March 28, 2013, a Judgment was entered in the Action confirming the Award (the "Judgment"), a copy of which is attached hereto as Exhibit 1;

WHEREAS, on April 24, 2013, Leeward filed a motion to amend the Judgment so as to reduce the Judgment to a money judgment in the net amount due Leeward under the Award, with interest (the "Motion to Amend"), which motion seeks the entry of a proposed Amended

1

Judgment in Leeward's favor in the net amount of $910,804.49 as of April 23, 2013, plus interest at a rate of 7% per annum until paid;

WHEREAS, a second arbitration is pending between Leeward and AUA before the American Arbitration Association International Center for Dispute Resolution under Case No. 50 110 T 00118 13 (the "Second Arbitration");

WHEREAS, Leeward has asserted a claim in the amount of US $30,672.80 (exclusive of interest) against AUA in the Second Arbitration, and AUA has asserted a counterclaim against Leeward in the amount of US $1,334,854.21 (exclusive of interest) in the Second Arbitration; and

WHEREAS, AUA and Leeward have reached an agreement that mutually serves to (a) secure payment by AUA of (i) the Judgment or any Amended Judgment that may be entered and (ii) Leeward's claim in the Second Arbitration; and (b) secure payment by Leeward of AUA's counterclaim in the Second Arbitration to the extent of the monies due Leeward under the Judgment;

NOW, THEREFORE, Leeward and AUA agree as follows:

1.      Leeward shall cease any and all efforts to execute on the Judgment, or any Amended Judgment that may be entered (the "Amended Judgment"), pending the issuance of an arbitration award by the tribunal in the Second Arbitration, except that Leeward shall be permitted to file the Motion to Amend to seek entry of an Amended Judgment.

2.      Within seven (7) days of execution of this Agreement, the parties shall file a Stipulation and Consent Order staying execution of the Judgment/Amended Judgment in the

form attached hereto as Exhibit 2. Notwithstanding the express intent of Leeward and AUA to seek entry of the Stipulation and Consent Order, Leeward and AUA shall be bound by the mutual obligations set forth in this Agreement regardless of whether the Court enters the Stipulation and Consent Order submitted. Leeward and AUA further agree that both shall cooperate in modifying the form of the Stipulation and Consent Order attached hereto as Exhibit 2 to the extent necessary to facilitate its entry by the Court.

      3.    To secure payment of the Judgment/Amended Judgment, AUA shall post security in the form of a bond issued by a surety company authorized by the laws of the State of New York to transact business and certified by the New York State Superintendent of Insurance under the provisions of Insurance Law § 1111 or who holds a certificate of authority from the Secretary of the U.S. Treasury. The bond shall be in the amount the amount of $1,073,000.00, which is presently sufficient to fully secure both the Judgment/Amended Judgment and Leeward's claim in the Second Arbitration, plus interest on such Judgment/Amended Judgment and such claim at a rate of 7% per annum through April 23, 2015. To the extent AUA is required to maintain its bond beyond April 23, 2015, AUA shall be obligated to increase the amount of its bond to cover additional interest that may accrue in no less than three (3) month increments, as and when necessary, to ensure that it remains sufficient in amount to fully secure Leeward. If an increase in the amount of the bond becomes necessary and AUA fails to increase the amount of the bond as required, AUA shall be liable for actual attorneys' fees and expenses incurred by Leeward to seek enforcement of this provision.

4.     Upon issuance of an award by the tribunal in the Second Arbitration, the parties shall determine the net amount due to either Leeward or AUA, taking into consideration: (a) the Judgment/Amended Judgment; and (b) the award, whether in favor of Leeward or AUA, issued in the Second Arbitration.

5.     To the extent Leeward is entitled to a net award, such net award, including interest, shall be paid within sixty (60) days of the issuance of the award in the Second Arbitration by AUA and/or from the security posted by AUA pursuant to Paragraph 3 of this Agreement, with the source of such payment being within AUA's sole discretion. Payment shall be to "Lewis & Greer, P.C., as attorney" and shall be in U.S. dollars, only, subject to the following:

(a)     If AUA moves to vacate or modify the award issued in the Second Arbitration prior to the expiration of the sixty (60) day period, then AUA shall not be obligated to pay Leeward as set forth in this Paragraph unless and until Leeward posts security in the form of a bond issued by a surety company authorized by the laws of the State of New York to transact business and certified by the New York State Superintendent of Insurance under the provisions of Insurance Law § 1111 or who holds a certificate of authority from the Secretary of the U.S. Treasury, to secure the amount of such payment made to Leeward. Such bond shall remain in place during the pendency of AUA's motion to vacate or modify the award issued in the Second Arbitration. If the award is vacated in full only, such bond shall continue to remain in place through any further proceedings until the claims in the Second Arbitration are finally resolved and confirmed. If Leeward elects payment and posts a bond and AUA's motion to vacate or

4

modify is denied, then AUA agrees to reimburse Leeward for the costs incurred to obtain the bond.

(b)     If AUA moves to vacate or modify the award issued by the tribunal in the Second Arbitration as provided in subparagraph (a) and Leeward does not elect to post a bond in exchange for receiving payment while AUA pursues such motion, the stay of execution on the Judgment/Amended Judgment shall remain in place, as will AUA's bond securing such Judgment/Amended Judgment, during the pendency of the AUA's motion to vacate or modify the award issued in the Second Arbitration. If the award is vacated in full only, such stay and such bond shall continue to remain in place through any further proceedings until the claims in the Second Arbitration are finally resolved and confirmed.   In the event Leeward thereafter remains entitled to a net award, Leeward shall be paid the net award then due it by AUA and/or from the security provided by AUA within ten (10) days of any court order denying AUA's motion to vacate or, if the award is vacated, upon issuance of any confirmed award that results from further proceedings. Upon receipt of payment of the net award plus interest due and owing in accordance with the Paragraph, Leeward shall thereafter file a Satisfaction of Judgment with the United States District Court for the Southern District of New York. In the event AUA and/or the surety fails to make payment within the time frames set forth in this Paragraph, AUA shall be liable for actual attorneys' fees and expenses incurred to collect the Judgment/Amended Judgment that may be entered, including any enforcement action against the surety/bond.


6. To the extent AUA it entitled to a net award, then sixty (60) days after the issuance of an award in the Second Arbitration, the security posted by AUA shall be released and returned to AUA and AUA's award shall be deemed partially satisfied to the extent of the

Judgment/Amended Judgment, inclusive of interest, due to Leeward on the date such award is issued. In that event, the Judgment/Amended Judgment against AUA shall be deemed satisfied in full, and Leeward shall thereafter file a Satisfaction of Judgment with the United States District Court for the Southern District of New York, subject to the following: If Leeward moves to vacate or modify the award issued in the Second Arbitration within sixty (60) days of its issuance, then AUA's bond and Leeward's stay of execution on the Judgment/Amended Judgment shall remain in place during the pendency of a motion by Leeward to vacate or modify the award. If the award is vacated in full only, both AUA's bond and Leeward's stay of execution on the Judgment/Amended Judgment shall continue to remain in place until the claims in the Second Arbitration are finally resolved and confirmed. In the event AUA thereafter remains entitled to a net award, the security posted by AUA shall be released and returned to AUA within ten (10) days of any court order denying Leeward's motion to vacate or, if the award is vacated, upon issuance of any confirmed award that results from further proceedings. AUA's award shall be deemed partially satisfied to the extent of the Judgment/Amended Judgment, inclusive of interest, due to Leeward on the date such decision or award is issued. In such event, the Judgment/Amended Judgment against AUA shall be deemed satisfied in full, and Leeward shall thereafter file a Satisfaction of Judgment with the United States District Court for the Southern District of New York.

7.     In consideration of the stay of execution referenced in Paragraph 1 and 2, above, AUA agrees to waive its right to appeal the Judgment/Amended Judgment. Such waiver shall be effective upon full execution of this Agreement.

6

8.      This Agreement constitutes the entire and complete understanding and agreement between the parties hereto concerning the matters set forth herein, and there are no understandings and agreements, oral or otherwise, that are not reflected herein. This Agreement may not be clarified, modified, changed or amended except in a writing signed by each of the parties hereto.

9.      Leeward and AUA were represented by counsel and this Agreement was negotiated by counsel. Each party and counsel for each party to this Agreement have reviewed this Agreement and have participated in its drafting and, accordingly, no party shall attempt to invoke the rule of construction to the effect that ambiguities, if any, are to be resolved against the drafting party.

10.     If any provision of this Agreement, or the application thereof to any person or circumstance, is invalid or unenforceable in any jurisdiction: (a) a substitute and equitable provision shall be substituted therefore in order to carry out, so far as may be valid and enforceable in such jurisdiction, the intent and purpose of the invalid or unenforceable provision; and (b) the remainder of this Agreement and the application of such provision to other persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall the invalidity or unenforceability of such provisions affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

11.     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the doctrine of conflicts of law. The Federal and

7

States Courts within the State of New York shall have exclusive jurisdiction over any claim arising from this Agreement, and Leeward and AUA each consent and agree to be subject to the jurisdiction of said Courts for the limited purpose of adjudicating any such disputes arising out of this Agreement. Further, the parties agree that service of any such action commenced pursuant to this paragraph of the Agreement shall be deemed effective if service is made by FedEx upon Leeward to its counsel of record: J. Scott Greer, Esq., Lewis & Greer, P.C., 510 Haight Avenue, Suite 202, Poughkeepsie, New York 12603, and to AUA to its counsel of record: Jonathan S. Jemison, Esq., Sills Cummis & Gross, P.C., 30 Rockefeller Center, New York, New York 10112.

12.    This Agreement may be executed in one or more counterparts, each of which shall be an original as against the party who signed it, and all of which shall constitute one and the same instrument. Signatures may be transmitted by facsimile or email.

IN WITNESS WHEREOF, the parties have signed this Agreement as of the date first written above.

Leeward Construction Company, Ltd.,

By: _____
Its: _____

American University of Antigua — College of Medicine

By: _____
Its: _____

8

# EXHIBIT
# 16

AMERICAN ARBITRATION ASSOCIATION
CONSTRUCTION INDUSTRY ARBITRATION RULES
------------------------------------------------------------------------x
LEEWARD CONSTRUCTION COMPANY, LTD.,

                       Claimant,

     -against-

AMERICAN UNIVERSITY OF ANTIGUA
COLLEGE OF MEDICINE C/O GCLR, LLC,

                       Respondent.
------------------------------------------------------------------------x

**ERIC LINDE**
**WITNESS STATEMENT**

Case No. 50 110 T 00075 11

1.     I am a Director in Leeward Construction Company, Ltd. in Antigua.  I have over 45 years of hands-on experience in the construction industry both through work in Antigua as well as in the United States.

2.     Born and raised in Pennsylvania, I began coming to Antigua in 1982 with my family on vacations.  My father was an Eastern Airlines Captain who bought a residence in Nelson's Dockyard that year.  Thereafter, our family vacationed in Antigua annually.

3.     In addition to being a pilot, my father was also involved in the construction industry in Pennsylvania through our company Linde Enterprises, Inc. ("Linde") which specialized in utility, heavy and highway construction.  I was also one of the principals in Linde along with my brother and sister.

4.     In 1986, Linde bid and was awarded a US $4,500,000.00 (EC $13,558,635.00)[1] project for U.S.A.I.D. to rehabilitate water systems for the Antiguan Public Utility Authority. We became aware of the project through Gannett & Fleming, an engineering firm from Harrisburg, Pennsylvania with whom we had done considerable work in Pennsylvania. U.S.A.I.D. hired Gannett & Fleming to design the engineering work for the project.

---

[1] The exchange rate for US Dollars to Eastern Caribbean Dollars is 3.01303 as of January 31, 2012.

5.    Following the initial project, we did another US $3,500,000.00 (EC $10,545,605.00) project for U.S.A.I.D. involving the construction of the Bendell's Water Treatment Plant and the rehabilitation of six pumping and treatment stations throughout Antigua.

6.    In 1988, Linde was the successful bidder on a U.S. Air Force contract for asphalt resurfacing of the Air Force and Naval Bases in Antigua. Linde imported the first hot mix asphalt plant to Antigua for the project.

7.    Upon completion, Linde formed a joint venture with Antigua Masonry Products to do asphalt paving and construction work in Antigua. Over the next several years, Linde completed projects in excess of US $15,000,000.00 (EC $45,195,450.00) which included Harbor Road and the Royal Antiguan Hotel as well as more than 30 miles of road resurfacing in the various constituencies.

8.    At the same time, Linde was also performing concrete construction work in Antigua and was responsible for the construction of the water and sewer treatment facilities at Jolly Harbor. We trained and engaged the local work force with supervision and support from our Pennsylvania base.

9.    My father passed away in 1988. In 1992, I purchased my brother and sister's interest in Linde's business in Antigua. Thereafter, I formed Linde Antigua, Ltd. ("Linde Antigua") with Andy Green. We proceeded to engage in concrete construction and various other building projects over the next four years.

10.    In 1993, I left Linde in Pennsylvania and formed my own construction company named Leeward Construction, Inc. ("Leeward Construction"). Leeward Construction is engaged in heavy, highway, utility and site development work throughout the Northeast area of the United States. We have extensive experience in concrete, road, bridge and pipeline construction. Over

2

the years Leeward Construction has continued to expand and completes on average US $45,000,000.00 (EC $135,586,350.00) in work annually.

11.     In 1995, Antigua was struck by Hurricane Louis.  As a result, between 1995 and 1996 Linde Antigua's work program and work force mushroomed to in excess of 200 employees.  We were instrumental in many rehabilitations projects on Antigua, including Cable & Wireless, Jolly Harbor, Marina Bay and various residential homes.

12.     From 1995 through the present time, we have maintained a steady influx of projects.  One of our main sources of work and revenue in recent years was projects completed for the Stanford Development Company, including the Stickey Wicket Restaurant, the 20/20 Cricket Stadium Improvements and Barnacle Point.  Since 2000, Leeward Construction Ltd. has performed between EC $1,000,000.00 (US $331,890.00)[2] and EC $15,000,000.00 (US $4,978,350.00) in work annually.  We completed some very large projects.  No one else in Antigua was doing the same level of work.

13.     In 2006, Andy and I formed Leeward Construction Company, Ltd.  The two companies remain linked by my common stock ownership in both.  Leeward Construction, Ltd., just as Linde Antigua before it, has always been supported by the resources and expertise of Leeward Construction, its Pennsylvania counterpart, including labor, material and engineering expertise.

14.     I continue to be actively involved in the operations in Antigua.  While I am only here on a part-time basis, I am in constant contact and spend a total of 4 months per year in Antigua.

15.     When Leeward started doing work for the American University of Antigua - School of Medicine ("AUA") in 2007 with respect to what we call the "Phase I" deep pile

---

[2] The exchange rate for Eastern Caribbean Dollars to US Dollars is 0.33189 as of January 31, 2012.

foundations and slabs (LC 67), we were not by any means a small, start-up operation with little experience with projects of this magnitude. By then, Leeward had already earned a reputation as the go-to contractor for large and difficult projects that other contractors in Antigua did not have the experience and resources to construct.

16.     As a director of Leeward, I am fully familiar with the AUA project at issue in this arbitration.  Nevertheless, I defer to Witness Statements of Andy Green, Neil Dickensen and Robert Winwood, rather than repeat their testimony.  I would, however, like to address one incident that demonstrates the type of people we were dealing with at the AUA.  The AUA's cooptation of Leeward's subcontractors on the Project, the details of which are set forth in Andy Green's witness statement at ¶¶37-38.  As I explained in my March 22, 2010 letter to AUA President Neil Simon (LC 222), never in my 45 years in the construction industry have I experienced such unethical and fraudulent behavior where the owner of the project secretly goes behind our back and pays our subcontractors for work that the owner had already contracted out to my company, and then withhold payment for the work from our requisitions even though we had already paid the subcontractors for that work.  What makes this even more egregious is that when we confronted the AUA's project representative, Lt. Col. Anthony Roche, and Project Architect, Nagesh, in February, 2010, they unequivocally denied this had occurred even after our subcontractors, including Danny's Tiling and Monty Daniel's Contracting, admitted to the Colonel and Nagesh that they invoiced both the AUA and Leeward and had been paid twice for the same work and we produced the documentation to the AUA to prove it.

17.     The AUA has refused to pay Leeward for this work -- apparently because the AUA improperly paid the subcontractors for the work directly.  Although this is only a small part of our claim for the contract balance, this type of underhanded mismanagement of the project on

4

the part of the AUA, its project representative, and the project architect, is a big reason why we are in arbitration.

Dated: February/1, 2012

Eric R. Linde

# EXHIBIT
# 17

Page 210

1              AMERICAN ARBITRATION ASSOCIATION

2         CONSTRUCTION INDUSTRY ARBITRATION RULES

3    -------------------------------------------------

4    LEEWARD CONSTRUCTION COMPANY,

5    LTD.

6                   Claimant

7       -v-              Case No. 50 110 T 00075 11

8    AMERICAN UNIVERSITY OF ANTIGUA

9    COLLEGE OF MEDICINE c/o

10   GCLR, LLC

11                 Respondent

12   -------------------------------------------------

13              ARBITRATION PROCEEDINGS

14

15      VOLUME 2 OF 5          Pages 210 - 358

16

17

18              Tuesday, March 6, 2012

19              9:48 A.M. TO 2:07 P.M.

20

21                 held at

22              Boardroom 1

23         The Courtyard Marriott

24         Isla Verde Beach Resort

25         San Juan, Puerto Rico

1                       ERIC LINDE

2             called as a witness in this case,

3               having been first duly sworn

4             upon his oath by Chairman Jimenez

5                    testified as follows:

6             CHAIRMAN JIMENEZ:  Please consider

7         yourself under oath.  Thank you.

8                    DIRECT EXAMINATION

9    BY MR. GREER:

10       Q.   Mr. Linde, placed before you is a copy of

11   your witness statement, and I ask you to review your

12   witness statement -- I ask you whether you have

13   reviewed your witness statement, and if so, do you

14   adopt that as your testimony?

15       A.   I do.

16            MR. GREER:  I turn you over for

17        cross-examination.

18                    CROSS-EXAMINATION

19   BY MR. JEMISON:

20       Q.   Good afternoon, Mr. Linde.

21       A.   Good afternoon.

22       Q.   You're a director in Leeward Construction

23   Company; is that correct?

24       A.   That's correct.

25       Q.   And that is the claimant in this case.

1    Correct?

2         A.    That's correct.

3         Q.    And you've been in the construction

4    industry for 45 years.   Right?

5         A.    Correct.

6         Q.    That's what you say in your witness

7    statement, correct?

8         A.    Yes.

9         Q.    And during those 45 years you've formed --

10   either you've been part of or you've formed a number

11   of different companies.   Correct?

12        A.    That's correct.

13        Q.    Including claimant Leeward in this case.

14   Right?

15        A.    That's correct.

16        Q.    And in 1993 -- correct me if I'm wrong,

17   but 1993 you began forming a business with Andy

18   Green.   Correct?   Is that about the right timeframe

19   there?

20        A.    Let me check --

21             CHAIRMAN JIMENEZ:   While he checks, and

22        unless counsel understands that it's necessary,

23        if you're relating to the facts that he already

24        testified under oath, that this was his sworn

25        statement, I don't see the need for repetition,

Page 336

1       unless you think otherwise.

2               Ms. Benanti, just for the record, I don't

3       have a signed copy of Mr. Linde's sworn

4       statement.

5               PARALEGAL MS. BANANTI:  I'll make a copy

6       for each of you.

7               MR. OLINSKY:  I think we served these by

8       e-mail a few days after the final ...

9               CHAIRMAN JIMENEZ:  Back on the record.

10  BY MR. JEMISON:

11      Q.   The question pending to you, if you can

12  answer it, if not, I can follow up.

13      A.   No, 1993 was the formation of Leeward

14  Construction, Incorporated, which is the New Jersey

15  corporation that is our -- my other company in the

16  States.

17      Q.   Okay.  And Leeward Construction,

18  Incorporated, is a company that you own, but

19  Mr. Green does not have ownership interest in,

20  correct?

21      A.   That's -- that I own with other

22  stockholders.  But Mr. Green is not involved in that

23  company.

24      Q.   Thank you.  But you did form Linde Antigua

25  with Mr. Green; is that correct?

Page 337

1       A.    Yes, I did.

2       Q.    And that was in the 1992, 1993 timeframe?

3       A.    That's correct.

4       Q.    And in 1996 you formed Leeward

5  Construction Company, the claimant here in this

6  case.   Correct?

7       A.    That's correct.

8       Q.    And in your witness statement you spoke

9  about work that you performed, whether through

10  Leeward, the United States company, Construction,

11  Inc., or Leeward Construction, Limited, the claimant

12  here, with respect to one of your clients Stanford

13  Development Company.   Correct?

14       A.    That's correct.

15       Q.    And both Leeward Construction Company, the

16  U.S. company, and Leeward Construction, the Antigua

17  company here, both did work for Stanford.   Is that

18  right?

19       A.    No.

20       Q.    Did Leeward, the U.S. company do any work

21  for Stanford Development --

22       A.    No.

23       Q.    Did Leeward in Antigua do any work for

24  Stanford Development?

25       A.    Yes.

Page 338

1      Q.   And Leeward the claimant here did work for

2    Stanford Development.   Correct?

3      A.   Yes.

4      Q.   And in your witness statement, in

5    paragraph 12 you state, "One of our main sources of

6    work and revenue in recent years was projects

7    completed for Stanford Development Company."

8             Okay?  Do you see that?

9      A.   I see that.

10     Q.   And when you say "our" in the first clause

11   of that sentence, does the "our" refer to Leeward

12   the claimant in this action exclusively?  Or does it

13   also include Linde Antigua?

14     A.   It includes Linde Antigua.

15     Q.   And Mr. Green had an interest in both of

16   those companies, correct?

17     A.   Identical.

18     Q.   Now, some of the projects you did for

19   Stanford was the Sticky Wicket Restaurant?

20     A.   That's correct.

21     Q.   And that's a project that you completed in

22   the year 2000 --

23     A.   I --

24     Q.   You or the company that was doing that

25   work.

1        A.    I believe that's correct.

2        Q.    And about a million dollars EC was earned

3    constructing the Sticky Wicket Restaurant?

4            MR. GREER:  Object to the form.

5            CHAIRMAN JIMENEZ:  Rephrase, please.

6    BY MR. JEMISON:

7        Q.    Mr. Green, your business colleague, he had

8    said in his statement, "In 2000 we completed EC

9    $1,000,000.00 (US $331,890.00) in work on the Sticky

10   Wicket Restaurant for Stanford Development."

11            Does that sound correct?

12       A.    That sounds correct, yes.

13       Q.    And Mr. Green says, "In 2003 and 2004, we

14   performed EC $5.2 million (US $1,725,828.00) in work

15   at Barnacle Point for Stanford Development."

16            Is that correct?

17       A.    That sounds correct, yes.

18       Q.    And he goes on.  And these are all in

19   paragraph 5 in Mr. Green's statement, for the

20   record.

21            CHAIRMAN JIMENEZ:  Oh, Mr. Green or

22       Mr. Linde?

23            MR. JEMISON:  Mr. Green.  I'm reading from

24       Mr. Green's statement.

25            MR. GREER:  I will object that he's being

1      cross-examined -- cross-examined from the other

2      statement --

3            CHAIRMAN JIMENEZ:  Are you reading from

4      Mr. Linde or Mr. Green?

5            MR. JEMISON:  Mr. Green.  I'm asking him

6      whether the statements from Mr. Green's witness

7      statement, they're partners, whether they are

8      accurate.

9            CHAIRMAN JIMENEZ:  Hold on, please,

10     because I was looking at Mr. Linde's.

11           MR. JEMISON:  That's okay.

12           MR. GREER:  I object --

13           CHAIRMAN JIMENEZ:  I'll deal with that in

14     a second, please.

15                 (SIMULTANEOUS SPEAKING)

16           CHAIRMAN JIMENEZ:  No, that is Mr. Linde.

17     This is Mr. Green.

18           Can you make a proffer on why you're

19     making statements on Mr. Green's statement

20     rather than Mr. Linde?

21           MR. JEMISON:  Mr. Linde, in his statement,

22     talks about the main sources of work and I

23     identified three projects, Sticky Wicket, 20/20

24     Stadium improvements and Barnacle Point.  He

25     refers to them in general.

1          Mr. Green, his business partner, provides

2       more specifics.  I'm just asking Mr. Linde

3       whether the specifics -- Mr. Green's statement

4       about the same items identified in his

5       statement are accurate.

6          CHAIRMAN JIMENEZ:  May I jump in?

7          MR. JEMISON:  Of course.

8                    EXAMINATION

9  BY CHAIRMAN JIMENEZ:

10      Q.   Mr. Linde, have you read Mr. Green's

11  statement?

12      A.   Yes.

13      Q.   Are anything -- is anything in Mr. Green's

14  statement that you disagree with, or that is not

15  factual or a truthful statement?

16      A.   No, it is not.

17      Q.   Do you reaffirm your statement as to the

18  fact that everything that Mr. Green stated there, to

19  the best of your knowledge, is true and correct?

20      A.   I do.

21          CHAIRMAN JIMENEZ:  Go ahead, please.

22          CONTINUING CROSS-EXAMINATION

23  BY MR. JEMISON:

24      Q.   Is it fair to say that between 2000 and

25  2008 that Hindi Antigua and Leeward Construction,

1  the Antigua operation, generated significant

2  revenues for the work they did for Stanford

3  Development?

4      A.   That would be correct.

5      Q.   And would it be accurate to say that in

6  your witness statement --

7          CHAIRMAN JIMENEZ:  Now, he's -- now

8      Mr. Linde's?

9         MR. JEMISON:  Uh-huh.

10          CHAIRMAN JIMENEZ:  What paragraph?

11         MR. JEMISON:  I didn't mention by

12      paragraph.  I'm just asking him a general

13      question about his testimony.

14  BY MR. JEMISON:

15      Q.   Is it accurate to say that in your witness

16  statement, your direct testimony in this arbitration

17  hearing, that you do not indicate any revenues

18  generated by Stanford Development in 2009?

19      A.   I believe that's correct.

20      Q.   And Leeward didn't generate revenues from

21  Stanford Development in 2009.  Is that correct?

22      A.   I believe that's correct, I said.

23      Q.   And Stanford -- and Leeward did not

24  generate --

25         (REPORTER REQUESTED CLARIFICATION)

Page 343

1    Q.    Leeward did not generate any revenues from

2    Stanford Development in 2010?

3    A.    I believe that's correct.  Mr. Stanford's

4    operation ceased operation, I think, on the 5th or

5    6th of January in 2009.

6    Q.    Mr. Stanford, that's Allen Stanford?

7    A.    That would be one and the same.

8    Q.    And that's the Allen Stanford that was

9    indicted for fraud and arrested?

10    MR. GREER:  Objection, Your Honor,

11    relevant.

12    (SIMULTANEOUS SPEAKING)

13    CHAIRMAN JIMENEZ:  Excuse me.  Excuse me.

14    Can you please excuse us from the room.

15    (WITNESS LEAVES THE

16    ARBITRATION ROOM)

17    MR. GREER:  Do you want Mr. Green to

18    leave?

19    CHAIRMAN JIMENEZ:  It's your decision.

20    MR. GREER:  He can stay.

21    MR. JEMISON:  No, that's fine.

22    CHAIRMAN JIMENEZ:  Proffer, please.

23    MR. JEMISON:  Certainly.  My questions

24    about Stanford Development corporation go

25    toward the bias and prejudice of this witness.