D6sQleeC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   LEEWARD CONSTRUCTION COMPANY,
     LTD.
 4
                     Plaintiff
 5
              v.                         12 CV 6280 (LAK)
 6
     AMERICAN UNIVERSITY OF ANTIGUA
 7   – COLLEGE OF MEDICINE

 8                    Respondent

 9   ------------------------------x
                                         New York, N.Y.
10                                       June 28, 2013
                                         4:30 p.m.
11
     Before:
12
                         HON. LEWIS A. KAPLAN
13
                                         District Judge
14
                              APPEARANCES
15
     LEWIS & GREER PC
16        510 Haight Avenue, P. O. Box 2990
          Poughkeepsie NY 12603
17        Attorney for Petitioner Leeward
     VERONICA A. McMILLAN
18
     SILLS CUMMIS & GROSS PC
19        One Riverfront Plaza
          Newark, NJ 07102
20        Attorney for Respondent A.U.A.
     JONATHAN S. JEMISON
21

22

23

24

25
```

D6sQleeC

```
 1              (In open court)
 2              THE COURT:  Good afternoon, folks.
 3              MS. McMILLAN:  Good afternoon, your Honor.
 4              MR. JEMISON:  Good afternoon, your Honor.
 5              THE COURT:  Ms. McMillan, I appreciate that you've
 6    come from Poughkeepsie.  There is a TRO requested.  I don't
 7    normally grant those without having the other side heard.
 8    Sorry you had to take the train ride, but your alternative
 9    would have been to consent to the relief.
10              MS. McMILLAN:  I appreciate the Court's patience in
11    getting here this afternoon.
12              THE COURT:  It's all right.  Judges don't like Friday
13    afternoons TROs any more than litigants do.
14              Mr. Jemison?
15              MR. JEMISON:  Yes, your Honor.
16              THE COURT:  Use the podium, please.
17              MR. JEMISON:  I will.
18              THE COURT:  Go ahead.
19              MR. JEMISON:  Thank you, your Honor.  So this is our
20    application, and the reason for our application, I believe, is
21    quite simple and straightforward.  As you know, this Court
22    entered a judgment against my client, American University of
23    Antigua, and my clients reached out to the counsel for Leeward,
24    and in light of a second separate arbitration pending between
25    the parties and other considerations, including, I believe, an
```

D6sQIeeC

understanding that Leeward itself, an Antigua entity, had no

other assets other than its judgments, and that my client had

claims that exceeded the amount of the judgments, I had

offered -- I had indicated my intent to come to this court two

months ago to seek a stay of enforcement and offered a

compromise which Leeward accepted.

          We spent the next several weeks primarily with

Ms. McMillan negotiating a stay in which Leeward would stay

enforcement of this Court's judgment pending the resolution of

the second arbitration, and my client would obtain a bond in

the full amount of the judgment plus interest for two years

plus the amount of Leeward's claim in the second arbitration

and interest on that for two years plus an agreement to

supplement that bond if the passage of time warranted because

the security wouldn't be sufficient to cover fully Leeward's

judgments or claims, and my client also had agreed to waive its

right to appeal this Court's judgment.

          The parties, after negotiating the agreement,

ultimately executed the agreement, exchanged the fully executed

document, and two days after full execution, Ms. McMillan's

partner emailed me and said, "I think we're going to renege.

We believe that you withheld information, and we're going to

put the agreement on hold," notwithstanding the fact that the

parties had fully executed that agreement already.  And because

of that, the second part of the consideration, which was the

D6sQIeeC

1    withdrawal of our appeal, we held off on for no other reason

2    than to protect our appellate rights.  We obviously would

3    fully -- we would immediately withdraw that appeal upon an

4    order of a stay from this Court in connection with our motion.

5              We've also, as I say in my papers, obtained the bond

6    that we promised to obtain.  We actually had to put up the

7    entire amount of the judgment to the bonding company plus the

8    premium.  So all the money that Leeward could possibly be owed

9    at this moment or two years from now is already fully paid to a

10   surety company fully securing their judgment.  It's what we

11   bargained for, and we fully expect that Leeward would comply.

12             As you know, Leeward has taken a different view, and

13   despite the conversations that I've had with them indicating

14   that their position was without merit, primarily their position

15   was that they did not know AUA was going to try to amend the

16   claims pending in the arbitration to assert construction defect

17   claims notwithstanding the fact that AUA had --

18             THE COURT:  Run that last point by me again.

19             MR. JEMISON:  Sure.  The reason proffered by McMillan

20   and her partner, Mr. Greer, as to why they deemed our agreement

21   to be null and void was that they said they learned for the

22   first time the day after they signed the agreement that AUA was

23   intending to amend their claims pending in the arbitration to

24   assert construction defect claims.  And the documents that we

25   attached, the Sclafani Declaration, Exhibits 8 and 9,

D6sQleeC

conclusively demonstrate that AUA made Leeward well aware in

February, two months before this Court's judgment was even

entered, that AUA was intending to assert construction defect

claims in that arbitration; that it was looking for more time

from the arbitrators in order to get its ducks in a row.

Leeward responded in kind, basically arguing that it

would be improper for AUA to assert those claims in that form.

That being the case, to say that they learned for the first

time after they signed the agreement that AUA was going to

pursue those claims in the arbitration is just flatly

contradicted by the documents, and so it's our position that

Leeward --

THE COURT:  The first of the documents -- I see it's

copied to Mr. Greer.

MR. JEMISON:  Yes, correct, to the arbitrators, a copy

to Mr. Greer.  In that email it says quite clearly what they

intend to do.

The second document is a letter written by

Ms. McMillan on February 19 specifically identifying the

construction defect claims and objecting to AUA's right to

assert it in the second arbitration.

AUA to date has still not formally asserted those

claims.  It's in the process of trying to do so.  It let the

arbitrators know what those claims were last week and itemized

them because they were asked to, but the claim has been

D6sQleeC

submitted to an architect for a ruling, and the architect, as

far as I know, the last time I talked to my client today, has

not yet issued a ruling on those claims.  Those were, I think,

just submitted late last week.  So it has not taken the next

step to formally amend their counterclaims in the arbitration,

        But what I'm talking about, you know, Mr. Greer in his

initial email to me on February 15 where he indicated that he

was now reneging or considering reneging on the agreement that

the parties had just entered for a stay because he had heard

for the first time the day before that AUA was going to pursue

construction defect claims, and, again, I submit that that is

just inaccurate.  Be that as it may -- sorry, go ahead.

        THE COURT:  You are asking me, as I understand it, for

a stay on two different grounds:  One ground is that you want

me to make a determination either today or in the future in

this case that you have a legally effective agreement --

        MR. JEMISON:  That's right.

        THE COURT:  -- for the stay.  And the second ground is

you want it under Rule 62 pending appeal in this case.  Is that

right?

        MR. JEMISON:  Well, I'll clarify.  The second ground

is -- I'm not seeking an appeal bond.  What I am seeking is the

exercise of this Court's inherent powers to grant the stay akin

to a Rule 62 stay.  I cited the *Katz v. Feinberg* case as an

example where that has been done by the Southern District in

D6sQleeC

1    somewhat similar factual circumstances.

2              I certainly could, if I wanted to, post an appeal

3    bond.  I haven't done that because I've agreed to waive my

4    right to appeal as consideration for the stay that I did agree

5    to -- that my client did agree to.  An appeal bond, if my

6    client were to seek one, it would get us -- I guess would get

7    us a stay, but, you know, that's not what we're looking for.  I

8    don't know how long the appeal may take, and, frankly, as I

9    said, my client already agreed to withdraw that --

10             THE COURT:  Don't I have authority under Rule 62 to

11   grant a stay pending appeal on whatever security, if any, I

12   think appropriate?

13             MR. JEMISON:  You do.  Again, of course that appeal --

14   that stay would be effective so long as the appeal remains

15   prosecuted.

16             THE COURT:  Right.

17             MR. JEMISON:  Once the appeal is either withdrawn or

18   prosecuted one way or the other -- and from our perspective and

19   the reason why we sought an agreement for a different kind of

20   bond, a bond that would be -- and a stay that would remain in

21   place through the second arbitration, is that the second

22   arbitration may last longer than the appeal.

23             THE COURT:  Which part of Rule 62 gives me the

24   authority to grant a stay pending appeal without security or

25   with security in a form other than a supersedeas bond?  I

D6sQleeC

1    remember that there are cases that have done that, but I'm not

2    locating it quickly in the rule.  Do you know where it is?

3              MR. JEMISON:  Well, I believe the rule states that in

4    exceptional circumstances the Court does not have to require

5    the posting of a supersedeas bond depending on the

6    circumstances.

7              THE COURT:  Which part of the rule do you say says

8    that?

9              MR. JEMISON:  Again, my application, while it is under

10   Rule 62, it's not per se under Rule 62, so I don't have the

11   answer to your question in front of me.  I don't have the rule

12   in front of me.

13             THE COURT:  So the answer is we don't know; is that

14   the answer?

15             MR. JEMISON:  The answer is -- yes.  But what I can

16   say and what I, again, put forward in my papers was I cited to

17   a case *Katz v. Feinberg* in which the Southern District --

18             THE COURT:  You would essentially like specific

19   performance --

20             MR. JEMISON:  Of my agreement.

21             THE COURT:  -- of your agreement.

22             MR. JEMISON:  Or, alternatively, a stay in light of

23   the fact that Leeward is insolvent.  There is another

24   arbitration pending between the parties.

25             THE COURT:  Here is the problem.  Judgment has been

D6sQleeC

1    entered in this case, right?

2            MR. JEMISON:  Right.

3            THE COURT:  The case is over, right?

4            MR. JEMISON:  Right.

5            THE COURT:  And my memory is that under the *Kokkonen*

6    case, a district court has no authority to enforce a settlement

7    agreement, and, by logical extension, any other agreement

8    between the parties, even an agreement of settling a case that

9    previously was before it unless there has been an express

10   reservation of jurisdiction to enforce a settlement.  I don't

11   remember there being such in this case even assuming what we

12   were talking about was a settlement, which I'm not so sure

13   about.

14           So, to the extent you are effectively asking me to

15   grant specific performance of the stay agreement, or whatever

16   you call it, I'm not sure I have any power to do that.  That is

17   why I am focused on Rule 62.  What can you tell me about those

18   problems?

19           MR. JEMISON:  Well, do you want me to talk about the

20   problem about your authority to issue a stay or about Rule 62?

21   Which question are you asking me?

22           THE COURT:  I thought it was quite clear, but I am

23   asking whether I have any jurisdiction at all to do anything at

24   all unless it's under Rule 62.

25           MR. JEMISON:  It is my understanding -- and, again,

D6sQleeC

1    I'll go back to the case that I cited in my papers, *Katz v.*

2    *Feinberg* where under the Court had cited the inherent powers of

3    the all writs act.  In that case, what had happened was that

4    judgment was entered, and an application was made to stay the

5    judgment, not because of an appeal or a supersedeas bond being

6    posted, but because there was a second arbitration pending.  In

7    fact, in that instance, the party seeking a stay wasn't a party

8    to the arbitration, but that other arbitration triggered a

9    right of setoff that he would lose potentially because the

10   party from which it set off its judgment was arguably

11   judgment-proof, and he would have no way of collecting

12   ultimately the benefit of his setoff.  What he had asked for

13   was for the Court to stay execution and enforcement of the

14   judgment that it had entered pending the resolution of that

15   second arbitration.

16          The Court in its opinion says that we understand

17   there's no specific rule -- and this is not a pure Rule 62

18   issue, it doesn't fall within any of the rules of the Federal

19   Rules of Civil Procedure -- but it is akin to a Rule 62 motion.

20   We are going to apply those standards and look at it from that

21   lens, and then they concluded that if the arbitration went a

22   certain way, the party seeking the stay would have a right to

23   setoff, and it felt that under the circumstances that right

24   could be deemed eradicated if it didn't issue a stay, and it

25   ordered the party to obtain a bond pending the resolution of

D6sQleeC

1    that arbitration to secure the judgment which it did.

2           THE COURT:  How is that relief in aid of my

3    jurisdiction in this case?

4           MR. JEMISON:  That relief happened in the same

5    procedural posture that this case is in.

6           THE COURT:  That's not an answer to the question.  The

7    all writs act gives me the authority to issue, and I quote:

8    "All writs necessary or appropriate in aid of my jurisdiction."

9    How is this stay you're asking for in any respect in aid of my

10   jurisdiction, however fair and equitable it might seem to me?

11          MR. JEMISON:  This Court issued its judgment --

12          THE COURT:  Right.

13          MR. JEMISON:  -- and AUA is seeking relief from that

14   judgment under the circumstances via a stay because of the fact

15   that it has claims against Leeward.  Leeward's insolvent and

16   Leeward agreed under the stay agreement to provide us with that

17   stay, and absent a stay, my client may never be able to collect

18   on its claims should it prevail.  Leeward agreed to the

19   contract.  My client has posted a bond, albeit not a

20   supersedeas bond --

21          THE COURT:  I got all that.  I got all that.  Anything

22   else?

23          MR. JEMISON:  No, your Honor.  Other than that, I will

24   rely on our papers.

25          THE COURT:  OK.  Ms. McMillan?

D6sQleeC

1              MS. McMILLAN:  Good afternoon, your Honor.

2              THE COURT:  Good afternoon.

3              MS. McMILLAN:  We just received the papers this

4    morning so my argument may not be as good as it would otherwise

5    be with some preparation, but I would initially say, your

6    Honor, that the application before the Court this afternoon for

7    a temporary restraining order should be denied because there is

8    no immediate irreparable harm to the AUA, as the Court has

9    aptly pointed out.

10             THE COURT:  Now, wait a minute.  You have a writ of

11   execution which means that you can go grab their property

12   without notice any minute, right?

13             MS. McMILLAN:  Except that, as your Honor aptly

14   pointed out, they could post a supersedeas bond and stay the

15   enforcement of the judgment pending the outcome of the appeal.

16             THE COURT:  Yes, but they don't have an obligation to

17   do that.  What you have now is court process that allows you to

18   grab their property.  Are you telling me you have no intention

19   of doing that?

20             MS. McMILLAN:  No, I'm not telling you that, your

21   Honor.

22             THE COURT:  So, obviously you do have an intention of

23   doing that, or at least there's a credible threat that you do.

24   In light of what has been said about the status of Leeward, and

25   it seems to me that there is a manifest threat that if you were

D6sQIeeC

1    to do that, the property would be dissipated and that would be

2    the end of it.  It would be irreparable.

3              MS. McMILLAN:  Well, your Honor, like you were

4    previously indicating to Mr. Jemison, they could post the

5    supersedeas bond, and it would be secured during the pendency

6    of the appeal.  In addition to that --

7              THE COURT:  We just covered that ground.  Is there

8    something else you want to say about that?

9              MS. McMILLAN:  Well, in terms of the stay agreement, I

10   think it would be unfair in terms of the Court enforcing that

11   agreement because there was a misrepresentation between the

12   parties with regards --

13             THE COURT:  And what was it?

14             MS. McMILLAN:  The AUA initially earlier this year

15   when the second arbitration was commenced asked for an

16   extension of time to respond to the counterclaim for defective

17   work.  At that time, I opposed the request for extension saying

18   that any of the claims would be barred under the doctrine of

19   res judicata.  After that, we didn't hear anything further with

20   regard to defective work claims.  The only thing that the

21   AUA --

22             THE COURT:  So the fraud was that they said we're

23   going to sue you for defective work.  You said it would be a

24   bad claim.  And so knowing full well that their stated

25   intention was to sue you, they defrauded you?

D6sQleeC

1        MS. McMILLAN:  Well, no, your Honor, because --

2        THE COURT:  That's a stretch.

3        MS. McMILLAN:  It went a little further than that.  As

4   Mr. Jemison indicated, we had a negotiation with regard to a

5   stay agreement.  The entire length of that negotiation, and

6   indeed the document itself, only refers to the ABST claim.

7   There was never any indication after that initial letter from

8   Mr. Sclafani which then he supplemented on --

9        THE COURT:  Let me ask you this:  Having already told

10  you that they were contemplating defective work claims, what is

11  the source of a legal duty to tell you again, and again, and

12  again?

13       MS. McMILLAN:  They indicated in the stay agreement

14  that the crux of their claim was the ABST claim that we already

15  had in front of us as part of the arbitration.

16       THE COURT:  Possibly you could direct me to that.

17       MS. McMILLAN:  Sure.  The time to amend the claim

18  within the arbitration had passed --

19       THE COURT:  Ms. McMillan, please direct me to where

20  they said in the stay agreement that it was the ABST claim.

21       MS. McMILLAN:  It's the second to last "whereas"

22  clause:  "Whereas Leeward has asserted a claim in the amount of

23  U.S. $30,000 and change in the second arbitration.  The AUA has

24  asserted a counterclaim against Leeward in the amount" --

25       THE COURT:  And where does it say, "whereas AUA has

D6sQleeC

1   previously advised you that they are contemplating defective

2   work claims but now represents that they are no longer going to

3   do that"?

4           MS. McMILLAN:  It was the totality of the

5   circumstances.

6           THE COURT:  Right.  I think that's probably a dead

7   loser.  OK?  Just to be frank about this.  You are in an

8   adversary negotiation with your judgment creditor about a stay,

9   and the judgment creditor has already told you -- I guess

10  they're the judgment debtor, excuse me -- has already told you

11  he's going to make defective work claims against you, and you

12  are somehow trying to conjure out of this a duty to remind you

13  over and over again.  Well, I don't think it flies.  Certainly

14  for the purpose of this afternoon it doesn't fly.

15          MS. McMILLAN:  Very good, your Honor.

16          With regard to the defective work claims and the fact

17  that they're further evidence of the AUA just dragging this

18  entire proceeding out as long as possible, I would note that we

19  do have some information now with regard to the defective work

20  claims.  They essentially almost tripled the amount that they

21  are demanding in the arbitration, and it will push out the

22  second arbitration for, you know, probably two to three years.

23          THE COURT:  Life is like that.  You're fully secured,

24  right?

25          MS. McMILLAN:  Well, with the exception that this kind

D6sQleeC

1    of came out of left field, and we do believe that it was a

2    misrepresentation on their part.  I understand the Court

3    doesn't agree, but that was our position because we no sooner

4    signed this agreement that only indicated the ABST claim, and

5    several days later there was a subsequent proceeding where all

6    of a sudden the defective work claim was --

7         THE COURT:  There's another view of this, and the

8    other view of this is that you were on notice, and if your

9    office, or whoever negotiated this, did not take the care to

10   button down what the other counterclaims might be, it's your

11   own fault.  That is another view of this.

12        MS. McMILLAN:  Well taken, your Honor.

13        THE COURT:  So, now why isn't the right thing to do

14   here, since you are fully secured for this in some manner or

15   form, to be stayed, the execution?

16        MS. McMILLAN:  Well, I would agree with the Court that

17   staying the execution during the pendency of the appeal would

18   be appropriate.  The appeal right now is scheduled to go at

19   least through the fall.  I'm not sure what the Second Circuit's

20   decision time frame is, but we could be looking at the

21   beginning of next year before there is a decision on --

22        THE COURT:  In the meantime, you are going to have a

23   collateral litigation about your claim that the stay agreement

24   was induced by fraud, which will certainly lead to motion

25   practice, which my best guess is you will lose on; but if you

D6sQleeC

1    don't lose on the motion practice, then you will have a trial

2    on that, and you will spend a whole bunch more money, whether

3    before this Court or some other court, and at the end of the

4    day you are going to, in all likelihood, wind up with a poorer

5    client and no faster.  Isn't that really true?  Is that an

6    incorrect analysis on my part?

7             MS. McMILLAN:  No doubt, your Honor, that the amount

8    of fees that have already been expended in litigating this

9    claim have been substantial.

10            THE COURT:  So why don't you do the right thing and

11   simply go back to the stay agreement and go forward with the

12   deal that you made --

13            MS. McMILLAN:  The short --

14            THE COURT:  -- and avoid the appeal to the Second

15   Circuit in the bargain?  It's not like you gave them the stay

16   for nothing.

17            MS. McMILLAN:  The short answer, your Honor, is that

18   we would have to consult with our client about that and get

19   their permission to do that before we do.  But if that is the

20   Court's direction, we would certainly take that.

21            THE COURT:  It's not my direction.  I am trying to do

22   something practical here.  I'm perfectly prepared to decide

23   this motion this afternoon, and you can fight it over till the

24   devil comes out on ice skates.  I mean, it's that simple if

25   that's what you and your client want to do and they and their

D6sQleeC

1   client wants to do.  We're just the referees.  But it doesn't

2   seem to me to make a whole lot of sense.

3          Well, I'm going to grant a stay.  I take it you don't

4   have any quarrel with the proposition that I have the authority

5   to do that under Rule 62 on such terms as I think appropriate

6   even without a supersedeas bond, right?

7          MS. McMILLAN:  Are we talking about during the

8   pendency of the appeal or until the second arbitration is

9   completed?

10          THE COURT:  Well, we're talking about the during the

11   pendency of the appeal, but for the moment we're talking only

12   about until this motion gets decided.

13          MS. McMILLAN:  I would agree with your Honor that

14   that's permissible.

15          THE COURT:  OK.  Do you consent to the stay being in

16   effect until I decide this motion?

17          MS. McMILLAN:  Based on what's transpired here today,

18   we will consent to that.

19          THE COURT:  OK.  You've received the papers, right,

20   Ms. McMillan?

21          MS. McMILLAN:  I have as of this afternoon, your

22   Honor.  I'm sorry.  They did come email this morning, but I

23   received a hard copy this afternoon.

24          THE COURT:  You're both on the electronic case file,

25   right?

D6sQleeC

1          MS. McMILLAN:  Yes, your Honor.

2          MR. JEMISON:  Yes, your Honor.

3          THE COURT:  I have signed the TRO and the order to

4   show cause.  I have made the order to show cause returnable on

5   July 22 at 4:00 p.m.  Answering papers are due July 15.  Reply

6   papers July 18.

7          If you would like me to take the motion on submission

8   on July 22, I would probably be happy to do so, but you need to

9   get to me the week before.  So my law clerk will make a copy of

10  the order to show cause that I have signed, and you can pick it

11  up from my chambers in about ten minutes.  And I think that

12  takes care of that.

13         So, unless there's anything else, we are concluded for

14  this afternoon.

15         MR. JEMISON:  Your Honor, can I just -- can you

16  clarify just so I make sure I understand what you meant when

17  you said take it on submission on the 22nd?

18         THE COURT:  That means nobody has to show up if I take

19  it on submission.

20         MR. JEMISON:  That is what I thought you meant.  I

21  wanted to make sure I understood you correctly.

22         THE COURT:  Yes.  And I think in your briefing you

23  need to address the Rule 62 point that I raised with counsel.

24  I think you need to address the question of whether I have any

25  subject matter jurisdiction to deal with the dispute over the

D6sQleeC

1   stay agreement at all in light of the lack of a reservation of

2   jurisdiction and the *Kokkonen* case in the Supreme Court and

3   such others matters as you think appropriate.

4           I think what you may have here as far as the stay

5   agreement is concerned is a contract dispute that's not within

6   my jurisdiction because you've got aliens on both sides and

7   therefore you don't have diversity.  But I leave that to you

8   folks.  Thank you.  Have a good weekend.

9           MS. McMILLAN:  Thank you again, your Honor, for your

10  patience in my travel time today.

11          THE COURT:  Not at all.

12          (Adjourned)

13

14

15

16

17

18

19

20

21

22

23

24

25